**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | | |
|---|---|---|
| JANIS LOWE, ET AL., | § | CASE NO.: 9:05-cv-38 |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| ANTELOPE TECHNOLOGIES, INC. | § | |
| a Colorado Corporation | § | |
| | § | |
| *Nominal Defendant.* | § | |
| | § | |

## AFFIDAVIT OF LANCE MORMAN

I, _____ , being duly sworn on oath, depose and state as follows:

1.      My name is Lance Morman.  I am a Managing Director of OverMont Consulting, LLC and a Certified Fraud Examiner.  I have provided financial consulting services to companies throughout my career, including valuation-related services.  My qualifications are listed in my resume along with a list of my testimony during the last four years.[1]  I called upon my education, training, experience, and specialized knowledge and expertise in order to perform the analyses resulting in the conclusions included in this affidavit.  I am over the age of eighteen (18), of sound mind, and otherwise competent to make this affidavit.  I have not been convicted of a

---

[1] Attachment 1 (Expert Report of Lance Morman, June 30, 2014, See Exhibit 1).

felony or a crime of moral turpitude.  This affidavit contains my work and conclusions, that work is within my personal knowledge, and this affidavit is a true and correct recitation of my work.

2.      I have been retained by George O. Mejlaender, counsel for Terry Henderson, Debbie Henderson, Alan H. Taylor, Becky Taylor, C. Stephen Guyer and Guy R. Fisher, and derivatively on behalf of Antelope Technologies, Inc. (collectively the "Plaintiffs").  I have been requested to evaluate the economic damages, if any, in connection with the alleged actions of Pierre Sternweiss, Klaus Genssler, MCC Computer Company, LLC, Scaltech International, Inc., Thomas J. Lykos, JR., Anna Cole, Ivan Cardenas, Victor Cardenas, Jr., Rodolfo Fabre, Kenneth Geyer, John Gary Newton, Thomas Scott, Rolf Genssler, and Scaltech International, L.L.C. (collectively the "Defendants").  I understand the remaining Defendants in this case are Anna Cole and John Gary Newton.  Plaintiffs made claims against Defendants including Derivative Allegations, Lanham Act Violations, RICO Act Violations, Breach of Fiduciary Duty, Civil Conspiracy, Aiding and Abetting Breach of Fiduciary Duty, Conversion, Civil Theft, Breach of Contract, Interface with Prospective Economic Advantage, and Injunctive Relief.[2]  On June 30, 2014, I issued an Expert Report in this matter.[3]

3.      I have been requested by counsel for Antelope to file this affidavit regarding the damages suffered by Plaintiffs with respect to the Defendants' actions mentioned above.

4.      In my Expert Report, I asserted and addressed the following damages claims against Defendants:

- If the Defendants are found to have destroyed Antelope, Plaintiffs are entitled to damages equating the market value of Antelope prior to the alleged actions of the Defendants.  Antelope's market value as of August 18, 2004[4] was in range of approximately $30.6 million to $40.0 million.

---

[2] Attachment 2 (Plaintiff's Proposed Sixth Amended Original Complaint).
[3] Attachment 1 (Expert Report of Lance Morman and Exhibits, June 30, 2014).
[4] Date in which Mr. Genssler, Mr. Geyer, and Mr. Scott filed a Temporary Restraining Order against Antelope's Board of Directors.

5.      In the event the trier of fact determines that the Defendants' actions have not destroyed Antelope, I also calculated the amount by which the Defendants have been unjustly enriched:

- The Defendants' unjust enrichment can be measured by the significant research and development and start-up costs the Defendants avoided as a result of their alleged actions.  These avoided costs were estimated by analyzing the amounts Antelope spent on developing and acquiring its technology, which equates to approximately $5.2 million; and

- The Defendants' unjust enrichment can also be measured by the value Defendants placed on the misappropriated assets at the time of taking, which would equate to approximately $30.6 million.  As of August 18, 2004, Defendants' owned approximately 65.45% of the outstanding voting and non-voting shares of Antelope Stock.[5]  Therefore, Defendants' unjust enrichment measured by the value Defendants placed on the misappropriated assets at the time of taking is $20.0 million.[6]

*Litigation Background*

6.      Antelope was founded in May 2002 in Highlands Ranch, Colorado to further develop and exploit IBM's "Meta Pad" technology which was licensed to Antelope by IBM under a 10 year license agreement.[7]  The product was based on the concept of a Mobile (Modular) Computer Core ("MCC"), a self-contained computer comprising a processor, internal battery, data storage, and a full-version of Microsoft Windows XP or LINUX.[8]

7.      By September 2003 Antelope had already completed its first round of funding totaling approximately $4.5 million and had opened, and was running, a Swiss production facility. Antelope's first manufactured MCCs were shipped in November 2003.[9]

---

[5] Discussion with counsel.
[6] $20.0 million = $30.6 million x 65.45%.
[7] Attachment 3 (Antelope Technologies, Inc., Summary Legal and Financial Information, May 3, 2004, pg. 2); Attachment 4 (Antelope Technologies, Inc.'s Business Plan Executive Summary, December 2003 – Revision 2.3 and Attachments, pg. 3; Product Features, Strategic Position and Potential Attachment, pg. 24).
[8] Attachment 5 (https://www-03.ibm.com/press/us/en/pressrelease/22046.wss).
[9] Attachment 4 (Antelope Technologies, Inc.'s Business Plan Executive Summary, December 2003 – Revision 2.3 and Attachments, pgs. 3-4).

*Confidential – Attorney's Eyes Only*

8.     I understand that beginning on or around June 2004 Antelope through its then CEO, Alan Taylor, and other board members began discussions with Mr. Klaus Genssler regarding a potential investment in Antelope to further its MCC product offering.[10]   Mr. Genssler and Antelope entered into a "Mutual Nondisclosure & Non-Compete Agreement" dated July 4, 2004 and subsequent to this agreement, Antelope provided Mr. Genssler with access to highly confidential business information relating to Antelope's MCC, the market potential, and its Swiss production facility.[11]  Following the agreement, Mr. Genssler made his first offer to invest in Antelope.[12]  As per his offer, Mr. Genssler would loan Antelope $250,000 for working capital at a 10% interest rate with a due date of December 31, 2004.[13]  In addition, Mr. Genssler and his company, Scaltech International Inc., would obtain warrants to purchase Antelope stock at a price of $2.94 per share.[14]

9.     On August 4, 2004, Mr. Genssler terminated his original investment offer, citing that Antelope was not in compliance with the law due to unpaid payroll taxes.[15]   However, Mr. Genssler made another offer to invest in Antelope on August 12, 2004.[16]  In addition, it is my understanding that between August 4, 2004 and August 12, 2004, Mr. Genssler, or his company, purchased 20% of the voting stock in Antelope from Kenneth Geyer and Tom Scott, both directors of Antelope at the time.[17]

10.    Subsequent to Mr. Genssler's termination of his original investment offer, he became aware of Antelope's pursuit of another investor, Xybernaut Corporation.[18]  Mr. Genssler threated to retain an attorney to file a temporary restraining order against Antelope to prevent Antelope

---

[10] Attachment 2 (Plaintiffs' Proposed Sixth Amended Original Complaint); Attachment 6 (Affidavit of C. Stephen Guyer, November 14, 2004, pg. 1).

[11] Attachment 7 (Mutual Nondisclosure & Non-Compete Agreement between Antelope and President of Scaltech International Inc., dated July 4, 2004); Attachment 6 (Affidavit of C. Stephen Guyer, November 14, 2004, pgs. 2-3).

[12] Attachment 6 (Affidavit of C. Stephen Guyer, November 14, 2004, pg. 3).

[13] Attachment 8 (Genssler's Working Capital Loan and Equity Placement Term Sheet sent to Alan Taylor, July 6, 2004, pg. 3).

[14] Attachment 8 (Genssler's Working Capital Loan and Equity Placement Term Sheet sent to Alan Taylor, July 6, 2004, pg. 3).

[15] According to Antelope's August 6, 2004 Board of Directors minutes, the underlying reason for Mr. Genssler's termination was a "perceived interference of the transaction by Kenneth Geyer, and Tom Scott through their Attorney Glenn Hagen".

[16] Attachment 6 (Affidavit of C. Stephen Guyer, November 14, 2004, pg. 12).

[17] Attachment 6 (Affidavit of C. Stephen Guyer, November 14, 2004, pgs. 6-7, 12).

[18] Attachment 2 (Plaintiffs' Proposed Sixth Amended Original Complaint); Attachment 6 (Affidavit of C. Stephen Guyer, November 14, 2004, pgs. 12-13).

from considering any investment offers.[19]   On August 15, 2004, Mr. Genssler executed a stock subscription agreement to purchase approximately $4.7 million worth of Antelope stock.[20]

11.     On August 18, 2004 Mr. Genssler along with Kenneth Geyer and Tom Scott filed a temporary restraining order against Antelope and the other directors which precluded Antelope and its board from "convening any board meetings", "managing the affairs of Antelope Technologies", "transferring or conveying any proprietary technological information", and "considering any investment proposal not previously presented to the board of directors prior to August 16, 2004".[21]   However, it is my understanding, that the $100,000 bond required in order to file the Temporary Restraining Order was never paid to the court and that this suit was filed primarily to stop the negotiations from going forward between Antelope and the Xybernaut Corporation.[22]

12.     On August 19, 2004, Mr. Genssler withdrew his approximately $4.7 million subscription agreement dated August 15, 2004.[23]   It appears that sometime between August 18, 2004 and August 25, 2004, Mr. Genssler, through purchase or proxy was able to secure enough votes to obtain effective control of the company (51%).[24]

13.     Upon the resignation of Antelope's CEO, Alan Taylor, and Tom Lykos being voted as interim CEO of Antelope, Mr. Genssler and the Defendant directors were able to control all of Antelope's operations.[25]   Additionally, over the ensuing months, the Defendants raided the company of its assets and effectively left Antelope as a worthless shell with nothing but liabilities.[26]

---

[19] Attachment 6 (Affidavit of C. Stephen Guyer, November 14, 2004, pg. 12).

[20] Attachment 9 (Subscription Agreement dated August 15, 2004, pg. 3).

[21] Attachment 10 (Temporary Restraining Order granted on August 18, 2004, pg. 2.); Attachment 6 (Affidavit of C. Stephen Guyer, November 14, 2004, pg. 19).

[22] Attachment 10 (Temporary Restraining Order granted on August 18, 2004, pg. 2); Attachment 2 (Plaintiffs' Proposed Sixth Amended Original Complaint); Attachment 6 (Affidavit of C. Stephen Guyer, November 14, 2004, pg. 21).

[23] Attachment 6 (Affidavit of C. Stephen Guyer, November 14, 2004, pg. 21).

[24] It is my understanding that Mr. Genssler reached an agreement with Anna Cole, Gary Newton, and Ivan Cardenas and his family that enabled him to gain effective control of Antelope.

[25] Attachment 11 (Alan Taylor Resignation letter dated September 2, 2004); Attachment 2 (Plaintiffs' Proposed Sixth Amended Original Complaint).

[26] Attachment 2 (Plaintiffs' Proposed Sixth Amended Original Complaint).

14.     Around this time, the Defendants created a competing company in Delaware named MCC Computer Company, LLC.  Formation of that competing company was in direct violation of the employment and non-compete agreements covering many of the Defendants.[27]  The Defendants began to use the valuable assets taken from Antelope to manufacture, market, and sell Antelope cores to Antelope's customers as MCC Computer Company products.[28]

15.     In November 2004, Antelope approved a "proposal to file a Chapter 11 petition".[29]  On February 14, 2007, a voluntary Chapter 11 petition was filed.[30]  As a result of the Defendants' alleged actions, the Plaintiffs claim that the value of Antelope as an ongoing business has been destroyed.[31]

*Valuation of Antelope*

16.     In order to estimate the value of Antelope prior to the alleged actions of the Defendants on or about August 18, 2004, I have relied upon two of the three traditional valuation approaches as described below.

17.     Under the Income Approach, I specifically considered the discounted cash flow method to estimate the value of Antelope as of August 18, 2004.[32]  I performed an analysis of Antelope's projections based upon the information contained in its December 2003 financial model and adjusted these projections for events known[33] as of August 18, 2004.  Upon review of required rates of return used by venture capitalists for investment opportunities, it is my opinion that the appropriate venture capital discount rate to discount the cash flows to their current dollar values as of the valuation date would be 40%.[34]  Therefore, the indicated enterprise value of Antelope for the discounted cash flows method as of August 18, 2004 is $40 million.[35]

---

[27] Attachment 2 (Plaintiffs' Proposed Six Amended Original Complaint).

[28] Attachment 12 (Second Affidavit of C. Stephen Guyer, November 14, 2004).

[29] Attachment 13 (In Re: Antelope Technologies, Inc., Memorandum Opinion and Order, July 21, 2010, pg. 3).

[30] Attachment 13 (In Re: Antelope Technologies, Inc., Memorandum Opinion and Order, July 21, 2010, pg. 4).

[31] Attachment 2 (Plaintiffs' Proposed Sixth Amended Original Complaint).

[32] Date in which Mr. Geyer, Mr. Scott, and Mr. Genssler filed and obtained a temporary restraining order against Antelope; Attachment 10 (Temporary Restraining Order granted on August 18, 2004); Attachment 6 (Affidavit of C. Stephen Guyer, November 14, 2004, pg. 19).

[33] Some of the adjustments include the delay in introduction of MCC version 1.5 and capital infusion of approximately $4.7 million based on Mr. Genssler's proposed investment.

[34] Attachment 1 (Expert Report of Lance Morman, June 30, 2014).

[35] Attachment 1 (Expert Report of Lance Morman, June 30, 2014, See Exhibit 3).

18.     Under the Market Approach, I was able to identify a number of arm's length transactions or proposed transactions involving Antelope's common stock.  During the period between July 2004 and August 15, 2004, Mr. Genssler made three offers to invest in Antelope.  I reviewed and analyzed the third offer[36] dated August 15, 2005[37] (the "Final Offer") made by Mr. Genssler in order to estimate the implied value of Antelope.  The terms of Mr. Genssler's final offer was 1,604,787 Antelope shares (884,238 voting stock and 720,549 non-voting stock) at a price per share of $2.9412 resulting in a purchase price of approximately $4.7 million.[38]  The implied minority interest value in Antelope based upon Mr. Genssler's Final Offer was approximately $16.8 million.[39]  Under this approach, I considered a control premium of 31.3% based on my review of the median premium offered for a controlling interest for transactions in the computer hardware industry, as well as for all transactions tracked by Mergerstat Review.[40]  I also considered an additional discount for lack of marketability of 38.6% since minority interest in privately held businesses are more illiquid.[41]  The discount for lack of marketability was derived by taking the median discount for lack of marketability on empirical studies as well as transactions in the computer industry.  It is my understanding that the purchase price of a company often represents the "best evidence" of the market value of the company.[42]  Based upon my analysis of the Final Offer made by Mr. Genssler, the value of Antelope prior to the alleged actions of the Defendants was approximately $30.6 million.[43]  I understand from my interview of Stephen Guyer that the Final Offer price per share was not based on the expected value of Antelope.  The price per share was based on the amount of cash needed divided by the total number of shares to be issued. Therefore, the $30.6 million represents the floor in terms of the value of Antelope as of the valuation date.

---

[36] Due to the Final Offer being for purchase of Antelope shares while the first two offers involved an option, but not an obligation, to purchase shares in Antelope, the implied value of Antelope was determined based on the Final Offer.
[37] Attachment 9 (Subscription Agreement dated August 15, 2004).
[38] Attachment 9 (Subscription Agreement dated August 15, 2004).
[39] Attachment 1 (Expert Report of Lance Morman, June 30, 2014, See Exhibit 19).
[40] Attachment 1 (Expert Report of Lance Morman, June 30, 2014, See Exhibit 19).
[41] Attachment 1 (Expert Report of Lance Morman, June 30, 2014, See Exhibit 19).
[42] Attachment 14 (*Schonfeld v Hilliard,* 218 F.3d 164).
[43] Attachment 1 (Expert Report of Lance Morman, June 30, 2014, See Exhibit 19).

19.     In my opinion, for several reasons, the Asset Approach is not applicable for the purpose of determining the value of Antelope and I have not used this approach in reaching my opinions regarding value.   I believe Antelope had substantial value over and above the value of its tangible assets such as cash, accounts receivable, inventories and equipment, in addition to its intangible assets such as customer relationships, customer contracts, vendor relationships, and employees.

## *Unjust Enrichment*

20.     One approach for determining damages as a result of the Defendants' alleged actions is the determination of the Defendants' unjust enrichment.[44]   Based upon the information I have reviewed and analyzed up until the date of my Expert Report, it is my opinion that the Defendants' unjust enrichment is best measured by their avoided costs or the expected benefits they expected to receive as a result of their alleged actions.  I have seen no evidence indicating that the Defendants incurred any costs on typical R&D and start-up costs needed to develop their MCC computer core and the MCC Computer Company.  As a proxy for these avoided costs, in my opinion, the amount Antelope spent on acquiring and developing its technology and market serves as a reasonable estimate of the Defendants' avoided costs.  Based upon my analysis of Antelope's financial records, Antelope expended approximately $5.2 million[45] on the development of its market, computer core and accessories.

21.     As of the date of my Expert Report, the Defendants have not produced any financial information related to the expected benefits they expected to obtain as a result of other alleged actions.  However, as discussed above, the offers made by Mr. Genssler to invest in Antelope can be used to estimate the minimum expected benefits the Defendants would have expected to achieve.  As of August 18, 2004, Defendants' owned approximately 65.45% of the outstanding shares, voting and non-voting, of Antelope stock.[46]

---

[44] I understand that Antelope is entitled to recover damages that can be measured using various methodologies, which but for the actions of the Defendants would make Antelope whole, while at the same time ensuring that the Defendants have not been unjustly enriched as a result of their alleged actions.

[45] Attachment 1 (Expert Report of Lance Morman, June 30, 2014, See Exhibit 18).

[46] Discussion with counsel.

*Confidential – Attorney's Eyes Only*

22.     Based upon Mr. Genssler's Final Offer, the minimum expected benefits to the Defendants were approximately $20.0 million.[47]

23.     No relevant information has been produced or presented in this matter after the date of issuance of my Expert Report.

---

[47] $20.0 million = $30.6 million x 65.45%.

FURTHER AFFIANT SAYETH NOT.

SWORN TO AND SUBSCRIBED before me on this the 14th day of October 2014.

Notary Public, State of TEXAS
My Commission Expires: _____ 10 7 16

# ATTACHMENT # 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | | |
|---|---|---|
| **JANIS LOWE, ET AL.,** | § | |
| | § | |
| | § | **CASE NO.: 9:05-cv-38** |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| **ELTAN, B.V., ET AL** | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| **ANTELOPE TECHNOLOGIES, INC.** | § | |
| a Colorado Corporation | § | |
| | § | |
| *Nominal Defendant.* | § | |

---

## EXPERT REPORT OF LANCE MORMAN

---

Dated:  June 30, 2014


Respectfully submitted,


_____
Lance Morman

## Table of Contents

1.0    QUALIFICATIONS ......................................................................................................... 3

2.0    ASSIGNMENT AND SCOPE OF ENGAGEMENT............................................................. 3

3.0    INFORMATION OBTAINED AND PROCEDURES PERFORMED ............................ 4

4.0    SUMMARY OF OPINIONS ............................................................................................ 4

5.0    BACKGROUND INFORMATION ................................................................................. 5

    5.1    Antelope ........................................................................................................................ 5

    5.2    MCC Market ................................................................................................................. 7

    5.3    Defendants Alleged Actions......................................................................................... 9

6.0    DAMAGES ANALYSIS ............................................................................................... 14

    6.1    Lost Business Value ................................................................................................... 14

    6.2    Defendant's Unjust Enrichment ................................................................................ 19

7.0    RESERVATION OF RIGHTS ...................................................................................... 20

## 1.0    QUALIFICATIONS

1.      I am a Managing Director of OverMont Consulting, LLC. ("OverMont") and a Certified Fraud Examiner.  I have provided financial consulting services to companies throughout my career, including valuation-related services.  My qualifications are listed in my resume and a list of my testimony during the last four years attached as Exhibit 1.   OverMont is being compensated at an hourly rate of $275 for my work performed in connection with this matter.  OverMont's fees are not contingent upon the outcome of this litigation.

## 2.0    ASSIGNMENT AND SCOPE OF ENGAGEMENT

2.      I have been retained by George O. Mejlaender., counsel for Terry & Debby Henderson, Alan H. Taylor, Becky Taylor, C. Stephen Guyer and Guy R. Fisher and derivatively on behalf of Antelope Technologies, Inc. (collectively the "Plaintiffs").  I have been requested to evaluate the economic damages, if any, in connection with the alleged actions of Pierre Sternweiss, Klaus Genssler, MCC Computer Company, LLC, Scaltech International, Inc., Thomas J. Lykos, JR., Anna Cole, Ivan Cardenas, Victor Cardenas, Jr., Rodolfo Fabre, Kenneth Geyer, John Gary Newton, Thomas Scott, Rolf Genssler, and Scaltech International, L.L.C. (collectively the "Defendants").  Plaintiffs have made the following claims against Defendants:[1]

- Derivative Allegations;
- Lanham Act Violations;
- RICO Act Violations;
- Breach of Fiduciary Duty;
- Civil Conspiracy;
- Aiding and Abetting Breach of Fiduciary Duty;
- Conversion;
- Civil Theft;
- Breach of Contract;
- Interference with Prospective Economic Advantage; and

---

[1] Plaintiffs' Proposed Six Amended Original Complaint.

- Injunctive Relief.

3.      This report summarizes my opinions, analyses and conclusions based on the information available to me as of the date of this report.  It is my understanding that discovery in this matter is ongoing and I may modify this report or update my opinions, analyses and conclusions subsequent to the date of this report should additional information become available.  I may also prepare demonstrative exhibits for use at trial based on the information I have reviews and analyzed in this case.

## 3.0      INFORMATION OBTAINED AND PROCEDURES PERFORMED

4.      In connection with this report, OverMont professionals working under my supervision and direction and I have reviewed certain documents, information and testimony in this matter. To the extent additional documents or evidence is provided after the date of this report, I reserve the right to supplement my opinions.   The information I have reviewed and considered is identified in the body and footnotes of this report as well as in Exhibit 2.   In addition, I interviewed the following individuals:

- Stephen Guyer, former CFO of Antelope.

## 4.0      SUMMARY OF OPINIONS

5.      Based upon the procedures performed, as well as my review of the available records produced in connection with this matter, and my training, education, and experience in related matters, I have concluded the following:

- If the Defendants are found to have destroyed Antelope, it is my opinion that the Plaintiffs are entitled to damages equating to the market value of Antelope prior to the alleged actions of the Defendants.  The market value of Antelope as of August 18, 2004 was in range of approximately $30.6 million to $40.0 million.  See Exhibit 3.

6.      In the event the trier of fact determines that the Defendants actions have not destroyed Antelope, I have also calculated the amount by which the Defendants have been unjustly enriched.

- The Defendants' unjust enrichment can be measured by the significant research and development ("R&D") and start-up costs the Defendants avoided as a result of their alleged actions.  These avoided costs are best estimated by analyzing the amounts Antelope spent on developing and acquiring its technology, which equates to approximately $5.2 million.  See Exhibit 18.

- The Defendants' unjust enrichment can also be measured by the value Defendants placed on the misappropriated assets at the time of taking, which would equate to approximately $30.6 million.  See Exhibit 3.  As of August 18, 2004, Defendants' owned approximately 65.45% of the outstanding shares (voting and non-voting) of Antelope stock.[2]  Therefore, Defendants' unjust enrichment measured by the value Defendants placed on the misappropriated assets at the time of taking is $20.0 million.[3]

7.      The basis for my opinions is described in the remainder of this expert report.

8.      The amounts discussed above do not include any adjustments for prejudgment or post-judgment interest.  It is my understanding that prejudgment and post-judgment interest, including the appropriate interest rates, are a matter for the Court.  I am prepared to calculate any prejudgment and post-judgment interest associated with these amounts if asked to do so.

## 5.0     BACKGROUND INFORMATION

### 5.1     Antelope

9.      Antelope was founded in May 2002 in Highlands Ranch, Colorado to further develop and exploit IBM's "Meta Pad" technology that was licensed to Antelope by IBM under a 10 year

---

[2] Discussion with counsel.
[3] $20.0 million = $30.6 million x 65.45%.

license agreement.[4]   It is my understanding that Antelope was originally founded by Kenneth Geyer, Anna Cole, Thomas Scott and David Witt.[5]  IBM's "Meta Pad" product was based on the concept of a Mobile (Modular) Computer Core ("MCC") which was envisioned to be a fully functional computer complete with processor, memory, data, applications, and a full-version operating system such as Windows XP or LINUX.[6]  All this would be contained in a device no larger than a laptop battery.[7]

10.     The Antelope MCC is a portable computer that weighs approximately 9 ounces and measures approximately 3''x5''x3/4'', essentially the equivalent of a deck of playing cards.[8] The Antelope MCC is a self-contained computer comprising a processor, internal battery, data storage, and a full-version of Microsoft Windows XP or LINUX.[9]  Antelope's MCC is designed to be plugged into a variety of accessories, such as a hand held shell, a laptop shell, a desktop shell and a wearable handset, depending on the needs of the end user.[10]

11.     In April 2003, Antelope opened its Swiss facility in conjunction with completing its first round of funding.[11]   Antelope's first round of funding totaled approximately $4.5 million consisting of approximately $1.95 million in equity and an approximate $2.57 million working capital credit facility.[12]  By September 2003, Antelope's Swiss production facility was up and running and the first Antelope manufactured MCCs were shipped in November 2003.[13]

12.     Since its inception, Antelope's MCC has received numerous industry awards and recognition, including the following:

---

[4] Antelope Technologies, Inc., Summary Legal and Financial Information, May 3, 2004 pg. 2; Antelope Technologies Inc.'s Business Plan Executive Summary, December 2003 – Revision 2.3, pg. 3; Product Features, Strategic Position and Potential, Attachment to December 2003 Antelope Business Plan, October 20, 2003, pg.  24.
[5] Antelope Technologies Inc.'s Business Plan Executive Summary, December 2003 – Revision 2.3, pg. 10.
[6] https://www-03.ibm.com/press/us/en/pressrelease/22046.wss.
[7] http://www.thefreelibrary.com/Antelope+Technologies'+Crusoe-based+Mobile+Computer+Core+Wins+Popular...-a094152464.
[8] Product Features, Strategic Position and Potential, Attachment to December 2003 Antelope Business Plan, October 20, 2003, pg. 22.
[9] Product Features, Strategic Position and Potential, Attachment to December 2003 Antelope Business Plan, October 20, 2003, pgs. 22, 29.
[10] Product Features, Strategic Position and Potential, Attachment to December 2003 Antelope Business Plan, October 20, 2003, pg. 22.
[11] Antelope Technologies Inc.'s Business Plan, Executive Summary, December 2003 – Revision 2.3, pg. 4.
[12] Antelope Technologies Inc.'s Business Plan, Executive Summary, December 2003 – Revision 2.3, pg. 3.
[13] Antelope Technologies Inc.'s Business Plan, Executive Summary, December 2003 – Revision 2.3, pg. 4.

- Antelope's MCC (IBM's MetaPad) was the winner of Popular Science's prestigious 2002 **Best of What's New** award.[14]
- Product of the year for Field Force Magazine.[15]
- Giga Information Group's "The future of connected personal computing" award.[16]

## 5.2    MCC Market

### *Estimated Market Size for MCC's as of 2004*

13.    According to the Giga Information Group, the market for modular computers such as those being manufactured by Antelope would increase from approximately 940,000 units in 2003 to approximately 14,700,000 units by 2006.[17]   A white paper prepared by Creative Strategies, Inc., addressing the Ultra Personal Computer ("UPC") market, which was defined as "a device that provides full Windows XP capability in the palm of your hand"[18] projected the UPC market to be approximately 30,000 units in 2003 and increase to 1,800,000 units by 2006.[19]   However, it should be noted that the Creative Strategies' white paper only appears to account for the enterprise and corporate channels and not the entire UPC market as covered by the Giga Information Group.[20]

14.    The following table illustrates Antelope's expected market share by year based upon both the Giga Information Group and Creative Strategies market estimates.

---

[14] http://www.thefreelibrary.com/Antelope+Technologies'+Crusoe-based+Mobile+Computer+Core+Wins+Popular...-a094152464; Award Letter to Kenneth Geyer from Popular Science Editor-in-Chief, Scott Mowbray, January 22, 2003.

[15] "Small Solution, The new MCC from Antelope Technologies cuts the PC down to size", Field Force Automation, October 2002.

[16] http://www.thefreelibrary.com/Giga+Information+Group's+Emerging+Technology+Showcase+Featured+Some...-a095516647.

[17] The Estimated Market for Modular Computers, dated July 16, 2002, Giga Information Group, Inc.

[18] The UPC Market: Handheld XP Solutions for the Enterprise, Creative Strategies, Inc.

[19] The UPC Market: Handheld XP Solutions for the Enterprise, Creative Strategies, Inc.

[20] The UPC Market: Handheld XP Solutions for the Enterprise, Creative Strategies, Inc.; The Estimated Market for Modular Computers, dated July 16, 2002, Giga Information Group, Inc.

| Antelope's Estimated Market Share Based Upon Industry Data | | | | |
|---|---|---|---|---|
| Year | Giga Information Group (Units) | Creative Strategies (Units) | Antelope (Units)[21],[22] | Corresponding Antelope (%) |
| 2004 | 3,300,000 | 350,000 | 31,125 | (.9%, 9%) |
| 2005 | 6,500,000 | 1,000,000 | 135,900 | (2%, 14%) |
| 2006 | 14,700,000 | 1,800,000 | 207,900 | (1%, 12%) |

*Competitors*

15.     Based upon my review of the documents produced, as well as my own industry research, Antelope had very few competitors in the MCC market and none that appeared to be as far along as Antelope in terms of an actual product with similar features and functionality at the time of the Defendants alleged actions.[23]   According to Antelope's December 2003 Business Plan, the following companies were viewed as potential competitors to Antelope:[24]

- OQO, a California based company founded in 2000, with the intent to design a hand held computer running Windows XP.  It is my understanding that OQO unveiled its first product at the 2004 Consumer Electronics Show.[25]  In addition, OQO's product appeared to target the consumer segment of the ultra-portable computer market, which is different from the military, industrial, and healthcare markets initially targeted by Antelope.[26]

- Xybernaut, a Virginia based company, focused on research and development and commercialization of mobile, wearable computing and communication devices. Based upon my independent research, it appears that Xybernaut introduced its

---

[21] Antelope Technologies Inc.'s Business Plan, February 2004 – Revised 2.7, pg. 15.
[22] Projected number of units (before adjustments).
[23] Antelope Technologies Inc.'s Business Plan, February 2004 – Revised 2.7, pgs. 6-7.
[24] Market Analysis, Attachment to December 2003 Antelope Business Plan, October 20, 2003, pgs. 27-28.
[25] http://shup.com/oqo/oqo.com/about/index.html.
[26] Market Analysis, Attachment to December 2003 Antelope Business Plan, October 20, 2003, pgs. 27.

Atigo T product in or around November 2003.[27]   The Atigo T incorporated a Transmeta processor and was designed to operate with Windows XP.[28]

- Paravant, a wholly owned subsidiary of DRS Technologies (a large defense contractor), provides leading edge products and services to government and commercial customers worldwide.[29]   In the 2004 time frame, DRS Technologies' closest product offering to Antelope's was the Scorpion HTU (Handheld Terminal Unit).[30]

- Tiqit, a California based company was founded in March 2000 to design and manufacture an "ultra mobile computer for professionals on the go".[31]   Tiqit's ultra-mobile computer was designed to operate with a Windows, UNIX or Linux operating system.[32]   According to Tiqit, limited commercial availability for this product was expected in the second half of 2006.[33]

- Kontron Mobile Computing Inc., a Minnesota based corporation, designs, manufactures and markets rugged computers for a multiple industries and applications around the world.[34]   Based upon my review of Kontron's website, it appears Kontron manufactures ruggedized laptops, which I understand are not directly comparable to Antelope's MCC.[35]

### 5.3    Defendants Alleged Actions

16.    Beginning on or around June 2004 Antelope through its then CEO, Alan Taylor, and other board members began discussions with Mr. Klaus Genssler[36] regarding a potential

---

[27] http://www.businesswire.com/news/home/20031117005425/en/Xybernaut-Introduces-Atigo-Dual-Purpose-Flat-Panel#.U62Rk_ldV8E.

[28] http://www.businesswire.com/news/home/20031117005425/en/Xybernaut-Introduces-Atigo-Dual-Purpose-Flat-Panel#.U62Rk_ldV8E.

[29] http://www.thefreelibrary.com/DRS+Technologies+to+Acquire+Paravant.-a093303555.

[30] http://www.drs-ts.com/pdf/ScorpionHTU-EK.pdf.

[31] http://www.list-company.com/company-info/4028809a13dd74c80113dd7661372411/TIQIT-Computers-Inc-Consumer-Electronics-Computer-Peripherals-Californi%E2%80%A6; http://www.tiqit.com/about.shtml.

[32] http://www.tiqit.com/tq_ds.pdf.

[33] http://www.tiqit.com/faq.shtml.

[34] http://www.bloomberg.com/quote/FWRX:US/profile.

[35] http://www.kontron.com/products/systems-and-platforms/notebooks-and-laptops/.

[36] With regard to the Defendants alleged actions, I may refer to Mr. Genssler which I consider to also include his company Scaltech International, Inc.

investment in Antelope to further develop its MCC product offering.[37]  It is my understanding that as negotiations progressed Mr. Genssler and Antelope entered into a "Mutual Nondisclosure & Non-Compete Agreement" dated July 4, 2004 and subsequent to this agreement, Antelope provided Mr. Genssler with access to highly confidential business information relating to Antelope's MCC, the market potential, and its Swiss production facility.[38]

17.     Following Mr. Genssler's execution of the "Mutual Nondisclosure & Non-Compete Agreement", he made his first offer to invest in Antelope.[39]  According to the terms of this offer, Mr. Genssler would loan Antelope $250,000 for working capital at a 10% interest rate with a due date of December 31, 2004.[40]   In addition to the working capital term loan, Scaltech International, Inc. and Mr. Genssler would obtain warrants to purchase Antelope stock at a price of $2.94 per share.[41]

18.     On August 4, 2004 Mr. Genssler terminated his original investment offer citing that Antelope was not in compliance with the law due to unpaid payroll taxes.[42] However, based upon my review of the documents produced to date, it does not appear that the unpaid payroll taxes were of a major concern to Mr. Genssler considering he made another offer to invest in Antelope 11 days later on August 12, 2004.[43]  In addition, it is my understanding that between August 4, 2004 and August 12, 2004, Mr. Genssler (or Scaltech International) purchased approximately 20% of the voting stock in Antelope from Kenneth Geyer and Tom Scott, both directors of Antelope at the time.[44]

19.     Subsequent to Mr. Genssler's termination of his original investment offer, Antelope entered into discussions with Xybernaut Corporation in regards to a potential relationship

---

[37] Plaintiffs' Proposed Six Amended Original Complaint; Affidavit of C. Stephen Guyer, November 14, 2004, pg. 1.
[38] Mutual Nondisclosure & Non-Compete Agreement between Antelope and  President of Scaltech International Inc., dated July 4, 2004; Affidavit of C. Stephen Guyer, November 14, 2004, pg. 2.
[39] Affidavit of C. Stephen Guyer, November 14, 2004, pg. 3.
[40] Genssler's Working Capital Loan and Equity Placement Term Sheet sent to Alan Taylor, July 6, 2004, pg. 3.
[41] Genssler's Working Capital Loan and Equity Placement Term Sheet sent to Alan Taylor, July 6, 2004, pg. 3.
[42] According to Antelope's August 6, 2004 Board of Directors minutes, the underlying reason for Mr. Genssler's termination was a "perceived interference of the transaction by Kenneth Geyer, and Tom Scott through their attorney Glenn Hagen".
[43] Affidavit of C. Stephen Guyer, November 14, 2004, pg. 12.
[44] Affidavit of C. Stephen Guyer, November 14, 2004, pgs. 6,7,12.

between the two companies.[45]   However, it is my understanding that once Mr. Genssler became aware of Antelope's pursuit of another investor he threatened to retain an attorney to file a temporary restraining order against Antelope in order to prevent Antelope from considering any investment offers.[46]

20.     On August 15, 2004, Mr. Genssler executed a stock subscription agreement agreeing to purchase approximately $4.7 million worth of Antelope stock.[47]   Under the terms of the subscription agreement, Mr. Genssler would pay $300,000 on August 20, 2004, $250,000 on August 31, 2004, and the remaining balance on or before October 15, 2004.[48]

21.     On or around August 18, 2004 Mr. Genssler along with Kenneth Geyer and Tom Scott filed suit against Antelope and the other directors.[49]   On August 18, 2004, a temporary restraining order was issued against Antelope and the other directors which precluded Antelope and its board from performing in the following:[50]

- "Convening any board meetings until Tom Scott, Davit Witt and Ken Geyer are reinstated to the Antelope Technologies board of directors";
- "Managing the affairs of Antelope Technologies through any Board resolution involving the participation of board members elected pursuant to a special shareholders' meeting on August 16, 2004";
- "Transferring or conveying any proprietary technological information to a competitor of Antelope Technology"; and
- "Considering any investment proposal not previously presented to the board of directors prior to August 16, 2004".

---

[45] Plaintiffs' Proposed Six Amended Original Complaint; Affidavit of C. Stephen Guyer, November 14, 2004, pgs.12, 13.
[46] According to an email from Stephen Guyer, dated August 12, 2004, Mr. Genssler promised to file a lawsuit to force Antelope's Board of Directors to consider Mr. Genssler's most recent investment proposal.
[47] Subscription Agreement dated August 15, 2004, pg. 3.
[48] Subscription Agreement dated August 15, 2004, pg. 3; Mr. Genssler signed this subscription agreement on behalf of the MCC Computer Investor Group LLP.
[49] Affidavit of C. Stephen Guyer, November 14, 2004, pg. 19.
[50] Temporary Restraining Order granted on August 18, 2004, pg. 2.

22.     Under the terms of the Temporary Restraining Order, Tom Scott, Ken Geyer and Mr. Genssler were required to file a bond in the amount of $100,000.[51]  It is my understanding that the bond was never paid to the court and that this suit was filed primarily to stop the negotiations from going forward between Antelope and the Xybernaut Corporation.[52]

23.     On August 19, 2004, Mr. Genssler withdrew his approximately $4.7 million subscription agreement dated August 15, 2004.[53]  However it appears that sometime between August 18, 2004 and August 26, 2004, Mr. Genssler, through purchase or proxy was able to secure enough votes to obtain effective control of the company (51%).[54]

24.     Alan Taylor resigned as the CEO of Antelope on September 2, 2004, allegedly because the Board of Directors would no longer communicate with him.[55]  Shortly after Mr. Taylor's resignation, on September 4, 2004, the Board of Directors held a board meeting where Mr. Taylor's resignation was accepted along with the resignations of Tom Scott and Ken Geyer from the Board of Directors.[56]  The majority of the remaining Board of Directors then voted to install Tom Lykos as interim CEO of Antelope.[57]

25.     Plaintiffs' claim that once Mr. Lykos was installed as CEO, Mr. Genssler and the Defendant directors effectively controlled all the operations of Antelope and over the ensuing months raided the company of its assets and effectively left Antelope as a worthless shell company with nothing but liabilities.[58]

26.     However, I understand that in order to retain the significant value that Mr. Genssler and the other Defendants placed on Antelope's MCC product, the Defendants created a competing

---

[51] Temporary Restraining Order granted on August 18, 2004, pg. 2.
[52] Plaintiffs' Proposed Six Amended Original Complaint; Affidavit of C. Stephen Guyer, November 14, 2004, pg. 21.
[53] Affidavit of C. Stephen Guyer, November 14, 2004, pg. 21; Subscription Agreement dated August 15, 2004, pg. 3.
[54] It is my understanding that Mr. Genssler reached an agreement with Anna Cole, Gary Newton, and Ivan Cardenas and his family that enabled him to gain effective control of Antelope.
[55] Alan Taylor resignation letter dated September 2, 2004.
[56] Affidavit of C. Stephen Guyer, November 14, 2004, pg. 28.
[57] According to the minutes from the September 4, 2004 Board of Directors meeting, Stephen Guyer and Terry Henderson voted against installing Mr. Lykos as interim CEO and David Witt abstained; Affidavit of C. Stephen Guyer, November 14, 2004, pgs. 29-30 .
[58] Plaintiffs' Proposed Six Amended Original Complaint.

company named MCC Computer Company, LLC ("MCC Computer Company")[59], in direct violation of the employment and non-disclosure agreements covering many of the Defendants.[60] Operating as the MCC Computer Company, the Defendants began to use the valuable assets taken from Antelope to manufacture, market, and sell Antelope cores to Antelope's customers as an MCC Computer Company product.[61]   According to the documents produced in this matter, the Defendants went as far as re-labeling actual Antelope cores with an MCC Computer Company logo in order to pass off the Antelope product as its own.[62]

27.   In November 2006, Antelope approved a "proposal to file a Chapter 11 petition."[63]   On February 14, 2007, a voluntary Chapter 11 petition was filed.[64]   The Memorandum Opinion and Order stated:[65]

> "it appears clear that, although Lykos (and perhaps Genssler) saw an opportunity for growth of the Debtor's business through recapitalization, Debtor's near-term capital needs were not so urgent as to cause the filing of a Chapter 1 petition at the time Debtor's board authorized and directed Lykos to file it…, or for more than two years thereafter.   Indeed, in light of the passage of two years after that resolution was approved (itself passed after the resignation or ouster of previous management, including Taylor, the former CEO), the proposing on the petition date of a plan by which Genssler was to obtain a release of the shareholder litigation and retain control of Debtor, and Lykos' admission that the upcoming trial prompted the filing, the court infers that Debtor filed the petition in the instant case for the primary purpose of obtaining leverage in the shareholder litigation, not for the Debtor's financial reorganization or in response to a particular financial crisis.   There is litigation pending in the United States District Court for the Eastern District of Texas addressing rights the minority shareholders believe have been infringed.   In light of the filing of the bankruptcy petition to gain an unfair advantage in the shareholder litigation, the absence of any clear need for financial reorganization, and the assertions that the management who ultimately filed the bankruptcy petition gained control by illegal or unethical means, which assertions can be dealt with in the pending shareholder litigation,

---

[59] Second Affidavit of C. Stephen Guyer, November, 14, 2004, pg. 4.

[60] Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 14.

[61] Second Affidavit of C. Stephen Guyer, November, 14, 2004, pgs. 11-12; Plaintiffs' Proposed Six Amended Original Complaint.

[62] Many of the Defendants continued to serve on Antelope's board, which at the same time working to establish MCC Computer Company to directly compete with Antelope.

[63] In Re: Antelope Technologies, Inc., Memorandum Opinion and Order, July 21, 2010, pg. 3.

[64] In Re: Antelope Technologies, Inc., Memorandum Opinion and Order, July 21, 2010, pg. 4.

[65] In Re: Antelope Technologies, Inc., Memorandum Opinion and Order, July 21, 2010, pg. 12.

the court concludes, on the totality of the circumstances, that the above captioned Chapter 11 case should be dismissed."

28.     As a result of the Defendants' alleged actions, the Plaintiffs claim that the value of Antelope as an ongoing business has been destroyed.

## 6.0     DAMAGES ANALYSIS

29.     This expert report is preliminary, and my analysis of and investigation into the Plaintiffs' damages is ongoing.   The following sections of this expert report describe my analyses of damages and findings to date.

### 6.1     Lost Business Value

*Standard of Value*

30.     In the nomenclature of business valuation, different definitions of value are called "standards of value." It is important for the valuation practitioner to establish the appropriate standard of value prior to conducting a valuation assignment so that the valuation conclusion can be properly understood.   The standard of value used in my analysis is fair value.   Fair value is defined in Section 10.362(b) of the Texas Business Organization Code as:

> "In computing the fair value of an ownership interest…, consideration must be given to the value of the organization as a going concern without including in the computation of value any: (1) payment for a control premium or minority discount other than a discount attributable to the type of ownership interests held by the dissenting owner; and (2) limitation placed on the rights and preferences of those ownership interests."[66]

31.     In instances where the valuation date for a fair value valuation is a historical date, the valuation practitioner should not normally use hindsight (i.e., use information or events that have transpired between the valuation date and the current date that would bias the valuation) when

---

[66] Texas Business Organizations Code – Section 10.362.  Computation and Determination of Fair Value of Ownership Interest.  In addition, *Cardiac Perfusion Services, Inc. et al v. Randall Hughes*, stated "The enterprise value of stock is determined by the value of the company as a whole and ascribing to each share its pro rata portion of that overall enterprise value;" and "Enterprise value does not include a discount based on the stock's minority status or lack of marketability."  *Cardiac Perfusion Services, Inc. et al v. Randall Hughes (380 S.W.3d 198 2012).*

conducting the valuation analysis.  Rather, the valuation practitioner should base his assumptions on reasonable expectations as of the valuation date.  This is because the goal of establishing a fair value at a historical date is to establish a price a willing buyer and willing seller would have paid and accepted, respectively, for the investment at that time.  Therefore, hindsight which incorporates events or information that could not have been reasonably forecasted at the valuation date should be ignored.[67]

### Approaches to Valuation

32.     In order to estimate the value of Antelope prior to the alleged actions of the Defendants on or about August 18, 2004, I have relied upon traditional valuation approaches.   In the valuation of a business, three different approaches are typically considered: (1) the Income Approach, (2) the Market Approach, and (3) the Cost Approach.  While each of these approaches is initially considered in the valuation of a company, the nature and characteristics of the company will indicate which approach, or approaches, are most applicable. Based on these accepted valuation approaches, I performed specific valuation analyses, as described further below.

### The Income Approach

33.     The income valuation approach determines the value of a business based on the present value (an amount expressed in today's dollars) of expected future earnings.  One methodology in the Income Approach is the discounted cash flow ("DCF") method, which focuses on the expected cash flow of Antelope.  I specifically considered the DCF method to estimate the value of Antelope as of August 18, 2004.[68]  The DCF method is widely accepted and commonly-used method for valuing start-up and emerging companies.

34.     I performed an analysis of Antelope's projections based upon the information contained in its December 2003 financial model,[69] and adjusted these projections for events known[70] as of

---

[67] AICPA Statement on Standards for Valuation Services, #1.
[68] On August 18, 2004, Mr. Geyer, Mr. Scott and Mr. Genssler filed and obtained a temporary restraining order against Antelope.  Affidavit of C. Stephen Guyer, November, 14, 2004, pg. 19.
[69] Version 2.3.
[70] Some of the adjustments include the delay in introduction of MCC version 1.5 and capital infusion of approximately $4.7 million based on Mr. Genssler's proposed investment.

August 18, 2004.  Further, in order to estimate the value of the invested capital in Antelope, I converted the projected net income (after adjustments) into cash flows and calculated a terminal value based on capitalizing the last projected year's earnings.

35.     Under the DCF method, future cash flows are reduced by a mathematical factor, referred to as a present value factor, to measure the future cash flows in today's dollars.  The present value factor accounts for time, and risk regarding the likelihood these projections will be realized.  I determined a discount rate based upon typical required venture capital returns as the appropriate present value factor to discount the cash flows in the projections to their current dollar values as of the valuation date.  A venture capital discount rate represents the rate of return that has to be paid to an investor in a start-up or emerging company business, in order to attract money for the business to operate and grow.

36.     Based on my review of required rates of return used by venture capitalists for investment opportunities,[71] it is my opinion that the appropriate venture capital discount rate would be 40%.[72, 73]

37.     I applied the discount rate to the projected cash flows of Antelope to determine the enterprise value of Antelope as of August 18, 2004.  Since I am determining the enterprise value of Antelope there is no need to deduct the interest-bearing debt of Antelope to determine the value of the company.

38.     The indicated enterprise value for the DCF method as of the August 18, 2004 is $40.0 million.[74]

---

[71] "*Early-Stage Technologies, Valuation and Pricing,*" Richard Razgaitis, pgs. 130-132; "*Valuation for M&A: Building Value in Private Companies,*" Frank C. Evans and David M. Bishop; pgs. 121, 144.

[72] Such as making a new product using a not well-understood technology and marketing to an existing segment or a well-understood technology to a new market segment (Source: "*Early-Stage technologies, Valuation and Pricing,*" Richard Razagitis, pg. 132; Exhibit 7.2: Approximate Values of Risk-Adjusted Hurdle Rate Used in License Negotiations).

[73] "*Early-Stage Technologies, Valuation and Pricing,*" Richard Razagitis, pg. 132; Exhibit 7.2: Approximate Values of Risk-Adjusted Hurdle Rate Used in License Negotiations.

[74] See Exhibit 3.

*Confidential –Attorneys Eyes Only*

*The Market Approach*

39.     The Market Approach is a general way of determining the value of a business by using one or more methods such as the guideline company valuation method, the guideline transaction valuation method or the subject company transaction valuation method.

40.     As of the date of this valuation, I have been unable to identify any public or private guideline companies or transactions that were sufficiently comparable to Antelope.  However, I was able to identify a number of arm's length transactions or proposed transactions involving Antelope's common stock, which enabled me to estimate the value of Antelope using the subject company transaction method.

41.     During the period between July 2004 and August 15, 2004, Mr. Genssler made three offers to invest in Antelope.  As part of my valuation analysis under the subject company transaction method, I reviewed and analyzed the third offer[75] dated August 15, 2004[76] (the "Final Offer") made by Mr. Genssler in order to estimate the implied value of Antelope.

42.     The terms of Mr. Genssler's final offer was 1,604,787 Antelope shares (884,238 voting stock and 720,549 non-voting stock) at a price per share of $2.9412 resulting in a purchase price of approximately $4.7 million.[77]   The implied minority interest value in Antelope based upon Mr. Genssler's Final Offer was approximately $16.8 million.  See Exhibit 19.

43.     In order to determine the implied enterprise value of Antelope resulting from Mr. Genssler's Final Offer, a control premium and an additional discount for lack of marketability needs to be added to the implied minority interest value in Antelope.

44.     An accepted method for estimating a control premium is the comparison of the premiums paid for the acquisition of controlling interests in public companies with the public market

---

[75] The first and second offers dated July 2004 and August 12, 2004, respectively, were warrants to purchase shares in Antelope, which essentially was an option, but not an obligation, to acquire shares in Antelope.  Since the Final Offer was for purchase of Antelope shares while the first two offers involved an option to purchase shares in Antelope, the implied value of Antelope was determined based on the Final Offer.
[76] Subscription Agreement dated August 15, 2004.
[77] Subscription Agreement dated August 15, 2004.

minority trading prices prior to the acquisition announcement.[78]   Based on my review of the median premium[79] offered for a controlling interest for transactions in the computer hardware industry, as well as for all transactions tracked by Mergerstat Review, a control premium of 31.3% was considered.[80]

45.      In addition to the control premium, I also considered an additional discount for lack of marketability of 38.6%[81] since minority interests in privately held businesses are more illiquid. The discount for lack of marketability was derived by taking the median discount for lack of marketability on empirical studies as well as transactions in the computer industry.

46.      It is my understanding that the purchase price of a company often represents the "best evidence" of the market value of the company.[82]   Based upon my analysis of the Final Offer made by Mr. Genssler, the value of Antelope prior to the alleged actions of the Defendants was approximately $30.6 million.  See Exhibit 19.  I understand that the Final Offer price per share was not based on the expected value of Antelope.[83]   The price per share was based on the amount of cash needed divided by the total number of shares to be issued.[84]   Therefore, the $30.6 million represents the floor in terms of the value of Antelope as of the valuation date.

### *The Asset Approach*

47.      The Asset Approach determines a value of a business by adjusting the individual asset and liability accounts on the subject company's balance sheet from its reported book values to its fair market values.

48.      In my opinion, for several reasons, the Asset Approach is not applicable in this matter for the purpose of determining the value of Antelope.  I have seen no indication that Antelope could be replicated by simply purchasing tangible assets.  In other words, I believe that Antelope had substantial value over and above the value of its tangible assets such as cash, accounts

---

[78] *"Business Valuation: Discounts and Premiums,"* 2nd Edition, Shannon P. Pratt, pg. 41.
[79] *"Business Valuation: Discounts and Premiums,"* 2nd Edition, Shannon P. Pratt, pg. 63.
[80] See Exhibit 19.
[81] See Exhibit 19.
[82] *Schonfleld v Hilliard,* 218 F.3d 164.
[83] Interview of Stephen Guyer.
[84] Interview of Stephen Guyer.

receivable, inventories, and equipment.  This additional value is from the intangible assets that Antelope possessed, such as its customer relationships, customer contracts, vendor relationships and employees.[85]   Accordingly, I have not used the Asset Approach in reaching my opinions regarding value.

### 6.2   Defendant's Unjust Enrichment

49.    I understand that Antelope is entitled to recover damages that can be measured using various methodologies, which but for the actions of the Defendants would make Antelope whole, while at the same time ensuring that the Defendants have not been unjustly enriched as a result of their alleged actions.

50.    One approach for determining damages as a result of the Defendants alleged actions is the determination of the Defendant's unjust enrichment.  The benefits to the Defendants, or unjust enrichment, may be measured in several ways, including the following: (1) disgorgement of the Defendants' profits resulting from its alleged actions; (2) avoided development costs resulting from the alleged actions; and/or (3) the related value or benefit the Defendants expected to obtain as a result of their alleged actions.

51.    Based upon the information I have reviewed and analyzed to date, it is my opinion that the Defendants' unjust enrichment is best measured by their avoided costs or the expected benefits they expected to receive as a result of their alleged actions.

52.    I have seen no evidence indicating that the Defendants incurred any costs on typical R&D and start-up costs needed to develop their MCC computer core and the MCC Computer Company.  In my opinion, as a proxy for these avoided costs, the amount Antelope spent on acquiring and developing its technology and market serves as a reasonable estimate of the Defendants' avoided costs.  Based upon my analysis of Antelope's financial records, Antelope

---

[85] Antelope Technologies Inc.'s Business Plan, December 2003 – Revision 2.3.

expended approximately $5.2 million[86] on the development of its market, computer core and accessories.

53.     The value of the expected benefits to the Defendants at the time of alleged actions may also be used as a measure of unjust enrichment.  Analysis of this measure of damages typically involves determining the future profits that the Defendants would reasonably have expected to generate upon entering the modular computing market.  After estimating these profits, a discount rate is used to determine the value of the cash flows stream stemming from the Defendants' expected sales of its modular computing products.

54.     As of the date of this report, the Defendants have not produced any financial information related to the expected benefits they expected to obtain as a result of their alleged actions. However, the offers made by Mr. Genssler to invest in Antelope, as discussed previously can be used to estimate the minimum expected benefits the Defendants would have expected to achieve. As of August 18, 2004, Defendants' owned approximately 65.45% of the outstanding shares (voting and non-voting) of Antelope stock.[87]   Based upon Mr. Genssler's Final Offer, the minimum expected benefits to the Defendants were approximately $20.0 million.[88]

## 7.0     RESERVATION OF RIGHTS

55.     It is my understanding that additional documents and/or deposition testimony may be produced in this matter that could provide information relevant to my analysis.  If information I determine to be relevant is produced or presented in this matter after the date of issuance of this report, I may revise my analyses and/or my report to reflect the relevant information.  I further reserve the right to consider and comment on any opinion and reports offered by the Defendant's experts pertaining to the subject matter hereof.  Furthermore, I may prepare demonstrative graphs and/or charts to assist in the presentation of my opinions at deposition or at hearing or trial, if I am requested to testify.

---

[86] See Exhibit 18.
[87] Discussion with counsel.
[88] $20.0 million = $30.6 million x 65.45%.

**Exhibit 1**



# LANCE MORMAN

Managing Director
OverMont Consulting LLC
3100 Weslayan, Suite 340
Houston, Texas 77027
Phone: (713) 590-2852
Cell: (832) 731-0028
Email: lmorman@overmont.com

| | |
|---|---|
| **Education** | B.B.A. in Finance & Economics Baylor University |
| **Associations** | Certified Fraud Examiner, Association of Certified Fraud Examiners<br>Austin Advanced Patent Law Institute Planning Committee Member |
| **Service Lines** | Intellectual Property Damages<br>Intellectual Property Valuation and Licensing<br>Complex Commercial Litigation<br>Business Valuation<br>Personal Injury and Wrongful Death |
| **Professional History** | 2013 - Present   Managing Director, OverMont Consulting LLC |
| | 2009 - 2013   Director, OverMont Consulting LLC |
| | 2007 - 2009   Navigant Consulting |
| | 2004 - 2007   CRA International |
| | 2001 - 2004   InteCap |

Lance is a Managing Director with OverMont Consulting, LLC.   Prior to joining OverMont Consulting, he was a Managing Consultant with Navigant Consulting, Inc.   Lance typically consults on business matters involving complex financial, accounting and economic issues, particularly as they relate to economic damages or business valuations.   Lance has experience in matters involving computation of economic damages, including breach of contract, infringement of intellectual property rights, business valuation, and other causes of action.   He has performed damage analyses that involve lost profits, reasonable royalties, price erosion, diminution of business value and insolvency analyses, among others.

**Range of Industry Experience**

Industry Experience Includes:

- Pharmaceuticals
- Oil & Gas
- Mining
- Oilfield Services
- Semiconductor
- Computer Hardware & Software
- Security Products
- Consumer Electronics

- Death Care Industry
- Professional Services
- Auto Manufacturers
- Auto Tire Manufacturers
- Real Estate
- Internet Services Providers
- Retail & Consumer Products
- Telecommunications Products

## Examples of Litigation Experience

### Intellectual Property

- Retained as damages expert in a patent infringement matter involving aramid fibers used in motorcycle grips. Analyses included review of the companies' licenses, third-party licenses, design-around alternatives, a detailed analysis of sales, costs, profits, and the calculation of reasonable royalties.

- Managed a patent infringement matter involving auto manufacturers incorporating portable audio players to an automobile sound system. Analyses included the preparation of an expert report and trial demonstratives related to reasonable royalty damages.

- Managed a patent infringement matter involving one of the largest semiconductor manufacturers in the world. The dispute involved the alleged infringement of patents covering various multimedia technologies embedded in microprocessors.  Analyses included a review of the companies' licenses as compared to third-party licenses, design-around alternatives, a detailed analysis of the manufactures sales, costs and profits, and the calculation of lost profits and reasonable royalties.

- Managed a patent infringement matter involving one of the largest biotechnology companies in the world. The dispute involved the alleged infringement of patents covering non-Hopkins lymphoma treatment. Analyses included reviewing and rebutting plaintiff's report and calculation of a reasonable royalty.

- Managed a misappropriation of trade secrets involving sulfur removal technology for gasoline refinery operations.  Analyses included reviewing and rebutting plaintiff's report and calculation of alleged lost profits, reasonable royalties and future damages.

- Managed a misappropriation of trade secrets matter involving a prime defense contractor and a subcontractor.  The dispute involved the alleged misappropriation of certain trade secrets relating to gimbal technology.  Analyses included review of the value of the purported trade secrets, lost profits, unjust enrichment including disgorgement of profits, avoided costs, and head start advantages, plus reasonable royalties.  Analyses also included rebuttal of the opposing expert's report and opinions.

## Valuations

- Managed a valuation of a U.S. subsidiary of a global automobile tire manufacturer.  Conducted financial analysis on behalf of a minority shareholder for a potential additional investment of capital.  Analyses included reviewing industry trends, company profitability, inter-company transactions, competitor financial performance and recent industry mergers, competitor financial performance.  Assignment led to litigation, where deposition testimony was given.

- Managed a valuation and solvency engagement of one of the largest internet service providers.  Analyses included evaluating the methodologies employed by the plaintiff's expert regarding the valuation, solvency analysis and estimation of alleged damages suffered by the plaintiff.

- Managed a valuation and solvency analysis related to a fraudulent conveyance action of an investment holding company with commercial real estate properties.  Analyses included investigation of the books and records and preparation of a reorganization plan.

## International Arbitration

- Managed a Bilateral Investment Treaty Dispute regarding the evaluation of the cost structure of a gold mining company and the impact of windfall tax legislation on the company. Specifically, we were asked to quantify the cost per ounce of gold mined, benchmark these cost measures with other gold mining operations and assess whether Mongolia's windfall tax would make it uneconomic for claimant to continue to mine gold.

- Managed a breach of contract matter regarding a valuation of claimant's damages allegedly suffered as a result of being denied the right to fully participate in the co-development of a natural gas field in Ukraine.

- Managed a Bilateral Investment Treaty Dispute regarding the valuation of oil & gas assets held in Ecuador and the impact of windfall tax legislation on the company.  Specifically, we were asked to quantify the losses sustained by claimant due the passage of a law which significantly reduced the profitability of oil production activities in the Republic of Ecuador.

## Breach of Contract

- Retained as damages expert in a breach of contract matter between a large enterprise data service center and an infrastructure solutions provider.  Analysis included the quantification of lost profits damages.

- Retained as damages expert in a tortious interference matter between two stevedoring services companies. Analyses included rebuttal of damages expert and the quantification of lost profits damages.

- Managed a breach of contract matter between a large oil company and ATM service provider.  Analyses included rebuttal of multiple experts and the quantification of lost profits damages.

- Managed a breach of contract matter between a large casket manufacturer and several independent distributors. Analyses included quantification of lost profits for breach of contract, tortious interference and unfair competition and included rebuttal of multiple experts methodologies.

- Managed a breach of contract matter between a large regional sports network and two professional sports teams. Analyses included industry research, valuation of media rights, relevant license agreements, competitive benchmarks and calculation of contract default damages.

<u>Consulting Projects</u>

- Managed a team regarding the world's leading provider of software and systems enabling converged billing and active customer management solutions provider regarding the delay in filing its periodic financial reports. The analysis included the evaluation of application of generally accepted accounting principles in connection with the recognition of revenue, including the assessment of vendor specific objective evidence.

- Assisted potential licensors with licensing analyses, including market research and analyses of royalty rates.

- Assisted private company in its annual financial impact related to the impairment analysis of SFAS 141/142.

## Recent Speeches/Publications

"Economic Damages in Trade Secrets Litigation" *University of Houston Law School,* April 15, 2014.

"Business Valuation in Litigation & Bankruptcy" *University of ST. Thomas Alumni Association*, May 21, 2013

"Economic Damages in Trademark Litigation" *University of Houston Law School*, November 20, 2012.

"Trade Secret – Value and Damages Considerations" Littler Mendelson, P.C., October 17, 2012

"Trade Secret – Value and Damages Considerations" Houston Intellectual Property Law Association, September 6, 2012

"Trade Secret and Trademark – Value and Damages Considerations" Houston CPA Chapter, August 23, 2012

"Economic Damages in Trade Secrets Litigation" *University of Houston Law School,* April 4, 2012.

"Economic Damages in Trademark Litigation" *University of Houston Law School*, November 8, 2011.

"Determination of Post Judgment Royalties and Damages Issues from Uniloc" co-presented CLE program at Locke Lord Bissell & Liddell, May 2011

"Update on Damages after Lucent and ResQNet" co-presented CLE program at Wong, Cabello, Lutsch, Rutherford & Brucculeri L.L.P, April 2011

"Economic Damages in Trademark Litigation." co-presented at the University of Houston Law School, November 2010

"Post Lucent Damages" Spring 2010 Multiple Law firms

"Overview of Intellectual Property Damages," co-presented at The Intellectual Property and Information Law Institute's Intellectual Property for the General Attorney, University of Houston Law School, August 2008.

"Overview of Intellectual Property Damages in the United States." les Nouvelles, December 2008.

**Deposition/Expert Designations**

Mary Valentine v. Ilse Rew (Expert Report, Deposition)

Bullet Proof Technology of Texas, LLC v. Renthal LTD; Renthal America, Inc.; Plano Fun Center, Inc. d/b/a Plano Kawasaki Suzuki; BG Motorsports, L.P. d/b/a Golden Triangle Powersports (Expert Report, Deposition)

Jenifer Lynn Walls the wife of Ronald Kyle Robinson and Catrena Swank as next friend of Lela Bradshaw v. Angel Brothers Enterprises, LTD., Richard Hairell and Jones Trucking (Expert Report)

Robert Arnold v. BP America, Inc., TES Electric, L.P., and Bovis Construction Corp. (Expert Report)

Shenan Brantley, As Next Friend of M.A.S., and Mervin Soileau v. Centerpoint Energy Houston Electric, LLC and MP Technologies, LLC (Expert Report)

James J. Flanagan Shipping Corporation v. Richard Bradford, Steve Abernathy, Gulf Stevedoring Services, LLC, Pacific Stevedoring, Inc., and Del Monte Fresh Produce, N.A., Inc. (Expert Report)

Cyrus Networks, LLC D/B/A Cyrusone v. Evolve Consulting Group, LLC; Evolve Enterprises, Inc. N/K/A Evolve Infrastructure Solutions LLC (Expert Designation)

In the matter of Proyectos y Construcciones Procisa, S.A. De  C.V. v. Continental Tire North America, Inc., et al., Case No. 04-602540 (Fact witness in a Shareholder Dispute and Valuation)

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                                    Exhibit 2

# <u>Documents Reviewed and Considered</u>

**<u>Legal Filings</u>**
Defendants Ivan Cardenas and Victor Cardenas' Answer to Plaintiffs' Sixth Amended Complaint and Defendant Ivan Cardenas' Original Counter Claim, May
Defendants' Klaus Genssler, Rolf Genssler, MCC Computer Company, LLC, Scaltech International, LLC, and Scaltech International, Inc.'s
   Answer to Plaintiffs' Sixth Amended Complaint, April 30, 2013.
Plaintiffs' Proposed Sixth Amended Original Complaint, April 17, 2013.
Scheduling Order, May 7, 2014.
Temporary Restraining Order, August 18, 2004.

**<u>Cases</u>**
*Cardiac Perfusion Services, Inc. et al v. Randall Hughes (380 S.W. 3d 198 2012).*
In Re: Antelope Technologies, Inc., Memorandum Opinion, January 7, 2010.
In Re: Antelope Technologies, Inc., Memorandum Opinion and Order, July 21, 2010.
*Schonfled v. Hilliard* , 218 F.3d 164.

**<u>Affidavits</u>**
Affidavit of C. Stephen Guyer, November 14, 2004.
Second Affidavit of C. Stephen Guyer, November 14, 2004.

**<u>Native Excel Files</u>**
Antelope Historical Financials.xls
Antelope Sales by Customer Detail 121206.xls
Antelope_Fin_Model_2_bu.xls.
AT Sales Pricing Model 06L 5000 pcs.xls
AT Sales Pricing Model 06R 5000 pcs.xls
Avoided Costs.xls
Balance_sheet_2004-3-2.xls
BCNReconciledDecMarchDE.xls
Calculation of Implied Value Based on Gennsler's Offer.xls
Cash Flow Plan w cons sales =6-26-04.xls
Component_Estimates.XLS
Copy of Antelope_Stock_Ledger.xls
Copy of Antelope_Stock_Ledger-With Genssler.xls
Copy of AT Sales Pricing Model 06J 5000 pcs.xls
Copy of AT Sales Pricing Model 07.xls

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                          Exhibit 2

Copy of Consolidating_2004-3-31.xls
Copy of Csh Flw Pln Case 4 w Adjtd pricingJan-Mar 7-1-04.xls
Copy of Csh Flw Pln Case 4 w Jun at breakeven  7-12-04.xls
Csh Flw Pln Base Case =6-26-04.xls
Csh Flw Pln Case 1 =6-26-04.xls
Csh Flw Pln Case 2 =6-27-04.xls
Csh Flw Pln Case 4 w Adjtd pricing =6-30-04.xls
Csh Flw Pln Case 4 w Adjtd pricing 6-30-04-2.xls
Csh Flw Pln Case 4 w Adjtd pricing 6-30-04-3.xls
Csh Flw Pln Case 4 w Adjtd pricing&Jan-Mar 7-5-04.xls
FinancialModel_rev2.3.xls.
FinancialModel_rev2.3-updated.xls
FinancialModelSwissDecemberStartIntegrated5.xls.
FinancialModelSwissDecemberStartIntegrated5a.xls.
Gensssler's Offers.xls
MMC_Cost_Estimates.xls
New Cash Flow Plan DGE Update E- 0615 PM.xls
Pipe_Line.xl
Weinstein_Status.xls
Xybernaut Financials-Exported from Capital IQ.xls.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                 Exhibit 2

**PowerPoint Presentations**
Company Market Strategy.ppt.
MCP-ext-Biz-AT6.ppt.

**Other**
Agreement between Scaltech International, Janice K. Witt, and David E. Witt, August 25, 2004.
Agreement between Scaltech International, Klaus Gennsler, Anna C. Cole, J. Gary Newton, Wells Family Investment Co., Cecilia Cardenas-Fabre, Ivan R. Cardenas, Victor J. Cardenas, Jr., Victor J. Cardenas, Sr., and Thomas K. Donalson, October 10, 2004.
Agreement between Scaltech International, Klaus Genssler, Anna C. Cole, and J. Gary Newton, August 25, 2004.
Agreement between Scaltech International, Klaus Genssler, Anna C. Cole, J. Gary Newton, Wells Family Investment Co., Cecilia Cardenas-Fabre, Rudy Fabre, Ivan R. Cardenas, Victor J. Cardenas, Jr., Victor J. Cardenas, Sr., Thomas K. Donalson, and  Guy Fischer, September 1, 2004.
AICPA Statement on Standards for Valuation Services, #1.
Alan H. Taylor Resignation Letter, dated September 2, 2004.
Anna Cole's Employment Agreement.
Annual Report 10-K, Xybernaut Corp, December 31, 2003.
*Antelope Announces Licensing Agreement for IBM's Meta Pad Prototype* , IBM Research News, IBM.
Antelope Project Plan 80702.
Antelope Quickbooks file.
Antelope Shareholders by Dollar Amount, as  of July 25, 2004.
Antelope Stock Ownership-Purchase, May 15, 2002 through July 23, 2004.
Antelope Technologies Inc., Business Plan, February 20004 - Revised 2.7.
Antelope Technologies, Inc., Business Plan, Executive Summary and Attachment, December 2003 - Revision 2.3.
Antelope Technologies, Inc., Report to Shareholders, March 31, 2004.
Antelope Technologies, Inc., Summary Legal and Financial Information, May 3, 2004.

Award Letter to Kenneth Geyer from Scott Mowbray, Editor-in-Chief for Popular Science, January 22, 2003.
*"Business Valuation: Discounts and Premiums"* , 2nd Edition, Shannon P. Pratt, pgs. 41. 63.
Corporation Taxes, Department of the Treasury, Internal Revenue Service, Rev. February 2006.
*"Early-Stage technologies, Valuation and Pricing,"*  Richard Razagitis, pgs. 130-132; Exhibit 7.2: Approximate Values of Risk-Adjusted Hurdle Rate Used in License Negotiations.
Email from Doug Foote to C. Stephen Guyer, Share Offer, August 6, 2004.
*Emerging Displays Review* , Stanford Resources, July 2002.
Escrow Agreement among Robbi J. Jackson and Etlan B.V., November 1, 2004.
*Giga ETS Polling Results: Modular Computers Named the Most Exciting Desktop Technology* , Rob Enderle, Giga Information Group, December 18, 2001.
*Handspring, Inc* ., Equity Research Notes, Piper Jaffray, July 17, 2000.
*Handspring, Inc.* , Piper Jaffray, August 200.

*Handspring, Inc* ., Supply Chain Technology, Baird, June 1, 2001.

http://business.highbeam.com/5697/article-1G1-81413341/wearable-computers-coming-into-fashion-business-applications.

http://investorshub.advfn.com/boards/read_msg.aspx?message_id=336984.

http://shup.com/oqo/oqo.com/about/index.html.

http://www.bizjournals.com/denver/stories/2002/06/17/story3.html?page=all.

http://www.bloomberg.com/quote/FWRX:US/profile.

http://www.businesswire.com/news/home/20031117005425/en/Xybernaut-Introduces-Atigo-Dual-Purpose-Flat-Panel#.U62Rk_ldV8E.

http://www.drs-ts.com/pdf/ScorpionHTU-EK.pdf.

http://www.kontron.com/products/systems-and-platforms/notebooks-and-laptops/.

http://www.list-company.com/company-info/4028809a13dd74c80113dd7661372411/TIQIT-Computers-Inc-Consumer-Electronics-Computer-Peripherals-Californi%E2%80%A6.

http://www.pcstats.com/articleview.cfm?articleID=1166.

http://www.prnewswire.com/news-releases/antelope-technologies-and-secure-communication-systems-announce-production-of-tough-hand-held-  shell-for-the-modular-computing-core-72159707.html.

http://www.prnewswire.com/news-releases/antelope-technologies-announces-worldwide-launch-at-demomobile-conference-71170137.html.

http://www.thefreelibrary.com/Antelope+Technologies'+Crusoe-based+Mobile+Computer+Core+Wins+Popular...-a094152464.

http://www.thefreelibrary.com/DRS+Technologies+to+Acquire+Paravant.-a093303555.

http://www.thefreelibrary.com/Giga+Information+Group's+Emerging+Technology+Showcase+Featured+Some...-a095516647.

http://www.thefreelibrary.com/Microvision+and+Antelope+Technologies+Sign+Co-Marketing+Agreement.-a090323385.

http://www.tiqit.com/faq.shtm.

https://www-03.ibm.com/press/us/en/pressrelease/22046.wss.

*IBM Licenses Pocket-Sized PC Module to Antelope Technologies* , Pal Horvitz, Bloomberg.com, May 23, 2002.

Invoice from Scaltech International to Antelope Technologies totaling $12,799.40, August 11, 2004.

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                                          Exhibit 2

### Other

*IT Support best practices compilation* , TechRepublic, 2002.

Letter from Ivan Cardenas to Anna Cole regarding Oxford Technologies and attachment of data from the US Bureau of Labor Statistics for the process, petroleum, power and first responder  sectors and the Department of Defense stats for military markets, October 25, 2002.

Letter from Klaus Genssler to Alan Taylor attaching Working Capaital Loan and Equity Placement, July 6, 2004.

Letter From Scaltech International to Steven Newman, August 30, 2004.

Letter from Transmeta Direrector of Finance, Richard Carter, to Dave Witt and Kenneth Geyer, January 22, 2003.

Letter to Gregory Fox from Stephen Guyer regarding Stock Price and Account Receivable Calculations, February 12, 2007.

*Local Company's Computers Designed for Progressive Niche* , RockyMountainNews.com, June 24, 2002.

MCC Shareholders List.

*Modular Computing: The Next Generation of Personal Computing* , Rob Enderle, Giga Information Group, Inc., April 16, 2002.

Mutual Nondisclosure & Non-Compete Agreement between Scaltech International and Antelope Technologies, July 4, 2004.

Notes on Research and Development Spending, December 10, 2002.

*Palm Inc* .,  ING Barings, July 14, 2000.

*Palm In* c., Company Report, Prudential Financial, May 2001.

*Palm Inc* ., Equity Research Technology, Bear Stearns, April 11, 2000.

*Palm Inc* ., Handheld Devices, Salomon Smith Barney, October 18, 2000.

*Palm Inc* ., Piper Jaffray, April 2006.

*Palm Inc.* , Robertson Stephens, March 29, 2000.

*Palm Inc* ., Equity Research iAppliances, Bear Stearns, December 4, 2001.

Popular Science 15th Annual Best of What's New website.

Product Overview of the Tiqit, 2003.

Scorpion HTU-EK- Handheld Terminal Unit Embedded Keyboard Product Description.

*Small Solution, The new MCC from Antelope Technologies cuts the PC down to size* , Field Force Automation, October 2002.

Subscription Agreement from Klaus Genssler to Antelope Technologies, August 15, 2004.

Term Sheet between Antelope, Newton, and Scaltech International, Inc.

Texas Business Organizations Code – Section 10.362.  Computation and Determination of Fair Value of Ownership Interest.

*The Estimated Market for Modular Computers* , Rob Enderle, Giga Information Group, July 16, 2002.

*The UPC Market: Handheld XP Solutions for the Enterprise* , White Paper, Tim Bajarin, Creative Stragies, Inc.

"*Valuation for M&A: Building Value in Private Companies,"*  Frank C. Evans and David M. Bishop; pgs. 121, 144.

Vista due Diligence Questions to Craig Hanson from Antelope.

Voting Agreement between Scaltech International, Klaus Genssler, Anna C. Cole, and J. Gary Newton, August 24, 2004.

*Xybernaut Corporation* , Company Profile, DataMonitor, October 2006.

*Xybernaut Introduces Atigo T Dual Purpose Flat Panel Computer* , Business Wire, November 17, 2003.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                             Exhibit  3

## **Market Value of Antelope as of August 18, 2004**

Income Approach - Enterprise Value [1]                          $40,042,466

Market Approach - Enterprise Value [2]                          $30,597,306

*Notes/Sources:*
1. See Exhibit 4.
2. See Exhibit 19.

Confidential – Attorneys Eyes Only                     Page 1 of 1

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                    Exhibit 4

## Summary of DCF

|  | August 18, 2004- April 05 Fiscal Yr 1 | May-05-April 06 Fiscal Yr 2 | May 06- April 07 Fiscal Yr 3 | May 07- April 08 Fiscal Yr 4 |
|---|---|---|---|---|
| Present Value of Projected Cash Flows [1] | ($501,040) | $4,487,694 | $8,552,389 | $11,916,027 |
| Present Value of Terminal Cash Flows [2] |  |  |  | $28,126,439 |
| Total Enterprise Value |  |  |  | $40,042,466 |
| Less: Debt [3] |  |  |  | $0 |
| Total Enterprise Value |  |  |  | $40,042,466 |

*Notes/Sources:*
1. See Exhibit 5.
2. See Exhibit 6.
3. See Exhibit 8.

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                    Exhibit 5

## Discounted Cash Flows

| | August 18, 2004-April 05 **Fiscal Yr 1** | May-05-April 06 **Fiscal Yr 2** | May 06- April 07 **Fiscal Yr 3** | May 07- April 08 **Fiscal Yr 4** |
|---|---|---|---|---|
| Projected Net Income [1] | ($1,378,870) | $15,123,754 | $27,157,252 | $38,638,608 |
| Add: Depreciation and Amortization [1] | $442,945 | $1,343,033 | $3,160,990 | $5,600,220 |
| Add: Interest Expense, Net of Taxes [1] | $93,944 | $116,142 | $64,633 | $12,248 |
| Less: Capital Expenditures [2] | ($1,140,071) | ($4,123,209) | ($7,380,304) | ($10,595,182) |
| Less: Change in Working Capital [3] | $1,294,961 | ($2,815,248) | ($395,344) | ($513,349) |
| Projected Cash Flows | ($687,091) | $9,644,471 | $22,607,227 | $33,142,545 |
| Discount Factor [4]            40% | 0.8805 | 0.6653 | 0.4752 | 0.3395 |
| Discounted Cash Flows [5] | ($501,040) | $4,487,694 | $8,552,389 | $11,916,027 |

*Notes/Sources:*
1. See Exhibit 8.
2. See Exhibit 14.
3. See Exhibit 7.
4. "Early-Stage Technologies, Valuation and Pricing," Richard Razgaitis, pgs. 130-132;
     "Valuation for M&A: Building Value in Private Companies," Frank C. Evans and David M. Bishop; pgs. 121, 144.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                          Exhibit 6

## Terminal Value

|  | April'08-Forward Terminal Value |
|---|---|
| Projected Net Income [1] | $38,638,608 |
| Add: Depreciation and Amortization [1] | $5,600,220 |
| Add: Interest Expense, Net of Taxes [1] | $12,248 |
| Less: Capital Expenditures [1] | ($10,595,182) |
| Less: Change in Working Capital [1] | ($513,349) |
| Projected Cash Flows | $33,142,545 |
| Capitalization Rate [1]    40% | 0.4000 |
| Terminal Value of Cash Flows | $82,856,364 |
| Present Value Factor [1]    40% | 0.3395 |
| Present Value of Terminal Cash Flow | $28,126,439 |

*Notes/Sources:*
1. See Exhibit 5.

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                                    Exhibit 7

## Working Capital Schedule

|  | May-04-April 05 Fiscal Yr 1 | May-05-April 06 Fiscal Yr 2 | May 06- April 07 Fiscal Yr 3 | May 07- April 08 Fiscal Yr 4 |
|---|---|---|---|---|
| Inventory [1] | $0 | $0 | $0 | $0 |
| Prepaid Royalties [1] | $175,000 | $175,000 | $175,000 | $175,000 |
| Trade Receivables [1] | $7,169,115 | $23,470,135 | $34,850,915 | $49,628,688 |
| **Total Current Assets** | **$7,344,115** | **$23,645,135** | **$35,025,915** | **$49,803,688** |
| | | | | |
| Trade Payables [1] | $6,920,075 | $22,654,832 | $33,640,268 | $47,904,693 |
| Line of Credit [1] | $0 | $0 | $0 | $0 |
| Inventory Financing Facility [1] | $0 | $0 | $0 | $0 |
| Current Maturities of Liabilities [1] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [1] | $2,248,985 | $0 | $0 | $0 |
| Payroll Taxes Payable [1] | $0 | $0 | $0 | $0 |
| Customer Prepayments [1] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes [1] | $0 | $0 | $0 | $0 |
| **Total Current Liabilities** | **$9,169,060** | **$22,654,832** | **$33,640,268** | **$47,904,693** |
| | | | | |
| Net Working Capital | ($1,824,945) | $990,303 | $1,385,647 | $1,898,996 |
| | | | | |
| **Change in Net Working Capital** | **($1,824,945)** | **$2,815,248** | **$395,344** | **$513,349** |

*Notes/Sources:*
1. See Exhibit 10.

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                      Exhibit 8

## Summary

| Valuation | Factor | Fiscal Yr 1 | Fiscal Yr 2 | Fiscal Yr 3 | Fiscal Yr 4 |
|---|---|---|---|---|---|
| Times revenue [1] | 1.5 | $20,092,614 | $197,810,440 | $361,615,188 | $521,409,096 |
| Cash flow [2] | | $419,332 | $8,873,130 | $21,887,394 | $32,833,550 |
| Times cashflow [1] | 6 | $2,515,990 | $53,238,778 | $131,324,366 | $197,001,301 |
| Ending cash [3] | | $1,252,428 | $10,125,558 | $32,012,952 | $64,846,502 |
| Book value [3] | | ($44,369) | $15,079,385 | $42,236,637 | $80,875,245 |

| INCOME STATEMENT SUMMARY | | May 04-April 05 | May-05-April 06 | May 06- April 07 | May 07- April 08 |
|---|---|---|---|---|---|
| | | **Fiscal Yr 1** | **Fiscal Yr 2** | **Fiscal Yr 3** | **Fiscal Yr 4** |
| **CORES PER YEAR** [4] | | 5,908 | 64,800 | 136,800 | 208,800 |
| **CUMULATIVE CORES SOLD** [4] | | 5,908 | 70,727 | 207,527 | 416,327 |
| **Total Revenue** [4] | | $13,395,076 | $131,873,627 | $241,076,792 | $347,606,064 |
| **Costs and Expenses:** [4] | | | | | |
| Manufacturing Costs | | | | | |
| Fixed | | $278,742 | $388,800 | $450,000 | $511,200 |
| Cost of Goods Sold | | $9,697,320 | $95,469,462 | $174,526,721 | $251,648,224 |
| Variable | | $1,531,045 | $3,590,014 | $6,483,527 | $9,300,104 |
| Total Manufacturing Costs | | $11,507,106 | $99,448,276 | $181,460,248 | $261,459,528 |
| Gross Margin | | 14.1% | 24.6% | 24.7% | 24.8% |
| Selling: [4] | | | | | |
| Fixed | | $143,080 | $732,000 | $1,452,000 | $2,172,000 |
| Variable | | $339,621 | $1,200,484 | $2,199,492 | $3,199,882 |
| Total Selling | | $365,489 | $1,932,484 | $3,651,492 | $5,371,882 |
| General & Administrative: [4] | | | | | |
| Fixed | | $711,586 | $1,722,246 | $2,873,015 | $3,901,297 |
| Variable | | $1,890,209 | $4,449,358 | $7,378,021 | $10,266,042 |
| Total General & Administrative | | $2,601,795 | $6,171,605 | $10,251,036 | $14,167,339 |
| Depreciation & Amortization: [4] | | | | | |
| Depreciation | | $624,228 | $1,343,033 | $3,160,990 | $5,600,220 |
| Amortization | | $0 | $0 | $0 | $0 |
| **Total Costs and Expenses** | | $15,215,831 | $108,895,398 | $198,523,766 | $286,598,969 |
| **Income Before Interest & Taxes** | | ($1,820,755) | $22,978,229 | $42,553,026 | $61,007,095 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                            Exhibit 8

**Other Income (Expense)** [4]

| | | | | |
|---|---|---|---|---|
| Interest Expense | ($132,392) | ($86,601) | ($47,289) | ($8,902) |
| Interest Income | $9,952 | $61,969 | $380,772 | $906,629 |
| Accrued expenses | $0 | $0 | $0 | $0 |
| **Pre Tax Net Income (Loss)** | ($1,943,195) | $22,953,597 | $42,886,509 | $61,904,822 |
| | | | | |
| Preferred Stock Dividends | | | | |
| Federal Income Tax [5] | $0 | ($6,767,092) | ($13,743,611) | ($20,400,021) |
| State Income Tax [5] | $0 | ($1,062,752) | ($1,985,645) | ($2,866,193) |
| **Net Income (loss) to Common Shareholders** | ($1,943,195) | $15,123,754 | $27,157,252 | $38,638,608 |
| Net Profit Margin | -14.5% | 11.5% | 11.3% | 11.1% |

**BALANCE SHEET SUMMARY**

| | May 04-April 05 Fiscal Yr 1 | May-05-April 06 Fiscal Yr 2 | May 06- April 07 Fiscal Yr 3 | May 07- April 08 Fiscal Yr 4 |
|---|---|---|---|---|
| **ASSETS:** | | | | |
| **CURRENT ASSETS:** [3] | | | | |
| Cash | $1,252,428 | $10,125,558 | $32,012,952 | $64,846,502 |
| Cash equivalents | $0 | $0 | $0 | $0 |
| Inventory | $0 | $0 | $0 | $0 |
| Prepaid Royalties | $175,000 | $175,000 | $175,000 | $175,000 |
| Trade receivables | $7,169,115 | $23,470,135 | $34,850,915 | $49,628,688 |
| **Total Current Assets** | $8,596,543 | $33,770,693 | $67,038,867 | $114,650,191 |
| | | | | |
| **LONG TERM ASSETS** [3] | | | | |
| Property, plant and equipment | $2,470,532 | $6,593,741 | $13,974,045 | $24,569,227 |
| Accumulated depreciation | ($710,704) | ($2,053,737) | ($5,214,727) | ($10,814,946) |
| Net PP&E and R&D | $1,759,828 | $4,540,004 | $8,759,318 | $13,754,280 |
| Security Deposits | $103,957 | $103,957 | $103,957 | $103,957 |
| License Agreement | $271,510 | $271,510 | $271,510 | $271,510 |
| **Total Long Term Assets** | $2,135,295 | $4,915,471 | $9,134,785 | $14,129,747 |
| | | | | |
| **TOTAL ASSETS** | $10,731,838 | $38,686,164 | $76,173,652 | $128,779,938 |

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                        Exhibit 8

**LIABILITIES**

| | | | | | |
|---|---|---|---|---|---|
| **CURRENT LIABILITIES** [3] | | $260 | $87 | $70 | $69 |
| Trade payables | | $6,920,075 | $22,654,832 | $33,640,268 | $47,904,693 |
| Line of Credit | | $0 | $0 | $0 | $0 |
| Inventory financing facility | | $0 | $0 | $0 | $0 |
| Current maturities of liabilities | | $0 | $0 | $0 | $0 |
| Deferred compensation and deferred liabilities | | $2,248,985 | $0 | $0 | $0 |
| Payroll taxes payable and customer prepayments | | $0 | $0 | $0 | $0 |
| Accrued Income Taxes | | | | | |
| **Total Current Liabilities** | | $9,169,060 | $22,654,832 | $33,640,268 | $47,904,693 |
| | | | | | |
| **LONG TERM LIABILITIES** [3] | | | | | |
| Senior Debt | | $1,607,147 | $951,947 | $296,747 | $0 |
| Other | | $0 | $0 | $0 | $0 |
| **Total Long Term Liabilities** | | $1,607,147 | $951,947 | $296,747 | $0 |
| | | | | | |
| **STOCKHOLDER'S EQUITY** [3] | | | | | |
| Common stock | | $7,215,071 | $7,215,071 | $7,215,071 | $7,215,071 |
| Foreign Currency Translation Adjustment | | ($59,207) | ($59,207) | ($59,207) | ($59,207) |
| Additional paid in capital | | $0 | $0 | $0 | $0 |
| Accumulated retained earnings | | ($7,200,233) | $7,923,521 | $35,080,773 | $73,719,381 |
| **Total Stockholder's equity** | | ($44,369) | $15,079,385 | $42,236,637 | $80,875,245 |
| | | | | | |
| **TOTAL LIABILITIES & EQUITY** | | $10,731,838 | $38,686,164 | $76,173,652 | $128,779,938 |

**Use of Proceeds**

| | | |
|---|---|---|
| Capital Expenditures: [5] | | |
| Manufacturing equipment & systems (1) | | $1,266,220 |
| Capital equipment per operation emp (1) | | $36,000 |
| Capital equipment per admin. Emp (1) | | $24,000 |
| Total Capital Expenditures | | $1,326,220 |
| | | |
| Components for the first units  (2) | 0 | $0 |
| | | |
| Startup Operating Requirements (**first 3 months**) [6] | | |
| Management/Officer Salaries (3) | | $0 |
| Marketing & public relations (4) | | $0 |
| Facilities (rent, utilities and ins) (4) | | $0 |
| Operating personnel (4) | | $0 |
| General & administrative (4) | | $0 |
| Total start-up operating expenses | | $0 |

Confidential – Attorneys Eyes Only                                              Page 3 of 5

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                    Exhibit 8

| | |
|---|---:|
| Contingency | $1,168,851 |
| Start-up Funding Request [7] | $2,495,071 |
| | |
| Total Inventory Support Funds Request (5) [7] | $0 |
| | |
| Total Project Cost | $2,495,071 |

(1) From employees hired times rate on assumption pages and
     from the Capital Expenditure section of the Assumption pages

(2) Includes first license royalty payment of $500,000 to IBM

(3) Includes 7 officers at $120,000 per year for first 3 months

(4) From detail budgeting and expense calculations

(5) Brought in and serviced as shown on Sources & Uses pages

**MCC Project Investments to Date by Oxford/Antelope**

Capital Expenditures [1]
     R&D Equipment

| | |
|---|---:|
| CNC Mill | $110,000 |
| Saw | $20,000 |
| Man Mill | $3,000 |
| Misc | $62,000 |
| Total R&D Equipment | $195,000 |
| | |
| Flow racks, workstations | $75,000 |
| Other Capital Equipment | |
| Phone system | $8,000 |
| Furniture | $45,000 |
| Computers | $58,534 |
| Software | $42,000 |
| Total Capital Assets | $423,534 |

Operating Investment [1]
     Operating exp:

| | |
|---|---:|
| Tools | $5,063 |
| Freight | $4,103 |
| Officer salaries | $653,466 |
| Equipment rental | $4,353 |
| Rent | $121,675 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                              Exhibit 8

| | |
|---|---|
| R & D | $452,601 |
| Utilities | $53,001 |
| Total Operating Expenses | $1,294,262 |
| | |
| Selling expenses: | |
| Materials & literature | $28,665 |
| Travel, lodging, entertainment | $67,000 |
| Marketing | $68,887 |
| Total Selling Exp | $164,552 |
| | |
| General and Admin | |
| Contract labor | $68,000 |
| Supplies | $8,320 |
| Bank interest & service charges | $3,761 |
| Postage and delivery | $2,055 |
| Insurance | $34,020 |
| Professional fees | $429,168 |
| Total General Admin | $545,324 |
| | |
| Total Non-Capital Expense | $2,004,138 |
| | |
| Market development [1] | $734,400 |
| Total Operating and Marketing Investment | $2,738,538 |
| | |
| Secured Inventory Financing | |
| IBM Global Financing [1] | $1,000,000 |
| | |
| **Total Project Investment to Date** | **$4,162,072** |
| | |
| **Total Projected  Project Cost** | **$6,657,143** |

*Notes/Sources:*

1. FinancialModel_rev2.3.xl.
2. See Exhibit 11.
3. See Exhibit 10.
4. See Exhibit 9.
5. See Exhibit 14; Corporate tax rates.
6. See Exhibit 15.
7. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Income Statement

Exhibit 9

| | Apr-04 | May-04 | Jun-04 | Jul-04 | Aug-04 |
|---|---|---|---|---|---|
| **CORES PER MONTH** [1] | 19 | 2 | 14 | 0 | 22 |
| **CUMULATIVE CORES SOLD** | 19 | 21 | 35 | 35 | 57 |
| **Revenue:** | | | | | |
| Sales [1] | $48,663 | $4,969 | $34,781 | $0 | $52,966 |
| Secondary sales [1] | $0 | $0 | $0 | $0 | $0 |
| **Total Revenue** | $48,663 | $4,969 | $34,781 | $0 | $52,966 |
| **Costs and Expenses:** | | | | | |
| Manufacturing Costs [2] | | | | | |
| Fixed | $21,826 | $21,812 | $21,822 | $21,810 | $21,829 |
| Cost of Goods Sold | $35,229 | $3,597 | $25,180 | $0 | $38,344 |
| Variable | $116,804 | $116,634 | $116,754 | $116,614 | $116,834 |
| Total Manufacturing Costs | $173,859 | $142,043 | $163,755 | $138,424 | $177,007 |
| Gross Margin | -257% | -2759% | -371% | 0% | -234% |
| Selling: [2] | | | | | |
| Fixed | $7,190 | $7,020 | $7,140 | $7,000 | $7,220 |
| Variable | $22,272 | $22,162 | $22,237 | $22,150 | $22,282 |
| Total Selling | $29,462 | $29,182 | $29,377 | $29,150 | $29,502 |
| General & Administrative: [2] | | | | | |
| Compensation of Officers & Bonuses | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Fixed | $50,326 | $50,034 | $50,237 | $50,000 | $50,368 |
| Variable | $139,316 | $138,866 | $139,173 | $138,815 | $139,361 |
| Total General & Administrative | $189,642 | $188,900 | $189,411 | $188,815 | $189,729 |
| Depreciation & Amortization: [2] | | | | | |
| Depreciation | $35,173 | $36,880 | $36,884 | $36,913 | $36,913 |
| Amortization | | | | | |
| **Total Costs and Expenses** | $428,136 | $397,005 | $419,427 | $393,302 | $433,151 |

*Janis Lowe, et al. v. Eltan, B.V., et al*

Income Statement

Exhibit 9

| | | | | | |
|---|---|---|---|---|---|
| **Income Before Interest & Taxes** | ($379,473) | ($392,036) | ($384,646) | ($393,302) | ($380,185) |
| **Other Income (Expense)** | | | | | |
| Interest Expense [3] | $0 | $0 | ($2,777) | $0 | ($67,870) |
| Interest Income [1,4] | $26 | $1,388 | $886 | $382 | $0 |
| Accrued expenses [1] | $0 | $0 | $0 | $0 | $0 |
| **Pre Tax Net Income (Loss)** | ($379,447) | ($390,648) | ($386,537) | ($392,920) | ($448,056) |
| | -780% | -7862% | -1111% | 0% | -846% |
| Preferred Stock Dividends | | | | | |
| Federal Income Tax [5] | $0 | $0 | $0 | $0 | $0 |
| State Income Tax [1] | $0 | $0 | $0 | $0 | $0 |
| **Net Income (loss) to Common Shareholders** | ($379,447) | ($390,648) | ($386,537) | ($392,920) | ($448,056) |
| Net Profit Margin | -780% | -7862.1% | -1111.3% | 0.0% | -845.9% |

Notes/Sources:

1. See Exhibit 14.
2. See Exhibit 15.
3. See Exhibits 12 and 13.
4. See Exhibit 11.
5. See Exhibit 8.

Confidential – Attorneys Eyes Only

Janis Lowe, et al. v. Eltan, B.V., et al

Income Statement

Exhibit 9

| | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Jan-05 |
|---|---|---|---|---|---|
| **CORES PER MONTH** [1] | 10 | 10 | 100 | 150 | 650 |
| **CUMULATIVE CORES SOLD** | 67 | 77 | 177 | 327 | 977 |
| | | | | | |
| **Revenue:** | | | | | |
| Sales [1] | $24,075 | $24,075 | $233,069 | $349,604 | $1,514,950 |
| Secondary sales [1] | $0 | $0 | $0 | $0 | $0 |
| **Total Revenue** | $24,075 | $24,075 | $233,069 | $349,604 | $1,514,950 |
| | | | | | |
| **Costs and Expenses:** | | | | | |
| | | | | | |
| Manufacturing Costs [2] | | | | | |
| Fixed | $21,819 | $21,819 | $21,895 | $21,938 | $22,363 |
| Cost of Goods Sold | $17,429 | $17,429 | $168,730 | $253,094 | $1,096,743 |
| Variable | $116,714 | $116,714 | $117,614 | $118,114 | $127,550 |
| Total Manufacturing Costs | $155,961 | $155,961 | $308,238 | $393,146 | $1,246,656 |
| | | | | | |
| Gross Margin | -548% | -548% | -32% | -12% | 18% |
| | | | | | |
| Selling: [2] | | | | | |
| Fixed | $7,100 | $7,100 | $8,000 | $8,500 | $13,500 |
| Variable | $22,210 | $22,210 | $22,733 | $23,024 | $25,937 |
| Total Selling | $29,310 | $29,310 | $30,733 | $31,524 | $39,437 |
| General & Administrative: [2] | | | | | |
| Compensation of Officers & Bonuses | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Fixed | $50,167 | $50,167 | $51,653 | $52,479 | $60,742 |
| Variable | $139,063 | $139,063 | $141,216 | $142,416 | $159,222 |
| Total General & Administrative | $189,230 | $189,230 | $192,868 | $194,895 | $219,964 |
| Depreciation & Amortization: [2] | | | | | |
| Depreciation | $36,957 | $86,520 | $56,442 | $56,636 | $56,927 |
| Amortization | | | | | |
| | | | | | |
| **Total Costs and Expenses** | $411,459 | $461,022 | $588,281 | $676,201 | $1,562,985 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Income Statement

Exhibit 9

| | | | | | |
|---|---|---|---|---|---|
| **Income Before Interest & Taxes** | ($387,384) | ($436,947) | ($355,212) | ($326,597) | ($48,035) |
| | | | | | |
| **Other Income (Expense)** | | | | | |
| Interest Expense [3] | ($2,777) | ($926) | $0 | $0 | $0 |
| Interest Income [1,4] | $0 | $0 | $1,920 | $1,479 | $1,088 |
| Accrued expenses [1] | $0 | $0 | $0 | $0 | $0 |
| **Pre Tax Net Income (Loss)** | ($390,161) | ($437,872) | ($353,292) | ($325,117) | ($46,947) |
| | -1621% | -1819% | -152% | -93% | -3% |
| Preferred Stock Dividends | | | | | |
| Federal Income Tax [5] | $0 | $0 | $0 | $0 | $0 |
| State Income Tax [1] | $0 | $0 | $0 | $0 | $0 |
| **Net Income (loss) to Common Shareholders** | ($390,161) | ($437,872) | ($353,292) | ($325,117) | ($46,947) |
| Net Profit Margin | -1620.6% | -1818.8% | -151.6% | -93.0% | -3.1% |

Notes/Sources:
1. See Exhibit 14.
2. See Exhibit 15.
3. See Exhibits 12 and 13.
4. See Exhibit 11.
5. See Exhibit 8.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 9

Income Statement

| | Feb-05 | Mar-05 | Apr-05 | May-05 | Jun-05 |
|---|---|---|---|---|---|
| **CORES PER MONTH** [1] | 1,150 | 1,650 | 2,150 | 2,650 | 3,150 |
| **CUMULATIVE CORES SOLD** | 2,127 | 3,777 | 5,927 | 8,577 | 11,727 |
| **Revenue:** | | | | | |
| Sales [1] | $2,591,934 | $3,718,862 | $4,845,790 | $5,769,103 | $6,857,613 |
| Secondary sales [1] | $0 | $0 | $0 | $0 | $0 |
| **Total Revenue** | $2,591,934 | $3,718,862 | $4,845,790 | $5,769,103 | $6,857,613 |
| **Costs and Expenses:** | | | | | |
| Manufacturing Costs [2] | | | | | |
| Fixed | $22,788 | $29,213 | $29,638 | $30,063 | $30,488 |
| Cost of Goods Sold | $1,876,422 | $2,692,258 | $3,508,093 | $4,176,522 | $4,964,546 |
| Variable | $141,827 | $155,700 | $169,977 | $184,455 | $198,732 |
| Total Manufacturing Costs | $2,041,037 | $2,877,171 | $3,707,708 | $4,391,040 | $5,193,765 |
| Gross Margin | 21% | 23% | 23% | 24% | 24% |
| Selling: [2] | | | | | |
| Fixed | $18,500 | $23,500 | $28,500 | $33,500 | $38,500 |
| Variable | $38,713 | $41,530 | $54,431 | $56,739 | $69,544 |
| Total Selling | $57,213 | $65,030 | $82,931 | $90,239 | $108,044 |
| General & Administrative: [2] | | | | | |
| Compensation of Officers & Bonuses | $55,000 | $55,000 | $55,000 | $55,000 | $55,000 |
| Fixed | $73,757 | $81,913 | $90,068 | $97,653 | $105,701 |
| Variable | $180,686 | $197,097 | $235,232 | $249,545 | $275,931 |
| Total General & Administrative | $254,444 | $279,010 | $325,300 | $347,199 | $381,632 |
| Depreciation & Amortization: [2] | | | | | |
| Depreciation | $58,329 | $60,766 | $64,060 | $68,626 | $73,628 |
| Amortization | | | | | |
| **Total Costs and Expenses** | $2,411,022 | $3,281,977 | $4,179,999 | $4,897,104 | $5,757,069 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Income Statement

Exhibit 9

| **Income Before Interest & Taxes** | $180,912 | $436,885 | $665,791 | $871,999 | $1,100,544 |
|---|---|---|---|---|---|
| **Other Income (Expense)** | | | | | |
| Interest Expense [3] | ($58,042) | $0 | $0 | $0 | $0 |
| Interest Income [1,4] | $1,004 | $605 | $1,199 | $2,087 | $2,364 |
| Accrued expenses [1] | $0 | $0 | $0 | $0 | $0 |
| **Pre Tax Net Income (Loss)** | $123,874 | $437,490 | $666,991 | $874,086 | $1,102,907 |
| | 5% | 12% | 14% | 15% | 16% |
| Preferred Stock Dividends | | | | | |
| Federal Income Tax [5] | $0 | $0 | $0 | $563,924 | $563,924 |
| State Income Tax [1] | $5,735 | $20,256 | $30,882 | $40,470 | $51,065 |
| **Net Income (loss) to Common Shareholders** | $118,138 | $417,234 | $636,109 | $269,692 | $487,918 |
| Net Profit Margin | 4.6% | 11.2% | 13.1% | 5% | 7.1% |

Notes/Sources:
1. See Exhibit 14.
2. See Exhibit 15.
3. See Exhibits 12 and 13.
4. See Exhibit 11.
5. See Exhibit 8.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Income Statement

Exhibit 9

| | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 |
|---|---|---|---|---|---|
| **CORES PER MONTH** [1] | 3,650 | 4,150 | 4,650 | 5,150 | 5,650 |
| **CUMULATIVE CORES SOLD** | 15,377 | 19,527 | 24,177 | 29,327 | 34,977 |
| **Revenue:** | | | | | |
| Sales [1] | $7,946,123 | $8,715,764 | $9,765,856 | $10,815,948 | $11,431,916 |
| Secondary sales [1] | $0 | $0 | $0 | $0 | $0 |
| **Total Revenue** | $7,946,123 | $8,715,764 | $9,765,856 | $10,815,948 | $11,431,916 |
| **Costs and Expenses:** | | | | | |
| Manufacturing Costs [2] | | | | | |
| Fixed | $30,913 | $31,338 | $31,763 | $32,188 | $32,613 |
| Cost of Goods Sold | $5,752,569 | $6,309,747 | $7,069,958 | $7,830,168 | $8,276,097 |
| Variable | $212,605 | $272,308 | $281,744 | $301,063 | $314,936 |
| Total Manufacturing Costs | $5,996,087 | $6,613,392 | $7,383,465 | $8,163,418 | $8,623,645 |
| Gross Margin | 25% | 24% | 24% | 25% | 25% |
| Selling: [2] | | | | | |
| Fixed | $43,500 | $48,500 | $53,500 | $58,500 | $63,500 |
| Variable | $72,265 | $84,273 | $86,898 | $99,607 | $101,146 |
| Total Selling | $115,765 | $132,773 | $140,398 | $158,107 | $164,646 |
| General & Administrative: [2] | | | | | |
| Compensation of Officers & Bonuses | $55,000 | $60,000 | $60,000 | $60,000 | $60,000 |
| Fixed | $113,749 | $125,904 | $133,844 | $141,785 | $148,509 |
| Variable | $291,946 | $321,597 | $337,217 | $363,207 | $374,355 |
| Total General & Administrative | $405,695 | $447,502 | $471,061 | $504,991 | $522,864 |
| Depreciation & Amortization: [2] | | | | | |
| Depreciation | $79,704 | $86,520 | $94,672 | $102,949 | $112,379 |
| Amortization | | | | | |
| **Total Costs and Expenses** | $6,597,251 | $7,280,186 | $8,089,595 | $8,929,465 | $9,423,534 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Income Statement

Exhibit 9

| | | | | | |
|---|---:|---:|---:|---:|---:|
| **Income Before Interest & Taxes** | $1,348,872 | $1,435,577 | $1,676,260 | $1,886,482 | $2,008,382 |
| | | | | | |
| **Other Income (Expense)** | | | | | |
| Interest Expense [3] | $0 | ($48,214) | $0 | $0 | $0 |
| Interest Income [1,4] | $2,933 | $3,865 | $156 | $1,452 | $3,029 |
| Accrued expenses [1] | $0 | $0 | $0 | $0 | $0 |
| **Pre Tax Net Income (Loss)** | $1,351,806 | $1,391,227 | $1,676,416 | $1,887,934 | $2,011,411 |
| | 17% | 16% | 17% | 17% | 18% |
| Preferred Stock Dividends | | | | | |
| Federal Income Tax [5] | $563,924 | $563,924 | $563,924 | $563,924 | $563,924 |
| State Income Tax [1] | $62,589 | $64,414 | $77,618 | $87,411 | $93,128 |
| **Net Income (loss) to Common Shareholders** | $725,293 | $762,889 | $1,034,874 | $1,236,598 | $1,354,358 |
| Net Profit Margin | 9.1% | 8.8% | 10.6% | 11.4% | 11.8% |

Notes/Sources:
1. See Exhibit 14.
2. See Exhibit 15.
3. See Exhibits 12 and 13.
4. See Exhibit 11.
5. See Exhibit 8.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Income Statement

Exhibit 9

| | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 |
|---|---|---|---|---|---|
| **CORES PER MONTH** [1] | 6,150 | 6,650 | 7,150 | 7,650 | 8,150 |
| **CUMULATIVE CORES SOLD** | 41,127 | 47,777 | 54,927 | 62,577 | 70,727 |
| **Revenue:** | | | | | |
| Sales [1] | $12,443,590 | $13,455,264 | $13,917,561 | $14,890,817 | $15,864,073 |
| Secondary sales [1] | $0 | $0 | $0 | $0 | $0 |
| **Total Revenue** | $12,443,590 | $13,455,264 | $13,917,561 | $14,890,817 | $15,864,073 |
| **Costs and Expenses:** | | | | | |
| Manufacturing Costs [2] | | | | | |
| Fixed | $33,038 | $33,463 | $33,888 | $34,313 | $34,738 |
| Cost of Goods Sold | $9,008,495 | $9,740,893 | $10,075,571 | $10,780,156 | $11,484,741 |
| Variable | $329,213 | $338,649 | $352,926 | $371,841 | $431,543 |
| Total Manufacturing Costs | $9,370,745 | $10,113,004 | $10,462,384 | $11,186,309 | $11,951,022 |
| Gross Margin | 25% | 25% | 25% | 25% | 25% |
| Selling: [2] | | | | | |
| Fixed | $68,500 | $73,500 | $78,500 | $83,500 | $88,500 |
| Variable | $113,759 | $116,288 | $127,527 | $129,960 | $142,477 |
| Total Selling | $182,259 | $189,788 | $206,027 | $213,460 | $230,977 |
| General & Administrative: [2] | | | | | |
| Compensation of Officers & Bonuses | $60,000 | $60,000 | $60,000 | $60,000 | $60,000 |
| Fixed | $156,342 | $164,175 | $170,469 | $178,194 | $185,919 |
| Variable | $411,302 | $426,526 | $441,658 | $456,486 | $499,588 |
| Total General & Administrative | $567,644 | $590,701 | $612,128 | $634,681 | $685,508 |
| Depreciation & Amortization: [2] | | | | | |
| Depreciation | $122,100 | $132,997 | $144,349 | $156,225 | $168,884 |
| Amortization | | | | | |
| **Total Costs and Expenses** | $10,242,748 | $11,026,491 | $11,424,888 | $12,190,675 | $13,036,390 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*
Income Statement

Exhibit 9

| | | | | | |
|---|---|---|---|---|---|
| **Income Before Interest & Taxes** | $2,200,842 | $2,428,774 | $2,492,673 | $2,700,142 | $2,827,683 |
| **Other Income (Expense)** | | | | | |
| Interest Expense [3] | $0 | $0 | ($38,386) | $0 | $0 |
| Interest Income [1,4] | $4,837 | $6,866 | $9,252 | $11,170 | $13,957 |
| Accrued expenses [1] | $0 | $0 | $0 | $0 | $0 |
| **Pre Tax Net Income (Loss)** | $2,205,679 | $2,435,640 | $2,463,538 | $2,711,312 | $2,841,640 |
| | 18% | 18% | 18% | 18% | 18% |
| Preferred Stock Dividends | | | | | |
| Federal Income Tax [5] | $563,924 | $563,924 | $563,924 | $563,924 | $563,924 |
| State Income Tax [1] | $102,123 | $112,770 | $114,062 | $125,534 | $131,568 |
| **Net Income (loss) to Common Shareholders** | $1,539,632 | $1,758,946 | $1,785,552 | $2,021,854 | $2,146,148 |
| Net Profit Margin | 12.4% | 13.1% | 12.8% | 13.6% | 13.5% |

Notes/Sources:
1. See Exhibit 14.
2. See Exhibit 15.
3. See Exhibits 12 and 13.
4. See Exhibit 11.
5. See Exhibit 8.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Income Statement

Exhibit 9

| | May-06 | Jun-06 | Jul-06 | Aug-06 | Sep-06 |
|---|---|---|---|---|---|
| **CORES PER MONTH** [1] | 8,650 | 9,150 | 9,650 | 10,150 | 10,650 |
| **CUMULATIVE CORES SOLD** | 79,377 | 88,527 | 98,177 | 108,327 | 118,977 |
| **Revenue:** | | | | | |
| Sales [1] | $16,172,697 | $17,107,535 | $18,042,373 | $18,457,288 | $19,366,514 |
| Secondary sales [1] | $0 | $0 | $0 | $0 | $0 |
| **Total Revenue** | $16,172,697 | $17,107,535 | $18,042,373 | $18,457,288 | $19,366,514 |
| **Costs and Expenses:** | | | | | |
| Manufacturing Costs [2] | | | | | |
| Fixed | $35,163 | $35,588 | $36,013 | $36,438 | $36,863 |
| Cost of Goods Sold | $11,708,169 | $12,384,942 | $13,061,715 | $13,362,091 | $14,020,322 |
| Variable | $440,980 | $455,256 | $469,130 | $488,448 | $497,885 |
| Total Manufacturing Costs | $12,184,311 | $12,875,786 | $13,566,857 | $13,886,976 | $14,555,069 |
| Gross Margin | 25% | 25% | 25% | 25% | 25% |
| Selling: [2] | | | | | |
| Fixed | $93,500 | $98,500 | $103,500 | $108,500 | $113,500 |
| Variable | $143,248 | $155,669 | $158,006 | $169,127 | $171,400 |
| Total Selling | $236,748 | $254,169 | $261,506 | $277,627 | $284,900 |
| General & Administrative: [2] | | | | | |
| Compensation of Officers & Bonuses | $60,000 | $70,000 | $70,000 | $70,000 | $70,000 |
| Fixed | $191,784 | $209,401 | $217,019 | $223,180 | $230,726 |
| Variable | $507,570 | $532,373 | $546,806 | $572,803 | $586,972 |
| Total General & Administrative | $699,354 | $741,775 | $763,824 | $795,984 | $817,698 |
| Depreciation & Amortization: [2] | | | | | |
| Depreciation | $183,159 | $196,776 | $211,393 | $226,623 | $242,504 |
| Amortization | | | | | |
| **Total Costs and Expenses** | $13,303,573 | $14,068,505 | $14,803,580 | $15,187,209 | $15,900,170 |

Confidential – Attorneys Eyes Only

Exhibit 9

*Janis Lowe, et al. v. Eltan, B.V., et al*
Income Statement

| | | | | | |
|---|---|---|---|---|---|
| **Income Before Interest & Taxes** | $2,869,124 | $3,039,031 | $3,238,793 | $3,270,079 | $3,466,344 |
| | | | | | |
| **Other Income (Expense)** | | | | | |
| Interest Expense [3] | $0 | $0 | $0 | ($28,558) | $0 |
| Interest Income [1,4] | $16,876 | $19,016 | $21,339 | $23,971 | $26,096 |
| Accrued expenses [1] | $0 | $0 | $0 | $0 | $0 |
| **Pre Tax Net Income (Loss)** | $2,886,000 | $3,058,047 | $3,260,133 | $3,265,491 | $3,492,439 |
| | 18% | 18% | 18% | 18% | 18% |
| Preferred Stock Dividends | | | | | |
| Federal Income Tax [5] | $1,145,301 | $1,145,301 | $1,145,301 | $1,145,301 | $1,145,301 |
| State Income Tax [1] | $133,622 | $141,588 | $150,944 | $151,192 | $161,700 |
| **Net Income (loss) to Common Shareholders** | $1,607,078 | $1,771,159 | $1,963,887 | $1,968,998 | $2,185,438 |
| Net Profit Margin | 9.9% | 10% | 10.9% | 10.7% | 11.3% |

Notes/Sources:
1. See Exhibit 14.
2. See Exhibit 15.
3. See Exhibits 12 and 13.
4. See Exhibit 11.
5. See Exhibit 8.

Confidential – Attorneys Eyes Only

Janis Lowe, et al. v. Eltan, B.V., et al

Exhibit 9

Income Statement

| | Oct-06 | Nov-06 | Dec-06 | Jan-07 | Feb-07 |
|---|---|---|---|---|---|
| **CORES PER MONTH** [1] | 11,150 | 11,650 | 12,150 | 12,650 | 13,150 |
| **CUMULATIVE CORES SOLD** | 130,127 | 141,777 | 153,927 | 166,577 | 179,727 |
| **Revenue:** | | | | | |
| Sales [1] | $20,275,740 | $20,289,826 | $21,160,634 | $22,031,442 | $21,891,857 |
| Secondary sales [1] | $0 | $0 | $0 | $0 | $0 |
| **Total Revenue** | $20,275,740 | $20,289,826 | $21,160,634 | $22,031,442 | $21,891,857 |
| **Costs and Expenses:** | | | | | |
| Manufacturing Costs [2] | | | | | |
| Fixed | $37,288 | $37,713 | $38,138 | $38,563 | $38,988 |
| Cost of Goods Sold | $14,678,553 | $14,688,751 | $15,319,169 | $15,949,588 | $15,848,535 |
| Variable | $512,161 | $526,035 | $590,173 | $604,652 | $618,928 |
| Total Manufacturing Costs | $15,228,001 | $15,252,498 | $15,947,480 | $16,592,802 | $16,506,451 |
| Gross Margin | 25% | 25% | 25% | 25% | 25% |
| Selling: [2] | | | | | |
| Fixed | $118,500 | $123,500 | $128,500 | $133,500 | $138,500 |
| Variable | $183,756 | $183,791 | $196,052 | $198,229 | $207,963 |
| Total Selling | $302,256 | $307,291 | $324,552 | $331,729 | $346,463 |
| General & Administrative: [2] | | | | | |
| Compensation of Officers & Bonuses | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 |
| Fixed | $238,272 | $243,312 | $250,750 | $258,188 | $262,797 |
| Variable | $611,511 | $616,459 | $651,956 | $665,729 | $674,662 |
| Total General & Administrative | $849,783 | $859,771 | $902,706 | $923,917 | $937,459 |
| Depreciation & Amortization: [2] | | | | | |
| Depreciation | $258,781 | $276,039 | $293,142 | $311,803 | $314,228 |
| Amortization | | | | | |
| **Total Costs and Expenses** | $16,638,822 | $16,695,599 | $17,467,879 | $18,160,251 | $18,104,601 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Income Statement

Exhibit 9

| | | | | | |
|---|---:|---:|---:|---:|---:|
| **Income Before Interest & Taxes** | $3,636,918 | $3,594,228 | $3,692,755 | $3,871,192 | $3,787,256 |
| | | | | | |
| **Other Income (Expense)** | | | | | |
| Interest Expense [3] | $0 | $0 | $0 | $0 | ($18,730) |
| Interest Income [1,4] | $29,088 | $32,324 | $35,612 | $38,924 | $42,562 |
| Accrued expenses [1] | $0 | $0 | $0 | $0 | $0 |
| **Pre Tax Net Income (Loss)** | $3,666,006 | $3,626,551 | $3,728,367 | $3,910,116 | $3,811,088 |
| | 18% | 18% | 18% | 18% | 17% |
| Preferred Stock Dividends | | | | | |
| Federal Income Tax [5] | $1,145,301 | $1,145,301 | $1,145,301 | $1,145,301 | $1,145,301 |
| State Income Tax [1] | $169,736 | $167,909 | $172,623 | $181,038 | $176,453 |
| **Net Income (loss) to Common Shareholders** | $2,350,969 | $2,313,341 | $2,410,443 | $2,583,776 | $2,489,334 |
| Net Profit Margin | 11.6% | 11.4% | 11.4% | 11.7% | 11.4% |

Notes/Sources:
1. See Exhibit 14.
2. See Exhibit 15.
3. See Exhibits 12 and 13.
4. See Exhibit 11.
5. See Exhibit 8.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                        Exhibit 9

Income Statement

| | Mar-07 | Apr-07 | May-07 | Jun-07 | Jul-07 |
|---|---|---|---|---|---|
| **CORES PER MONTH** [1] | 13,650 | 14,150 | 14,650 | 15,150 | 15,650 |
| **CUMULATIVE CORES SOLD** | 193,377 | 207,527 | 222,177 | 237,327 | 252,977 |
| **Revenue:** | | | | | |
| Sales [1] | $22,724,247 | $23,556,637 | $24,389,027 | $25,221,417 | $26,053,807 |
| Secondary sales [1] | $0 | $0 | $0 | $0 | $0 |
| **Total Revenue** | $22,724,247 | $23,556,637 | $24,389,027 | $25,221,417 | $26,053,807 |
| **Costs and Expenses:** | | | | | |
| Manufacturing Costs [2] | | | | | |
| Fixed | $39,413 | $39,838 | $40,263 | $40,688 | $41,113 |
| Cost of Goods Sold | $16,451,141 | $17,053,747 | $17,656,353 | $18,258,959 | $18,861,565 |
| Variable | $632,802 | $647,078 | $656,515 | $675,833 | $689,707 |
| Total Manufacturing Costs | $17,123,355 | $17,740,663 | $18,353,130 | $18,975,480 | $19,592,384 |
| Gross Margin | 25% | 25% | 25% | 25% | 25% |
| Selling: [2] | | | | | |
| Fixed | $143,500 | $148,500 | $153,500 | $158,500 | $163,500 |
| Variable | $210,044 | $222,208 | $224,289 | $236,454 | $238,535 |
| Total Selling | $353,544 | $370,708 | $377,789 | $394,954 | $402,035 |
| General & Administrative: [2] | | | | | |
| Compensation of Officers & Bonuses | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 |
| Fixed | $270,128 | $277,459 | $284,789 | $292,120 | $299,451 |
| Variable | $688,039 | $723,140 | $736,517 | $760,265 | $773,642 |
| Total General & Administrative | $958,167 | $1,000,599 | $1,021,306 | $1,052,385 | $1,073,092 |
| Depreciation & Amortization: [2] | | | | | |
| Depreciation | $313,706 | $332,837 | $351,288 | $371,747 | $393,152 |
| Amortization | | | | | |
| **Total Costs and Expenses** | $18,748,771 | $19,444,806 | $20,103,514 | $20,794,565 | $21,460,663 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Income Statement

Exhibit 9

| | | | | | |
|---|---|---|---|---|---|
| **Income Before Interest & Taxes** | $3,975,476 | $4,111,831 | $4,285,513 | $4,426,852 | $4,593,144 |
| | | | | | |
| **Other Income (Expense)** | | | | | |
| Interest Expense [3] | $0 | $0 | $0 | $0 | $0 |
| Interest Income [1,4] | $45,589 | $49,376 | $53,355 | $56,705 | $60,260 |
| Accrued expenses [1] | $0 | $0 | $0 | $0 | $0 |
| **Pre Tax Net Income (Loss)** | $4,021,065 | $4,161,206 | $4,338,868 | $4,483,557 | $4,653,404 |
| | 18% | 18% | 18% | 18% | 18% |
| Preferred Stock Dividends | | | | | |
| Federal Income Tax [5] | $1,145,301 | $1,145,301 | $1,700,002 | $1,700,002 | $1,700,002 |
| State Income Tax [1] | $186,175 | $192,664 | $200,890 | $207,589 | $215,453 |
| **Net Income (loss) to Common Shareholders** | $2,689,589 | $2,823,241 | $2,437,977 | $2,575,966 | $2,737,950 |
| Net Profit Margin | 11.8% | 12.0% | 10.0% | 10.2% | 10.5% |

Notes/Sources:
1. See Exhibit 14.
2. See Exhibit 15.
3. See Exhibits 12 and 13.
4. See Exhibit 11.
5. See Exhibit 8.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Income Statement

Exhibit 9

| | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 |
|---|---|---|---|---|---|
| **CORES PER MONTH** [1] | 16,150 | 16,650 | 17,150 | 17,650 | 18,150 |
| **CUMULATIVE CORES SOLD** | 269,127 | 285,777 | 302,927 | 320,577 | 338,727 |
| **Revenue:** | | | | | |
| Sales [1] | $26,886,197 | $27,718,587 | $28,550,977 | $29,383,367 | $30,215,757 |
| Secondary sales [1] | $0 | $0 | $0 | $0 | $0 |
| **Total Revenue** | $26,886,197 | $27,718,587 | $28,550,977 | $29,383,367 | $30,215,757 |
| **Costs and Expenses:** | | | | | |
| Manufacturing Costs [2] | | | | | |
| Fixed | $41,538 | $41,963 | $42,388 | $42,813 | $43,238 |
| Cost of Goods Sold | $19,464,171 | $20,066,776 | $20,669,382 | $21,271,988 | $21,874,594 |
| Variable | $749,409 | $758,845 | $773,122 | $792,037 | $806,314 |
| Total Manufacturing Costs | $20,255,117 | $20,867,584 | $21,484,892 | $22,106,838 | $22,724,145 |
| Gross Margin | 25% | 25% | 25% | 25% | 25% |
| Selling: [2] | | | | | |
| Fixed | $168,500 | $173,500 | $178,500 | $183,500 | $188,500 |
| Variable | $250,699 | $252,780 | $264,944 | $267,025 | $279,189 |
| Total Selling | $419,199 | $426,280 | $443,444 | $450,525 | $467,689 |
| General & Administrative: [2] | | | | | |
| Compensation of Officers & Bonuses | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 |
| Fixed | $306,781 | $314,112 | $321,443 | $328,773 | $336,104 |
| Variable | $810,489 | $823,866 | $847,614 | $860,991 | $896,092 |
| Total General & Administrative | $1,117,271 | $1,137,978 | $1,169,057 | $1,189,765 | $1,232,196 |
| Depreciation & Amortization: [2] | | | | | |
| Depreciation | $415,058 | $438,392 | $461,609 | $466,298 | $490,840 |
| Amortization | | | | | |
| **Total Costs and Expenses** | $22,206,645 | $22,870,234 | $23,559,002 | $24,213,426 | $24,914,871 |

*Janis Lowe, et al. v. Eltan, B.V., et al*
Income Statement

Exhibit 9

| | | | | | |
|---|---|---|---|---|---|
| **Income Before Interest & Taxes** | $4,679,552 | $4,848,353 | $4,991,975 | $5,169,941 | $5,300,886 |
| **Other Income (Expense)** | | | | | |
| Interest Expense [3] | ($8,902) | $0 | $0 | $0 | $0 |
| Interest Income [1,4] | $64,093 | $67,509 | $71,754 | $76,219 | $80,946 |
| Accrued expenses [1] | $0 | $0 | $0 | $0 | $0 |
| **Pre Tax Net Income (Loss)** | $4,734,743 | $4,915,861 | $5,063,729 | $5,246,160 | $5,381,831 |
| | 18% | 18% | 18% | 18% | 17.8% |
| Preferred Stock Dividends | | | | | |
| Federal Income Tax [5] | $1,700,002 | $1,700,002 | $1,700,002 | $1,700,002 | $1,700,002 |
| State Income Tax [1] | $219,219 | $227,604 | $234,451 | $242,897 | $249,179 |
| **Net Income (loss) to Common Shareholders** | $2,815,522 | $2,988,255 | $3,129,277 | $3,303,261 | $3,432,651 |
| Net Profit Margin | 10.5% | 10.8% | 11.0% | 11.2% | 11.4% |

Notes/Sources:
1. See Exhibit 14.
2. See Exhibit 15.
3. See Exhibits 12 and 13.
4. See Exhibit 11.
5. See Exhibit 8.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Income Statement

Exhibit 9

| | Jan-08 | Feb-08 | Mar-08 | Apr-08 |
|---|---|---|---|---|
| **CORES PER MONTH** [1] | 18,650 | 19,150 | 19,650 | 20,150 |
| **CUMULATIVE CORES SOLD** | 357,377 | 376,527 | 396,177 | 416,327 |
| | | | | |
| **Revenue:** | | | | |
| Sales [1] | $31,048,147 | $31,880,537 | $32,712,927 | $33,545,317 |
| Secondary sales [1] | $0 | $0 | $0 | $0 |
| **Total Revenue** | $31,048,147 | $31,880,537 | $32,712,927 | $33,545,317 |
| | | | | |
| **Costs and Expenses:** | | | | |
| | | | | |
| Manufacturing Costs [2] | | | | |
| Fixed | $43,663 | $44,088 | $44,513 | $44,938 |
| Cost of Goods Sold | $22,477,200 | $23,079,806 | $23,682,412 | $24,285,018 |
| Variable | $815,750 | $830,027 | $843,900 | $908,644 |
| Total Manufacturing Costs | $23,336,613 | $23,953,921 | $24,570,825 | $25,238,599 |
| | | | | |
| Gross Margin | 25% | 25% | 25% | 25% |
| | | | | |
| Selling: [2] | | | | |
| Fixed | $193,500 | $198,500 | $203,500 | $208,500 |
| Variable | $281,270 | $293,435 | $295,516 | $315,747 |
| Total Selling | $474,770 | $491,935 | $499,016 | $524,247 |
| | | | | |
| General & Administrative: [2] | | | | |
| Compensation of Officers & Bonuses | $70,000 | $70,000 | $70,000 | $70,000 |
| Fixed | $343,435 | $350,766 | $358,096 | $365,427 |
| Variable | $909,469 | $928,414 | $941,791 | $976,892 |
| Total General & Administrative | $1,252,904 | $1,279,179 | $1,299,887 | $1,342,319 |
| | | | | |
| Depreciation & Amortization: [2] | | | | |
| Depreciation | $516,256 | $540,867 | $565,275 | $589,436 |
| Amortization | | | | |
| | | | | |
| **Total Costs and Expenses** | $25,580,544 | $26,265,902 | $26,935,002 | $27,694,601 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                  Exhibit 9
Income Statement

| | | | | |
|---|---:|---:|---:|---:|
| **Income Before Interest & Taxes** | $5,467,603 | $5,614,635 | $5,777,925 | $5,850,716 |
| | | | | |
| **Other Income (Expense)** | | | | |
| Interest Expense [3] | $0 | $0 | $0 | $0 |
| Interest Income [1,4] | $85,871 | $91,093 | $96,549 | $102,276 |
| Accrued expenses [1] | $0 | $0 | $0 | $0 |
| **Pre Tax Net Income (Loss)** | $5,553,474 | $5,705,728 | $5,874,474 | $5,952,992 |
| | 17.9% | 17.9% | 18.0% | 17.7% |
| Preferred Stock Dividends | | | | |
| Federal Income Tax [5] | $1,700,002 | $1,700,002 | $1,700,002 | $1,700,002 |
| State Income Tax [1] | $257,126 | $264,175 | $271,988 | $275,624 |
| **Net Income (loss) to Common Shareholders** | $3,596,347 | $3,741,552 | $3,902,484 | $3,977,367 |
| Net Profit Margin | 11.6% | 11.7% | 11.9% | 11.9% |

Notes/Sources:
1. See Exhibit 14.
2. See Exhibit 15.
3. See Exhibits 12 and 13.
4. See Exhibit 11.
5. See Exhibit 8.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                    Exhibit 10

Balance Sheet

| | Time 0-Mar'04 [1] | Apr-04 | May-04 | Jun-04 | Jul-04 |
|---|---|---|---|---|---|
| **ASSETS:** | | | | | |
| **CURRENT ASSETS:** | | | | | |
| Cash [2] | $15,544 | $833,097 | $531,425 | $229,197 | ($75,022) |
| Cash equivalents | | | | | |
| Inventory [3] | $785,946 | $0 | $0 | $0 | $0 |
| Prepaid Royalties | $175,000 | $175,000 | $175,000 | $175,000 | $175,000 |
| Trade receivables [4,5] | $404,122 | $71,994 | $7,351 | $51,457 | $0 |
| **Total Current Assets** | $1,380,612 | $1,080,091 | $713,776 | $455,654 | $99,978 |
| | | | | | |
| **LONG TERM ASSETS** | | | | | |
| PP&E and Capitalized R&D [5] | $1,266,220 | $1,327,680 | $1,327,829 | $1,328,872 | $1,328,872 |
| Accumulated depreciation [4] | ($51,303) | ($86,476) | ($123,356) | ($160,240) | ($197,153) |
| Net PP&E and R&D | $1,214,917 | $1,241,204 | $1,204,473 | $1,168,632 | $1,131,719 |
| Security Deposits [6] | $103,957 | $103,957 | $103,957 | $103,957 | $103,957 |
| License Agreement [6] | $271,510 | $271,510 | $271,510 | $271,510 | $271,510 |
| **Total Long Term Assets** | $1,590,384 | $1,616,671 | $1,579,940 | $1,544,099 | $1,507,186 |
| | | | | | |
| **TOTAL ASSETS** | $2,970,996 | $2,696,762 | $2,293,716 | $1,999,753 | $1,607,164 |
| | | | | | |
| **LIABILITIES** | | | | | |
| **CURRENT LIABILITIES** | | | | | |
| Trade Payables [4,5] | $1,236,460 | $1,305,953 | $1,243,556 | $1,286,129 | $1,236,460 |
| Line of Credit [7] | $193,170 | $193,170 | $193,170 | $193,170 | $193,170 |
| Inventory Financing Facility | $0 | $0 | $0 | $0 | $0 |
| Current Maturities of Liabilities [8] | $327,600 | $327,600 | $327,600 | $327,600 | $327,600 |
| Deferred Compensation and Deferred Liabilities [9] | $1,583,985 | $1,633,985 | $1,683,985 | $1,733,985 | $1,783,985 |
| Payroll Taxes Payable [4] | $65,607 | $65,607 | $65,607 | $65,607 | $65,607 |
| Customer Prepayments [10] | $14,280 | $0 | $0 | $0 | $0 |
| Accrued Income Taxes | | | | | |

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                 Exhibit 10

Balance Sheet

| | | | | | |
|---|---|---|---|---|---|
| **Total Current Liabilities** | $3,421,102 | $3,526,315 | $3,513,918 | $3,606,491 | $3,606,822 |
| | | | | | |
| **LONG TERM LIABILITIES** | | | | | |
| Senior Debt (Note Payable) [1, 11] | $1,934,747 | $1,934,747 | $1,934,747 | $1,934,747 | $1,934,747 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **Total Long Term Liabilities** | $1,934,747 | $1,934,747 | $1,934,747 | $1,934,747 | $1,934,747 |
| | | | | | |
| **STOCKHOLDER'S EQUITY** | | | | | |
| Common stock [12,1] | $2,495,071 | $2,495,071 | $2,495,071 | $2,495,071 | $2,495,071 |
| Foreign Currency Translation Adjustment [13] | ($59,207) | ($59,207) | ($59,207) | ($59,207) | ($59,207) |
| Additional paid in capital | $0 | $0 | $0 | $0 | $0 |
| Accumulated retained earnings [4] | ($4,820,717) | ($5,200,164) | ($5,590,812) | ($5,977,349) | ($6,370,269) |
| **Total Stockholder's equity** | ($2,384,853) | ($2,764,300) | ($3,154,948) | ($3,541,485) | ($3,934,405) |
| | | | | | |
| **TOTAL LIABILITIES & STOCKHOLDER EQUITY** | $2,970,996 | $2,696,762 | $2,293,716 | $1,999,753 | $1,607,164 |
| | 0 | 0 | 0 | 0 | 0 |

*Notes/Sources:*

1. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.
2. See Exhibit 11.
3. Revenue is recognized in the same month it is manufactured, therefore, there is no inventory.
4. See Exhibit 9.
5. See Exhibit 14.
6. No change.
7. See Exhibit 13.
8. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 13.
9. See Exhibit 15.
10. Due to all revenue being recognized in same month, prepayments are zero.
11.  See Exhibit 12.
12. See Exhibit 14
13. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 11.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 10

Balance Sheet

|  | Aug-04 | Sep-04 | Oct-04 | Nov-04 |
|---|---|---|---|---|
| **ASSETS:** | | | | |
| **CURRENT ASSETS:** | | | | |
| Cash [2] | ($218,076) | ($520,517) | $1,152,171 | $887,588 |
| Cash equivalents | | | | |
| Inventory [3] | $0 | $0 | $0 | $0 |
| Prepaid Royalties | $175,000 | $175,000 | $175,000 | $175,000 |
| Trade receivables [4,5] | $78,360 | $35,618 | $35,618 | $344,815 |
| **Total Current Assets** | $35,284 | ($309,899) | $1,362,789 | $1,407,403 |
| | | | | |
| **LONG TERM ASSETS** | | | | |
| PP&E and Capitalized R&D [5] | $1,330,461 | $1,331,184 | $2,031,906 | $2,038,898 |
| Accumulated depreciation [4] | ($234,066) | ($271,023) | ($357,543) | ($413,985) |
| Net PP&E and R&D | $1,096,395 | $1,060,160 | $1,674,363 | $1,624,913 |
| Security Deposits [6] | $103,957 | $103,957 | $103,957 | $103,957 |
| License Agreement [6] | $271,510 | $271,510 | $271,510 | $271,510 |
| **Total Long Term Assets** | $1,471,862 | $1,435,627 | $2,049,830 | $2,000,380 |
| | | | | |
| **TOTAL ASSETS** | $1,507,146 | $1,125,728 | $3,412,619 | $3,407,783 |
| | | | | |
| **LIABILITIES** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Trade Payables [4,5] | $1,312,098 | $1,270,841 | $34,381 | $332,837 |
| Line of Credit [7] | $193,170 | $193,170 | $0 | $0 |
| Inventory Financing Facility | $0 | $0 | $0 | $0 |
| Current Maturities of Liabilities [8] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [9] | $1,833,985 | $1,883,985 | $1,933,985 | $1,983,985 |
| Payroll Taxes Payable [4] | $65,607 | $65,607 | $0 | $0 |
| Customer Prepayments [10] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes | | | | |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                      Exhibit 10

Balance Sheet

| | | | | |
|---|---|---|---|---|
| **Total Current Liabilities** | $3,404,860 | $3,413,603 | $1,968,366 | $2,316,822 |
| | | | | |
| **LONG TERM LIABILITIES** | | | | |
| Senior Debt (Note Payable) [1, 11] | $1,934,747 | $1,934,747 | $1,934,747 | $1,934,747 |
| Other | $0 | $0 | $0 | $0 |
| **Total Long Term Liabilities** | $1,934,747 | $1,934,747 | $1,934,747 | $1,934,747 |
| | | | | |
| **STOCKHOLDER'S EQUITY** | | | | |
| Common stock [12,1] | $3,045,071 | $3,045,071 | $7,215,071 | $7,215,071 |
| Foreign Currency Translation Adjustment [13] | ($59,207) | ($59,207) | ($59,207) | ($59,207) |
| Additional paid in capital | $0 | $0 | $0 | $0 |
| Accumulated retained earnings [4] | ($6,818,325) | ($7,208,486) | ($7,646,358) | ($7,999,650) |
| **Total Stockholder's equity** | ($3,832,461) | ($4,222,622) | ($490,494) | ($843,786) |
| | | | | |
| **TOTAL LIABILITIES & STOCKHOLDER EQUITY** | $1,507,146 | $1,125,728 | $3,412,619 | $3,407,783 |
| | 0 | 0 | (0) | (0) |

*Notes/Sources:*

1. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.
2. See Exhibit 11.
3. Revenue is recognized in the same month it is manufactured, therefore, there
4. See Exhibit 9.
5. See Exhibit 14.
6. No change.
7. See Exhibit 13.
8. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 13.
9. See Exhibit 15.
10. Due to all revenue being recognized in same month, prepayments are zero.
11.  See Exhibit 12.
12. See Exhibit 14
13. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 1

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 10

Balance Sheet

| | Dec-04 | Jan-05 | Feb-05 | Mar-05 |
|---|---|---|---|---|
| **ASSETS:** | | | | |
| **CURRENT ASSETS:** | | | | |
| Cash [2] | $652,630 | $602,271 | $363,030 | $719,549 |
| Cash equivalents | | | | |
| Inventory [3] | $0 | $0 | $0 | $0 |
| Prepaid Royalties | $175,000 | $175,000 | $175,000 | $175,000 |
| Trade receivables [4,5] | $517,222 | $2,241,296 | $3,834,643 | $5,501,879 |
| **Total Current Assets** | $1,344,852 | $3,018,566 | $4,372,673 | $6,396,428 |
| | | | | |
| **LONG TERM ASSETS** | | | | |
| PP&E and Capitalized R&D [5] | $2,049,386 | $2,099,835 | $2,187,593 | $2,306,158 |
| Accumulated depreciation [4] | ($470,621) | ($527,549) | ($585,877) | ($646,644) |
| Net PP&E and R&D | $1,578,765 | $1,572,286 | $1,601,715 | $1,659,515 |
| Security Deposits [6] | $103,957 | $103,957 | $103,957 | $103,957 |
| License Agreement [6] | $271,510 | $271,510 | $271,510 | $271,510 |
| **Total Long Term Assets** | $1,954,232 | $1,947,753 | $1,977,182 | $2,034,982 |
| | | | | |
| **TOTAL ASSETS** | $3,299,084 | $4,966,319 | $6,349,855 | $8,431,409 |
| | | | | |
| **LIABILITIES** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Trade Payables [4,5] | $499,255 | $2,163,438 | $3,701,435 | $5,310,755 |
| Line of Credit [7] | $0 | $0 | $0 | $0 |
| Inventory Financing Facility | $0 | $0 | $0 | $0 |
| Current Maturities of Liabilities [8] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [9] | $2,033,985 | $2,083,985 | $2,138,985 | $2,193,985 |
| Payroll Taxes Payable [4] | $0 | $0 | $0 | $0 |
| Customer Prepayments [10] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes | | | | |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                      Exhibit 10

Balance Sheet

| | | | | |
|---|---|---|---|---|
| **Total Current Liabilities** | $2,533,240 | $4,247,423 | $5,840,420 | $7,504,740 |
| | | | | |
| **LONG TERM LIABILITIES** | | | | |
| Senior Debt (Note Payable) [1, 11] | $1,934,747 | $1,934,747 | $1,607,147 | $1,607,147 |
| Other | $0 | $0 | $0 | $0 |
| **Total Long Term Liabilities** | $1,934,747 | $1,934,747 | $1,607,147 | $1,607,147 |
| | | | | |
| **STOCKHOLDER'S EQUITY** | | | | |
| Common stock [12,1] | $7,215,071 | $7,215,071 | $7,215,071 | $7,215,071 |
| Foreign Currency Translation Adjustment [13] | ($59,207) | ($59,207) | ($59,207) | ($59,207) |
| Additional paid in capital | $0 | $0 | $0 | $0 |
| Accumulated retained earnings [4] | ($8,324,767) | ($8,371,714) | ($8,253,576) | ($7,836,342) |
| **Total Stockholder's equity** | ($1,168,903) | ($1,215,850) | ($1,097,712) | ($680,478) |
| | | | | |
| **TOTAL LIABILITIES & STOCKHOLDER EQUITY** | $3,299,084 | $4,966,319 | $6,349,855 | $8,431,409 |
| | 0 | 0 | 0 | (0) |

*Notes/Sources:*

1. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.
2. See Exhibit 11.
3. Revenue is recognized in the same month it is manufactured, therefore, there
4. See Exhibit 9.
5. See Exhibit 14.
6. No change.
7. See Exhibit 13.
8. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 13.
9. See Exhibit 15.
10. Due to all revenue being recognized in same month, prepayments are zero.
11.  See Exhibit 12.
12. See Exhibit 14
13. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 1

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 10

Balance Sheet

| | Apr-05 | May-05 | Jun-05 | Jul-05 |
|---|---|---|---|---|
| **ASSETS:** | | | | |
| **CURRENT ASSETS:** | | | | |
| Cash [2] | $1,252,428 | $1,418,221 | $1,760,097 | $2,318,768 |
| Cash equivalents | | | | |
| Inventory [3] | $0 | $0 | $0 | $0 |
| Prepaid Royalties | $175,000 | $175,000 | $175,000 | $175,000 |
| Trade receivables [4,5] | $7,169,115 | $8,535,111 | $10,145,510 | $11,755,908 |
| **Total Current Assets** | $8,596,543 | $10,128,332 | $12,080,607 | $14,249,676 |
| | | | | |
| **LONG TERM ASSETS** | | | | |
| PP&E and Capitalized R&D [5] | $2,470,532 | $2,650,605 | $2,869,334 | $3,114,717 |
| Accumulated depreciation [4] | ($710,704) | ($779,330) | ($852,958) | ($932,661) |
| Net PP&E and R&D | $1,759,828 | $1,871,276 | $2,016,376 | $2,182,056 |
| Security Deposits [6] | $103,957 | $103,957 | $103,957 | $103,957 |
| License Agreement [6] | $271,510 | $271,510 | $271,510 | $271,510 |
| **Total Long Term Assets** | $2,135,295 | $2,246,743 | $2,391,843 | $2,557,523 |
| | | | | |
| **TOTAL ASSETS** | $10,731,838 | $12,375,075 | $14,472,450 | $16,807,199 |
| | | | | |
| **LIABILITIES** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Trade Payables [4,5] | $6,920,075 | $8,238,620 | $9,793,076 | $11,347,533 |
| Line of Credit [7] | $0 | $0 | $0 | $0 |
| Inventory Financing Facility | $0 | $0 | $0 | $0 |
| Current Maturities of Liabilities [8] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [9] | $2,248,985 | $2,303,985 | $2,358,985 | $2,413,985 |
| Payroll Taxes Payable [4] | $0 | $0 | $0 | $0 |
| Customer Prepayments [10] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes | | | | |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 10

Balance Sheet

| | | | | |
|---|---|---|---|---|
| **Total Current Liabilities** | $9,169,060 | $10,542,605 | $12,152,061 | $13,761,518 |
| | | | | |
| **LONG TERM LIABILITIES** | | | | |
| Senior Debt (Note Payable) [1, 11] | $1,607,147 | $1,607,147 | $1,607,147 | $1,607,147 |
| Other | $0 | $0 | $0 | $0 |
| **Total Long Term Liabilities** | $1,607,147 | $1,607,147 | $1,607,147 | $1,607,147 |
| | | | | |
| **STOCKHOLDER'S EQUITY** | | | | |
| Common stock [12,1] | $7,215,071 | $7,215,071 | $7,215,071 | $7,215,071 |
| Foreign Currency Translation Adjustment [13] | ($59,207) | ($59,207) | ($59,207) | ($59,207) |
| Additional paid in capital | $0 | $0 | $0 | $0 |
| Accumulated retained earnings [4] | ($7,200,233) | ($6,930,541) | ($6,442,623) | ($5,717,330) |
| **Total Stockholder's equity** | ($44,369) | $225,323 | $713,241 | $1,438,534 |
| | | | | |
| **TOTAL LIABILITIES & STOCKHOLDER EQUITY** | $10,731,838 | $12,375,075 | $14,472,450 | $16,807,199 |
| | 0 | 0 | 0 | 0 |

*Notes/Sources:*

1. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.
2. See Exhibit 11.
3. Revenue is recognized in the same month it is manufactured, therefore, there
4. See Exhibit 9.
5. See Exhibit 14.
6. No change.
7. See Exhibit 13.
8. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 13.
9. See Exhibit 15.
10. Due to all revenue being recognized in same month, prepayments are zero.
11.  See Exhibit 12.
12. See Exhibit 14
13. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 1

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 10

Balance Sheet

|  | Aug-05 | Sep-05 | Oct-05 | Nov-05 |
|---|---|---|---|---|
| **ASSETS:** |  |  |  |  |
| **CURRENT ASSETS:** |  |  |  |  |
| Cash [2] | $93,565 | $871,168 | $1,817,269 | $2,902,392 |
| Cash equivalents |  |  |  |  |
| Inventory [3] | $0 | $0 | $0 | $0 |
| Prepaid Royalties | $175,000 | $175,000 | $175,000 | $175,000 |
| Trade receivables [4,5] | $12,894,554 | $14,448,115 | $16,001,676 | $16,912,972 |
| **Total Current Assets** | $13,163,119 | $15,494,283 | $17,993,945 | $19,990,364 |
|  |  |  |  |  |
| **LONG TERM ASSETS** |  |  |  |  |
| PP&E and Capitalized R&D [5] | $3,408,190 | $3,706,166 | $4,045,644 | $4,395,602 |
| Accumulated depreciation [4] | ($1,019,181) | ($1,113,853) | ($1,216,802) | ($1,329,181) |
| Net PP&E and R&D | $2,389,009 | $2,592,313 | $2,828,842 | $3,066,421 |
| Security Deposits [6] | $103,957 | $103,957 | $103,957 | $103,957 |
| License Agreement [6] | $271,510 | $271,510 | $271,510 | $271,510 |
| **Total Long Term Assets** | $2,764,476 | $2,967,780 | $3,204,309 | $3,441,888 |
|  |  |  |  |  |
| **TOTAL ASSETS** | $15,927,595 | $18,462,062 | $21,198,254 | $23,432,252 |
|  |  |  |  |  |
| **LIABILITIES** |  |  |  |  |
| **CURRENT LIABILITIES** |  |  |  |  |
| Trade Payables [4,5] | $12,446,625 | $13,946,218 | $15,445,812 | $16,325,451 |
| Line of Credit [7] | $0 | $0 | $0 | $0 |
| Inventory Financing Facility | $0 | $0 | $0 | $0 |
| Current Maturities of Liabilities [8] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [9] | $0 | $0 | $0 | $0 |
| Payroll Taxes Payable [4] | $0 | $0 | $0 | $0 |
| Customer Prepayments [10] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes |  |  |  |  |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                        Exhibit 10

Balance Sheet

| | | | | |
|---|---|---|---|---|
| **Total Current Liabilities** | $12,446,625 | $13,946,218 | $15,445,812 | $16,325,451 |
| | | | | |
| **LONG TERM LIABILITIES** | | | | |
| Senior Debt (Note Payable) [1, 11] | $1,279,547 | $1,279,547 | $1,279,547 | $1,279,547 |
| Other | $0 | $0 | $0 | $0 |
| **Total Long Term Liabilities** | $1,279,547 | $1,279,547 | $1,279,547 | $1,279,547 |
| | | | | |
| **STOCKHOLDER'S EQUITY** | | | | |
| Common stock [12,1] | $7,215,071 | $7,215,071 | $7,215,071 | $7,215,071 |
| Foreign Currency Translation Adjustment [13] | ($59,207) | ($59,207) | ($59,207) | ($59,207) |
| Additional paid in capital | $0 | $0 | $0 | $0 |
| Accumulated retained earnings [4] | ($4,954,440) | ($3,919,567) | ($2,682,968) | ($1,328,610) |
| **Total Stockholder's equity** | $2,201,424 | $3,236,297 | $4,472,896 | $5,827,254 |
| | | | | |
| **TOTAL LIABILITIES & STOCKHOLDER EQUITY** | $15,927,595 | $18,462,062 | $21,198,254 | $23,432,252 |
| | 0 | 0 | 0 | 0 |

*Notes/Sources:*

1. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.
2. See Exhibit 11.
3. Revenue is recognized in the same month it is manufactured, therefore, there
4. See Exhibit 9.
5. See Exhibit 14.
6. No change.
7. See Exhibit 13.
8. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 13.
9. See Exhibit 15.
10. Due to all revenue being recognized in same month, prepayments are zero.
11.  See Exhibit 12.
12. See Exhibit 14
13. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 1

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                          Exhibit 10

Balance Sheet

|  | Dec-05 | Jan-06 | Feb-06 | Mar-06 |
|---|---|---|---|---|
| **ASSETS:** | | | | |
| **CURRENT ASSETS:** | | | | |
| Cash [2] | $4,119,824 | $5,551,116 | $6,702,131 | $8,374,467 |
| Cash equivalents | | | | |
| Inventory [3] | $0 | $0 | $0 | $0 |
| Prepaid Royalties | $175,000 | $175,000 | $175,000 | $175,000 |
| Trade receivables [4,5] | $18,409,695 | $19,906,418 | $20,590,364 | $22,030,250 |
| **Total Current Assets** | $22,704,519 | $25,632,534 | $27,467,495 | $30,579,717 |
| | | | | |
| **LONG TERM ASSETS** | | | | |
| PP&E and Capitalized R&D [5] | $4,787,910 | $5,196,567 | $5,624,094 | $6,079,819 |
| Accumulated depreciation [4] | ($1,451,281) | ($1,584,279) | ($1,728,628) | ($1,884,853) |
| Net PP&E and R&D | $3,336,628 | $3,612,289 | $3,895,466 | $4,194,966 |
| Security Deposits [6] | $103,957 | $103,957 | $103,957 | $103,957 |
| License Agreement [6] | $271,510 | $271,510 | $271,510 | $271,510 |
| **Total Long Term Assets** | $3,712,095 | $3,987,756 | $4,270,933 | $4,570,433 |
| | | | | |
| **TOTAL ASSETS** | $26,416,614 | $29,620,290 | $31,738,429 | $35,150,150 |
| | | | | |
| **LIABILITIES** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Trade Payables [4,5] | $17,770,181 | $19,214,911 | $19,875,098 | $21,264,965 |
| Line of Credit [7] | $0 | $0 | $0 | $0 |
| Inventory Financing Facility | $0 | $0 | $0 | $0 |
| Current Maturities of Liabilities [8] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [9] | $0 | $0 | $0 | $0 |
| Payroll Taxes Payable [4] | $0 | $0 | $0 | $0 |
| Customer Prepayments [10] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes | | | | |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                 Exhibit 10

Balance Sheet

| | | | | |
|---|---|---|---|---|
| **Total Current Liabilities** | $17,770,181 | $19,214,911 | $19,875,098 | $21,264,965 |
| | | | | |
| **LONG TERM LIABILITIES** | | | | |
| Senior Debt (Note Payable) [1, 11] | $1,279,547 | $1,279,547 | $951,947 | $951,947 |
| Other | $0 | $0 | $0 | $0 |
| **Total Long Term Liabilities** | $1,279,547 | $1,279,547 | $951,947 | $951,947 |
| | | | | |
| **STOCKHOLDER'S EQUITY** | | | | |
| Common stock [12,1] | $7,215,071 | $7,215,071 | $7,215,071 | $7,215,071 |
| Foreign Currency Translation Adjustment [13] | ($59,207) | ($59,207) | ($59,207) | ($59,207) |
| Additional paid in capital | $0 | $0 | $0 | $0 |
| Accumulated retained earnings [4] | $211,022 | $1,969,967 | $3,755,519 | $5,777,373 |
| **Total Stockholder's equity** | $7,366,886 | $9,125,831 | $10,911,383 | $12,933,237 |
| | | | | |
| **TOTAL LIABILITIES & STOCKHOLDER EQUITY** | $26,416,614 | $29,620,290 | $31,738,429 | $35,150,150 |
| | 0 | 0 | 0 | 0 |

*Notes/Sources:*

1. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.
2. See Exhibit 11.
3. Revenue is recognized in the same month it is manufactured, therefore, there
4. See Exhibit 9.
5. See Exhibit 14.
6. No change.
7. See Exhibit 13.
8. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 13.
9. See Exhibit 15.
10. Due to all revenue being recognized in same month, prepayments are zero.
11.  See Exhibit 12.
12. See Exhibit 14
13. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 1

Balance Sheet

|  | Apr-06 | May-06 | Jun-06 | Jul-06 |
|---|---|---|---|---|
| **ASSETS:** | | | | |
| **CURRENT ASSETS:** | | | | |
| Cash [2] | $10,125,558 | $11,409,753 | $12,803,417 | $14,382,382 |
| Cash equivalents | | | | |
| Inventory [3] | $0 | $0 | $0 | $0 |
| Prepaid Royalties | $175,000 | $175,000 | $175,000 | $175,000 |
| Trade receivables [4,5] | $23,470,135 | $23,926,730 | $25,309,778 | $26,692,826 |
| **Total Current Assets** | $33,770,693 | $35,511,483 | $38,288,195 | $41,250,208 |
| | | | | |
| **LONG TERM ASSETS** | | | | |
| PP&E and Capitalized R&D [5] | $6,593,741 | $7,083,922 | $7,610,148 | $8,158,419 |
| Accumulated depreciation [4] | ($2,053,737) | ($2,236,896) | ($2,433,672) | ($2,645,065) |
| Net PP&E and R&D | $4,540,004 | $4,847,026 | $5,176,476 | $5,513,355 |
| Security Deposits [6] | $103,957 | $103,957 | $103,957 | $103,957 |
| License Agreement [6] | $271,510 | $271,510 | $271,510 | $271,510 |
| **Total Long Term Assets** | $4,915,471 | $5,222,493 | $5,551,943 | $5,888,822 |
| | | | | |
| **TOTAL ASSETS** | $38,686,164 | $40,733,976 | $43,840,138 | $47,139,030 |
| | | | | |
| **LIABILITIES** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Trade Payables [4,5] | $22,654,832 | $23,095,566 | $24,430,570 | $25,765,574 |
| Line of Credit [7] | $0 | $0 | $0 | $0 |
| Inventory Financing Facility | $0 | $0 | $0 | $0 |
| Current Maturities of Liabilities [8] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [9] | $0 | $0 | $0 | $0 |
| Payroll Taxes Payable [4] | $0 | $0 | $0 | $0 |
| Customer Prepayments [10] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes | | | | |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                    Exhibit 10

Balance Sheet

| | | | | |
|---|---|---|---|---|
| **Total Current Liabilities** | $22,654,832 | $23,095,566 | $24,430,570 | $25,765,574 |
| | | | | |
| **LONG TERM LIABILITIES** | | | | |
| Senior Debt (Note Payable) [1, 11] | $951,947 | $951,947 | $951,947 | $951,947 |
| Other | $0 | $0 | $0 | $0 |
| **Total Long Term Liabilities** | $951,947 | $951,947 | $951,947 | $951,947 |
| | | | | |
| **STOCKHOLDER'S EQUITY** | | | | |
| Common stock [12,1] | $7,215,071 | $7,215,071 | $7,215,071 | $7,215,071 |
| Foreign Currency Translation Adjustment [13] | ($59,207) | ($59,207) | ($59,207) | ($59,207) |
| Additional paid in capital | $0 | $0 | $0 | $0 |
| Accumulated retained earnings [4] | $7,923,521 | $9,530,599 | $11,301,757 | $13,265,645 |
| **Total Stockholder's equity** | $15,079,385 | $16,686,463 | $18,457,621 | $20,421,509 |
| | | | | |
| **TOTAL LIABILITIES & STOCKHOLDER EQUITY** | $38,686,164 | $40,733,976 | $43,840,138 | $47,139,030 |
| | 0 | 0 | 0 | 0 |

*Notes/Sources:*

1. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.
2. See Exhibit 11.
3. Revenue is recognized in the same month it is manufactured, therefore, there
4. See Exhibit 9.
5. See Exhibit 14.
6. No change.
7. See Exhibit 13.
8. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 13.
9. See Exhibit 15.
10. Due to all revenue being recognized in same month, prepayments are zero.
11. See Exhibit 12.
12. See Exhibit 14
13. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 1

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 10

Balance Sheet

|  | Aug-06 | Sep-06 | Oct-06 | Nov-06 |
|---|---|---|---|---|
| **ASSETS:** | | | | |
| **CURRENT ASSETS:** | | | | |
| Cash [2] | $15,657,360 | $17,452,579 | $19,394,329 | $21,367,290 |
| Cash equivalents | | | | |
| Inventory [3] | $0 | $0 | $0 | $0 |
| Prepaid Royalties | $175,000 | $175,000 | $175,000 | $175,000 |
| Trade receivables [4,5] | $27,306,672 | $28,651,829 | $29,996,985 | $30,017,825 |
| **Total Current Assets** | $43,139,032 | $46,279,408 | $49,566,314 | $51,560,116 |
| | | | | |
| **LONG TERM ASSETS** | | | | |
| PP&E and Capitalized R&D [5] | $8,730,138 | $9,316,133 | $9,937,405 | $10,553,100 |
| Accumulated depreciation [4] | ($2,871,687) | ($3,114,191) | ($3,372,973) | ($3,649,012) |
| Net PP&E and R&D | $5,858,450 | $6,201,942 | $6,564,433 | $6,904,088 |
| Security Deposits [6] | $103,957 | $103,957 | $103,957 | $103,957 |
| License Agreement [6] | $271,510 | $271,510 | $271,510 | $271,510 |
| **Total Long Term Assets** | $6,233,917 | $6,577,409 | $6,939,900 | $7,279,555 |
| | | | | |
| **TOTAL ASSETS** | $49,372,950 | $52,856,817 | $56,506,214 | $58,839,671 |
| | | | | |
| **LIABILITIES** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Trade Payables [4,5] | $26,358,096 | $27,656,525 | $28,954,953 | $28,975,070 |
| Line of Credit [7] | $0 | $0 | $0 | $0 |
| Inventory Financing Facility | $0 | $0 | $0 | $0 |
| Current Maturities of Liabilities [8] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [9] | $0 | $0 | $0 | $0 |
| Payroll Taxes Payable [4] | $0 | $0 | $0 | $0 |
| Customer Prepayments [10] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes | | | | |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                                  Exhibit 10

Balance Sheet

| | | | | |
|---|---|---|---|---|
| **Total Current Liabilities** | $26,358,096 | $27,656,525 | $28,954,953 | $28,975,070 |
| | | | | |
| **LONG TERM LIABILITIES** | | | | |
| Senior Debt (Note Payable) [1, 11] | $624,347 | $624,347 | $624,347 | $624,347 |
| Other | $0 | $0 | $0 | $0 |
| **Total Long Term Liabilities** | $624,347 | $624,347 | $624,347 | $624,347 |
| | | | | |
| **STOCKHOLDER'S EQUITY** | | | | |
| Common stock [12,1] | $7,215,071 | $7,215,071 | $7,215,071 | $7,215,071 |
| Foreign Currency Translation Adjustment [13] | ($59,207) | ($59,207) | ($59,207) | ($59,207) |
| Additional paid in capital | $0 | $0 | $0 | $0 |
| Accumulated retained earnings [4] | $15,234,642 | $17,420,081 | $19,771,049 | $22,084,391 |
| **Total Stockholder's equity** | $22,390,506 | $24,575,945 | $26,926,913 | $29,240,255 |
| | | | | |
| **TOTAL LIABILITIES & STOCKHOLDER EQUITY** | $49,372,950 | $52,856,817 | $56,506,214 | $58,839,671 |
| | 0 | 0 | 0 | 0 |

*Notes/Sources:*
1. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.
2. See Exhibit 11.
3. Revenue is recognized in the same month it is manufactured, therefore, there
4. See Exhibit 9.
5. See Exhibit 14.
6. No change.
7. See Exhibit 13.
8. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 13.
9. See Exhibit 15.
10. Due to all revenue being recognized in same month, prepayments are zero.
11.  See Exhibit 12.
12. See Exhibit 14
13. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 1

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 10

Balance Sheet

| | Dec-06 | Jan-07 | Feb-07 | Mar-07 |
|---|---|---|---|---|
| **ASSETS:** | | | | |
| **CURRENT ASSETS:** | | | | |
| Cash [2] | $23,354,303 | $25,537,186 | $27,353,565 | $29,625,352 |
| Cash equivalents | | | | |
| Inventory [3] | $0 | $0 | $0 | $0 |
| Prepaid Royalties | $175,000 | $175,000 | $175,000 | $175,000 |
| Trade receivables [4,5] | $31,306,144 | $32,594,463 | $32,387,953 | $33,619,434 |
| **Total Current Assets** | $54,835,447 | $58,306,648 | $59,916,518 | $63,419,786 |
| | | | | |
| **LONG TERM ASSETS** | | | | |
| PP&E and Capitalized R&D [5] | $11,224,919 | $11,892,862 | $12,559,618 | $13,248,346 |
| Accumulated depreciation [4] | ($3,942,153) | ($4,253,957) | ($4,568,184) | ($4,881,890) |
| Net PP&E and R&D | $7,282,766 | $7,638,906 | $7,991,434 | $8,366,456 |
| Security Deposits [6] | $103,957 | $103,957 | $103,957 | $103,957 |
| License Agreement [6] | $271,510 | $271,510 | $271,510 | $271,510 |
| **Total Long Term Assets** | $7,658,233 | $8,014,373 | $8,366,901 | $8,741,923 |
| | | | | |
| **TOTAL ASSETS** | $62,493,679 | $66,321,021 | $68,283,419 | $72,161,709 |
| | | | | |
| **LIABILITIES** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Trade Payables [4,5] | $30,218,635 | $31,462,200 | $31,262,864 | $32,451,566 |
| Line of Credit [7] | $0 | $0 | $0 | $0 |
| Inventory Financing Facility | $0 | $0 | $0 | $0 |
| Current Maturities of Liabilities [8] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [9] | $0 | $0 | $0 | $0 |
| Payroll Taxes Payable [4] | $0 | $0 | $0 | $0 |
| Customer Prepayments [10] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes | | | | |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                 Exhibit 10

Balance Sheet

| | | | | |
|---|---|---|---|---|
| **Total Current Liabilities** | $30,218,635 | $31,462,200 | $31,262,864 | $32,451,566 |
| | | | | |
| **LONG TERM LIABILITIES** | | | | |
| Senior Debt (Note Payable) [1, 11] | $624,347 | $624,347 | $296,747 | $296,747 |
| Other | $0 | $0 | $0 | $0 |
| **Total Long Term Liabilities** | $624,347 | $624,347 | $296,747 | $296,747 |
| | | | | |
| **STOCKHOLDER'S EQUITY** | | | | |
| Common stock [12,1] | $7,215,071 | $7,215,071 | $7,215,071 | $7,215,071 |
| Foreign Currency Translation Adjustment [13] | ($59,207) | ($59,207) | ($59,207) | ($59,207) |
| Additional paid in capital | $0 | $0 | $0 | $0 |
| Accumulated retained earnings [4] | $24,494,834 | $27,078,610 | $29,567,944 | $32,257,532 |
| **Total Stockholder's equity** | $31,650,698 | $34,234,474 | $36,723,808 | $39,413,396 |
| | | | | |
| **TOTAL LIABILITIES & STOCKHOLDER EQUITY** | $62,493,679 | $66,321,021 | $68,283,419 | $72,161,709 |
| | 0 | 0 | 0 | 0 |

*Notes/Sources:*

1. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.
2. See Exhibit 11.
3. Revenue is recognized in the same month it is manufactured, therefore, there
4. See Exhibit 9.
5. See Exhibit 14.
6. No change.
7. See Exhibit 13.
8. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 13.
9. See Exhibit 15.
10. Due to all revenue being recognized in same month, prepayments are zero.
11.  See Exhibit 12.
12. See Exhibit 14
13. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 1

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 10

Balance Sheet

| | Apr-07 | May-07 | Jun-07 | Jul-07 |
|---|---|---|---|---|
| **ASSETS:** | | | | |
| **CURRENT ASSETS:** | | | | |
| Cash [2] | $32,012,952 | $34,022,767 | $36,156,059 | $38,455,768 |
| Cash equivalents | | | | |
| Inventory [3] | $0 | $0 | $0 | $0 |
| Prepaid Royalties | $175,000 | $175,000 | $175,000 | $175,000 |
| Trade receivables [4,5] | $34,850,915 | $36,082,396 | $37,313,877 | $38,545,358 |
| **Total Current Assets** | $67,038,867 | $70,280,163 | $73,644,936 | $77,176,126 |
| | | | | |
| **LONG TERM ASSETS** | | | | |
| PP&E and Capitalized R&D [5] | $13,974,045 | $14,710,716 | $15,482,358 | $16,270,972 |
| Accumulated depreciation [4] | ($5,214,727) | ($5,566,014) | ($5,937,761) | ($6,330,914) |
| Net PP&E and R&D | $8,759,318 | $9,144,701 | $9,544,597 | $9,940,059 |
| Security Deposits [6] | $103,957 | $103,957 | $103,957 | $103,957 |
| License Agreement [6] | $271,510 | $271,510 | $271,510 | $271,510 |
| **Total Long Term Assets** | $9,134,785 | $9,520,168 | $9,920,064 | $10,315,526 |
| | | | | |
| **TOTAL ASSETS** | $76,173,652 | $79,800,331 | $83,565,000 | $87,491,652 |
| | | | | |
| **LIABILITIES** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Trade Payables [4,5] | $33,640,268 | $34,828,970 | $36,017,672 | $37,206,374 |
| Line of Credit [7] | $0 | $0 | $0 | $0 |
| Inventory Financing Facility | $0 | $0 | $0 | $0 |
| Current Maturities of Liabilities [8] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [9] | $0 | $0 | $0 | $0 |
| Payroll Taxes Payable [4] | $0 | $0 | $0 | $0 |
| Customer Prepayments [10] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes | | | | |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                   Exhibit 10

Balance Sheet

| | | | | |
|---|---|---|---|---|
| **Total Current Liabilities** | $33,640,268 | $34,828,970 | $36,017,672 | $37,206,374 |
| | | | | |
| **LONG TERM LIABILITIES** | | | | |
| Senior Debt (Note Payable) [1, 11] | $296,747 | $296,747 | $296,747 | $296,747 |
| Other | $0 | $0 | $0 | $0 |
| **Total Long Term Liabilities** | $296,747 | $296,747 | $296,747 | $296,747 |
| | | | | |
| **STOCKHOLDER'S EQUITY** | | | | |
| Common stock [12,1] | $7,215,071 | $7,215,071 | $7,215,071 | $7,215,071 |
| Foreign Currency Translation Adjustment [13] | ($59,207) | ($59,207) | ($59,207) | ($59,207) |
| Additional paid in capital | $0 | $0 | $0 | $0 |
| Accumulated retained earnings [4] | $35,080,773 | $37,518,750 | $40,094,717 | $42,832,666 |
| **Total Stockholder's equity** | $42,236,637 | $44,674,614 | $47,250,581 | $49,988,530 |
| | | | | |
| **TOTAL LIABILITIES & STOCKHOLDER EQUITY** | $76,173,652 | $79,800,331 | $83,565,000 | $87,491,652 |
| | 0 | 0 | 0 | 0 |

*Notes/Sources:*
1. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.
2. See Exhibit 11.
3. Revenue is recognized in the same month it is manufactured, therefore, there
4. See Exhibit 9.
5. See Exhibit 14.
6. No change.
7. See Exhibit 13.
8. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 13.
9. See Exhibit 15.
10. Due to all revenue being recognized in same month, prepayments are zero.
11.  See Exhibit 12.
12. See Exhibit 14
13. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 1

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 10

Balance Sheet

| | Aug-07 | Sep-07 | Oct-07 | Nov-07 |
|---|---|---|---|---|
| **ASSETS:** | | | | |
| **CURRENT ASSETS:** | | | | |
| Cash [2] | $40,505,237 | $43,052,547 | $45,731,124 | $48,567,403 |
| Cash equivalents | | | | |
| Inventory [3] | $0 | $0 | $0 | $0 |
| Prepaid Royalties | $175,000 | $175,000 | $175,000 | $175,000 |
| Trade receivables [4,5] | $39,776,839 | $41,008,320 | $42,239,802 | $43,471,283 |
| **Total Current Assets** | $80,457,076 | $84,235,867 | $88,145,926 | $92,213,686 |
| | | | | |
| **LONG TERM ASSETS** | | | | |
| PP&E and Capitalized R&D [5] | $17,112,558 | $17,949,116 | $18,818,645 | $19,709,146 |
| Accumulated depreciation [4] | ($6,745,972) | ($7,184,364) | ($7,645,973) | ($8,112,271) |
| Net PP&E and R&D | $10,366,586 | $10,764,752 | $11,172,672 | $11,596,875 |
| Security Deposits [6] | $103,957 | $103,957 | $103,957 | $103,957 |
| License Agreement [6] | $271,510 | $271,510 | $271,510 | $271,510 |
| **Total Long Term Assets** | $10,742,053 | $11,140,219 | $11,548,139 | $11,972,342 |
| | | | | |
| **TOTAL ASSETS** | $91,199,129 | $95,376,086 | $99,694,065 | $104,186,028 |
| | | | | |
| **LIABILITIES** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Trade Payables [4,5] | $38,395,076 | $39,583,778 | $40,772,480 | $41,961,182 |
| Line of Credit [7] | $0 | $0 | $0 | $0 |
| Inventory Financing Facility | $0 | $0 | $0 | $0 |
| Current Maturities of Liabilities [8] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [9] | $0 | $0 | $0 | $0 |
| Payroll Taxes Payable [4] | $0 | $0 | $0 | $0 |
| Customer Prepayments [10] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes | | | | |

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                    Exhibit 10

Balance Sheet

| | | | | |
|---|---|---|---|---|
| **Total Current Liabilities** | $38,395,076 | $39,583,778 | $40,772,480 | $41,961,182 |
| | | | | |
| **LONG TERM LIABILITIES** | | | | |
| Senior Debt (Note Payable) [1, 11] | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 |
| **Total Long Term Liabilities** | $0 | $0 | $0 | $0 |
| | | | | |
| **STOCKHOLDER'S EQUITY** | | | | |
| Common stock [12,1] | $7,215,071 | $7,215,071 | $7,215,071 | $7,215,071 |
| Foreign Currency Translation Adjustment [13] | ($59,207) | ($59,207) | ($59,207) | ($59,207) |
| Additional paid in capital | $0 | $0 | $0 | $0 |
| Accumulated retained earnings [4] | $45,648,189 | $48,636,444 | $51,765,721 | $55,068,982 |
| **Total Stockholder's equity** | $52,804,053 | $55,792,308 | $58,921,585 | $62,224,846 |
| | | | | |
| **TOTAL LIABILITIES & STOCKHOLDER EQUITY** | $91,199,129 | $95,376,086 | $99,694,065 | $104,186,028 |
| | 0 | 0 | 0 | 0 |

*Notes/Sources:*
1. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.
2. See Exhibit 11.
3. Revenue is recognized in the same month it is manufactured, therefore, there
4. See Exhibit 9.
5. See Exhibit 14.
6. No change.
7. See Exhibit 13.
8. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 13.
9. See Exhibit 15.
10. Due to all revenue being recognized in same month, prepayments are zero.
11.  See Exhibit 12.
12. See Exhibit 14
13. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 1

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 10

Balance Sheet

|  | Dec-07 | Jan-08 | Feb-08 | Mar-08 |
|---|---|---|---|---|
| **ASSETS:** | | | | |
| **CURRENT ASSETS:** | | | | |
| Cash [2] | $51,522,642 | $54,656,022 | $57,929,246 | $61,365,838 |
| Cash equivalents | | | | |
| Inventory [3] | $0 | $0 | $0 | $0 |
| Prepaid Royalties | $175,000 | $175,000 | $175,000 | $175,000 |
| Trade receivables [4,5] | $44,702,764 | $45,934,245 | $47,165,726 | $48,397,207 |
| **Total Current Assets** | $96,400,406 | $100,765,267 | $105,269,972 | $109,938,045 |
| | | | | |
| **LONG TERM ASSETS** | | | | |
| PP&E and Capitalized R&D [5] | $20,634,619 | $21,571,063 | $22,537,479 | $23,525,867 |
| Accumulated depreciation [4] | ($8,603,111) | ($9,119,368) | ($9,660,235) | ($10,225,510) |
| Net PP&E and R&D | $12,031,507 | $12,451,695 | $12,877,244 | $13,300,357 |
| Security Deposits [6] | $103,957 | $103,957 | $103,957 | $103,957 |
| License Agreement [6] | $271,510 | $271,510 | $271,510 | $271,510 |
| **Total Long Term Assets** | $12,406,974 | $12,827,162 | $13,252,711 | $13,675,824 |
| | | | | |
| **TOTAL ASSETS** | $108,807,381 | $113,592,429 | $118,522,683 | $123,613,869 |
| | | | | |
| **LIABILITIES** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Trade Payables [4,5] | $43,149,884 | $44,338,586 | $45,527,288 | $46,715,991 |
| Line of Credit [7] | $0 | $0 | $0 | $0 |
| Inventory Financing Facility | $0 | $0 | $0 | $0 |
| Current Maturities of Liabilities [8] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [9] | $0 | $0 | $0 | $0 |
| Payroll Taxes Payable [4] | $0 | $0 | $0 | $0 |
| Customer Prepayments [10] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes | | | | |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 10

Balance Sheet

| | | | | |
|---|---|---|---|---|
| **Total Current Liabilities** | $43,149,884 | $44,338,586 | $45,527,288 | $46,715,991 |
| | | | | |
| **LONG TERM LIABILITIES** | | | | |
| Senior Debt (Note Payable) [1, 11] | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 |
| **Total Long Term Liabilities** | $0 | $0 | $0 | $0 |
| | | | | |
| **STOCKHOLDER'S EQUITY** | | | | |
| Common stock [12,1] | $7,215,071 | $7,215,071 | $7,215,071 | $7,215,071 |
| Foreign Currency Translation Adjustment [13] | ($59,207) | ($59,207) | ($59,207) | ($59,207) |
| Additional paid in capital | $0 | $0 | $0 | $0 |
| Accumulated retained earnings [4] | $58,501,632 | $62,097,979 | $65,839,530 | $69,742,014 |
| **Total Stockholder's equity** | $65,657,496 | $69,253,843 | $72,995,394 | $76,897,878 |
| | | | | |
| **TOTAL LIABILITIES & STOCKHOLDER EQUITY** | $108,807,381 | $113,592,429 | $118,522,683 | $123,613,869 |
| | 0 | 0 | 0 | 0 |

*Notes/Sources:*

1. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.
2. See Exhibit 11.
3. Revenue is recognized in the same month it is manufactured, therefore, there
4. See Exhibit 9.
5. See Exhibit 14.
6. No change.
7. See Exhibit 13.
8. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 13.
9. See Exhibit 15.
10. Due to all revenue being recognized in same month, prepayments are zero.
11.  See Exhibit 12.
12. See Exhibit 14
13. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 1

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                      Exhibit 10

Balance Sheet

|  | Apr-08 |
|---|---|
| **ASSETS:** | |
| **CURRENT ASSETS:** | |
| Cash [2] | $64,846,502 |
| Cash equivalents | |
| Inventory [3] | $0 |
| Prepaid Royalties | $175,000 |
| Trade receivables [4,5] | $49,628,688 |
| **Total Current Assets** | **$114,650,191** |
| | |
| **LONG TERM ASSETS** | |
| PP&E and Capitalized R&D [5] | $24,569,227 |
| Accumulated depreciation [4] | ($10,814,946) |
| Net PP&E and R&D | $13,754,280 |
| Security Deposits [6] | $103,957 |
| License Agreement [6] | $271,510 |
| **Total Long Term Assets** | **$14,129,747** |
| | |
| **TOTAL ASSETS** | **$128,779,938** |
| | |
| **LIABILITIES** | |
| **CURRENT LIABILITIES** | |
| Trade Payables [4,5] | $47,904,693 |
| Line of Credit [7] | $0 |
| Inventory Financing Facility | $0 |
| Current Maturities of Liabilities [8] | $0 |
| Deferred Compensation and Deferred Liabilities [9] | $0 |
| Payroll Taxes Payable [4] | $0 |
| Customer Prepayments [10] | $0 |
| Accrued Income Taxes | |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 10

Balance Sheet

| | |
|---|---:|
| **Total Current Liabilities** | $47,904,693 |
| | |
| **LONG TERM LIABILITIES** | |
| Senior Debt (Note Payable) [1, 11] | $0 |
| Other | $0 |
| **Total Long Term Liabilities** | $0 |
| | |
| **STOCKHOLDER'S EQUITY** | |
| Common stock [12,1] | $7,215,071 |
| Foreign Currency Translation Adjustment [13] | ($59,207) |
| Additional paid in capital | $0 |
| Accumulated retained earnings [4] | $73,719,381 |
| **Total Stockholder's equity** | $80,875,245 |
| | |
| **TOTAL LIABILITIES & STOCKHOLDER EQUITY** | $128,779,938 |
| | 0 |

*Notes/Sources:*

1. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.
2. See Exhibit 11.
3. Revenue is recognized in the same month it is manufactured, therefore, there
4. See Exhibit 9.
5. See Exhibit 14.
6. No change.
7. See Exhibit 13.
8. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 13.
9. See Exhibit 15.
10. Due to all revenue being recognized in same month, prepayments are zero.
11. See Exhibit 12.
12. See Exhibit 14
13. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 1

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 11

Cash Flow Statement

| | Time 0- March 2004 [6] | Apr-04 | May-04 | Jun-04 |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net Income[1] | | ($379,447) | ($390,648) | ($386,537) |
| | | | | |
| Items not requiring cash: | | | | |
| Depreciation [1] | | $35,173 | $36,880 | $36,884 |
| Amortization [1] | | $0 | $0 | $0 |
| Stock transactions | | | | |
| Changes in operating assets and liabilities: | | | | |
| Trade Receivables [2] | | $332,128 | $64,643 | ($44,106) |
| Prepaid Royalties [2] | | $0 | $0 | $0 |
| Inventories [2] | | $785,946 | $0 | $0 |
| Accounts Payable [2] | | $69,493 | ($62,398) | $42,574 |
| Line of Credit [2] | | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [2] | | $50,000 | $50,000 | $50,000 |
| Payroll Taxes Payable [2] | | $0 | $0 | $0 |
| Customer Prepayments [2] | | ($14,280) | $0 | $0 |
| Accrued Income Taxes [2] | | | | |
| **Net cash generated (used) from operating activities** | | $879,012 | ($301,522) | ($301,185) |
| | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Capital expenditures [3] | | ($61,460) | ($149) | ($1,043) |
| Cash paid for investments and acquisitions | | | | |
| Deferred acquisition costs | | | | |
| Capitalized assets | | | | |
| **Net cash generated (used) from investing activities** | | ($61,460) | ($149) | ($1,043) |
| | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Net proceeds from financing arrangements | | $0 | $0 | $0 |
| Net proceeds from issuing common stock [4] | | $0 | $0 | $0 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                Exhibit 11

Cash Flow Statement

| | Time 0- March 2004 [6] | Apr-04 | May-04 | Jun-04 |
|---|---|---|---|---|
| Proceeds from exercising options and warrants | | | | |
| Payments on long term debt and leases [5] | | $0 | $0 | $0 |
| **Net cash generated (used) from financing activities** | | $0 | $0 | $0 |
| | | | | |
| **INCREASE (DECREASE) IN CASH** | | $817,553 | ($301,671) | ($302,228) |
| | | | | |
| **CASH AT BEGINNING OF PERIOD** | $0 | $15,544 | $833,097 | $531,425 |
| | | | | |
| **CASH AT END OF PERIOD** | $15,544 | $833,097 | $531,425 | $229,197 |

Notes/Sources:
1. See Exhibit 9.
2. See Exhibit 10.
3. See Exhibit 14.
4. Subscription Agreement dated August 15, 2004.
5. See Exhibit 12.
6. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                        Exhibit 11

Cash Flow Statement

| | Jul-04 | Aug-04 | Sep-04 | Oct-04 | Nov-04 |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net Income[1] | ($392,920) | ($448,056) | ($390,161) | ($437,872) | ($353,292) |
| | | | | | |
| Items not requiring cash: | | | | | |
| Depreciation [1] | $36,913 | $36,913 | $36,957 | $86,520 | $56,442 |
| Amortization [1] | $0 | $0 | $0 | $0 | $0 |
| Stock transactions | | | | | |
| Changes in operating assets and liabilities: | | | | | |
| Trade Receivables [2] | $51,457 | ($78,360) | $42,742 | $0 | ($309,196) |
| Prepaid Royalties [2] | $0 | $0 | $0 | $0 | $0 |
| Inventories [2] | $0 | $0 | $0 | $0 | $0 |
| Accounts Payable [2] | ($49,669) | $75,638 | ($41,257) | ($1,236,460) | $298,456 |
| Line of Credit [2] | $0 | $0 | $0 | ($193,170) | $0 |
| Deferred Compensation and Deferred Liabilities [2] | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Payroll Taxes Payable [2] | $0 | $0 | $0 | ($65,607) | $0 |
| Customer Prepayments [2] | $0 | $0 | $0 | $0 | $0 |
| Accrued Income Taxes [2] | | | | | |
| **Net cash generated (used) from operating activities** | ($304,219) | ($363,865) | ($301,719) | ($1,796,589) | ($257,591) |
| | | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Capital expenditures [3] | $0 | ($1,589) | ($722) | ($700,722) | ($6,992) |
| Cash paid for investments and acquisitions | | | | | |
| Deferred acquisition costs | | | | | |
| Capitalized assets | | | | | |
| **Net cash generated (used) from investing activities** | $0 | ($1,589) | ($722) | ($700,722) | ($6,992) |
| | | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Net proceeds from financing arrangements | $0 | $0 | $0 | $0 | $0 |
| Net proceeds from issuing common stock [4] | $0 | $550,000 | $0 | $4,170,000 | $0 |

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                        Exhibit 11

Cash Flow Statement

|                                                        | Jul-04      | Aug-04      | Sep-04      | Oct-04      | Nov-04      |
|--------------------------------------------------------|-------------|-------------|-------------|-------------|-------------|
| Proceeds from exercising options and warrants          |             |             |             |             |             |
| Payments on long term debt and leases [5]              | $0          | ($327,600)  | $0          | $0          | $0          |
| **Net cash generated (used) from financing activities** | $0          | $222,400    | $0          | $4,170,000  | $0          |
| **INCREASE (DECREASE) IN CASH**                        | ($304,219)  | ($143,054)  | ($302,441)  | $1,672,688  | ($264,583)  |
| **CASH AT BEGINNING OF PERIOD**                        | $229,197    | ($75,022)   | ($218,076)  | ($520,517)  | $1,152,171  |
| **CASH AT END OF PERIOD**                              | ($75,022)   | ($218,076)  | ($520,517)  | $1,152,171  | $887,588    |

Notes/Sources:
1. See Exhibit 9.
2. See Exhibit 10.
3. See Exhibit 14.
4. Subscription Agreement dated August 15, 2004.
5. See Exhibit 12.
6. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                                          Exhibit 11

Cash Flow Statement

| | Dec-04 | Jan-05 | Feb-05 | Mar-05 |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net Income[1] | ($325,117) | ($46,947) | $118,138 | $417,234 |
| | | | | |
| Items not requiring cash: | | | | |
| Depreciation [1] | $56,636 | $56,927 | $58,329 | $60,766 |
| Amortization [1] | $0 | $0 | $0 | $0 |
| Stock transactions | | | | |
| Changes in operating assets and liabilities: | | | | |
| Trade Receivables [2] | ($172,407) | ($1,724,074) | ($1,593,347) | ($1,667,236) |
| Prepaid Royalties [2] | $0 | $0 | $0 | $0 |
| Inventories [2] | $0 | $0 | $0 | $0 |
| Accounts Payable [2] | $166,418 | $1,664,183 | $1,537,998 | $1,609,320 |
| Line of Credit [2] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [2] | $50,000 | $50,000 | $55,000 | $55,000 |
| Payroll Taxes Payable [2] | $0 | $0 | $0 | $0 |
| Customer Prepayments [2] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes [2] | | | | |
| **Net cash generated (used) from operating activities** | ($224,470) | $90 | $176,118 | $475,085 |
| | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Capital expenditures [3] | ($10,488) | ($50,448) | ($87,758) | ($118,566) |
| Cash paid for investments and acquisitions | | | | |
| Deferred acquisition costs | | | | |
| Capitalized assets | | | | |
| **Net cash generated (used) from investing activities** | ($10,488) | ($50,448) | ($87,758) | ($118,566) |
| | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Net proceeds from financing arrangements | $0 | $0 | $0 | $0 |
| Net proceeds from issuing common stock [4] | $0 | $0 | $0 | $0 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 11

Cash Flow Statement

| | Dec-04 | Jan-05 | Feb-05 | Mar-05 |
|---|---|---|---|---|
| Proceeds from exercising options and warrants | | | | |
| Payments on long term debt and leases [5] | $0 | $0 | ($327,600) | $0 |
| **Net cash generated (used) from financing activities** | $0 | $0 | ($327,600) | $0 |
| **INCREASE (DECREASE) IN CASH** | ($234,959) | ($50,359) | ($239,240) | $356,519 |
| **CASH AT BEGINNING OF PERIOD** | $887,588 | $652,630 | $602,271 | $363,030 |
| **CASH AT END OF PERIOD** | $652,630 | $602,271 | $363,030 | $719,549 |

Notes/Sources:
1. See Exhibit 9.
2. See Exhibit 10.
3. See Exhibit 14.
4. Subscription Agreement dated August 15, 2004.
5. See Exhibit 12.
6. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                                  Exhibit 11

Cash Flow Statement

| | Apr-05 | May-05 | Jun-05 | Jul-05 |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net Income[1] | $636,109 | $269,692 | $487,918 | $725,293 |
| | | | | |
| Items not requiring cash: | | | | |
| Depreciation [1] | $64,060 | $68,626 | $73,628 | $79,704 |
| Amortization [1] | $0 | $0 | $0 | $0 |
| Stock transactions | | | | |
| Changes in operating assets and liabilities: | | | | |
| Trade Receivables [2] | ($1,667,236) | ($1,365,997) | ($1,610,398) | ($1,610,398) |
| Prepaid Royalties [2] | $0 | $0 | $0 | $0 |
| Inventories [2] | $0 | $0 | $0 | $0 |
| Accounts Payable [2] | $1,609,320 | $1,318,545 | $1,554,457 | $1,554,457 |
| Line of Credit [2] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [2] | $55,000 | $55,000 | $55,000 | $55,000 |
| Payroll Taxes Payable [2] | $0 | $0 | $0 | $0 |
| Customer Prepayments [2] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes [2] | | | | |
| **Net cash generated (used) from operating activities** | $697,253 | $345,866 | $560,605 | $804,055 |
| | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Capital expenditures [3] | ($164,374) | ($180,073) | ($218,728) | ($245,384) |
| Cash paid for investments and acquisitions | | | | |
| Deferred acquisition costs | | | | |
| Capitalized assets | | | | |
| **Net cash generated (used) from investing activities** | ($164,374) | ($180,073) | ($218,728) | ($245,384) |
| | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Net proceeds from financing arrangements | $0 | $0 | $0 | $0 |
| Net proceeds from issuing common stock [4] | $0 | $0 | $0 | $0 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                 Exhibit 11

Cash Flow Statement

|                                                        | Apr-05      | May-05      | Jun-05      | Jul-05      |
| ------------------------------------------------------ | ----------- | ----------- | ----------- | ----------- |
| Proceeds from exercising options and warrants          |             |             |             |             |
| Payments on long term debt and leases [5]              | $0          | $0          | $0          | $0          |
| **Net cash generated (used) from financing activities** | $0          | $0          | $0          | $0          |
| **INCREASE (DECREASE) IN CASH**                        | $532,879    | $165,793    | $341,876    | $558,671    |
| **CASH AT BEGINNING OF PERIOD**                        | $719,549    | $1,252,428  | $1,418,221  | $1,760,097  |
| **CASH AT END OF PERIOD**                              | $1,252,428  | $1,418,221  | $1,760,097  | $2,318,768  |

Notes/Sources:
1. See Exhibit 9.
2. See Exhibit 10.
3. See Exhibit 14.
4. Subscription Agreement dated August 15, 2004.
5. See Exhibit 12.
6. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                          Exhibit 11

Cash Flow Statement

|                                                              | Aug-05       | Sep-05       | Oct-05       | Nov-05       |
| ------------------------------------------------------------ | ------------ | ------------ | ------------ | ------------ |
| **CASH FLOWS FROM OPERATING ACTIVITIES**                     |              |              |              |              |
| Net Income[1]                                                | $762,889     | $1,034,874   | $1,236,598   | $1,354,358   |
|                                                              |              |              |              |              |
| Items not requiring cash:                                    |              |              |              |              |
| Depreciation [1]                                             | $86,520      | $94,672      | $102,949     | $112,379     |
| Amortization [1]                                             | $0           | $0           | $0           | $0           |
| Stock transactions                                           |              |              |              |              |
| Changes in operating assets and liabilities:                 |              |              |              |              |
| Trade Receivables [2]                                        | ($1,138,646) | ($1,553,561) | ($1,553,561) | ($911,296)   |
| Prepaid Royalties [2]                                        | $0           | $0           | $0           | $0           |
| Inventories [2]                                              | $0           | $0           | $0           | $0           |
| Accounts Payable [2]                                         | $1,099,092   | $1,499,593   | $1,499,593   | $879,640     |
| Line of Credit [2]                                           | $0           | $0           | $0           | $0           |
| Deferred Compensation and Deferred Liabilities [2]           | ($2,413,985) | $0           | $0           | $0           |
| Payroll Taxes Payable [2]                                    | $0           | $0           | $0           | $0           |
| Customer Prepayments [2]                                     | $0           | $0           | $0           | $0           |
| Accrued Income Taxes [2]                                     |              |              |              |              |
| **Net cash generated (used) from operating activities**      | ($1,604,130) | $1,075,578   | $1,285,580   | $1,435,080   |
|                                                              |              |              |              |              |
| **CASH FLOWS FROM INVESTING ACTIVITIES**                     |              |              |              |              |
| Capital expenditures [3]                                     | ($293,473)   | ($297,976)   | ($339,478)   | ($349,957)   |
| Cash paid for investments and acquisitions                   |              |              |              |              |
| Deferred acquisition costs                                   |              |              |              |              |
| Capitalized assets                                           |              |              |              |              |
| **Net cash generated (used) from investing activities**      | ($293,473)   | ($297,976)   | ($339,478)   | ($349,957)   |
|                                                              |              |              |              |              |
| **CASH FLOWS FROM FINANCING ACTIVITIES**                     |              |              |              |              |
| Net proceeds from financing arrangements                     | $0           | $0           | $0           | $0           |
| Net proceeds from issuing common stock [4]                   | $0           | $0           | $0           | $0           |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                    Exhibit 11

Cash Flow Statement

|  | Aug-05 | Sep-05 | Oct-05 | Nov-05 |
|---|---|---|---|---|
| Proceeds from exercising options and warrants |  |  |  |  |
| Payments on long term debt and leases [5] | ($327,600) | $0 | $0 | $0 |
| **Net cash generated (used) from financing activities** | ($327,600) | $0 | $0 | $0 |
| **INCREASE (DECREASE) IN CASH** | ($2,225,203) | $777,603 | $946,102 | $1,085,123 |
| **CASH AT BEGINNING OF PERIOD** | $2,318,768 | $93,565 | $871,168 | $1,817,269 |
| **CASH AT END OF PERIOD** | $93,565 | $871,168 | $1,817,269 | $2,902,392 |

Notes/Sources:
1. See Exhibit 9.
2. See Exhibit 10.
3. See Exhibit 14.
4. Subscription Agreement dated August 15, 2004.
5. See Exhibit 12.
6. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                                      Exhibit 11

Cash Flow Statement

| | Dec-05 | Jan-06 | Feb-06 | Mar-06 |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net Income[1] | $1,539,632 | $1,758,946 | $1,785,552 | $2,021,854 |
| Items not requiring cash: | | | | |
| Depreciation [1] | $122,100 | $132,997 | $144,349 | $156,225 |
| Amortization [1] | $0 | $0 | $0 | $0 |
| Stock transactions | | | | |
| Changes in operating assets and liabilities: | | | | |
| Trade Receivables [2] | ($1,496,723) | ($1,496,723) | ($683,946) | ($1,439,886) |
| Prepaid Royalties [2] | $0 | $0 | $0 | $0 |
| Inventories [2] | $0 | $0 | $0 | $0 |
| Accounts Payable [2] | $1,444,730 | $1,444,730 | $660,187 | $1,389,867 |
| Line of Credit [2] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [2] | $0 | $0 | $0 | $0 |
| Payroll Taxes Payable [2] | $0 | $0 | $0 | $0 |
| Customer Prepayments [2] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes [2] | | | | |
| **Net cash generated (used) from operating activities** | $1,609,739 | $1,839,950 | $1,906,142 | $2,128,060 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Capital expenditures [3] | ($392,308) | ($408,658) | ($427,527) | ($455,725) |
| Cash paid for investments and acquisitions | | | | |
| Deferred acquisition costs | | | | |
| Capitalized assets | | | | |
| **Net cash generated (used) from investing activities** | ($392,308) | ($408,658) | ($427,527) | ($455,725) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Net proceeds from financing arrangements | $0 | $0 | $0 | $0 |
| Net proceeds from issuing common stock [4] | $0 | $0 | $0 | $0 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                      Exhibit 11

Cash Flow Statement

|  | Dec-05 | Jan-06 | Feb-06 | Mar-06 |
|---|---|---|---|---|
| Proceeds from exercising options and warrants |  |  |  |  |
| Payments on long term debt and leases [5] | $0 | $0 | ($327,600) | $0 |
| **Net cash generated (used) from financing activities** | $0 | $0 | ($327,600) | $0 |
| **INCREASE (DECREASE) IN CASH** | $1,217,432 | $1,431,292 | $1,151,016 | $1,672,336 |
| **CASH AT BEGINNING OF PERIOD** | $2,902,392 | $4,119,824 | $5,551,116 | $6,702,131 |
| **CASH AT END OF PERIOD** | $4,119,824 | $5,551,116 | $6,702,131 | $8,374,467 |

Notes/Sources:
1. See Exhibit 9.
2. See Exhibit 10.
3. See Exhibit 14.
4. Subscription Agreement dated August 15, 2004.
5. See Exhibit 12.
6. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                 Exhibit 11

Cash Flow Statement

| | Apr-06 | May-06 | Jun-06 | Jul-06 |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net Income[1] | $2,146,148 | $1,607,078 | $1,771,159 | $1,963,887 |
| | | | | |
| Items not requiring cash: | | | | |
| Depreciation [1] | $168,884 | $183,159 | $196,776 | $211,393 |
| Amortization [1] | $0 | $0 | $0 | $0 |
| Stock transactions | | | | |
| Changes in operating assets and liabilities: | | | | |
| Trade Receivables [2] | ($1,439,886) | ($456,595) | ($1,383,048) | ($1,383,048) |
| Prepaid Royalties [2] | $0 | $0 | $0 | $0 |
| Inventories [2] | $0 | $0 | $0 | $0 |
| Accounts Payable [2] | $1,389,867 | $440,734 | $1,335,004 | $1,335,004 |
| Line of Credit [2] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [2] | $0 | $0 | $0 | $0 |
| Payroll Taxes Payable [2] | $0 | $0 | $0 | $0 |
| Customer Prepayments [2] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes [2] | | | | |
| **Net cash generated (used) from operating activities** | $2,265,013 | $1,774,376 | $1,919,890 | $2,127,236 |
| | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Capital expenditures [3] | ($513,922) | ($490,181) | ($526,226) | ($548,271) |
| Cash paid for investments and acquisitions | | | | |
| Deferred acquisition costs | | | | |
| Capitalized assets | | | | |
| **Net cash generated (used) from investing activities** | ($513,922) | ($490,181) | ($526,226) | ($548,271) |
| | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Net proceeds from financing arrangements | $0 | $0 | $0 | $0 |
| Net proceeds from issuing common stock [4] | $0 | $0 | $0 | $0 |

Confidential – Attorneys Eyes Only                        Page 13 of 26

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                Exhibit 11

Cash Flow Statement

|  | Apr-06 | May-06 | Jun-06 | Jul-06 |
|---|---|---|---|---|
| Proceeds from exercising options and warrants |  |  |  |  |
| Payments on long term debt and leases [5] | $0 | $0 | $0 | $0 |
| **Net cash generated (used) from financing activities** | $0 | $0 | $0 | $0 |
| **INCREASE (DECREASE) IN CASH** | $1,751,091 | $1,284,195 | $1,393,664 | $1,578,965 |
| **CASH AT BEGINNING OF PERIOD** | $8,374,467 | $10,125,558 | $11,409,753 | $12,803,417 |
| **CASH AT END OF PERIOD** | $10,125,558 | $11,409,753 | $12,803,417 | $14,382,382 |

Notes/Sources:
1. See Exhibit 9.
2. See Exhibit 10.
3. See Exhibit 14.
4. Subscription Agreement dated August 15, 2004.
5. See Exhibit 12.
6. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                    Exhibit 11

Cash Flow Statement

| | Aug-06 | Sep-06 | Oct-06 | Nov-06 |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net Income[1] | $1,968,998 | $2,185,438 | $2,350,969 | $2,313,341 |
| Items not requiring cash: | | | | |
| Depreciation [1] | $226,623 | $242,504 | $258,781 | $276,039 |
| Amortization [1] | $0 | $0 | $0 | $0 |
| Stock transactions | | | | |
| Changes in operating assets and liabilities: | | | | |
| Trade Receivables [2] | ($613,846) | ($1,345,156) | ($1,345,156) | ($20,840) |
| Prepaid Royalties [2] | $0 | $0 | $0 | $0 |
| Inventories [2] | $0 | $0 | $0 | $0 |
| Accounts Payable [2] | $592,522 | $1,298,428 | $1,298,428 | $20,116 |
| Line of Credit [2] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [2] | $0 | $0 | $0 | $0 |
| Payroll Taxes Payable [2] | $0 | $0 | $0 | $0 |
| Customer Prepayments [2] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes [2] | | | | |
| **Net cash generated (used) from operating activities** | $2,174,297 | $2,381,214 | $2,563,022 | $2,588,656 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Capital expenditures [3] | ($571,719) | ($585,995) | ($621,272) | ($615,695) |
| Cash paid for investments and acquisitions | | | | |
| Deferred acquisition costs | | | | |
| Capitalized assets | | | | |
| **Net cash generated (used) from investing activities** | ($571,719) | ($585,995) | ($621,272) | ($615,695) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Net proceeds from financing arrangements | $0 | $0 | $0 | $0 |
| Net proceeds from issuing common stock [4] | $0 | $0 | $0 | $0 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                          Exhibit 11

Cash Flow Statement

|  | Aug-06 | Sep-06 | Oct-06 | Nov-06 |
|---|---|---|---|---|
| Proceeds from exercising options and warrants |  |  |  |  |
| Payments on long term debt and leases [5] | ($327,600) | $0 | $0 | $0 |
| **Net cash generated (used) from financing activities** | ($327,600) | $0 | $0 | $0 |
| **INCREASE (DECREASE) IN CASH** | $1,274,978 | $1,795,219 | $1,941,750 | $1,972,961 |
| **CASH AT BEGINNING OF PERIOD** | $14,382,382 | $15,657,360 | $17,452,579 | $19,394,329 |
| **CASH AT END OF PERIOD** | $15,657,360 | $17,452,579 | $19,394,329 | $21,367,290 |

Notes/Sources:

1. See Exhibit 9.
2. See Exhibit 10.
3. See Exhibit 14.
4. Subscription Agreement dated August 15, 2004.
5. See Exhibit 12.
6. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 11

Cash Flow Statement

| | Dec-06 | Jan-07 | Feb-07 | Mar-07 |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net Income [1] | $2,410,443 | $2,583,776 | $2,489,334 | $2,689,589 |
| Items not requiring cash: | | | | |
| Depreciation [1] | $293,142 | $311,803 | $314,228 | $313,706 |
| Amortization [1] | $0 | $0 | $0 | $0 |
| Stock transactions | | | | |
| Changes in operating assets and liabilities: | | | | |
| Trade Receivables [2] | ($1,288,319) | ($1,288,319) | $206,510 | ($1,231,481) |
| Prepaid Royalties [2] | $0 | $0 | $0 | $0 |
| Inventories [2] | $0 | $0 | $0 | $0 |
| Accounts Payable [2] | $1,243,565 | $1,243,565 | ($199,336) | $1,188,702 |
| Line of Credit [2] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [2] | $0 | $0 | $0 | $0 |
| Payroll Taxes Payable [2] | $0 | $0 | $0 | $0 |
| Customer Prepayments [2] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes [2] | | | | |
| **Net cash generated (used) from operating activities** | $2,658,831 | $2,850,826 | $2,810,735 | $2,960,515 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Capital expenditures [3] | ($671,819) | ($667,943) | ($666,756) | ($688,727) |
| Cash paid for investments and acquisitions | | | | |
| Deferred acquisition costs | | | | |
| Capitalized assets | | | | |
| **Net cash generated (used) from investing activities** | ($671,819) | ($667,943) | ($666,756) | ($688,727) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Net proceeds from financing arrangements | $0 | $0 | $0 | $0 |
| Net proceeds from issuing common stock [4] | $0 | $0 | $0 | $0 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                                                Exhibit 11

Cash Flow Statement

| | Dec-06 | Jan-07 | Feb-07 | Mar-07 |
|---|---|---|---|---|
| Proceeds from exercising options and warrants | | | | |
| Payments on long term debt and leases [5] | $0 | $0 | ($327,600) | $0 |
| **Net cash generated (used) from financing activities** | $0 | $0 | ($327,600) | $0 |
| | | | | |
| **INCREASE (DECREASE) IN CASH** | $1,987,012 | $2,182,883 | $1,816,379 | $2,271,788 |
| | | | | |
| **CASH AT BEGINNING OF PERIOD** | $21,367,290 | $23,354,303 | $25,537,186 | $27,353,565 |
| | | | | |
| **CASH AT END OF PERIOD** | $23,354,303 | $25,537,186 | $27,353,565 | $29,625,352 |

Notes/Sources:

1. See Exhibit 9.
2. See Exhibit 10.
3. See Exhibit 14.
4. Subscription Agreement dated August 15, 2004.
5. See Exhibit 12.
6. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 11

Cash Flow Statement

| | Apr-07 | May-07 | Jun-07 | Jul-07 |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net Income[1] | $2,823,241 | $2,437,977 | $2,575,966 | $2,737,950 |
| | | | | |
| Items not requiring cash: | | | | |
| Depreciation [1] | $332,837 | $351,288 | $371,747 | $393,152 |
| Amortization [1] | $0 | $0 | $0 | $0 |
| Stock transactions | | | | |
| Changes in operating assets and liabilities: | | | | |
| Trade Receivables [2] | ($1,231,481) | ($1,231,481) | ($1,231,481) | ($1,231,481) |
| Prepaid Royalties [2] | $0 | $0 | $0 | $0 |
| Inventories [2] | $0 | $0 | $0 | $0 |
| Accounts Payable [2] | $1,188,702 | $1,188,702 | $1,188,702 | $1,188,702 |
| Line of Credit [2] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [2] | $0 | $0 | $0 | $0 |
| Payroll Taxes Payable [2] | $0 | $0 | $0 | $0 |
| Customer Prepayments [2] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes [2] | | | | |
| **Net cash generated (used) from operating activities** | $3,113,299 | $2,746,486 | $2,904,934 | $3,088,323 |
| | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Capital expenditures [3] | ($725,699) | ($736,671) | ($771,643) | ($788,614) |
| Cash paid for investments and acquisitions | | | | |
| Deferred acquisition costs | | | | |
| Capitalized assets | | | | |
| **Net cash generated (used) from investing activities** | ($725,699) | ($736,671) | ($771,643) | ($788,614) |
| | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Net proceeds from financing arrangements | $0 | $0 | $0 | $0 |
| Net proceeds from issuing common stock [4] | $0 | $0 | $0 | $0 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 11

Cash Flow Statement

|  | Apr-07 | May-07 | Jun-07 | Jul-07 |
|---|---|---|---|---|
| Proceeds from exercising options and warrants |  |  |  |  |
| Payments on long term debt and leases [5] | $0 | $0 | $0 | $0 |
| **Net cash generated (used) from financing activities** | $0 | $0 | $0 | $0 |
| **INCREASE (DECREASE) IN CASH** | $2,387,600 | $2,009,815 | $2,133,292 | $2,299,709 |
| **CASH AT BEGINNING OF PERIOD** | $29,625,352 | $32,012,952 | $34,022,767 | $36,156,059 |
| **CASH AT END OF PERIOD** | $32,012,952 | $34,022,767 | $36,156,059 | $38,455,768 |

Notes/Sources:
1. See Exhibit 9.
2. See Exhibit 10.
3. See Exhibit 14.
4. Subscription Agreement dated August 15, 2004.
5. See Exhibit 12.
6. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 11

Cash Flow Statement

| | Aug-07 | Sep-07 | Oct-07 | Nov-07 |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net Income[1] | $2,815,522 | $2,988,255 | $3,129,277 | $3,303,261 |
| | | | | |
| Items not requiring cash: | | | | |
| Depreciation [1] | $415,058 | $438,392 | $461,609 | $466,298 |
| Amortization [1] | $0 | $0 | $0 | $0 |
| Stock transactions | | | | |
| Changes in operating assets and liabilities: | | | | |
| Trade Receivables [2] | ($1,231,481) | ($1,231,481) | ($1,231,481) | ($1,231,481) |
| Prepaid Royalties [2] | $0 | $0 | $0 | $0 |
| Inventories [2] | $0 | $0 | $0 | $0 |
| Accounts Payable [2] | $1,188,702 | $1,188,702 | $1,188,702 | $1,188,702 |
| Line of Credit [2] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [2] | $0 | $0 | $0 | $0 |
| Payroll Taxes Payable [2] | $0 | $0 | $0 | $0 |
| Customer Prepayments [2] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes [2] | | | | |
| **Net cash generated (used) from operating activities** | $3,187,802 | $3,383,868 | $3,548,107 | $3,726,780 |
| | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Capital expenditures [3] | ($841,586) | ($836,558) | ($869,529) | ($890,501) |
| Cash paid for investments and acquisitions | | | | |
| Deferred acquisition costs | | | | |
| Capitalized assets | | | | |
| **Net cash generated (used) from investing activities** | ($841,586) | ($836,558) | ($869,529) | ($890,501) |
| | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Net proceeds from financing arrangements | $0 | $0 | $0 | $0 |
| Net proceeds from issuing common stock [4] | $0 | $0 | $0 | $0 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 11

Cash Flow Statement

|  | Aug-07 | Sep-07 | Oct-07 | Nov-07 |
|---|---|---|---|---|
| Proceeds from exercising options and warrants |  |  |  |  |
| Payments on long term debt and leases [5] | ($296,747) | $0 | $0 | $0 |
| **Net cash generated (used) from financing activities** | ($296,747) | $0 | $0 | $0 |
| **INCREASE (DECREASE) IN CASH** | $2,049,469 | $2,547,310 | $2,678,577 | $2,836,279 |
| **CASH AT BEGINNING OF PERIOD** | $38,455,768 | $40,505,237 | $43,052,547 | $45,731,124 |
| **CASH AT END OF PERIOD** | $40,505,237 | $43,052,547 | $45,731,124 | $48,567,403 |

Notes/Sources:
1. See Exhibit 9.
2. See Exhibit 10.
3. See Exhibit 14.
4. Subscription Agreement dated August 15, 2004.
5. See Exhibit 12.
6. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                                    Exhibit 11

Cash Flow Statement

|  | Dec-07 | Jan-08 | Feb-08 | Mar-08 |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net Income[1] | $3,432,651 | $3,596,347 | $3,741,552 | $3,902,484 |
| Items not requiring cash: | | | | |
| Depreciation [1] | $490,840 | $516,256 | $540,867 | $565,275 |
| Amortization [1] | $0 | $0 | $0 | $0 |
| Stock transactions | | | | |
| Changes in operating assets and liabilities: | | | | |
| Trade Receivables [2] | ($1,231,481) | ($1,231,481) | ($1,231,481) | ($1,231,481) |
| Prepaid Royalties [2] | $0 | $0 | $0 | $0 |
| Inventories [2] | $0 | $0 | $0 | $0 |
| Accounts Payable [2] | $1,188,702 | $1,188,702 | $1,188,702 | $1,188,702 |
| Line of Credit [2] | $0 | $0 | $0 | $0 |
| Deferred Compensation and Deferred Liabilities [2] | $0 | $0 | $0 | $0 |
| Payroll Taxes Payable [2] | $0 | $0 | $0 | $0 |
| Customer Prepayments [2] | $0 | $0 | $0 | $0 |
| Accrued Income Taxes [2] | | | | |
| **Net cash generated (used) from operating activities** | $3,880,712 | $4,069,824 | $4,239,640 | $4,424,980 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Capital expenditures [3] | ($925,473) | ($936,444) | ($966,416) | ($988,388) |
| Cash paid for investments and acquisitions | | | | |
| Deferred acquisition costs | | | | |
| Capitalized assets | | | | |
| **Net cash generated (used) from investing activities** | ($925,473) | ($936,444) | ($966,416) | ($988,388) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Net proceeds from financing arrangements | $0 | $0 | $0 | $0 |
| Net proceeds from issuing common stock [4] | $0 | $0 | $0 | $0 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                    Exhibit 11

Cash Flow Statement

|  | Dec-07 | Jan-08 | Feb-08 | Mar-08 |
|---|---|---|---|---|
| Proceeds from exercising options and warrants |  |  |  |  |
| Payments on long term debt and leases [5] | $0 | $0 | $0 | $0 |
| **Net cash generated (used) from financing activities** | $0 | $0 | $0 | $0 |
| **INCREASE (DECREASE) IN CASH** | $2,955,239 | $3,133,380 | $3,273,224 | $3,436,592 |
| **CASH AT BEGINNING OF PERIOD** | $48,567,403 | $51,522,642 | $54,656,022 | $57,929,246 |
| **CASH AT END OF PERIOD** | $51,522,642 | $54,656,022 | $57,929,246 | $61,365,838 |

Notes/Sources:
1. See Exhibit 9.
2. See Exhibit 10.
3. See Exhibit 14.
4. Subscription Agreement dated August 15, 2004.
5. See Exhibit 12.
6. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 11

Cash Flow Statement

|  | Apr-08 |
|---|---:|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | |
| Net Income [1] | $3,977,367 |
| | |
| Items not requiring cash: | |
| Depreciation [1] | $589,436 |
| Amortization [1] | $0 |
| Stock transactions | |
| Changes in operating assets and liabilities: | |
| Trade Receivables [2] | ($1,231,481) |
| Prepaid Royalties [2] | $0 |
| Inventories [2] | $0 |
| Accounts Payable [2] | $1,188,702 |
| Line of Credit [2] | $0 |
| Deferred Compensation and Deferred Liabilities [2] | $0 |
| Payroll Taxes Payable [2] | $0 |
| Customer Prepayments [2] | $0 |
| Accrued Income Taxes [2] | |
| **Net cash generated (used) from operating activities** | $4,524,024 |
| | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | |
| Capital expenditures [3] | ($1,043,360) |
| Cash paid for investments and acquisitions | |
| Deferred acquisition costs | |
| Capitalized assets | |
| **Net cash generated (used) from investing activities** | ($1,043,360) |
| | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | |
| Net proceeds from financing arrangements | $0 |
| Net proceeds from issuing common stock [4] | $0 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                  Exhibit 11

Cash Flow Statement

| | Apr-08 |
|---|---|
| Proceeds from exercising options and warrants | |
| Payments on long term debt and leases [5] | $0 |
| **Net cash generated (used) from financing activities** | $0 |
| | |
| **INCREASE (DECREASE) IN CASH** | $3,480,665 |
| | |
| **CASH AT BEGINNING OF PERIOD** | $61,365,838 |
| | |
| **CASH AT END OF PERIOD** | $64,846,502 |

Notes/Sources:
1. See Exhibit 9.
2. See Exhibit 10.
3. See Exhibit 14.
4. Subscription Agreement dated August 15, 2004.
5. See Exhibit 12.
6. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                      Exhibit 12

### Senior Debt (Note Payable)

|  | Opening Loan Balance | Payment | Principal [1] | Interest | Closing Balance |
|---|---|---|---|---|---|
| 31-Dec-03 [1] |  |  |  |  | $2,262,347 |
| 31-Aug-04 | $2,262,347 | $395,470 | $327,600 | $67,870 | $1,934,747 |
| 28-Feb-05 | $1,934,747 | $385,642 | $327,600 | $58,042 | $1,607,147 |
| 31-Aug-05 | $1,607,147 | $375,814 | $327,600 | $48,214 | $1,279,547 |
| 28-Feb-06 | $1,279,547 | $365,986 | $327,600 | $38,386 | $951,947 |
| 31-Aug-06 | $951,947 | $356,158 | $327,600 | $28,558 | $624,347 |
| 28-Feb-07 | $624,347 | $346,330 | $327,600 | $18,730 | $296,747 |
| 31-Aug-07 | $296,747 | $305,649 | $296,747 | $8,902 | $0 |
| Total Amount |  | $2,531,052 | $2,262,347 | $268,705 |  |

6% Interest [1]

*Notes/Sources:*

1. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pgs. 13, 14.

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                       Exhibit 13

### Line of Credit [1]

|          | Opening Balance | Principal | Interest | Closing Balance |
|----------|----------------|-----------|----------|-----------------|
| Mar-04   |                |           |          | $193,170        |
| Apr-04   | $193,170       |           |          | $193,170        |
| May-04   | $193,170       |           |          | $193,170        |
| Jun-04   | $193,170       |           | $2,777   | $193,170        |
| Jul-04   | $193,170       |           |          | $193,170        |
| Aug-04   | $193,170       |           |          | $193,170        |
| Sep-04   | $193,170       |           | $2,777   | $193,170        |
| Oct-04   | $193,170       | $193,170  | $926     | $0              |
| Total Amount |            | $193,170  | $6,479   |                 |

5.75% Interest [1]

*Notes/Sources:*
1. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 12.

Confidential – Attorneys Eyes Only                              Page 1 of 1

Janis Lowe, et al. v. Elbau, B.V., et al

Exhibit 14

Assumptions

| REVENUE ASSUMPTIONS: | Factor | Rate | Apr-04 | May-04 |
|---|---|---|---|---|
| **Sales and Gross Revenue:** | | | | |
| Price Index (decline over time) [1] | | | 1.00 | 0.97 |
| Unit sales | | | | |
| Number of Cores [1] | 1.00 | 500 | 19 | 2 |
| Price per core [2] | | 1,432 | 1,432 | 1,389 |
| Number of Handhelds [1] | 0.95 | | 18 | 2 |
| Price per Handheld [2] | | 843 | 843 | 817 |
| Number of docks [1] | 1.20 | | 23 | 2 |
| Price per dock [2] | | 274 | 274 | 266 |
| Number of Peripherals [1] | | | 2 | 0 |
| Price per Peripheral [1] | | 0 | 0 | 0 |
| **Monthly Revenue (unit average)** | | 2,549 | $48,663 | $4,969 |
| | | | | |
| Secondary sales [1] | | | | |
| Number of units | | | | |
| Price per unit | | | | |
| **Monthly Revenue** | | | | |
| | | | | |
| **Total Revenue** | | | $48,663 | $4,969 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Elian, B.V., et al*                                                                                 Exhibit 14

Assumptions

| REVENUE ASSUMPTIONS: | Factor | Rate | Apr-04 | May-04 |
|---|---|---|---|---|
| Cumulative Cores Sold | | | 19 | 21 |
| **Staffing (Number of People)** | | | | |
| Operations: [1] | Units/month per person [1] | Salary per year [1] | | |
| Production Mgr - RL | 500,000 | $110,000 | 1 | 1 |
| Supply chain / Procurement Mgr - RB | 500,000 | $90,000 | 1 | 1 |
| Quality Mgr - PS | 500,000 | $70,000 | 1 | 1 |
| Materials Mgr | 500,000 | $60,000 | 1 | 1 |
| Supervisor | 4,000 | $58,500 | 1 | 1 |
| Other | | | | |
| Lead Sys. Eng. (Swiss) | 500,000 | $90,000 | 1 | 1 |
| BIOS Eng.(Swiss) | 500,000 | $100,000 | 1 | 1 |
| Hardware Eng. (Swiss) | 4,000 | $80,000 | 1 | 1 |
| ME (Swiss) | 4,000 | $80,000 | 1 | 1 |
| Tech (Swiss) | 1,000 | $48,000 | 1 | 1 |
| Image Burn | 2,500 | $50,000 | 1 | 1 |
| Purchasing | 12,000 | $44,000 | 1 | 1 |
| Parts Mgr | 4,000 | $50,000 | 1 | 1 |
| QC / Image Burn | 4,000 | $50,000 | 1 | 1 |
| Shipping | 4,000 | $44,000 | 1 | 1 |
| Warehouse | 4,000 | $44,000 | 1 | 1 |
| Other | 4,000 | $44,000 | 1 | 1 |
| Assembler | 400 | $44,000 | 1 | 1 |
| | | | 18 | 18 |
| Selling [1] | | | | |
| Sales (Swiss) | 1,000 | $100,000 | 1 | 1 |
| Sales (US) | | | | |
| Marketing/PR assistant (US) | | | | |
| Sales Mgr | 20,000 | $80,000 | 1 | 1 |
| | | | 2 | 2 |
| Administration: [1] | | | | |
| HR Admin plus temp | 2,000 | $60,000 | 1 | 1 |
| Human Resources | 500,000 | $60,000 | 1 | 1 |
| Sales  Support and Marketing | 1,000 | $50,000 | 1 | 1 |
| Customer Service | 600 | $44,000 | 1 | 1 |
| Finance Mgr (Swiss) | 500,000 | $75,000 | 1 | 1 |
| Accounting and Temporary | 1,000 | $45,000 | 1 | 1 |
| Warranty and Repair | 2,000 | $44,000 | 1 | 1 |
| Warranty Repair Mgr | 8,000 | $60,000 | 1 | 1 |
| | | | 8 | 8 |
| **Total Staffing Count (Number of employees)** | | | 28 | 28 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Elam, B.V., et al*
Assumptions

Exhibit 14

| | Factor | Rate | Apr-04 | May-04 |
|---|---|---|---|---|
| **REVENUE ASSUMPTIONS:** | | | | |
| **CAPITAL EXPENDITURES:** | | | | |
| Manfacturing eq & sys (incl IGS deliverables) [1] | | | | |
| Capital equipment per operation emp [1] | | (2,000) | $36,000 | $0 |
| Relocation and Legal Expenses [1] | | (3,000) | $24,000 | $0 |
| Engineering, Tooling & R&D [1,3] | 3% | | $1,460 | $149 |
| Incremental Capex (for version 1.5) | | | | |
| Total Capital Expenditures | | | $61,460 | $149 |
| Total Yearly Capital Expenditures | | | | $1,142,852 |
| **FINANCIAL ASSUMPTIONS:** | | | | |
| Depreciation rate per capital expenditure [1] | Straight Line 3 Yr | | | |
| Accounts Receivables (45 days) [4] | | | 1.5 | 1.5 |
| Accounts Payables (Cost of Goods Sold - 60 days) | | | 2.0 | 2.0 |
| Return on idle cash [1] | | 2% | | |
| Capital Infusion | | | 1.5 | |

*Notes/Sources:*
1. FinancialModel_rev2.3, Assumptions.
2. See Exhibit 17.
3. Antelope Technologies, Inc.'s Business Plan, February 2004 - Revision 2.7, pg. 8.
4. Letter from C. Stephen Guyer to Gregory F. Cox, February 12, 2007.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Elan, B.V., et al*
Assumptions

Exhibit 14

| REVENUE ASSUMPTIONS: | Jun-04 | Jul-04 | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales and Gross Revenue:** | | | | | | | | | | | | |
| Price Index (decline over time) [1] | 0.97 | 0.97 | 0.94 | 0.94 | 0.94 | 0.91 | 0.91 | 0.91 | 0.88 | 0.88 | 0.88 | 0.85 |
| Unit sales | | | | | | | | | | | | |
| Number of Cores [1] | 14 | 0 | 22 | 10 | 10 | 100 | 150 | 650 | 1,150 | 1,650 | 2,150 | 2,650 |
| Price per core [2] | 1,389 | 1,389 | 1,346 | 1,346 | 1,346 | 1,303 | 1,303 | 1,303 | 1,260 | 1,260 | 1,260 | 1,217 |
| Number of Handhelds [1] | 13 | 0 | 21 | 10 | 10 | 95 | 143 | 618 | 1,093 | 1,568 | 2,043 | 2,518 |
| Price per Handheld [2] | 817 | 817 | 792 | 792 | 792 | 767 | 767 | 767 | 741 | 741 | 741 | 716 |
| Number of docks [1] | 17 | 0 | 26 | 12 | 12 | 120 | 180 | 780 | 1,380 | 1,980 | 2,580 | 3,180 |
| Price per dock [2] | 266 | 266 | 257 | 257 | 257 | 249 | 249 | 249 | 241 | 241 | 241 | 233 |
| Number of Peripherals [1] | 1 | 0 | 2 | 1 | 1 | 10 | 15 | 65 | 115 | 165 | 215 | 265 |
| Price per Peripheral [1] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Monthly Revenue (unit average)** | $34,781 | $0 | $52,966 | $24,075 | $24,075 | $233,069 | $349,604 | $1,514,950 | $2,591,934 | $3,718,862 | $4,845,790 | $5,769,103 |
| Secondary sales [1] | | | | | | | | | | | | |
| Number of units | | | | | | | | | | | | |
| Price per unit | | | | | | | | | | | | |
| **Monthly Revenue** | | | | | | | | | | | | |
| **Total Revenue** | $34,781 | $0 | $52,966 | $24,075 | $24,075 | $233,069 | $349,604 | $1,514,950 | $2,591,934 | $3,718,862 | $4,845,790 | $5,769,103 |

Janis Lowe, et al. v. Eban, B.V., et al
Assumptions

Exhibit 14

| REVENUE ASSUMPTIONS: | Jun-04 | Jul-04 | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative Cores Sold | 35 | 35 | 57 | 67 | 77 | 177 | 327 | 977 | 2,127 | 3,777 | 5,927 | 8,577 |
| **Staffing (Number of People)** | | | | | | | | | | | | |
| Operations: [1] | | | | | | | | | | | | |
| Production Mgr - RL | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Supply chain / Procurement Mgr - RB | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Quality Mgr - PS | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Materials Mgr | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Supervisor | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Other | | | | | | | | | | | | |
| Lead Sys. Eng. (Swiss) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| BIOS Eng.(Swiss) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Hardware Eng. (Swiss) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| ME (Swiss) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Tech (Swiss) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 3 | 3 |
| Image Burn | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 |
| Purchasing | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Parts Mgr | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| QC / Image Burn | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Shipping | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Warehouse | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Other | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Assembler | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 3 | 5 | 6 | 7 |
| | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 19 | 21 | 23 | 25 | 27 |
| Selling [1] | | | | | | | | | | | | |
| Sales (Swiss) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 3 | 3 |
| Sales (US) | | | | | | | | | | | | |
| Marketing/PR assistant (US) | | | | | | | | | | | | |
| Sales Mgr | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 | 4 | 4 |
| Administration: [1] | | | | | | | | | | | | |
| HR Admin plus temp | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 |
| Human Resources | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Sales  Support and Marketing | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 3 | 3 |
| Customer Service | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 3 | 4 | 5 |
| Finance Mgr (Swiss) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Accounting and Temporary | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 3 | 3 |
| Warranty and Repair | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 |
| Warranty Repair Mgr | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 9 | 11 | 12 | 17 | 18 |
| **Total Staffing Count (Number of employees)** | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 30 | 35 | 38 | 46 | 49 |

*Janis Lowe, et al. v. Elian, B.V., et al*                                                                                                                                Exhibit 14

Assumptions

| | Jun-04 | Jul-04 | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE ASSUMPTIONS:** | | | | | | | | | | | | |
| **CAPITAL EXPENDITURES:** | | | | | | | | | | | | |
| Manfacturing eq & sys (incl IGS deliverables) [1] | | | | | | | | | | | | |
| Capital equipment per operation emp [1] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $2,000 | $4,000 | $4,000 | $4,000 | $4,000 |
| Relocation and Legal Expenses [1] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,000 | $6,000 | $3,000 | $15,000 | $3,000 |
| Engineering, Tooling & R&D [1,3] | $1,043 | $0 | $1,589 | $722 | $722 | $6,992 | $10,488 | $45,448 | $77,758 | $111,566 | $145,374 | $173,073 |
| Incremental Capex (for version 1.5) | | | | | $700,000 | | | | | | | |
| Total Capital Expenditures | $1,043 | $0 | $1,589 | $722 | $700,722 | $6,992 | $10,488 | $50,448 | $87,758 | $118,566 | $164,374 | $180,073 |
| Total Yearly Capital Expenditures | | | | | | | | | | | | $4,123,209 |
| **FINANCIAL ASSUMPTIONS:** | | | | | | | | | | | | |
| Depreciation rate per capital expenditure [3] | | | | | | | | | | | | |
| Accounts Receivables (45 days) [4] | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 |
| Accounts Payables (Cost of Goods Sold - 60 days) | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| Return on idle cash [1] | | | | | | | | | | | | |
| Capital Infusion | | | $550,000 | | $4,170,000 | | | | | | | |

*Notes/Sources:*
1. FinancialModel_rev2.3, Assumptions.
2. See Exhibit 17.
3. Antelope Technologies, Inc.'s Business Plan, February 2004 - Revision 2.7, pg. 8.
4. Letter from C. Stephen Guyer to Gregory F. Cox, February 12, 2007.

Janis Lowe, et al. v. Elan, B.V., et al

Exhibit 14

Assumptions

| REVENUE ASSUMPTIONS: | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales and Gross Revenue:** | | | | | | | | | | | | |
| Price Index (decline over time) [1] | 0.85 | 0.85 | 0.82 | 0.82 | 0.82 | 0.79 | 0.79 | 0.79 | 0.76 | 0.76 | 0.76 | 0.73 |
| Unit sales | | | | | | | | | | | | |
| Number of Cores [1] | 3,150 | 3,650 | 4,150 | 4,650 | 5,150 | 5,650 | 6,150 | 6,650 | 7,150 | 7,650 | 8,150 | 8,650 |
| Price per core [2] | 1,217 | 1,217 | 1,174 | 1,174 | 1,174 | 1,131 | 1,131 | 1,131 | 1,089 | 1,089 | 1,089 | 1,046 |
| Number of Handhelds [1] | 2,993 | 3,468 | 3,943 | 4,418 | 4,893 | 5,368 | 5,843 | 6,318 | 6,793 | 7,268 | 7,743 | 8,218 |
| Price per Handheld [2] | 716 | 716 | 691 | 691 | 691 | 666 | 666 | 666 | 640 | 640 | 640 | 615 |
| Number of docks [1] | 3,780 | 4,380 | 4,980 | 5,580 | 6,180 | 6,780 | 7,380 | 7,980 | 8,580 | 9,180 | 9,780 | 10,380 |
| Price per dock [2] | 233 | 233 | 225 | 225 | 225 | 216 | 216 | 216 | 208 | 208 | 208 | 200 |
| Number of Peripherals [3] | 315 | 365 | 415 | 465 | 515 | 565 | 615 | 665 | 715 | 765 | 815 | 865 |
| Price per Peripheral [3] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Monthly Revenue (unit average)** | $6,857,613 | $7,946,123 | $8,715,764 | $9,765,856 | $10,815,948 | $11,431,916 | $12,443,590 | $13,455,264 | $13,917,561 | $14,890,817 | $15,864,073 | $16,172,697 |
| Secondary sales [1] | | | | | | | | | | | | |
| Number of units | | | | | | | | | | | | |
| Price per unit | | | | | | | | | | | | |
| **Monthly Revenue** | | | | | | | | | | | | |
| **Total Revenue** | $6,857,613 | $7,946,123 | $8,715,764 | $9,765,856 | $10,815,948 | $11,431,916 | $12,443,590 | $13,455,264 | $13,917,561 | $14,890,817 | $15,864,073 | $16,172,697 |

Confidential – Attorneys Eyes Only

Janis Lowe, et al. v. Eltan, B.V., et al

Assumptions

Exhibit 14

| REVENUE ASSUMPTIONS: | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative Cores Sold | 11,727 | 15,377 | 19,527 | 24,177 | 29,327 | 34,977 | 41,127 | 47,777 | 54,927 | 62,577 | 70,727 | 79,377 |
| **Staffing (Number of People)** | | | | | | | | | | | | |
| Operations: [1] | | | | | | | | | | | | |
| Production Mgr - RL | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Supply chain / Procurement Mgr - RB | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Quality Mgr - PS | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Materials Mgr | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Supervisor | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 |
| Other | | | | | | | | | | | | |
| Lead Sys. Eng. (Swiss) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| BIOS Eng.(Swiss) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Hardware Eng. (Swiss) | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 |
| ME (Swiss) | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 |
| Tech (Swiss) | 4 | 4 | 5 | 5 | 6 | 6 | 7 | 7 | 8 | 8 | 9 | 9 |
| Image Burn | 2 | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 |
| Purchasing | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Parts Mgr | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 |
| QC / Image Burn | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 |
| Shipping | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 |
| Warehouse | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 |
| Other | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 |
| Assembler | 8 | 10 | 11 | 12 | 13 | 15 | 16 | 17 | 18 | 20 | 21 | 22 |
| | 29 | 31 | 41 | 42 | 45 | 47 | 49 | 50 | 52 | 55 | 65 | 66 |
| Selling [1] | | | | | | | | | | | | |
| Sales (Swiss) | 4 | 4 | 5 | 5 | 6 | 6 | 7 | 7 | 8 | 8 | 9 | 9 |
| Sales (US) | | | | | | | | | | | | |
| Marketing/PR assistant (US) | | | | | | | | | | | | |
| Sales Mgr | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | 5 | 5 | 6 | 6 | 7 | 7 | 8 | 8 | 9 | 9 | 10 | 10 |
| Administration: [1] | | | | | | | | | | | | |
| HR Admin plus temp | 2 | 2 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 5 | 5 |
| Human Resources | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Sales Support and Marketing | 4 | 4 | 5 | 5 | 6 | 6 | 7 | 7 | 8 | 8 | 9 | 9 |
| Customer Service | 6 | 7 | 7 | 8 | 9 | 10 | 11 | 12 | 12 | 13 | 14 | 15 |
| Finance Mgr (Swiss) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Accounting and Temporary | 4 | 4 | 5 | 5 | 6 | 6 | 7 | 7 | 8 | 8 | 9 | 9 |
| Warranty and Repair | 2 | 2 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 5 | 5 |
| Warranty Repair Mgr | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 |
| | 21 | 22 | 26 | 27 | 30 | 31 | 36 | 37 | 39 | 40 | 46 | 47 |
| **Total Staffing Count (Number of employees)** | 55 | 58 | 73 | 75 | 82 | 85 | 93 | 95 | 100 | 104 | 121 | 123 |

*Janis Lowe, et al. v. Elan, B.V., et al*
Assumptions

Exhibit 14

| REVENUE ASSUMPTIONS: | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CAPITAL EXPENDITURES:** | | | | | | | | | | | | |
| Manfacturing eq & sys (incl IGS deliverables) [1] | | | | | | | | | | | | |
| Capital equipment per operation emp [1] | $4,000 | $4,000 | $20,000 | $2,000 | $6,000 | $4,000 | $4,000 | $2,000 | $4,000 | $6,000 | $20,000 | $2,000 |
| Relocation and Legal Expenses [1] | $9,000 | $3,000 | $12,000 | $3,000 | $9,000 | $3,000 | $15,000 | $3,000 | $6,000 | $3,000 | $18,000 | $3,000 |
| Engineering, Tooling & R&D [1,3] | $205,728 | $238,384 | $261,473 | $292,976 | $324,478 | $342,957 | $373,308 | $403,658 | $417,527 | $446,725 | $475,922 | $485,181 |
| Incremental Capex (for version 1.5) | | | | | | | | | | | | |
| Total Capital Expenditures | $218,728 | $245,384 | $293,473 | $297,976 | $339,478 | $349,957 | $392,308 | $408,658 | $427,527 | $455,725 | $513,922 | $490,181 |
| Total Yearly Capital Expenditures | | | | | | | | | | | | $7,380,304 |
| **FINANCIAL ASSUMPTIONS:** | | | | | | | | | | | | |
| Depreciation rate per capital expenditure [3] | | | | | | | | | | | | |
| Accounts Receivables (45 days) [4] | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 |
| Accounts Payables (Cost of Goods Sold - 60 days) | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| Return on idle cash [1] | | | | | | | | | | | | |
| Capital Infusion | | | | | | | | | | | | |

*Notes/Sources:*
1. FinancialModel_rev2.3, Assumptions.
2. See Exhibit 17.
3. Antelope Technologies, Inc.'s Business Plan, February 2004 - Revision 2.7, pg. 8.
4. Letter from C. Stephen Goyer to Gregory F. Cox, February 12, 2007.

*Janis Lowe, et al. v. Elan, B.V., et al*
Assumptions

Exhibit 14

| REVENUE ASSUMPTIONS: | Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 | Dec-06 | Jan-07 | Feb-07 | Mar-07 | Apr-07 | May-07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales and Gross Revenue:** | | | | | | | | | | | | |
| Price Index (decline over time) [3] | 0.73 | 0.73 | 0.71 | 0.71 | 0.71 | 0.68 | 0.68 | 0.68 | 0.65 | 0.65 | 0.65 | 0.65 |
| Unit sales | | | | | | | | | | | | |
| Number of Cores [1] | 9,150 | 9,650 | 10,150 | 10,650 | 11,150 | 11,650 | 12,150 | 12,650 | 13,150 | 13,650 | 14,150 | 14,650 |
| Price per core [2] | 1,046 | 1,046 | 1,017 | 1,017 | 1,017 | 974 | 974 | 974 | 931 | 931 | 931 | 931 |
| Number of Handhelds [1] | 8,693 | 9,168 | 9,643 | 10,118 | 10,593 | 11,068 | 11,543 | 12,018 | 12,493 | 12,968 | 13,443 | 13,918 |
| Price per Handheld [2] | 615 | 615 | 598 | 598 | 598 | 573 | 573 | 573 | 548 | 548 | 548 | 548 |
| Number of docks [1] | 10,980 | 11,580 | 12,180 | 12,780 | 13,380 | 13,980 | 14,580 | 15,180 | 15,780 | 16,380 | 16,980 | 17,580 |
| Price per dock [2] | 200 | 200 | 194 | 194 | 194 | 186 | 186 | 186 | 178 | 178 | 178 | 178 |
| Number of Peripherals [1] | 915 | 965 | 1,015 | 1,065 | 1,115 | 1,165 | 1,215 | 1,265 | 1,315 | 1,365 | 1,415 | 1,465 |
| Price per Peripheral [2] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Monthly Revenue (unit average)** | $17,107,535 | $18,042,373 | $18,457,288 | $19,366,514 | $20,275,740 | $20,289,826 | $21,160,634 | $22,031,442 | $21,891,857 | $22,724,247 | $23,556,637 | $24,389,027 |
| Secondary sales [1] | | | | | | | | | | | | |
| Number of units | | | | | | | | | | | | |
| Price per unit | | | | | | | | | | | | |
| **Monthly Revenue** | | | | | | | | | | | | |
| **Total Revenue** | $17,107,535 | $18,042,373 | $18,457,288 | $19,366,514 | $20,275,740 | $20,289,826 | $21,160,634 | $22,031,442 | $21,891,857 | $22,724,247 | $23,556,637 | $24,389,027 |

Confidential – Attorneys Eyes Only

Janis Lowe, et al. v. Eban, B.V., et al                                                                                                   Exhibit 14
Assumptions

| REVENUE ASSUMPTIONS: | Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 | Dec-06 | Jan-07 | Feb-07 | Mar-07 | Apr-07 | May-07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative Cores Sold | 88,527 | 98,177 | 108,327 | 118,977 | 130,127 | 141,777 | 153,927 | 166,577 | 179,727 | 193,377 | 207,527 | 222,177 |
| **Staffing (Number of People)** | | | | | | | | | | | | |
| Operations:[1] | | | | | | | | | | | | |
| Production Mgr - RL | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Supply chain / Procurement Mgr - RB | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Quality Mgr - PS | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Materials Mgr | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Supervisor | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 4 |
| Other | | | | | | | | | | | | |
| Lead Sys. Eng. (Swiss) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| BIOS Eng.(Swiss) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Hardware Eng. (Swiss) | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 4 |
| ME (Swiss) | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 4 |
| Tech (Swiss) | 10 | 10 | 11 | 11 | 12 | 12 | 13 | 13 | 14 | 14 | 15 | 15 |
| Image Burn | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 6 | 6 | 6 | 6 | 6 |
| Purchasing | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 2 |
| Parts Mgr | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 4 |
| QC / Image Burn | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 4 |
| Shipping | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 4 |
| Warehouse | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 4 |
| Other | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 4 |
| Assembler | 23 | 25 | 26 | 27 | 28 | 30 | 31 | 32 | 33 | 35 | 36 | 37 |
| | 68 | 70 | 73 | 74 | 76 | 78 | 89 | 91 | 93 | 95 | 97 | 98 |
| Selling [1] | | | | | | | | | | | | |
| Sales (Swiss) | 10 | 10 | 11 | 11 | 12 | 12 | 13 | 13 | 14 | 14 | 15 | 15 |
| Sales (US) | | | | | | | | | | | | |
| Marketing/PR assistant (US) | | | | | | | | | | | | |
| Sales Mgr | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | 11 | 11 | 12 | 12 | 13 | 13 | 14 | 14 | 15 | 15 | 16 | 16 |
| Administration: [1] | | | | | | | | | | | | |
| HR Admin plus temp | 5 | 5 | 6 | 6 | 6 | 6 | 7 | 7 | 7 | 7 | 8 | 8 |
| Human Resources | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Sales Support and Marketing | 10 | 10 | 11 | 11 | 12 | 12 | 13 | 13 | 14 | 14 | 15 | 15 |
| Customer Service | 16 | 17 | 17 | 18 | 19 | 20 | 21 | 22 | 22 | 23 | 24 | 25 |
| Finance Mgr (Swiss) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Accounting and Temporary | 10 | 10 | 11 | 11 | 12 | 12 | 13 | 13 | 14 | 14 | 15 | 15 |
| Warranty and Repair | 5 | 5 | 6 | 6 | 6 | 6 | 7 | 7 | 7 | 7 | 8 | 8 |
| Warranty Repair Mgr | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| | 50 | 51 | 55 | 56 | 59 | 60 | 65 | 66 | 68 | 69 | 74 | 75 |
| **Total Staffing Count (Number of employees)** | 129 | 132 | 140 | 142 | 148 | 151 | 168 | 171 | 176 | 179 | 187 | 189 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Elan, B.V., et al*
Assumptions

Exhibit 14

| | Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 | Dec-06 | Jan-07 | Feb-07 | Mar-07 | Apr-07 | May-07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE ASSUMPTIONS:** | | | | | | | | | | | | |
| **CAPITAL EXPENDITURES:** | | | | | | | | | | | | |
| Manufacturing eq & sys (incl IGS deliverables) [1] | | | | | | | | | | | | |
| Capital equipment per operation emp [1] | $4,000 | $4,000 | $6,000 | $2,000 | $4,000 | $4,000 | $22,000 | $4,000 | $4,000 | $4,000 | $4,000 | $2,000 |
| Relocation and Legal Expenses [1] | $9,000 | $3,000 | $12,000 | $3,000 | $9,000 | $3,000 | $15,000 | $3,000 | $6,000 | $3,000 | $15,000 | $3,000 |
| Engineering, Tooling & R&D [1,3] | $513,226 | $541,271 | $553,719 | $580,995 | $608,272 | $608,695 | $634,819 | $660,943 | $656,756 | $681,727 | $706,699 | $731,671 |
| Incremental Capex (for version 1.5) | | | | | | | | | | | | |
| Total Capital Expenditures | $526,226 | $548,271 | $571,719 | $585,995 | $621,272 | $615,695 | $671,819 | $667,943 | $666,756 | $688,727 | $725,699 | $736,671 |
| | | | | | | | | | | | | |
| Total Yearly Capital Expenditures | | | | | | | | | | | | $10,595,182 |
| | | | | | | | | | | | | |
| **FINANCIAL ASSUMPTIONS:** | | | | | | | | | | | | |
| Depreciation rate per capital expenditure [3] | | | | | | | | | | | | |
| Accounts Receivables (45 days) [4] | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 |
| Accounts Payables (Cost of Goods Sold - 60 days) | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| Return on idle cash [1] | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Capital Infusion | | | | | | | | | | | | |

*Notes/Sources:*
1. FinancialModel_rev2.3, Assumptions.
2. See Exhibit 17.
3. Antelope Technologies, Inc.'s Business Plan, February 2004 - Revision 2.7, pg. 8.
4. Letter from C. Stephen Guyer to Gregory F. Cox, February 12, 2007.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Elan, B.V., et al*
Assumptions

Exhibit 14

| REVENUE ASSUMPTIONS: | Jun-07 | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales and Gross Revenue:** | | | | | | | | | | | |
| Price Index (decline over time) [1] | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 |
| Unit sales | | | | | | | | | | | |
| Number of Cores [1] | 15,150 | 15,650 | 16,150 | 16,650 | 17,150 | 17,650 | 18,150 | 18,650 | 19,150 | 19,650 | 20,150 |
| Price per core [2] | 931 | 931 | 931 | 931 | 931 | 931 | 931 | 931 | 931 | 931 | 931 |
| Number of Handhelds [1] | 14,393 | 14,868 | 15,343 | 15,818 | 16,293 | 16,768 | 17,243 | 17,718 | 18,193 | 18,668 | 19,143 |
| Price per Handheld [2] | 548 | 548 | 548 | 548 | 548 | 548 | 548 | 548 | 548 | 548 | 548 |
| Number of docks [1] | 18,180 | 18,780 | 19,380 | 19,980 | 20,580 | 21,180 | 21,780 | 22,380 | 22,980 | 23,580 | 24,180 |
| Price per dock [2] | 178 | 178 | 178 | 178 | 178 | 178 | 178 | 178 | 178 | 178 | 178 |
| Number of Peripherals [1] | 1,515 | 1,565 | 1,615 | 1,665 | 1,715 | 1,765 | 1,815 | 1,865 | 1,915 | 1,965 | 2,015 |
| Price per Peripheral [1] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Monthly Revenue (unit average)** | $25,221,417 | $26,053,807 | $26,886,197 | $27,718,587 | $28,550,977 | $29,383,367 | $30,215,757 | $31,048,147 | $31,880,537 | $32,712,927 | $33,545,317 |
| Secondary sales [1] | | | | | | | | | | | |
| Number of units | | | | | | | | | | | |
| Price per unit | | | | | | | | | | | |
| **Monthly Revenue** | | | | | | | | | | | |
| **Total Revenue** | $25,221,417 | $26,053,807 | $26,886,197 | $27,718,587 | $28,550,977 | $29,383,367 | $30,215,757 | $31,048,147 | $31,880,537 | $32,712,927 | $33,545,317 |

*Janis Lowe, et al. v. Elan, B.V., et al*
Assumptions

Exhibit 14

| REVENUE ASSUMPTIONS: | Jun-07 | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative Cores Sold | 237,327 | 252,977 | 269,127 | 285,777 | 302,927 | 320,577 | 338,727 | 357,377 | 376,527 | 396,177 | 416,327 |
| **Staffing (Number of People)** | | | | | | | | | | | |
| Operations:[1] | | | | | | | | | | | |
| Production Mgr - RL | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Supply chain / Procurement Mgr - RB | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Quality Mgr - PS | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Materials Mgr | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Supervisor | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 6 |
| Other | | | | | | | | | | | |
| Lead Sys. Eng. (Swiss) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| BIOS Eng.(Swiss) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Hardware Eng. (Swiss) | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 6 |
| ME (Swiss) | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 6 |
| Tech (Swiss) | 16 | 16 | 17 | 17 | 18 | 18 | 19 | 19 | 20 | 20 | 21 |
| Image Burn | 7 | 7 | 7 | 7 | 7 | 8 | 8 | 8 | 8 | 8 | 9 |
| Purchasing | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| Parts Mgr | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 6 |
| QC / Image Burn | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 6 |
| Shipping | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 6 |
| Warehouse | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 6 |
| Other | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 6 |
| Assembler | 38 | 40 | 41 | 42 | 43 | 45 | 46 | 47 | 48 | 50 | 51 |
| | 101 | 103 | 113 | 114 | 116 | 119 | 121 | 122 | 124 | 126 | 137 |
| Selling[1] | | | | | | | | | | | |
| Sales (Swiss) | 16 | 16 | 17 | 17 | 18 | 18 | 19 | 19 | 20 | 20 | 21 |
| Sales (US) | | | | | | | | | | | |
| Marketing/PR assistant (US) | | | | | | | | | | | |
| Sales Mgr | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 |
| | 17 | 17 | 18 | 18 | 19 | 19 | 20 | 20 | 21 | 21 | 23 |
| Administration:[1] | | | | | | | | | | | |
| HR Admin plus temp | 8 | 8 | 9 | 9 | 9 | 9 | 10 | 10 | 10 | 10 | 11 |
| Human Resources | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Sales  Support and Marketing | 16 | 16 | 17 | 17 | 18 | 18 | 19 | 19 | 20 | 20 | 21 |
| Customer Service | 26 | 27 | 27 | 28 | 29 | 30 | 31 | 32 | 32 | 33 | 34 |
| Finance Mgr (Swiss) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Accounting and Temporary | 16 | 16 | 17 | 17 | 18 | 18 | 19 | 19 | 20 | 20 | 21 |
| Warranty and Repair | 8 | 8 | 9 | 9 | 9 | 9 | 10 | 10 | 10 | 10 | 11 |
| Warranty Repair Mgr | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| | 78 | 79 | 84 | 85 | 88 | 89 | 94 | 95 | 97 | 98 | 103 |
| **Total Staffing Count (Number of employees)** | 196 | 199 | 215 | 217 | 223 | 227 | 235 | 237 | 242 | 245 | 263 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*
Assumptions

Exhibit 14

| REVENUE ASSUMPTIONS: | Jun-07 | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **CAPITAL EXPENDITURES:** | | | | | | | | | | | |
| Manufacturing eq & sys (incl IGS deliverables) [1] | | | | | | | | | | | |
| Capital equipment per operation emp [1] | $6,000 | $4,000 | $20,000 | $2,000 | $4,000 | $6,000 | $4,000 | $2,000 | $4,000 | $4,000 | $22,000 |
| Relocation and Legal Expenses [1] | $9,000 | $3,000 | $15,000 | $3,000 | $9,000 | $3,000 | $15,000 | $3,000 | $6,000 | $3,000 | $15,000 |
| Engineering, Tooling & R&D [1,3] | $756,643 | $781,614 | $806,586 | $831,558 | $856,529 | $881,501 | $906,473 | $931,444 | $956,416 | $981,388 | $1,006,360 |
| Incremental Capex (for version 1.5) | | | | | | | | | | | |
| Total Capital Expenditures | $771,643 | $788,614 | $841,586 | $836,558 | $869,529 | $890,501 | $925,473 | $936,444 | $966,416 | $988,388 | $1,043,360 |
| Total Yearly Capital Expenditures | | | | | | | | | | | |
| **FINANCIAL ASSUMPTIONS:** | | | | | | | | | | | |
| Depreciation rate per capital expenditure [1] | | | | | | | | | | | |
| Accounts Receivables (45 days) [4] | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 |
| Accounts Payables (Cost of Goods Sold - 60 days) | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| Return on idle cash [1] | | | | | | | | | | | |
| Capital Infusion | | | | | | | | | | | |

*Notes/Sources:*
1. FinancialModel_rev2.3, Assumptions.
2. See Exhibit 17.
3. Antelope Technologies, Inc.'s Business Plan, February 2004 - Revision 2.7, pg. 8.
4. Letter from C. Stephen Guyer to Gregory F. Cox, February 12, 2007.

*Janis Lowe, et al. v. Eltan, B.V., et al*

Detail Expense

Exhibit 15

| | Factor | Rate | Time 0 | Apr-04 | May-04 |
|---|---|---|---|---|---|
| **CORES PER MONTH** [1] | | | | 19 | 2 |
| **CUMULATIVE CORES SOLD** | | | | 19 | 21 |
| **Total Revenue** | | | | **$48,663** | **$4,969** |
| | | | | | |
| **Costs and Expenses:** | | | | | |
| | | | | | |
| **Operating:** | | | | | |
| **Fixed:** | | | | | |
| Rent [2] | | | | $16,750 | $16,750 |
| Electric, Water & Other [2] | | | | $2,000 | $2,000 |
| Repairs & Maintenance [2] | 3% | | | $60 | $60 |
| Insurance (auto, business) [2] | | 35% | | $1,007 | $1,001 |
| Telecommunications [2] | | 50% | | $2,010 | $2,001 |
| **Total Operating Fixed** | | | | $21,826 | $21,812 |
| | | | | | |
| **Cost of Goods Sold:** | | | | | |
| Total Core [1,2] | 1,000 | | | $19,000 | $2,000 |
| Electrical | | | | | |
| Mechanical | | | | | |
| Commodities | | | | | |
| Other | | | | | |
| | | | | | |
| Total Handheld Shell [1,2] | 510 | | | $9,206 | $969 |
| Electrical | | | | | |
| Mechanical | | | | | |
| Commodities | | | | | |
| Other | | | | | |
| | | | | | |
| Total Docking Station [1,2] | 180 | | | $4,104 | $432 |
| | | | | | |
| Total Notebook Shell [1,2] | | | | $0 | $0 |
| Electrical | | | | | |
| Mechanical | | | | | |
| Commodities | | | | | |
| Other | | | | | |
| | | | | | |
| Royalty (IBM) [1,2] | | 6% | | $2,920 | $298 |
| COGS Index [1] | | | | 1.00 | 0.97 |
| **Total Cost of Goods Sold** [2] | 1,690 | | | $35,229 | $3,597 |
| **COGS Margin** | | | | 28% | 28% |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*
Detail Expense

Exhibit 15

| | Factor | Rate | Time 0 | Apr-04 | May-04 |
|---|---|---|---|---|---|
| Variable Operating: | | | | | |
| Packaging materials [1,2] | 10 | | | $190 | $20 |
| Personnel [1] | | | | $96,375 | $96,375 |
| Burden [2] | | 21% | of Personnel | $20,239 | $20,239 |
| Consulting Fees [2] | 0.00 | | | $0 | $0 |
| Consulting Expenses [2] | 0 | | | $0 | $0 |
| Total Variable Operating | | | | $116,804 | $116,634 |
| **Total Manufacturing Costs** | | | | $173,859 | $142,043 |
| **Gross Margin** | | | | -257.3% | -2758.7% |
| | | | | | |
| **Selling:** | | | | | |
| Fixed: | | | | | |
| Yellow Pages [2] | | 1,000 | Specified | $0 | $0 |
| Specified Campaign [2] | | 3 | | $5,057 | $5,006 |
| PR [2] | | 7 | | $2,133 | $2,014 |
| Total Fixed Selling | | | | $7,190 | $7,020 |
| | | | | | |
| Variable: | | | | | |
| Travel [2] | 0.25% | | % of revenue | $4,122 | $4,012 |
| Commission [2] | 0 | | | $0 | $0 |
| Personnel [2] | | | | $15,000 | $15,000 |
| Burden [2] | 21% | | of Personnel | $3,150 | $3,150 |
| Consulting Fees [2] | 0 | | | $0 | $0 |
| Consulting Expenses [2] | 0 | | | $0 | $0 |
| Total Variable Selling | | | | $22,272 | $22,162 |
| **Total Selling** | | | | $29,462 | $29,182 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Detail Expense

Exhibit 15

| | Factor | Rate | Time 0 | Apr-04 | May-04 |
|---|---|---|---|---|---|
| **General & Administrative:** | | | | | |
| Fixed: | | | | | |
| Compensation of Officers & Bonuses [2] | 120,000 | per year base plus expat | | $50,000 | $50,000 |
| Professional Fees (legal & Audit) [2] | | 0.3% | % of revenue | $122 | $12 |
| Training & Development [2] | | 1.0% | % of salaries | $190 | $20 |
| Bank fees [2] | | 0.03% | % of revenue | $15 | $1 |
| License Fee [2] | | | | | |
| Total Fixed G & A | | | | $50,326 | $50,034 |
| | | | | | |
| Variable: | | | | | |
| Personnel [1,2] | | | | $36,500 | $36,500 |
| Burden [2] | 21% | | of Personnel | $7,665 | $7,665 |
| Postage [2] | | 0.01% | % of revenue | $5 | $0 |
| Office Supplies [2] | | 0.02% | % of revenue | $10 | $1 |
| Travel & Entertainment [2] | | 10.00% | % G&A personnel | $4,650 | $4,650 |
| Consulting Fees [2] | 0 | | | $65,000 | $65,000 |
| Consulting Expenses [2] | 0 | | | $25,000 | $25,000 |
| Other [2] | | 1.0% | % of revenue | $487 | $50 |
| Total Variable G & A | | | | $139,316 | $138,866 |
| **Total General & Administrative** | | | | $189,642 | $188,900 |
| | | | | | |
| **Depreciation & Amortization:** | | | | | |
| Depreciation [3] | | | | $35,173 | $36,880 |
| | | | | | |
| **Total Costs & Expenses** | | | | $428,136 | $397,005 |

<u>*Notes/Sources:*</u>
1. See Exhibit 14.
2. FinancialModel_rev2.3.xl.
3. See Exhibit 16.

*Janis Lowe, et al. v. Eltan, B.V., et al*

Detail Expense

Exhibit 15

| | Jun-04 | Jul-04 | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CORES PER MONTH** [1] | 14 | 0 | 22 | 10 | 10 | 100 | 150 | 650 | 1,150 | 1,650 | 2,150 | 2,650 |
| **CUMULATIVE CORES SOLD** | 35 | 35 | 57 | 67 | 77 | 177 | 327 | 977 | 2,127 | 3,777 | 5,927 | 8,577 |
| **Total Revenue** | $34,781 | $0 | $52,966 | $24,075 | $24,075 | $233,069 | $349,604 | $1,514,950 | $2,591,934 | $3,718,862 | $4,845,790 | $5,769,103 |
| **Costs and Expenses:** | | | | | | | | | | | | |
| **Operating:** | | | | | | | | | | | | |
| **Fixed:** | | | | | | | | | | | | |
| Rent [2] | $16,750 | $16,750 | $16,750 | $16,750 | $16,750 | $16,750 | $16,750 | $16,750 | $16,750 | $22,750 | $22,750 | $22,750 |
| Electric, Water & Other [2] | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| Repairs & Maintenance [2] | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 |
| Insurance (auto, business) [2] | $1,005 | $1,000 | $1,008 | $1,004 | $1,004 | $1,035 | $1,053 | $1,228 | $1,403 | $1,578 | $1,753 | $1,928 |
| Telecommunications [5] | $2,007 | $2,000 | $2,011 | $2,005 | $2,005 | $2,050 | $2,075 | $2,325 | $2,575 | $2,825 | $3,075 | $3,325 |
| **Total Operating Fixed** | $21,822 | $21,810 | $21,829 | $21,819 | $21,819 | $21,895 | $21,938 | $22,363 | $22,788 | $29,213 | $29,638 | $30,063 |
| **Cost of Goods Sold:** | | | | | | | | | | | | |
| Total Core [1,2] | $14,000 | $0 | $22,000 | $10,000 | $10,000 | $100,000 | $150,000 | $650,000 | $1,150,000 | $1,650,000 | $2,150,000 | $2,650,000 |
| Electrical | | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | | |
| Commodities | | | | | | | | | | | | |
| Other | | | | | | | | | | | | |
| Total Handheld Shell [1,2] | $6,783 | $0 | $10,659 | $4,845 | $4,845 | $48,450 | $72,675 | $314,925 | $557,175 | $799,425 | $1,041,675 | $1,283,925 |
| Electrical | | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | | |
| Commodities | | | | | | | | | | | | |
| Other | | | | | | | | | | | | |
| Total Docking Station [1,2] | $3,024 | $0 | $4,752 | $2,160 | $2,160 | $21,600 | $32,400 | $140,400 | $248,400 | $356,400 | $464,400 | $572,400 |
| Total Notebook Shell [1,2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Electrical | | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | | |
| Commodities | | | | | | | | | | | | |
| Other | | | | | | | | | | | | |
| Royalty (IBM) [1,2] | $2,087 | $0 | $3,178 | $1,445 | $1,445 | $13,984 | $20,976 | $90,897 | $155,516 | $223,132 | $290,747 | $346,146 |
| COGS Index [1] | 0.97 | 0.97 | 0.94 | 0.94 | 0.94 | 0.91 | 0.91 | 0.91 | 0.88 | 0.88 | 0.88 | 0.85 |
| **Total Cost of Goods Sold** [2] | $25,180 | $0 | $38,344 | $17,429 | $17,429 | $168,730 | $253,094 | $1,096,743 | $1,876,422 | $2,692,258 | $3,508,093 | $4,176,522 |
| **COGS Margin** | 28% | 0% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*
Detail Expense

Exhibit 15

| | Jun-04 | Jul-04 | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Variable Operating: | | | | | | | | | | | | |
| Packaging materials [1,2] | $140 | $0 | $220 | $100 | $100 | $1,000 | $1,500 | $6,500 | $11,500 | $16,500 | $21,500 | $26,500 |
| Personnel [1] | $96,375 | $96,375 | $96,375 | $96,375 | $96,375 | $96,375 | $96,375 | $100,042 | $107,708 | $115,042 | $122,708 | $130,542 |
| Burden [2] | $20,239 | $20,239 | $20,239 | $20,239 | $20,239 | $20,239 | $20,239 | $21,009 | $22,619 | $24,159 | $25,769 | $27,414 |
| Consulting Fees [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Consulting Expenses [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Variable Operating | $116,754 | $116,614 | $116,834 | $116,714 | $116,714 | $117,614 | $118,114 | $127,550 | $141,827 | $155,700 | $169,977 | $184,455 |
| **Total Manufacturing Costs** | $163,755 | $138,424 | $177,007 | $155,961 | $155,961 | $308,238 | $393,146 | $1,246,656 | $2,041,037 | $2,877,171 | $3,707,708 | $4,391,040 |
| **Gross Margin** | -370.8% | 0.0% | -234.2% | -547.8% | -547.8% | -32.3% | -12.5% | 17.7% | 21.3% | 22.6% | 23.5% | 23.9% |
| **Selling:** | | | | | | | | | | | | |
| Fixed: | | | | | | | | | | | | |
| Yellow Pages [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Specified Campaign [2] | $5,042 | $5,000 | $5,066 | $5,030 | $5,030 | $5,300 | $5,450 | $6,950 | $8,450 | $9,950 | $11,450 | $12,950 |
| PR [2] | $2,098 | $2,000 | $2,154 | $2,070 | $2,070 | $2,700 | $3,050 | $6,550 | $10,050 | $13,550 | $17,050 | $20,550 |
| Total Fixed Selling | $7,140 | $7,000 | $7,220 | $7,100 | $7,100 | $8,000 | $8,500 | $13,500 | $18,500 | $23,500 | $28,500 | $33,500 |
| Variable: | | | | | | | | | | | | |
| Travel [2] | $4,087 | $4,000 | $4,132 | $4,060 | $4,060 | $4,583 | $4,874 | $7,787 | $10,480 | $13,297 | $16,114 | $18,423 |
| Commission [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Personnel [2] | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $23,333 | $23,333 | $31,667 | $31,667 |
| Burden [2] | $3,150 | $3,150 | $3,150 | $3,150 | $3,150 | $3,150 | $3,150 | $3,150 | $4,900 | $4,900 | $6,650 | $6,650 |
| Consulting Fees [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Consulting Expenses [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Variable Selling | $22,237 | $22,150 | $22,282 | $22,210 | $22,210 | $22,733 | $23,024 | $25,937 | $38,713 | $41,530 | $54,431 | $56,739 |
| **Total Selling** | $29,377 | $29,150 | $29,502 | $29,310 | $29,310 | $30,733 | $31,524 | $39,437 | $57,213 | $65,030 | $82,931 | $90,239 |

*Janis Lowe, et al. v. Eltan, B.V., et al*
Detail Expense

Exhibit 15

| | Jun-04 | Jul-04 | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **General & Administrative:** | | | | | | | | | | | | |
| Fixed: | | | | | | | | | | | | |
| Compensation of Officers & Bonuses [2] | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $55,000 | $55,000 | $55,000 | $55,000 |
| Professional Fees (legal & Audit) [2] | $87 | $0 | $132 | $60 | $60 | $583 | $874 | $3,787 | $6,480 | $9,297 | $12,114 | $14,423 |
| Training & Development [2] | $140 | $0 | $220 | $100 | $100 | $1,000 | $1,500 | $6,500 | $11,500 | $16,500 | $21,500 | $26,500 |
| Bank fees [2] | $10 | $0 | $16 | $7 | $7 | $70 | $105 | $454 | $778 | $1,116 | $1,454 | $1,731 |
| License Fee [2] | | | | | | | | | | | | |
| Total Fixed G & A | $50,237 | $50,000 | $50,368 | $50,167 | $50,167 | $51,653 | $52,479 | $60,742 | $73,757 | $81,913 | $90,068 | $97,653 |
| | | | | | | | | | | | | |
| Variable: | | | | | | | | | | | | |
| Personnel [1,2] | $36,500 | $36,500 | $36,500 | $36,500 | $36,500 | $36,500 | $36,500 | $40,167 | $48,083 | $51,750 | $72,000 | $75,667 |
| Burden [2] | $7,665 | $7,665 | $7,665 | $7,665 | $7,665 | $7,665 | $7,665 | $8,435 | $10,098 | $10,868 | $15,120 | $15,890 |
| Postage [2] | $3 | $0 | $5 | $2 | $2 | $23 | $35 | $151 | $259 | $372 | $485 | $577 |
| Office Supplies [2] | $7 | $0 | $11 | $5 | $5 | $47 | $70 | $303 | $518 | $744 | $969 | $1,154 |
| Travel & Entertainment [2] | $4,650 | $4,650 | $4,650 | $4,650 | $4,650 | $4,650 | $4,650 | $5,017 | $5,808 | $6,175 | $8,200 | $8,567 |
| Consulting Fees [2] | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 |
| Consulting Expenses [2] | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| Other [2] | $348 | $0 | $530 | $241 | $241 | $2,331 | $3,496 | $15,149 | $25,919 | $37,189 | $48,458 | $57,691 |
| Total Variable G & A | $139,173 | $138,815 | $139,361 | $139,063 | $139,063 | $141,216 | $142,416 | $159,222 | $180,686 | $197,097 | $235,232 | $249,545 |
| **Total General & Administrative** | $189,411 | $188,815 | $189,729 | $189,230 | $189,230 | $192,868 | $194,895 | $219,964 | $254,444 | $279,010 | $325,300 | $347,199 |
| | | | | | | | | | | | | |
| **Depreciation & Amortization:** | | | | | | | | | | | | |
| Depreciation [3] | $36,884 | $36,913 | $36,913 | $36,957 | $86,520 | $56,442 | $56,636 | $56,927 | $58,329 | $60,766 | $64,060 | $68,626 |
| | | | | | | | | | | | | |
| **Total Costs & Expenses** | $419,427 | $393,302 | $433,151 | $411,459 | $461,022 | $588,281 | $676,201 | $1,562,985 | $2,411,022 | $3,281,977 | $4,179,999 | $4,897,104 |

*Notes/Sources:*
1. See Exhibit 14.
2. FinancialModel_rev2.3.xl.
3. See Exhibit 16.

Janis Lowe, et al. v. Eltan, B.V., et al

Exhibit 15

Detail Expense

| | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CORES PER MONTH**[1] | 3,150 | 3,650 | 4,150 | 4,650 | 5,150 | 5,650 | 6,150 | 6,650 | 7,150 | 7,650 | 8,150 | 8,650 |
| **CUMULATIVE CORES SOLD** | 11,727 | 15,377 | 19,527 | 24,177 | 29,327 | 34,977 | 41,127 | 47,777 | 54,927 | 62,577 | 70,727 | 79,377 |
| **Total Revenue** | **$6,857,613** | **$7,946,123** | **$8,715,764** | **$9,765,856** | **$10,815,948** | **$11,431,916** | **$12,443,590** | **$13,455,264** | **$13,917,561** | **$14,890,817** | **$15,864,073** | **$16,172,697** |
| **Costs and Expenses:** | | | | | | | | | | | | |
| **Operating:** | | | | | | | | | | | | |
| **Fixed:** | | | | | | | | | | | | |
| Rent [2] | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 |
| Electric, Water & Other [2] | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| Repairs & Maintenance [2] | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 |
| Insurance (auto, business) [2] | $2,103 | $2,278 | $2,453 | $2,628 | $2,803 | $2,978 | $3,153 | $3,328 | $3,503 | $3,678 | $3,853 | $4,028 |
| Telecommunications [3] | $3,575 | $3,825 | $4,075 | $4,325 | $4,575 | $4,825 | $5,075 | $5,325 | $5,575 | $5,825 | $6,075 | $6,325 |
| **Total Operating Fixed** | $30,488 | $30,913 | $31,338 | $31,763 | $32,188 | $32,613 | $33,038 | $33,463 | $33,888 | $34,313 | $34,738 | $35,163 |
| **Cost of Goods Sold:** | | | | | | | | | | | | |
| Total Core [1,2] | $3,150,000 | $3,650,000 | $4,150,000 | $4,650,000 | $5,150,000 | $5,650,000 | $6,150,000 | $6,650,000 | $7,150,000 | $7,650,000 | $8,150,000 | $8,650,000 |
| Electrical | | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | | |
| Commodities | | | | | | | | | | | | |
| Other | | | | | | | | | | | | |
| Total Handheld Shell [1,2] | $1,526,175 | $1,768,425 | $2,010,675 | $2,252,925 | $2,495,175 | $2,737,425 | $2,979,675 | $3,221,925 | $3,464,175 | $3,706,425 | $3,948,675 | $4,190,925 |
| Electrical | | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | | |
| Commodities | | | | | | | | | | | | |
| Other | | | | | | | | | | | | |
| Total Docking Station [1,2] | $680,400 | $788,400 | $896,400 | $1,004,400 | $1,112,400 | $1,220,400 | $1,328,400 | $1,436,400 | $1,544,400 | $1,652,400 | $1,760,400 | $1,868,400 |
| Total Notebook Shell [1,2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Electrical | | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | | |
| Commodities | | | | | | | | | | | | |
| Other | | | | | | | | | | | | |
| Royalty (IBM) [1,2] | $411,457 | $476,767 | $522,946 | $585,951 | $648,957 | $685,915 | $746,615 | $807,316 | $835,054 | $893,449 | $951,844 | $970,362 |
| COGS Index [1] | 0.85 | 0.85 | 0.82 | 0.82 | 0.82 | 0.79 | 0.79 | 0.79 | 0.76 | 0.76 | 0.76 | 0.73 |
| **Total Cost of Goods Sold** [2] | $4,964,546 | $5,752,569 | $6,309,747 | $7,069,958 | $7,830,168 | $8,276,097 | $9,008,495 | $9,740,893 | $10,075,571 | $10,780,156 | $11,484,741 | $11,708,169 |
| **COGS Margin** | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% |

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                                                    Exhibit 15

Detail Expense

| | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Variable Operating:** | | | | | | | | | | | | |
| Packaging materials [1,2] | $31,500 | $36,500 | $41,500 | $46,500 | $51,500 | $56,500 | $61,500 | $66,500 | $71,500 | $76,500 | $81,500 | $86,500 |
| Personnel [1] | $138,208 | $145,542 | $190,750 | $194,417 | $206,250 | $213,583 | $221,250 | $224,917 | $232,583 | $244,083 | $289,292 | $292,958 |
| Burden [2] | $29,024 | $30,564 | $40,058 | $40,828 | $43,313 | $44,853 | $46,463 | $47,233 | $48,843 | $51,258 | $60,751 | $61,521 |
| Consulting Fees [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Consulting Expenses [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Variable Operating | $198,732 | $212,605 | $272,308 | $281,744 | $301,063 | $314,936 | $329,213 | $338,649 | $352,926 | $371,841 | $431,543 | $440,980 |
| **Total Manufacturing Costs** | $5,193,765 | $5,996,087 | $6,613,392 | $7,383,465 | $8,163,418 | $8,623,645 | $9,370,745 | $10,113,004 | $10,462,384 | $11,186,309 | $11,951,022 | $12,184,311 |
| **Gross Margin** | 24.3% | 24.5% | 24.1% | 24.4% | 24.5% | 24.6% | 24.7% | 24.8% | 24.8% | 24.9% | 24.7% | 24.7% |
| **Selling:** | | | | | | | | | | | | |
| Fixed: | | | | | | | | | | | | |
| Yellow Pages [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Specified Campaign [2] | $14,450 | $15,950 | $17,450 | $18,950 | $20,450 | $21,950 | $23,450 | $24,950 | $26,450 | $27,950 | $29,450 | $30,950 |
| PR [2] | $24,050 | $27,550 | $31,050 | $34,550 | $38,050 | $41,550 | $45,050 | $48,550 | $52,050 | $55,550 | $59,050 | $62,550 |
| Total Fixed Selling | $38,500 | $43,500 | $48,500 | $53,500 | $58,500 | $63,500 | $68,500 | $73,500 | $78,500 | $83,500 | $88,500 | $93,500 |
| Variable: | | | | | | | | | | | | |
| Travel [2] | $21,144 | $23,865 | $25,789 | $28,415 | $31,040 | $32,580 | $35,109 | $37,638 | $38,794 | $41,227 | $43,660 | $44,432 |
| Commission [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Personnel [2] | $40,000 | $40,000 | $48,333 | $48,333 | $56,667 | $56,667 | $65,000 | $65,000 | $73,333 | $73,333 | $81,667 | $81,667 |
| Burden [2] | $8,400 | $8,400 | $10,150 | $10,150 | $11,900 | $11,900 | $13,650 | $13,650 | $15,400 | $15,400 | $17,150 | $17,150 |
| Consulting Fees [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Consulting Expenses [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Variable Selling | $69,544 | $72,265 | $84,273 | $86,898 | $99,607 | $101,146 | $113,759 | $116,288 | $127,527 | $129,960 | $142,477 | $143,248 |
| **Total Selling** | $108,044 | $115,765 | $132,773 | $140,398 | $158,107 | $164,646 | $182,259 | $189,788 | $206,027 | $213,460 | $230,977 | $236,748 |

Janis Lowe, et al. v. Eltan, B.V., et al

Detail Expense

Exhibit 15

| | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **General & Administrative:** | | | | | | | | | | | | |
| Fixed: | | | | | | | | | | | | |
| Compensation of Officers & Bonuses [2] | $55,000 | $55,000 | $60,000 | $60,000 | $60,000 | $60,000 | $60,000 | $60,000 | $60,000 | $60,000 | $60,000 | $60,000 |
| Professional Fees (legal & Audit) [2] | $17,144 | $19,865 | $21,789 | $24,415 | $27,040 | $28,580 | $31,109 | $33,638 | $34,794 | $37,227 | $39,660 | $40,432 |
| Training & Development [2] | $31,500 | $36,500 | $41,500 | $46,500 | $51,500 | $56,500 | $61,500 | $66,500 | $71,500 | $76,500 | $81,500 | $86,500 |
| Bank fees [2] | $2,057 | $2,384 | $2,615 | $2,930 | $3,245 | $3,430 | $3,733 | $4,037 | $4,175 | $4,467 | $4,759 | $4,852 |
| License Fee [2] | | | | | | | | | | | | |
| Total Fixed G & A | $105,701 | $113,749 | $125,904 | $133,844 | $141,785 | $148,509 | $156,342 | $164,175 | $170,469 | $178,194 | $185,919 | $191,784 |
| | | | | | | | | | | | | |
| Variable: | | | | | | | | | | | | |
| Personnel [1,2] | $87,250 | $90,917 | $107,500 | $111,167 | $122,750 | $126,417 | $146,667 | $150,333 | $158,250 | $161,917 | $187,167 | $190,833 |
| Burden [2] | $18,323 | $19,093 | $22,575 | $23,345 | $25,778 | $26,548 | $30,800 | $31,570 | $33,233 | $34,003 | $39,305 | $40,075 |
| Postage [2] | $686 | $795 | $872 | $977 | $1,082 | $1,143 | $1,244 | $1,346 | $1,392 | $1,489 | $1,586 | $1,617 |
| Office Supplies [2] | $1,372 | $1,589 | $1,743 | $1,953 | $2,163 | $2,286 | $2,489 | $2,691 | $2,784 | $2,978 | $3,173 | $3,235 |
| Travel & Entertainment [2] | $9,725 | $10,092 | $11,750 | $12,117 | $13,275 | $13,642 | $15,667 | $16,033 | $16,825 | $17,192 | $19,717 | $20,083 |
| Consulting Fees [2] | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 |
| Consulting Expenses [2] | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| Other [2] | $68,576 | $79,461 | $87,158 | $97,659 | $108,159 | $114,319 | $124,436 | $134,553 | $139,176 | $148,908 | $158,641 | $161,727 |
| Total Variable G & A | $275,931 | $291,946 | $321,597 | $337,217 | $363,207 | $374,355 | $411,302 | $426,526 | $441,658 | $456,486 | $499,588 | $507,570 |
| **Total General & Administrative** | $381,632 | $405,695 | $447,502 | $471,061 | $504,991 | $522,864 | $567,644 | $590,701 | $612,128 | $634,681 | $685,508 | $699,354 |
| | | | | | | | | | | | | |
| **Depreciation & Amortization:** | | | | | | | | | | | | |
| Depreciation [3] | $73,628 | $79,704 | $86,520 | $94,672 | $102,949 | $112,379 | $122,100 | $132,997 | $144,349 | $156,225 | $168,884 | $183,159 |
| | | | | | | | | | | | | |
| **Total Costs & Expenses** | $5,757,069 | $6,597,251 | $7,280,186 | $8,089,595 | $8,929,465 | $9,423,534 | $10,242,748 | $11,026,491 | $11,424,888 | $12,190,675 | $13,036,390 | $13,303,573 |

*Notes/Sources:*
1. See Exhibit 14.
2. FinancialModel_rev2.3.xl.
3. See Exhibit 16.

Janis Lowe, et al. v. Eltan, B.V., et al

Detail Expense

Exhibit 15

| | Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 | Dec-06 | Jan-07 | Feb-07 | Mar-07 | Apr-07 | May-07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CORES PER MONTH** [1] | 9,150 | 9,650 | 10,150 | 10,650 | 11,150 | 11,650 | 12,150 | 12,650 | 13,150 | 13,650 | 14,150 | 14,650 |
| **CUMULATIVE CORES SOLD** | 88,527 | 98,177 | 108,327 | 118,977 | 130,127 | 141,777 | 153,927 | 166,577 | 179,727 | 193,377 | 207,527 | 222,177 |
| **Total Revenue** | **$17,107,535** | **$18,042,373** | **$18,457,288** | **$19,366,514** | **$20,275,740** | **$20,289,826** | **$21,160,634** | **$22,031,442** | **$21,891,857** | **$22,724,247** | **$23,556,637** | **$24,389,027** |
| | | | | | | | | | | | | |
| **Costs and Expenses:** | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Operating:** | | | | | | | | | | | | |
| **Fixed:** | | | | | | | | | | | | |
| Rent [2] | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 |
| Electric, Water & Other [2] | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| Repairs & Maintenance [2] | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 |
| Insurance (auto, business) [2] | $4,203 | $4,378 | $4,553 | $4,728 | $4,903 | $5,078 | $5,253 | $5,428 | $5,603 | $5,778 | $5,953 | $6,128 |
| Telecommunications [3] | $6,575 | $6,825 | $7,075 | $7,325 | $7,575 | $7,825 | $8,075 | $8,325 | $8,575 | $8,825 | $9,075 | $9,325 |
| **Total Operating Fixed** | $35,588 | $36,013 | $36,438 | $36,863 | $37,288 | $37,713 | $38,138 | $38,563 | $38,988 | $39,413 | $39,838 | $40,263 |
| | | | | | | | | | | | | |
| **Cost of Goods Sold:** | | | | | | | | | | | | |
| Total Core [1,2] | $9,150,000 | $9,650,000 | $10,150,000 | $10,650,000 | $11,150,000 | $11,650,000 | $12,150,000 | $12,650,000 | $13,150,000 | $13,650,000 | $14,150,000 | $14,650,000 |
| Electrical | | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | | |
| Commodities | | | | | | | | | | | | |
| Other | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Total Handheld Shell [1,2] | $4,433,175 | $4,675,425 | $4,917,675 | $5,159,925 | $5,402,175 | $5,644,425 | $5,886,675 | $6,128,925 | $6,371,175 | $6,613,425 | $6,855,675 | $7,097,925 |
| Electrical | | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | | |
| Commodities | | | | | | | | | | | | |
| Other | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Total Docking Station [1,2] | $1,976,400 | $2,084,400 | $2,192,400 | $2,300,400 | $2,408,400 | $2,516,400 | $2,624,400 | $2,732,400 | $2,840,400 | $2,948,400 | $3,056,400 | $3,164,400 |
| | | | | | | | | | | | | |
| Total Notebook Shell [1,2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Electrical | | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | | |
| Commodities | | | | | | | | | | | | |
| Other | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Royalty (IBM) [1,2] | $1,026,452 | $1,082,542 | $1,107,437 | $1,161,991 | $1,216,544 | $1,217,390 | $1,269,638 | $1,321,887 | $1,313,511 | $1,363,455 | $1,413,398 | $1,463,342 |
| COGS Index [1] | 0.73 | 0.73 | 0.71 | 0.71 | 0.71 | 0.68 | 0.68 | 0.68 | 0.65 | 0.65 | 0.65 | 0.65 |
| **Total Cost of Goods Sold** [2] | $12,384,942 | $13,061,715 | $13,362,091 | $14,020,322 | $14,678,553 | $14,688,751 | $15,319,169 | $15,949,588 | $15,848,535 | $16,451,141 | $17,053,747 | $17,656,353 |
| **COGS Margin** | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Detail Expense

Exhibit 15

| | Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 | Dec-06 | Jan-07 | Feb-07 | Mar-07 | Apr-07 | May-07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Variable Operating: | | | | | | | | | | | | |
| Packaging materials [1,2] | $91,500 | $96,500 | $101,500 | $106,500 | $111,500 | $116,500 | $121,500 | $126,500 | $131,500 | $136,500 | $141,500 | $146,500 |
| Personnel [1] | $300,625 | $307,958 | $319,792 | $323,458 | $331,125 | $338,458 | $387,333 | $395,167 | $402,833 | $410,167 | $417,833 | $421,500 |
| Burden [2] | $63,131 | $64,671 | $67,156 | $67,926 | $69,536 | $71,076 | $81,340 | $82,985 | $84,595 | $86,135 | $87,745 | $88,515 |
| Consulting Fees [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Consulting Expenses [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Variable Operating | $455,256 | $469,130 | $488,448 | $497,885 | $512,161 | $526,035 | $590,173 | $604,652 | $618,928 | $632,802 | $647,078 | $656,515 |
| **Total Manufacturing Costs** | $12,875,786 | $13,566,857 | $13,886,976 | $14,555,069 | $15,228,001 | $15,252,498 | $15,947,480 | $16,592,802 | $16,506,451 | $17,123,355 | $17,740,663 | $18,353,130 |
| **Gross Margin** | 24.7% | 24.8% | 24.8% | 24.8% | 24.9% | 24.8% | 24.6% | 24.7% | 24.6% | 24.6% | 24.7% | 24.7% |
| **Selling:** | | | | | | | | | | | | |
| Fixed: | | | | | | | | | | | | |
| Yellow Pages [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Specified Campaign [2] | $32,450 | $33,950 | $35,450 | $36,950 | $38,450 | $39,950 | $41,450 | $42,950 | $44,450 | $45,950 | $47,450 | $48,950 |
| PR [2] | $66,050 | $69,550 | $73,050 | $76,550 | $80,050 | $83,550 | $87,050 | $90,550 | $94,050 | $97,550 | $101,050 | $104,550 |
| Total Fixed Selling | $98,500 | $103,500 | $108,500 | $113,500 | $118,500 | $123,500 | $128,500 | $133,500 | $138,500 | $143,500 | $148,500 | $153,500 |
| Variable: | | | | | | | | | | | | |
| Travel [2] | $46,769 | $49,106 | $50,143 | $52,416 | $54,689 | $54,725 | $56,902 | $59,079 | $58,730 | $60,811 | $62,892 | $64,973 |
| Commission [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Personnel [2] | $90,000 | $90,000 | $98,333 | $98,333 | $106,667 | $106,667 | $115,000 | $115,000 | $123,333 | $123,333 | $131,667 | $131,667 |
| Burden [2] | $18,900 | $18,900 | $20,650 | $20,650 | $22,400 | $22,400 | $24,150 | $24,150 | $25,900 | $25,900 | $27,650 | $27,650 |
| Consulting Fees [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Consulting Expenses [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Variable Selling | $155,669 | $158,006 | $169,127 | $171,400 | $183,756 | $183,791 | $196,052 | $198,229 | $207,963 | $210,044 | $222,208 | $224,289 |
| **Total Selling** | $254,169 | $261,506 | $277,627 | $284,900 | $302,256 | $307,291 | $324,552 | $331,729 | $346,463 | $353,544 | $370,708 | $377,789 |

Confidential – Attorneys Eyes Only

Janis Lowe, et al. v. Elan, B.V., et al

Exhibit 15

Detail Expense

| | Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 | Dec-06 | Jan-07 | Feb-07 | Mar-07 | Apr-07 | May-07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **General & Administrative:** | | | | | | | | | | | | |
| Fixed: | | | | | | | | | | | | |
| Compensation of Officers & Bonuses [2] | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 |
| Professional Fees (legal & Audit) [2] | $42,769 | $45,106 | $46,143 | $48,416 | $50,689 | $50,725 | $52,902 | $55,079 | $54,730 | $56,811 | $58,892 | $60,973 |
| Training & Development [2] | $91,500 | $96,500 | $101,500 | $106,500 | $111,500 | $116,500 | $121,500 | $126,500 | $131,500 | $136,500 | $141,500 | $146,500 |
| Bank fees [2] | $5,132 | $5,413 | $5,537 | $5,810 | $6,083 | $6,087 | $6,348 | $6,609 | $6,568 | $7,067 | $7,317 | |
| License Fee [2] | | | | | | | | | | | | |
| Total Fixed G & A | $209,401 | $217,019 | $223,180 | $230,726 | $238,272 | $243,312 | $250,750 | $258,188 | $262,797 | $270,128 | $277,459 | $284,789 |
| Variable: | | | | | | | | | | | | |
| Personnel [1,2] | $202,417 | $206,083 | $222,667 | $226,333 | $237,917 | $241,583 | $261,833 | $265,500 | $273,417 | $277,083 | $297,333 | $301,000 |
| Burden [2] | $42,508 | $43,278 | $46,760 | $47,530 | $49,963 | $50,733 | $54,985 | $55,755 | $57,418 | $58,188 | $62,440 | $63,210 |
| Postage [2] | $1,711 | $1,804 | $1,846 | $1,937 | $2,028 | $2,029 | $2,116 | $2,203 | $2,189 | $2,272 | $2,356 | $2,439 |
| Office Supplies [2] | $3,422 | $3,608 | $3,691 | $3,873 | $4,055 | $4,058 | $4,232 | $4,406 | $4,378 | $4,545 | $4,711 | $4,878 |
| Travel & Entertainment [2] | $21,242 | $21,608 | $23,267 | $23,633 | $24,792 | $25,158 | $27,183 | $27,550 | $28,342 | $28,708 | $30,733 | $31,100 |
| Consulting Fees [2] | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 |
| Consulting Expenses [2] | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| Other [2] | $171,075 | $180,424 | $184,573 | $193,665 | $202,757 | $202,898 | $211,606 | $220,314 | $218,919 | $227,242 | $235,566 | $243,890 |
| Total Variable G & A | $532,373 | $546,806 | $572,803 | $586,972 | $611,511 | $616,459 | $651,956 | $665,729 | $674,662 | $688,039 | $723,140 | $736,517 |
| **Total General & Administrative** | $741,775 | $763,824 | $795,984 | $817,698 | $849,783 | $859,771 | $902,706 | $923,917 | $937,459 | $958,167 | $1,000,599 | $1,021,306 |
| **Depreciation & Amortization:** | | | | | | | | | | | | |
| Depreciation [3] | $196,776 | $211,393 | $226,623 | $242,504 | $258,781 | $276,039 | $293,142 | $311,803 | $314,228 | $313,706 | $332,837 | $351,288 |
| **Total Costs & Expenses** | $14,068,505 | $14,803,580 | $15,187,209 | $15,900,170 | $16,638,822 | $16,695,599 | $17,467,879 | $18,160,251 | $18,104,601 | $18,748,771 | $19,444,806 | $20,103,514 |

*Notes/Sources:*
1. See Exhibit 14.
2. FinancialModel_rev2.3.xl.
3. See Exhibit 16.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 15

Detail Expense

| | Jun-07 | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **CORES PER MONTH** [1] | 15,150 | 15,650 | 16,150 | 16,650 | 17,150 | 17,650 | 18,150 | 18,650 | 19,150 | 19,650 | 20,150 |
| **CUMULATIVE CORES SOLD** | 237,327 | 252,977 | 269,127 | 285,777 | 302,927 | 320,577 | 338,727 | 357,377 | 376,527 | 396,177 | 416,327 |
| **Total Revenue** | **$25,221,417** | **$26,053,807** | **$26,886,197** | **$27,718,587** | **$28,550,977** | **$29,383,367** | **$30,215,757** | **$31,048,147** | **$31,880,537** | **$32,712,927** | **$33,545,317** |
| **Costs and Expenses:** | | | | | | | | | | | |
| **Operating:** | | | | | | | | | | | |
| **Fixed:** | | | | | | | | | | | |
| Rent [2] | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 | $22,750 |
| Electric, Water & Other [2] | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| Repairs & Maintenance [2] | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 | $60 |
| Insurance (auto, business) [2] | $6,303 | $6,478 | $6,653 | $6,828 | $7,003 | $7,178 | $7,353 | $7,528 | $7,703 | $7,878 | $8,053 |
| Telecommunications [4] | $9,575 | $9,825 | $10,075 | $10,325 | $10,575 | $10,825 | $11,075 | $11,325 | $11,575 | $11,825 | $12,075 |
| **Total Operating Fixed** | **$40,688** | **$41,113** | **$41,538** | **$41,963** | **$42,388** | **$42,813** | **$43,238** | **$43,663** | **$44,088** | **$44,513** | **$44,938** |
| **Cost of Goods Sold:** | | | | | | | | | | | |
| Total Core [1,2] | $15,150,000 | $15,650,000 | $16,150,000 | $16,650,000 | $17,150,000 | $17,650,000 | $18,150,000 | $18,650,000 | $19,150,000 | $19,650,000 | $20,150,000 |
| Electrical | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | |
| Commodities | | | | | | | | | | | |
| Other | | | | | | | | | | | |
| Total Handheld Shell [1,2] | $7,340,175 | $7,582,425 | $7,824,675 | $8,066,925 | $8,309,175 | $8,551,425 | $8,793,675 | $9,035,925 | $9,278,175 | $9,520,425 | $9,762,675 |
| Electrical | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | |
| Commodities | | | | | | | | | | | |
| Other | | | | | | | | | | | |
| Total Docking Station [1,2] | $3,272,400 | $3,380,400 | $3,488,400 | $3,596,400 | $3,704,400 | $3,812,400 | $3,920,400 | $4,028,400 | $4,136,400 | $4,244,400 | $4,352,400 |
| Total Notebook Shell [1,2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Electrical | | | | | | | | | | | |
| Mechanical | | | | | | | | | | | |
| Commodities | | | | | | | | | | | |
| Other | | | | | | | | | | | |
| Royalty (IBM) [1,2] | $1,513,285 | $1,563,228 | $1,613,172 | $1,663,115 | $1,713,059 | $1,763,002 | $1,812,945 | $1,862,889 | $1,912,832 | $1,962,776 | $2,012,719 |
| COGS Index [1] | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 | 0.65 |
| **Total Cost of Goods Sold** [2] | **$18,258,959** | **$18,861,565** | **$19,464,171** | **$20,066,776** | **$20,669,382** | **$21,271,988** | **$21,874,594** | **$22,477,200** | **$23,079,806** | **$23,682,412** | **$24,285,018** |
| **COGS Margin** | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% | 28% |

Confidential – Attorneys Eyes Only

Janis Lowe, et al. v. Elan, B.V., et al

Detail Expense

Exhibit 15

| | Jun-07 | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Variable Operating:** | | | | | | | | | | | |
| Packaging materials [1,2] | $151,500 | $156,500 | $161,500 | $166,500 | $171,500 | $176,500 | $181,500 | $186,500 | $191,500 | $196,500 | $201,500 |
| Personnel [1] | $433,333 | $440,667 | $485,875 | $489,542 | $497,208 | $508,708 | $516,375 | $520,042 | $527,708 | $535,042 | $584,417 |
| Burden [2] | $91,000 | $92,540 | $102,034 | $102,804 | $104,414 | $106,829 | $108,439 | $109,209 | $110,819 | $112,359 | $122,728 |
| Consulting Fees [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Consulting Expenses [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Variable Operating | $675,833 | $689,707 | $749,409 | $758,845 | $773,122 | $792,037 | $806,314 | $815,750 | $830,027 | $843,900 | $908,644 |
| **Total Manufacturing Costs** | $18,975,480 | $19,592,384 | $20,255,117 | $20,867,584 | $21,484,892 | $22,106,838 | $22,724,145 | $23,336,613 | $23,953,921 | $24,570,825 | $25,238,599 |
| **Gross Margin** | 24.8% | 24.8% | 24.7% | 24.7% | 24.7% | 24.8% | 24.8% | 24.8% | 24.9% | 24.9% | 24.8% |
| **Selling:** | | | | | | | | | | | |
| Fixed: | | | | | | | | | | | |
| Yellow Pages [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Specified Campaign [2] | $50,450 | $51,950 | $53,450 | $54,950 | $56,450 | $57,950 | $59,450 | $60,950 | $62,450 | $63,950 | $65,450 |
| PR [2] | $108,050 | $111,550 | $115,050 | $118,550 | $122,050 | $125,550 | $129,050 | $132,550 | $136,050 | $139,550 | $143,050 |
| Total Fixed Selling | $158,500 | $163,500 | $168,500 | $173,500 | $178,500 | $183,500 | $188,500 | $193,500 | $198,500 | $203,500 | $208,500 |
| Variable: | | | | | | | | | | | |
| Travel [2] | $67,054 | $69,135 | $71,215 | $73,296 | $75,377 | $77,458 | $79,539 | $81,620 | $83,701 | $85,782 | $87,863 |
| Commission [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Personnel [2] | $140,000 | $140,000 | $148,333 | $148,333 | $156,667 | $156,667 | $165,000 | $165,000 | $173,333 | $173,333 | $188,333 |
| Burden [2] | $29,400 | $29,400 | $31,150 | $31,150 | $32,900 | $32,900 | $34,650 | $34,650 | $36,400 | $36,400 | $39,550 |
| Consulting Fees [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Consulting Expenses [2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Variable Selling | $236,454 | $238,535 | $250,699 | $252,780 | $264,944 | $267,025 | $279,189 | $281,270 | $293,435 | $295,516 | $315,747 |
| **Total Selling** | $394,954 | $402,035 | $419,199 | $426,280 | $443,444 | $450,525 | $467,689 | $474,770 | $491,935 | $499,016 | $524,247 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                                                        Exhibit 15

Detail Expense

| | Jun-07 | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **General & Administrative:** | | | | | | | | | | | |
| Fixed: | | | | | | | | | | | |
| Compensation of Officers & Bonuses [2] | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 |
| Professional Fees (legal & Audit) [2] | $63,054 | $65,135 | $67,215 | $69,296 | $71,377 | $73,458 | $75,539 | $77,620 | $79,701 | $81,782 | $83,863 |
| Training & Development [2] | $151,500 | $156,500 | $161,500 | $166,500 | $171,500 | $176,500 | $181,500 | $186,500 | $191,500 | $196,500 | $201,500 |
| Bank fees [2] | $7,566 | $7,816 | $8,066 | $8,316 | $8,565 | $8,815 | $9,065 | $9,314 | $9,564 | $9,814 | $10,064 |
| License Fee [2] | | | | | | | | | | | |
| Total Fixed G & A | $292,120 | $299,451 | $306,781 | $314,112 | $321,443 | $328,773 | $336,104 | $343,435 | $350,766 | $358,096 | $365,427 |
| Variable: | | | | | | | | | | | |
| Personnel [1,2] | $312,583 | $316,250 | $337,833 | $341,500 | $353,083 | $356,750 | $377,000 | $380,667 | $388,583 | $392,250 | $412,500 |
| Burden [2] | $65,643 | $66,413 | $70,945 | $71,715 | $74,148 | $74,918 | $79,170 | $79,940 | $81,603 | $82,373 | $86,625 |
| Postage [2] | $2,522 | $2,605 | $2,689 | $2,772 | $2,855 | $2,938 | $3,022 | $3,105 | $3,188 | $3,271 | $3,355 |
| Office Supplies [2] | $5,044 | $5,211 | $5,377 | $5,544 | $5,710 | $5,877 | $6,043 | $6,210 | $6,376 | $6,543 | $6,709 |
| Travel & Entertainment [2] | $32,258 | $32,625 | $34,783 | $35,150 | $36,308 | $36,675 | $38,700 | $39,067 | $39,858 | $40,225 | $42,250 |
| Consulting Fees [2] | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 | $65,000 |
| Consulting Expenses [2] | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| Other [2] | $252,214 | $260,538 | $268,862 | $277,186 | $285,510 | $293,834 | $302,158 | $310,481 | $318,805 | $327,129 | $335,453 |
| Total Variable G & A | $760,265 | $773,642 | $810,489 | $823,866 | $847,614 | $860,991 | $896,092 | $909,469 | $928,414 | $941,791 | $976,892 |
| **Total General & Administrative** | $1,052,385 | $1,073,092 | $1,117,271 | $1,137,978 | $1,169,057 | $1,189,765 | $1,232,196 | $1,252,904 | $1,279,179 | $1,299,887 | $1,342,319 |
| **Depreciation & Amortization:** | | | | | | | | | | | |
| Depreciation [3] | $371,747 | $393,152 | $415,058 | $438,392 | $461,609 | $466,298 | $490,840 | $516,256 | $540,867 | $565,275 | $589,436 |
| **Total Costs & Expenses** | $20,794,565 | $21,460,663 | $22,206,645 | $22,870,234 | $23,559,002 | $24,213,426 | $24,914,871 | $25,580,544 | $26,265,902 | $26,935,002 | $27,694,601 |

Notes/Sources:
1. See Exhibit 14.
2. FinancialModel_rev2.3.xl.
3. See Exhibit 16.

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 16

Depreciation

| | | Life [1] | 36.00 | | Time 0-March 2004 | Mar-04 | Apr-04 | May-04 |
|---|---|---|---|---|---|---|---|---|
| | | | | | 1,266,220 [2] | $0 | $61,460 | $149 |
| Apr-04 | 1 | | | $35,173 | $35,173 | | | |
| May-04 | 2 | | | $36,880 | $35,173 | $0 | $1,707 | |
| Jun-04 | 3 | | | $36,884 | $35,173 | $0 | $1,707 | $4 |
| Jul-04 | 4 | | | $36,913 | $35,173 | $0 | $1,707 | $4 |
| Aug-04 | 5 | | | $36,913 | $35,173 | $0 | $1,707 | $4 |
| Sep-04 | 6 | | | $36,957 | $35,173 | $0 | $1,707 | $4 |
| Oct-04 | 7 | | | $36,977 | $35,173 | $0 | $1,707 | $4 |
| Nov-04 | 8 | | | $56,442 | $35,173 | $0 | $1,707 | $4 |
| Dec-04 | 9 | | | $56,636 | $35,173 | $0 | $1,707 | $4 |
| Jan-05 | 10 | | | $56,927 | $35,173 | $0 | $1,707 | $4 |
| Feb-05 | 11 | | | $58,329 | $35,173 | $0 | $1,707 | $4 |
| Mar-05 | 12 | | | $60,766 | $35,173 | $0 | $1,707 | $4 |
| Apr-05 | 13 | | | $64,060 | $35,173 | $0 | $1,707 | $4 |
| May-05 | 14 | | | $68,626 | $35,173 | $0 | $1,707 | $4 |
| Jun-05 | 15 | | | $73,628 | $35,173 | $0 | $1,707 | $4 |
| Jul-05 | 16 | | | $79,704 | $35,173 | $0 | $1,707 | $4 |
| Aug-05 | 17 | | | $86,520 | $35,173 | $0 | $1,707 | $4 |
| Sep-05 | 18 | | | $94,672 | $35,173 | $0 | $1,707 | $4 |
| Oct-05 | 19 | | | $102,949 | $35,173 | $0 | $1,707 | $4 |
| Nov-05 | 20 | | | $112,379 | $35,173 | $0 | $1,707 | $4 |
| Dec-05 | 21 | | | $122,100 | $35,173 | $0 | $1,707 | $4 |
| Jan-06 | 22 | | | $132,997 | $35,173 | $0 | $1,707 | $4 |
| Feb-06 | 23 | | | $144,349 | $35,173 | $0 | $1,707 | $4 |
| Mar-06 | 24 | | | $156,225 | $35,173 | $0 | $1,707 | $4 |
| Apr-06 | 25 | | | $168,884 | $35,173 | $0 | $1,707 | $4 |
| May-06 | 26 | | | $183,159 | $35,173 | $0 | $1,707 | $4 |
| Jun-06 | 27 | | | $196,776 | $35,173 | $0 | $1,707 | $4 |
| Jul-06 | 28 | | | $211,393 | $35,173 | $0 | $1,707 | $4 |
| Aug-06 | 29 | | | $226,623 | $35,173 | $0 | $1,707 | $4 |
| Sep-06 | 30 | | | $242,504 | $35,173 | $0 | $1,707 | $4 |
| Oct-06 | 31 | | | $258,781 | $35,173 | $0 | $1,707 | $4 |
| Nov-06 | 32 | | | $276,039 | $35,173 | $0 | $1,707 | $4 |
| Dec-06 | 33 | | | $293,142 | $35,173 | $0 | $1,707 | $4 |
| Jan-07 | 34 | | | $311,803 | $35,173 | $0 | $1,707 | $4 |

Exhibit 16

*Janis Lowe, et al. v. Eltan, B.V., et al*
Depreciation

| | | **Life** [1] | **36.00** | | **Time 0-March 2004** | **Mar-04** | **Apr-04** | **May-04** |
|---|---|---|---|---|---|---|---|---|
| Feb-07 | 35 | | | $314,228 | $19,043 | $0 | $1,707 | $4 |
| Mar-07 | 36 | | | $313,706 | | $0 | $1,707 | $4 |
| Apr-07 | 37 | | | $332,837 | | $0 | $1,707 | $4 |
| May-07 | 38 | | | $351,288 | | | | $4 |
| Jun-07 | 39 | | | $371,747 | | | | |
| Jul-07 | 40 | | | $393,152 | | | | |
| Aug-07 | 41 | | | $415,058 | | | | |
| Sep-07 | 42 | | | $438,392 | | | | |
| Oct-07 | 43 | | | $461,609 | | | | |
| Nov-07 | 44 | | | $466,298 | | | | |
| Dec-07 | 45 | | | $490,840 | | | | |
| Jan-08 | 46 | | | $516,256 | | | | |
| Feb-08 | 47 | | | $540,867 | | | | |
| Mar-08 | 48 | | | $565,275 | | | | |
| Apr-08 | 49 | | | $589,436 | | | | |
| May-08 | 50 | | | $584,870 | | | | |
| Jun-08 | 51 | | | | | | | |
| Jul-08 | 52 | | | | | | | |
| Aug-08 | 53 | | | | | | | |
| Sep-08 | 54 | | | | | | | |
| Oct-08 | 55 | | | | | | | |
| Nov-08 | 56 | | | | | | | |
| Dec-08 | 57 | | | | | | | |
| Jan-09 | 58 | | | | | | | |
| Feb-09 | 59 | | | | | | | |
| Mar-09 | 60 | | | | | | | |
| Apr-09 | 61 | | | | | | | |
| May-09 | 62 | | | | | | | |
| Jun-09 | 63 | | | | | | | |
| Jul-09 | 64 | | | | | | | |
| Aug-09 | 65 | | | | | | | |
| Sep-09 | 66 | | | | | | | |
| Oct-09 | 67 | | | | | | | |
| Nov-09 | 68 | | | | | | | |
| Dec-09 | 69 | | | | | | | |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Depreciation

Exhibit 16

| | | **Life** [1] | **36.00** | **Time 0-March 2004** | **Mar-04** | **Apr-04** | **May-04** |
|---|---|---|---|---|---|---|---|
| **Jan-10** | 70 | | | | | | |
| **Feb-10** | 71 | | | | | | |
| **Mar-10** | 72 | | | | | | |
| **Apr-10** | 73 | | | | | | |
| **May-10** | 74 | | | | | | |
| **Jun-10** | 75 | | | | | | |
| **Jul-10** | 76 | | | | | | |
| **Aug-10** | 77 | | | | | | |
| **Sep-10** | 78 | | | | | | |
| **Oct-10** | 79 | | | | | | |
| **Nov-10** | 80 | | | | | | |

*Notes/Sources:*

1. FinancialModel_rev2.3.xl.
2. See Exhibit 10.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                     Exhibit 16

Depreciation

| Jun-04 | Jul-04 | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $1,043 | $0 | $1,589 | $722 | $700,722 | $6,992 | $10,488 | $50,448 | $87,758 | $118,566 | $164,374 | $180,073 |
| $29 | | | | | | | | | | | |
| $29 | $0 | | | | | | | | | | |
| $29 | $0 | $44 | | | | | | | | | |
| $29 | $0 | $44 | $20 | | | | | | | | |
| $29 | $0 | $44 | $20 | $19,465 | | | | | | | |
| $29 | $0 | $44 | $20 | $19,465 | $194 | | | | | | |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | | | | | |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | | | | |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | | | |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | | |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |

*Janis Lowe, et al. v. Eltan, B.V., et al*

Depreciation

Exhibit 16

| Jun-04 | Jul-04 | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| $29 | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| | $0 | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| | | $44 | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| | | | $20 | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| | | | | $19,465 | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| | | | | | $194 | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| | | | | | | $291 | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| | | | | | | | $1,401 | $2,438 | $3,293 | $4,566 | $5,002 |
| | | | | | | | | $2,438 | $3,293 | $4,566 | $5,002 |
| | | | | | | | | | $3,293 | $4,566 | $5,002 |
| | | | | | | | | | | $4,566 | $5,002 |
| | | | | | | | | | | | $5,002 |

*Janis Lowe, et al. v. Eltan, B.V., et al*

Depreciation

Exhibit 16

| Jun-04 | Jul-04 | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|

*Janis Lowe, et al. v. Eltan, B.V., et al*

Depreciation

Exhibit 16

| Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $218,728 | $245,384 | $293,473 | $297,976 | $339,478 | $349,957 | $392,308 | $408,658 | $427,527 | $455,725 | $513,922 | $490,181 |
| $6,076 | | | | | | | | | | | |
| $6,076 | $6,816 | | | | | | | | | | |
| $6,076 | $6,816 | $8,152 | | | | | | | | | |
| $6,076 | $6,816 | $8,152 | $8,277 | | | | | | | | |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | | | | | | | |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | | | | | | |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | | | | | |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | | | | |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | | | |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | | |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 16

Depreciation

| Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
| $6,076 | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
|  | $6,816 | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
|  |  | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
|  |  | $8,152 | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
|  |  |  | $8,277 | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
|  |  |  |  | $9,430 | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
|  |  |  |  |  | $9,721 | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
|  |  |  |  |  |  | $10,897 | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
|  |  |  |  |  |  |  | $11,352 | $11,876 | $12,659 | $14,276 | $13,616 |
|  |  |  |  |  |  |  |  | $11,876 | $12,659 | $14,276 | $13,616 |
|  |  |  |  |  |  |  |  |  | $12,659 | $14,276 | $13,616 |
|  |  |  |  |  |  |  |  |  |  | $14,276 | $13,616 |
|  |  |  |  |  |  |  |  |  |  |  | $13,616 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Depreciation

Exhibit 16

| Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Depreciation

Exhibit 16

| Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 | Dec-06 | Jan-07 | Feb-07 | Mar-07 | Apr-07 | May-07 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $526,226 | $548,271 | $571,719 | $585,995 | $621,272 | $615,695 | $671,819 | $667,943 | $666,756 | $688,727 | $725,699 | $736,671 |

| Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 | Dec-06 |
|---|---|---|---|---|---|---|
| $14,617 | | | | | | |
| $14,617 | $15,230 | | | | | |
| $14,617 | $15,230 | $15,881 | | | | |
| $14,617 | $15,230 | $15,881 | $16,278 | | | |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | | |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 16

Depreciation

| Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 | Dec-06 | Jan-07 | Feb-07 | Mar-07 | Apr-07 | May-07 |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | | | | |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | | | |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | | |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| $14,617 | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| | $15,230 | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| | | $15,881 | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| | | | $16,278 | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| | | | | $17,258 | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| | | | | | $17,103 | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
| | | | | | | $18,662 | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |

Confidential – Attorneys Eyes Only                Page 11 of 15

*Janis Lowe, et al. v. Eltan, B.V., et al*

Depreciation

Exhibit 16

| Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 | Dec-06 | Jan-07 | Feb-07 | Mar-07 | Apr-07 | May-07 |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
|  |  |  |  |  |  |  | $18,554 | $18,521 | $19,131 | $20,158 | $20,463 |
|  |  |  |  |  |  |  |  | $18,521 | $19,131 | $20,158 | $20,463 |
|  |  |  |  |  |  |  |  |  | $19,131 | $20,158 | $20,463 |
|  |  |  |  |  |  |  |  |  |  | $20,158 | $20,463 |
|  |  |  |  |  |  |  |  |  |  |  | $20,463 |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Depreciation

Exhibit 16

| Jun-07 | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 |
|---|---|---|---|---|---|---|---|---|---|---|
| $771,643 | $788,614 | $841,586 | $836,558 | $869,529 | $890,501 | $925,473 | $936,444 | $966,416 | $988,388 | $1,043,360 |

*Janis Lowe, et al. v. Eltan, B.V., et al*

Depreciation

Exhibit 16

| Jun-07 | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| $21,435 | | | | | | | | | | |
| $21,435 | $21,906 | | | | | | | | | |
| $21,435 | $21,906 | $23,377 | | | | | | | | |
| $21,435 | $21,906 | $23,377 | $23,238 | | | | | | | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | | | | | | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | | | | | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | | | | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | | | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 16

Depreciation

| Jun-07 | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| $21,435 | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| | $21,906 | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| | | $23,377 | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| | | | $23,238 | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| | | | | $24,154 | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| | | | | | $24,736 | $25,708 | $26,012 | $26,845 | $27,455 | |
| | | | | | | $25,708 | $26,012 | $26,845 | $27,455 | |
| | | | | | | | $26,012 | $26,845 | $27,455 | |
| | | | | | | | | $26,845 | $27,455 | |
| | | | | | | | | | $27,455 | |

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                Exhibit 17

## Pricing

<span style="color:red">**Confidential**</span>   **Prices As of**          **1/1/2003**                    <span style="color:red">**Confidential**</span>





| Qty [1] | 1 [1] | 10 [1] | 100 [1] | 1000 [1] | 10000 [1] |
|---|---|---|---|---|---|
| Hand Held | 1,400 | 1,400 | 1,350 | 1,300 | 1,000 |
| Core | 2,600 | 2,400 | 2,000 | 1,800 | 1,700 |
| Total | 4,000 | 3,800 | 3,350 | 3,100 | 2,700 |
| Dock | 495 | 425 | 395 | 345 | 325 |
|  | 4,495 | 4,225 | 3,745 | 3,445 | 3,025 |

| Percent of Sales [1] | 0 | 0 | 0 | 0 | 1 | End User Price [1] | Distributor Price [1] | Effective Price [1] |
|---|---|---|---|---|---|---|---|---|
| Hand Held | 0 | 0 | 0 | 0 | 1,000 | 1,000 | 790 | 843 |
| Core | 0 | 0 | 0 | 0 | 1,700 | 1,700 | 1,343 | 1,432 |
| Dock | 0 | 0 | 0 | 0 | 325 | 325 | 257 | 274 |

| Base Distributer Discount [1] | 0.21 | Total End User Price | 3,025 | 2,390 | 2,549 |
|---|---|---|---|---|---|
| Percent Swiss Direct Sales [1] | 0.25 | Effective Discount Dir/Dis | 0.16 | Total Dist. Price | Total Effective Price |
|  |  | Effective Discounted Price Dir/Dis | 2,549 |  |  |

*Notes/Sources:*
1. FinancialModel_rev2.3.xl.

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                    Exhibit 18

## Avoided Costs

|  | For the period ended 12/31/2002 [1] | For the 12 months ended 12/31/2003 [2] | For the 3 months ended 03/31/2004 [2] | Total |
|---|---|---|---|---|
| Cost of Goods Sold |  | $225,543 | $305,278 | $530,821 |
| **Manufacturing Expenses:** |  |  |  |  |
| Rent |  | $183,549 | $149,233 | $332,782 |
| Telephone |  | $34,541 | $23,379 | $57,920 |
| Tooling and Consulting |  | $41,520 | $8,009 | $49,529 |
| Utilities |  | $8,907 | $4,235 | $13,142 |
| Total Manufacturing Expenses |  | $268,517 | $184,856 | $453,373 |
| **Selling Expenses:** |  |  |  |  |
| Marketing |  | $92,737 | $18,215 | $110,952 |
| Meals and Entertainment |  | $2,602 | $1,382 | $3,984 |
| Payroll |  | $258,640 | $49,428 | $308,068 |
| Shipping |  | $17,333 | $9,508 | $26,841 |
| Travel |  | $52,247 | $3,462 | $55,709 |
| Total Selling Expenses |  | $423,559 | $81,995 | $505,554 |
| **General and Administrative Expenses:** |  |  |  |  |
| Bank Fees |  | $3,979 | $3,031 | $7,010 |
| Contract Labor |  | $581,492 | $62,974 | $644,466 |
| Depreciation and Amortization |  | 102,407 | 51,303 | $153,710 |
| Dues |  | $1,449 | $417 | $1,866 |
| Insurance |  | $54,239 | $25,359 | $79,598 |
| Licenses |  | $58 | $224 | $282 |
| Office Supplies |  | $24,337 | $10,210 | $34,547 |
| Payroll |  | $581,468 | $174,395 | $755,863 |
| Postage |  | $9,126 | $2,699 | $11,825 |
| Professional Fees |  | $181,201 | $41,464 | $222,665 |
| Repairs and Maintenance |  | $11,430 | $1,441 | $12,871 |
| Travel |  | $63,975 | $10,566 | $74,541 |
| Total General and Administrative Expenses |  | $1,615,161 | $384,083 | $1,999,244 |

Confidential – Attorneys Eyes Only                                      Page 1 of 2

*Janis Lowe, et al. v. Eltan, B.V., et al*

Exhibit 18

| | | | | |
|---|---|---|---|---|
| Total Operating Expenses | $1,541,866 | $2,307,237 | $650,934 | $4,500,037 |
| Less: Revenues | $91,325 | $341,593 | $64,277 | $497,195 |
| Net Operating Expenses | $1,450,541 | $1,965,644 | $586,657 | $4,002,842 |
| Capital Investments | | | | |
| Property, Plant and Equipment (Net) | | $936,971 | $277,946 | $1,214,917 |
| Total Avoided Costs | $1,450,541 | $2,902,615 | $864,603 | $5,217,759 |

*Notes/Sources:*

1. Antelope Quickbooks file.

2. Antelope Technologies, Inc., Report to Shareholders, March 31, 2004, pg. 6.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                    Exhibit 19

## **Implied Value**

| | |
|---|---:|
| Purchase Price Based on Genssler's Third Offer [1] | $4,720,000 |
| Mr. Genssler's Implied Interest in Antelope | 28.1% |
| Implied Non-Marketable Minority Interest Value in Antelope Technologies | $16,810,187 |
| Add: Additional Discount for Lack of Marketability [2] | 38.60% |
| Implied Marketable Minority Interest Value in Antelope Technologies | $23,298,920 |
| Add: Control Premium [3] | 31.3% |
| **Implied Value of Antelope** | **$30,597,306** |

*Notes/Sources:*
1. Subscription Agreement dated August 15, 2004.
2. See Exhibit 22.
3. See Exhibits 20 and 21 (median of data points).

Confidential – Attorneys Eyes Only                                      Page 1 of 1

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                          Exhibit 20

## **Premium Offering**

|  | Premium Offered[1,2,3] | |
|---|---|---|
| Year | Average | Median |
| 2003 | 62.3% | 31.6% |
| 2002 | 59.7% | 34.4% |
| 2001 | 57.2% | 40.5% |
| 2000 | 49.2% | 41.1% |
| 1999 | 43.3% | 34.6% |
| 1998 | 40.7% | 30.1% |
| 1997 | 35.7% | 27.5% |
| 1996 | 36.6% | 27.3% |
| 1995 | 44.7% | 29.2% |
| 1994 | 41.9% | 35.0% |
|  |  |  |
| Mean | 47.1% | 33.1% |
| Median | 44.0% | **33.0%** |

*Notes/Sources:*

1. Mergerstat Review; National Association of Certified Valuators and Analysts, Chapter 7 Valuatoin Discounts and Premiums, pg. 13.

2. Premium calculations are based on the seller's closing market price 5 business days before the initial announcement.  These calculations exclude negative premiums.

3. Mergerstat Review tracks publicly announced formal transfers of ownership of at least 10% of a company's equity where the purchase price is at least $1,000,000 and where at least one of the parties is a U.S. entity.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                    Exhibit 21

## Premium Offering

| Year | Premium Offered[1,2,3,4] |
|------|--------------------------|
| 2003 | 79.4% |
| 2002 | 24.6% |
| 2001 | 28.7% |
| 2000 | 55.6% |
| 1999 | 30.6% |
| Mean | 34.9% |
| Median | **29.7%** |

*Notes/Sources:*

1. Mergerstat Review

2. Premium calculations are based on the seller's closing market price 5 business days before the initial announcement.  These calculations exclude negative premiums.

3. Mergerstat Review tracks publicly announced formal transfers of ownership of at least 10% of a company's equity where the purchase price is at least $1,000,000 and where at least one of the parties is a U.S. entity.

4. Excluded the premium for 2003 from the mean and median calculation as the premium offered for 2003 is an outlier.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                                                        Exhibit 22

## Lack of Marketability Discount

| Study | Median Discount | Mean Discount |
|---|---|---|
| **Valuation Advisors, LLC:** | | |
| Electronics Computer Industry - Within 2 Years of IPO Date (10 transactions)[1,2] | 38.60% | 38.90% |
| John Emory Studies (Pre-IPO Studies)[3] | 43.00% | 45.00% |
| Various Restricted Stock Studies[4] | 25.00% | 25.77% |
| Mean | 35.53% | 36.56% |
| Median | 38.60% | 38.90% |

*Notes/Sources:*

1. Valuation Advisors' Lack of Marketability Discount Study Database.

2. Transactions in electronics computer industry (SIC Code 3571). Excluded transactions with marketability discounts of less than 10% and more than 90% since they are outliers.

3. See Exhibit 23.

4. See Exhibit 24.

Confidential – Attorneys Eyes Only

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                 Exhibit 23

## Restricted Stock Studies [1]

| Year | Number of Observations | Median | Mean |
|------|:---:|:---:|:---:|
| SEC Institutional Investor Study | 398 | 24% | 26% |
| Gelman Study | 89 | 33% | 33% |
| Moroney Study | 146 | 34% | 35% |
| Maher Study | 34 | 33% | 35% |
| Trout Study | 60 | n/a | 34% |
| Williamette Mangement Study | 33 | 31% | n/a |
| Stryker/Pittcok | 28 | 45% | n/a |
| Silber Study | 69 | n/a | 34% |
| Hall & Polocek | >100 | n/a | 23% |
| Johnson Study | 72 | n/a | 20% |
| Colombia Financial Study | 23 | 14% | 21% |
| Columbia Financial Study | 15 | 9% | 13% |
| Mgt Planning | 53 | 25% | 27% |
| Mgt Planning | 27 | 9% | 12% |
| FMV Opinions | 243 | 20% | 22% |
| | Mean | 25% | 26% |
| | Median | 25% | 26% |
| | Quartile 1 | 17% | 21% |

*Notes/Sources:*

1. National Association of Certified Valuators and Analysts, Chapter 7 Valuatoin Discounts and Premiums, pg. 28.

Confidential – Attorneys Eyes Only                                   Page 1 of 1

*Janis Lowe, et al. v. Eltan, B.V., et al*                                    Exhibit 24

## **John Emory Studies** [1]

| Period | Number of IPOs | Median | Mean |
|--------|--------|--------|------|
| 1997-2000 | 266 | 52% | 50% |
| 1995-1997 | 84 | 41% | 43% |
| 1994-1995 | 45 | 47% | 45% |
| 1992-1993 | 49 | 43% | 45% |
| 1990-1992 | 30 | 33% | 42% |
| 1989-1990 | 17 | 40% | 45% |
| 1987-1989 | 21 | 43% | 45% |
| 1985-1986 | 19 | 43% | 43% |
| 1980-1981 | 12 | 68% | 60% |
| | | | |
| All Years | 543 | 43% | 45% |
| Quartile 1 | | 41% | 43% |

*Notes/Sources:*
1. Quantifying Marketability Discounts, pg. 80; "Business Valuation: Discounts and Premiums," 2nd Edition, Shannon P. Pratt, pg. 180.

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                 Exhibit 25

## **Mr. Genssler's Final Offer** [1]

| | |
|---|---|
| Number of Voting Shares | 884,238 |
| Number of Non-Voting Shares | 720,549 |
| Total Number of Shares | 1,604,787 |
| Purchase Price Per Share | $2.9412 |
| Purchase Price Based on Genssler's Offer | $4,720,000 |

*Notes/Sources:*
1. Subscription Agreement dated August 15, 2004.

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                                                      Exhibit 26

### Antelope Stock Ownership

|  | Authorized [1] |  |  |  | | 100,000,000 | 100,000,000 | 200,000,000 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Book date** | **Cert Date** | **Holder** | **State** | **Cert. No.** | **Price** | **Voting** | **Non-voting** | **Total** | **Voting %** | **Non-Voting %** | **Total %** | **Dollars** |
| 5/15/2002 | 5/15/2002 | Kenneth A. Geyer | CO | 1 | $ 0.0010 | 210,000 | | 210,000 | 7.1% | 0.0% | 3.7% | $210 |
| 5/15/2002 | 5/15/2002 | Kenneth A. Geyer | CO | 2 | $ 0.0010 | | 180,000 | 180,000 | 0.0% | 6.6% | 3.1% | $180 |
| 5/15/2002 | 5/15/2002 | Tom P. Scott | CO | 3 | $ 0.0010 | 210,000 | | 210,000 | 7.1% | 0.0% | 3.7% | $210 |
| 5/15/2002 | 5/15/2002 | Tom P. Scott | CO | 4 | $ 0.0010 | | 180,000 | 180,000 | 0.0% | 6.6% | 3.1% | $180 |
| 5/15/2002 | 5/15/2002 | David E. Witt | CO | 5 | $ 0.0010 | 210,000 | | 210,000 | 7.1% | 0.0% | 3.7% | $210 |
| 5/15/2002 | 5/15/2002 | David E. Witt | CO | 6 | $ 0.0010 | | 180,000 | 180,000 | 0.0% | 6.6% | 3.1% | $180 |
| 5/15/2002 | 5/15/2002 | Anna C. Cole | CO | 7 | $ 0.0010 | 210,000 | | 210,000 | 7.1% | 0.0% | 3.7% | $210 |
| 5/15/2002 | 5/15/2002 | Anna C. Cole | CO | 8 | $ 0.0010 | | 180,000 | 180,000 | 0.0% | 6.6% | 3.1% | $180 |
| 6/30/2002 | 5/15/2002 | J Gary Newton | NC | 9 | $ 1.2500 | 40,000 | | 40,000 | 1.3% | 0.0% | 0.7% | $50,000 |
| 6/30/2002 | 5/15/2002 | J Gary Newton | NC | 10 | $ 1.2500 | | 40,000 | 40,000 | 0.0% | 1.5% | 0.7% | $50,000 |
| 5/15/2002 | 5/15/2002 | C. Stephen Guyer | CO | 11 | $ 0.0010 | 120,000 | | 120,000 | 4.0% | 0.0% | 2.1% | $120 |
| 5/15/2002 | 5/15/2002 | C. Stephen Guyer | CO | 12 | Canceled | | | - | 0.0% | 0.0% | 0.0% | |
| 5/15/2002 | 5/15/2002 | Ronald J. Snow | CO | 13 | Canceled | | | - | 0.0% | 0.0% | 0.0% | |
| 7/1/2002 | 7/1/2002 | Deena F. Garinger | CO | 14 | $ 5.0000 | | 2,000 | 2,000 | 0.0% | 0.1% | 0.0% | $10,000 |
| 7/1/2002 | 7/1/2002 | Arlene & Milt Larsen | CA | 15 | $ 5.0000 | | 2,000 | 2,000 | 0.0% | 0.1% | 0.0% | $10,000 |
| 7/1/2002 | 7/1/2002 | Christine & Alice Zamiara | CA | 16 | $ 5.0000 | | 400 | 400 | 0.0% | 0.0% | 0.0% | $2,000 |
| 5/15/2002 | 5/15/2002 | Ronald J. Snow | CO | 17 | $ 0.0010 | | 100,000 | 100,000 | 0.0% | 3.6% | 1.7% | $100 |
| 10/16/2002 | 10/16/2002 | Hazel B. Guyer | PA | 18 | $ 5.0000 | | 4,000 | 4,000 | 0.0% | 0.1% | 0.1% | $20,000 |
| 1/1/2003 | 12/17/2002 | Janice K. Witt | CO | 19 | $ 0.0010 | 15,000 | | 15,000 | 0.5% | 0.0% | 0.3% | $15 |
| 1/1/2003 | 12/17/2002 | Tony Bacarella | TX | 20 | $ 0.0010 | | 10,000 | 10,000 | 0.0% | 0.4% | 0.2% | $10 |
| 1/27/2003 | 1/27/2003 | Tracy B. Guyer | CO | 21 | $ 3.0000 | | 1,000 | 1,000 | 0.0% | 0.0% | 0.0% | $3,000 |
| 2/24/2003 | 2/24/2003 | Donald F. Geyer | AL | 22 | $ 5.0000 | | 400 | 400 | 0.0% | 0.0% | 0.0% | $2,000 |
| 1/1/2003 | 4/1/2003 | Alan H. Taylor | TX | 23 | $ 0.0001 | 210,000 | | 210,000 | 7.1% | 0.0% | 3.7% | $21 |
| 1/1/2003 | 4/1/2003 | Alan H. Taylor | TX | 24 | $ 0.0001 | | 180,000 | 180,000 | 0.0% | 6.6% | 3.1% | $18 |
| 1/1/2003 | 4/1/2003 | Ivan R. Cardenas | TX | 25 | $ 0.0001 | 210,000 | | 210,000 | 7.1% | 0.0% | 3.7% | $21 |
| 1/1/2003 | 4/1/2003 | Ivan R. Cardenas | TX | 26 | $ 0.0001 | | 180,000 | 180,000 | 0.0% | 6.6% | 3.1% | $18 |
| 4/1/2003 | 4/1/2003 | Donald F. Geyer | AL | 27 | Canceled | | | - | 0.0% | 0.0% | 0.0% | $0 |
| 4/1/2003 | 4/1/2003 | Cecelia Cardenas-Fabre | TX | 28 | $ 2.9412 | | 51,000 | 51,000 | 0.0% | 1.9% | 0.9% | $150,000 |
| 4/1/2003 | 4/1/2003 | Aline Dickey | TX | 29 | $ 2.9412 | | 51,000 | 51,000 | 0.0% | 1.9% | 0.9% | $150,000 |
| 4/1/2003 | 4/1/2003 | Victor J. Cardenas | TX | 30 | $ 2.9412 | | 68,000 | 68,000 | 0.0% | 2.5% | 1.2% | $200,000 |
| 4/1/2003 | 4/1/2003 | Victor J. Cardenas, Jr. | TX | 31 | $ 2.9412 | | 68,000 | 68,000 | 0.0% | 2.5% | 1.2% | $200,000 |
| 4/1/2003 | 4/1/2003 | John Walker | CH | 32 | $ 2.9412 | | 51,000 | 51,000 | 0.0% | 1.9% | 0.9% | $150,000 |
| 4/1/2003 | 4/1/2003 | Janis Lowe | TX | 33 | $ 2.9412 | | 17,000 | 17,000 | 0.0% | 0.6% | 0.3% | $50,000 |
| 4/1/2003 | 4/1/2003 | Thomas K. Donalson | TX | 34 | $ 2.9412 | | 34,000 | 34,000 | 0.0% | 1.2% | 0.6% | $100,000 |
| 4/1/2003 | 4/1/2003 | Alinda & John Martin | TX | 35 | $ 2.9412 | | 3,400 | 3,400 | 0.0% | 0.1% | 0.1% | $10,000 |
| 4/1/2003 | 4/1/2003 | John C. Martin, III | TX | 36 | $ 2.9412 | | 2,550 | 2,550 | 0.0% | 0.1% | 0.0% | $7,500 |
| 4/1/2003 | 4/1/2003 | Michele and Neal Green | TX | 37 | $ 2.9412 | | 2,550 | 2,550 | 0.0% | 0.1% | 0.0% | $7,500 |
| 4/1/2003 | 4/1/2003 | Guy Fischer | CH | 38 | $ 2.9412 | | 24,523 | 24,523 | 0.0% | 0.9% | 0.4% | $72,128 |
| 4/1/2003 | 4/1/2003 | J. Gary Newton | NC | 39 | Canceled | | | - | 0.0% | 0.0% | 0.0% | $0 |
| 5/15/2002 | 4/1/2003 | C. Stephen Guyer | CO | 40 | $ 0.0010 | 90,000 | | 90,000 | 3.0% | 0.0% | 1.6% | $0 |

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                                                                   Exhibit 26

Authorized [1]                                                100,000,000   100,000,000   200,000,000

| Book date | Cert Date | Holder | State | Cert. No. | Price | Voting | Non-voting | Total | Voting % | Non-Voting % | Total % | Dollars |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/15/2002 | 4/1/2003 | C. Stephen Guyer | CO | 41 | Canceled | | - | - | 0.0% | 0.0% | 0.0% | $0 |
| 4/1/2003 | 4/1/2003 | J Gary Newton | NC | 42 | $ 0.0001 | | 57,750 | 57,750 | 0.0% | 2.1% | 1.0% | $6 |
| 10/27/2003 | 10/27/2003 | Deena F. Garinger | CO | 43 | $ 5.0000 | | 1,000 | 1,000 | 0.0% | 0.0% | 0.0% | $5,000 |
| 12/31/2003 | 1/13/2004 | Rick Sondag | CO | 44 | $ 2.9400 | 8,000 | | 8,000 | 0.3% | 0.0% | 0.1% | $23,530 |
| 12/31/2003 | 1/13/2004 | Daniel Burki | CH | 45 | $ 2.9412 | 3,992 | | 3,992 | 0.1% | 0.0% | 0.1% | $11,740 |
| 12/31/2003 | 1/13/2004 | Claude Frey | CH | 46 | $ 2.9412 | 4,000 | | 4,000 | 0.1% | 0.0% | 0.1% | $11,765 |
| 12/31/2003 | 1/13/2004 | Guy Fischer | CH | 47 | $ 2.9412 | 6,074 | | 6,074 | 0.2% | 0.0% | 0.1% | $17,861 |
| 12/31/2003 | 1/13/2004 | Victor Cardenas, Jr. | TX | 48 | $ 2.9412 | 36,380 | | 36,380 | 1.2% | 0.0% | 0.6% | $50,000 |
| 12/31/2003 | 1/13/2004 | Alan H. Taylor | TX | 49 | $ 2.9412 | 10,200 | | 10,200 | 0.3% | 0.0% | 0.2% | $30,000 |
| 12/31/2003 | 1/13/2004 | Cecilia Fabre | TX | 50 | $ 2.9412 | 13,600 | | 13,600 | 0.5% | 0.0% | 0.2% | $40,000 |
| 12/31/2003 | 1/13/2004 | John Walker | CH | 51 | $ 2.9412 | 17,000 | | 17,000 | 0.6% | 0.0% | 0.3% | $50,000 |
| 12/31/2003 | 1/13/2004 | Victor Cardenas, Sr. | TX | 52 | $ 2.9412 | 51,000 | | 51,000 | 1.7% | 0.0% | 0.9% | $150,000 |
| 1/13/2004 | 1/13/2004 | J. Gary Newton | TX | 53 | $ 2.9412 | 105,400 | | 105,400 | 3.5% | 0.0% | 1.8% | $310,002 |
| 1/13/2004 | 1/13/2004 | Anna C. Cole | CO | 54 | $ 2.9412 | 6,590 | | 6,590 | 0.2% | 0.0% | 0.1% | $19,383 |
| 2/3/2004 | 2/3/2004 | Ivan Cardenas | TX | 55 | $ 2.9412 | 1,802 | | 1,802 | 0.1% | 0.0% | 0.0% | $5,300 |
| 2/3/2004 | 2/3/2004 | Patrice Kelley | TX | 56 | $ 2.9412 | | 3,400 | 3,400 | 0.0% | 0.1% | 0.1% | $10,000 |
| 2/3/2004 | 2/3/2004 | Colin Newstead | TX | 57 | $ 2.9412 | | 1,020 | 1,020 | 0.0% | 0.0% | 0.0% | $3,000 |
| 2/3/2004 | 2/3/2004 | Cecilia Fabre | TX | 58 | $ 2.9412 | 3,400 | | 3,400 | 0.1% | 0.0% | 0.1% | $10,000 |
| 2/3/2004 | 2/3/2004 | C. Albert Guyer | PA | 59 | $ 5.0000 | | 2,000 | 2,000 | 0.0% | 0.1% | 0.0% | $10,000 |
| 2/3/2004 | 2/3/2004 | Bill Kelley | TX | 60 | $ 2.9412 | | 1,700 | 1,700 | 0.0% | 0.1% | 0.1% | $5,000 |
| | | Void - mis-printed | FL | 61 | $ 2.9412 | | | - | 0.0% | 0.0% | 0.0% | $0 |
| 3/8/2004 | 3/8/2004 | David Landreth | TX | 62 | $ 2.9412 | 17,000 | | 17,000 | 0.6% | 0.0% | 0.3% | $50,000 |
| 3/8/2004 | 3/8/2004 | Aparna Cherukupalli | TX | 63 | $ 2.9412 | | 1,700 | 1,700 | 0.0% | 0.1% | 0.0% | $5,000 |
| 3/8/2004 | 3/8/2004 | Michelle Young | TX | 64 | $ 2.9412 | | 6,800 | 6,800 | 0.0% | 0.2% | 0.1% | $20,000 |
| 3/8/2004 | 3/8/2004 | Lyle Pete Murphy | TX | 65 | $ 2.9412 | | 3,400 | 3,400 | 0.0% | 0.1% | 0.1% | $10,000 |
| 3/8/2004 | 3/8/2004 | Rainee S. Busby | TX | 66 | $ 2.9412 | | 3,400 | 3,400 | 0.0% | 0.1% | 0.1% | $10,000 |
| 3/8/2004 | 3/8/2004 | Wyndy Sheets | TX | 67 | $ 2.9412 | | 5,100 | 5,100 | 0.0% | 0.2% | 0.1% | $15,000 |
| 3/8/2004 | 3/8/2004 | Gina Long | TX | 68 | $ 2.9412 | | 1,700 | 1,700 | 0.0% | 0.1% | 0.0% | $5,000 |
| | | Void - mis-printed | | 69 | | | | | 0.0% | 0.0% | 0.0% | $0 |
| 3/8/2004 | 3/8/2004 | Jeurg Hofer | CH | 70 | $ 2.9412 | | 10,000 | 10,000 | 0.0% | 0.4% | 0.2% | $29,412 |
| 3/8/2004 | 3/8/2004 | Everett and Virginia Henderson | TX | 71 | $ 2.9412 | | 3,400 | 3,400 | 0.0% | 0.1% | 0.1% | $10,000 |
| 3/8/2004 | 3/8/2004 | Charles Dale | TX | 72 | $ 2.9412 | | 8,500 | 8,500 | 0.0% | 0.3% | 0.1% | $25,000 |
| 3/8/2004 | 3/8/2004 | Daren and Vanessa Gaines | TX | 73 | $ 2.9412 | | 1,700 | 1,700 | 0.0% | 0.1% | 0.0% | $5,000 |
| 3/8/2004 | 3/8/2004 | Wells Family Investment Co. | OK | 74 | $ 2.9412 | 17,000 | | 17,000 | 0.6% | 0.0% | 0.3% | $50,000 |
| 3/32/2004 | 3/32/2004 | Terry DeVille | TX | 76 | $ 2.9412 | | 1,700 | 1,700 | 0.0% | 0.1% | 0.0% | $5,000 |
| 3/23/2004 | 3/23/2004 | Scott Countryman | CO | 77 | $ 2.9412 | | 328 | 328 | 0.0% | 0.0% | 0.0% | $965 |
| 3/23/2004 | 3/23/2004 | Terry Henderson (RTC) | CO | 78 | $ 2.9412 | 68,000 | | 68,000 | 2.3% | 0.0% | 1.2% | $200,002 |
| 4/20/2004 | 4/20/2004 | Robert Haugen | | 79 | $ 2.9412 | 17,000 | | 17,000 | 0.6% | 0.0% | 0.3% | $50,000 |
| 4/22/2004 | 4/22/2004 | Kajal Roy | TX | 80 | $ 2.9412 | | 1,700 | 1,700 | 0.0% | 0.1% | 0.0% | $5,000 |
| 4/26/2004 | 4/26/2004 | Mark Keim (Lost) | TX | 81 | $ 2.9412 | | | | 0.0% | 0.0% | 0.0% | $0 |
| 5/15/2004 | 5/15/2004 | Scott M. Carlin | CO | 82 | $ 2.9412 | 100,000 | | 100,000 | 3.4% | 0.0% | 1.7% | $294,120 |
| 5/15/2004 | 5/15/2004 | Scott M. Carlin | CO | 83 | $ 2.9412 | | 100,000 | 100,000 | 0.0% | 3.6% | 1.7% | $294,120 |

*Janis Lowe, et al. v. Eltan, B.V., et al*                                                                                                Exhibit 26

|  | Authorized[1] |  |  |  |  |  | 100,000,000 | 100,000,000 | 200,000,000 |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Book date | Cert Date | Holder | State | Cert. No. | | Price | Voting | Non-voting | Total | Voting % | Non-Voting % | Total % | Dollars |
| 5/19/2004 | 5/19/2004 | Marya Kokaska | CO | 84 | $ | 0.0010 |  | 5,000 | 5,000 | 0.0% | 0.2% | 0.1% | $5 |
| 7/26/2004 | 7/26/2004 | C. Stephen Guyer | CO | 85 | $ | 0.0001 |  | 176,000 | 176,000 | 0.0% | 6.4% | 3.1% | $0 |
| 7/26/2004 | 7/26/2004 | Hazel B. Guyer | PA | 86 | $ | - |  | 4,000 | 4,000 | 0.0% | 0.1% | 0.1% | $0 |
| 4/26/2004 | 5/9/2004 | Mark Keim | TX | 87 | $ | 2.9412 |  | 10,000 | 10,000 | 0.0% | 0.4% | 0.2% | $29,412 |
| 7/23/2004 | 7/23/2004 | John Lipinski | TX | 88 | $ | 2.9412 | 17,000 |  | 17,000 | 0.6% | 0.0% | 0.3% | $50,000 |
| 8/8/2004 | 7/23/2004 | Terry Henderson (RTC) | TX | 89 | $ | 2.9412 | 41,072 |  | 41,072 | 1.4% | 0.0% | 0.7% | $120,801 |
| 7/23/2004 | 7/25/2004 | Mark Keim (RTC) | TX | 90 | $ | 2.9412 | 17,000 |  | 17,000 | 0.6% | 0.0% | 0.3% | $50,000 |
| 8/15/2004 |  | Klaus Genssler[2] |  |  | $ | 2.9412 | 884,238 | 720,549 | 1,604,787 | 29.8% | 26.3% | 28.1% | $4,720,000 |
|  |  |  |  |  |  |  |  |  | - |  |  |  |  |
|  |  |  |  |  |  |  |  |  | - |  |  |  |  |
|  |  |  |  |  |  |  | 2,970,748 | 2,744,670 | 5,715,418 | 100.0% | 100.0% | 100.0% | $8,062,438 |

*Notes/Sources:*

1. Antelope Stock Ownership-Purchase Spreadsheet.
2. Subscription Agreement dated August 15, 2004.

Confidential – Attorneys Eyes Only

# ATTACHMENT # 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### LUFKIN DIVISION

| | | |
|---|---|---|
| JANIS LOWE; RAINEE BUSBY; APARNA CHERUKUPALLI; ALINE DICKEY; CHARLES DALE; TERRY DEVILLE; GUY FISCHER; VANESSA & DARREN GAINES; NEAL & MICHELLE GREEN; C. STEPHEN GUYER; ROBERT HAUGEN; EVERETT & VIRGINIA HENDERSON; TERRY & DEBBY HENDERSON; MARK KEIM, PATRICE & ED KELLEY; DAVID LANDRETH; JOHN LIPINSKI; GINA LONG; JOHN MARTIN, III; JOHN & ALINDA MARTIN; PETE MURPHY; KAJAL ROY; WYNDY SHEETS; ALAN TAYLOR; and MICHELLE YOUNG Individually, and Derivatively on behalf of Nominal Defendant ANTELOPE TECHNOLOGIES, INC., a Colorado Corporation | § § § § § § § § § § § § § § § § § § § § | |
| **Plaintiffs** | § § | |
| v. | § § § | **CIVIL ACTION NO. 9:05-cv-38** |
| ELTAN, B.V.; PIERRE STIRNWEISS; KLAUS GENSSLER; MCC COMPUTER COMPANY, LLC; SCALTECH INTERNATIONAL, INC.; THOMAS LYKOS ANNA COLE; IVAN CARDENAS; VICTOR J. CARDENAS, JR.; RODOLFO FABRE; KENNETH GEYER; JOHN GARY NEWTON; THOMAS SCOTT AND ROLF GENSSLER | § § § § § § § § § § § | **JURY** |
| **Defendants** | § § | |
| -and- | § § | |
| ANTELOPE TECHNOLOGIES, INC., a Colorado Corporation | § § | |
| **Nominal Defendant** | § | |

## PLAINTIFFS' PROPOSED SIXTH AMENDED ORIGINAL COMPLAINT

NOW COME Plaintiffs, **TERRY HENDERSON, DEBBY HENDERSON, ALAN H.**

**TAYLOR, BECKY TAYLOR, C. STEPHEN GUYER** and **GUY R. FISHER**, some of

whom now own the Claims by **JANIS LOWE, CHARLES DALE; TERRY DEVILLE, MARK KEIM, ROBERT HAUGEN, EVERETT & VIRGINIA HENDERSON, MICHELLE YOUNG, JOHN MARTIN, ALINDA MARTIN, JOHN MARTIN, III, MICHELLE GREEN** and **NEAL GREEN,** Individually and Derivatively on behalf of **ANTELOPE TECHNOLOGIES, INC.,** a Colorado Corporation, complaining of the Defendants, **PIERRE STIRNWEISS, KLAUS GENSSLER, MCC COMPUTER COMPANY, LLC, SCALTECH INTERNATIONAL, INC., ANNA COLE, IVAN CARDENAS, VICTOR CARDENAS, JR., KENNETH GEYER, JOHN GARY NEWTON, THOMAS SCOTT, ROLF GENSSLER, JACQUELINE GENNSLER, SCALTECH INTERNATIONAL, L.L.C., NAHA HOLDINGS, LP, THE WELLS FAMILY TRUST, GENSSLER INVESTMENTS, LTD, AND TECHNOLOGY INVESTORS TRUST**, actions as follows:

## PARTIES

1.      Plaintiffs, **Terry Henderson** and **Debby Henderson** are residents of Cypress, Texas, at all relevant times have been shareholders of Antelope Technologies, Inc., and are the current owners (by Assignment or inheritance) of the Claims formerly owned by **Everette Henderson, Virginia Henderson, Terry Deville, Mark Keim, Michelle Young, Charles Dale, John Martin, Alinda Martin, John Martin, III, Michelle Green** and **Neal Green.**

2.      Plaintiffs, **Alan H. Taylor** and **Becky Taylor** are residents of Friendswood, Texas, at all relevant times have been shareholders of Antelope Technologies, Inc., and are the current owners (by Assignment) of the Claims formerly owned by **Janis Lowe**.

3.      Plaintiff, **C. Stephen Guyer** is a resident of Littleton, Colorado, and at all relevant times has been a shareholder of Antelope Technologies, Inc.

4.      Plaintiff, **Guy R. Fischer** is a resident of Boudry, Switzerland, and at all relevant times has been a shareholder of Antelope Technologies, Inc.

2

5.      Defendant, **Pierre Stirnweiss** is a Citizen of France residing in Neuchatel, Switzerland.

6.      Defendant, **Klaus Genssler** resides at 26 Farnham Park Drive, Houston, Texas 77024, and he can be served at that address.

7.      Defendant, **MCC Computer Company, LLC,** is a Delaware limited liability company with its principle place of business at 2727 Allen Parkway, Suite 1700, Houston, TX 77019. MCC can be served through its registered agent **Klaus Genssler** at its principle place of business.

8.      Defendant, **Scaltech International, Inc.,** is a Netherlands Antilles company doing business in the United States, with its principle place of business at 720 Oates Road, Houston, Texas 77013.  Scaltech International can be served at this address or by serving its president **Klaus Genssler** at his residence or principle place of business.

9.      Defendant, **Anna Cole** resides at 2801 Maffitt Court, Fayetteville, North Carolina 28303 and can be served at that address.

10.     Defendant, **Ivan Cardenas** resides at 2202 Enchanted Isle Drive, Houston, Texas 77062 and can be served at that address.

11.     Defendant, **Victor Cardenas, Jr.,** resides at 122 Majuro Drive, Galveston, Texas 77554 and can be served at that address.

12.     Defendant, **Kenneth Geyer** resides at 10557 Tiger Point, Littleton, Colorado 80124 and can be served at that address.

13.     Defendant, **John Gary Newton** resides at 915 Hay St., Fayetteville, North Carolina 28305 and can be served at that address

14.     Defendant, **Thomas P. Scott** resides at 9326 Bellewood Court, Highlands Ranch, Colorado 80129 and can be served at that address.

15.     Defendant, **Rolf Genssler** resides at 2602 Juniper Court, Palm City Florida, 34990 and can be served at that address.

16.     Defendant, **Scaltech International, L.L.C.** is a Texas company doing business in the United States, with its principal place of business at 400 North Richey Street, Pasadena, Texas

3

77506-1061. Scaltech International, L.L.C. can be served at this address or by serving its registered agent Klaus Genssler at his residence or principal place of business.

17.    Defendant, **Jacqueline Genssler**, the spouse of Klaus Genssler, she resides at 26 Farnham Park, Houston, Texas 77024, and she can be served at that address.

18.    Defendant, **NAHA Holdings, LP,** is a Texas limited partnership that can be served at 7911 Beverly Hills Street, Houston, Texas.

19.    Defendant, **Wells Family Trust**, is a California Trust that can be served at 5534 Dorothy Drive, San Diego, California 92115.

20.    Defendant, **Genssler Investment Partnership, LLP,** is a Florida Limited Liability Partnership that can be served by serving its Trustee, **Rolf Genssler** who resides at 2602 Juniper Court, Palm City Florida, 34990 and can be served at that address.

21.    Defendant **Technology Investors Trust**, is a trust that can be served by serving its Trustee, **Rolf Genssler**, who resides at 2602 Juniper Court, Palm City, Florida, 34990 and can be served at this address.

22.    Nominal Defendant, **Antelope Technologies, Inc.,** is a Colorado corporation that can be served through its registered agent, **Thomas J. Lykos, Jr.**, at 5858 Westheimer, Suite 301, Houston, Texas 77057.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction based upon The Lanham Act 15 U.S.C. §1121(a) and 1125(a), The RICO Act 18 U.S.C. §1964, et seq., and pendent jurisdiction of all related claims and parties, see 18 U.S.C. §1965(b).

24.    Venue is proper in this District as several defendants, including Pierre Stirnweiss and Scaltech International, Inc., are alien defendants. "An alien may be sued in any district." 28 U.S.C. §1391(d). Venue is proper as to each remaining defendants as they combined with, conspired with, aided and abetted every other defendant in producing the harm to Plaintiffs that is the subject of this action.

4

## FACTUAL ALLEGATIONS

25.    Plaintiffs are shareholders of Antelope Technologies, Inc., a high-tech company whose leading product is a modular computer.  On May 7, 2008, Antelope changed its original state of incorporation from Colorado to Delaware and changed its name to MCC Computer Company.  Modular computing is a revolutionary technology with great potential in the marketplace.  The modular computer or "core" developed by Antelope allows a customer to literally transport their entire computer in their shirt pocket.   The Antelope core is approximately three inches by five inches and less than an inch thick (3" X 5" X ¾").  Despite its small size, the Antelope core is powerful enough to run a full-scale operating system such as Windows XP.   Because of its small but powerful design, the Antelope core has several distinct advantages.  It allows the user to purchase only one copy of expensive software and eliminates redundancy in maintaining and synchronizing multiple computers.  No longer will a person need a desktop, a laptop and a personal digital assistant - - a single Antelope modular computer can fill all these needs.  The theft of this revolutionary "technology" is at the heart of this case.

26.    A history of the Antelope core's development is essential to understanding the present dispute.   Its foundation is a technology licensed from International Business Machines ("IBM").  Antelope took this foundation technology and upgraded it to the working computer that is now the Antelope core.  Antelope also developed specialized computer "shells" into which the core could be plugged to meet the needs of various customers.  For example, some customers need a small hand-held device with a touch-screen, while others prefer a desktop application.  Antelope developed "shells" to plug the core into for each of the various customer applications.

27.     To perfect the core's technology, Antelope contracted with a Dutch company, Eltan, B.V., a named defendant in this action to upgrade the "bios" or operating code for the core. The underlying technology upon which Eltan based its work was the IBM technology licensed to Antelope. Ultimately, Eltan's efforts were successful and were integrated into the new version of the Antelope core (known as version 1.5). Under the agreement with Eltan, the intellectual property created became the property of Antelope and Eltan expressly disclaimed any patents in the design. The IBM license was never transferred to Eltan, who acted merely as a contractor hired to perform a designated task.

28.     Once the design was perfected, Antelope took steps to bring the product to market. Among these were the selection of a production facility and the hiring of necessary personnel to physically make the cores and the related application shells. Also, the need for capital investors was recognized so Antelope began looking for persons willing to invest.

29.     A production facility was set up in Neuchatel, Switzerland under the direction of Ivan Cardenas, a named defendant in this action. Also retained, as the factory's production manager, was Pierre Stirnweiss, a French citizen and a named defendant in this action. Financing for the Swiss production facility was obtained through a Swiss bank, with half of the loan being underwritten by the Swiss economic development board (a quasi-governmental entity).

30.     Recognizing the need for additional working capital, the Antelope board of directors began to seek out investors. One such investor was Klaus Genssler, a Houston businessman and named Defendant in this action. Beginning in June of 2004, Alan Taylor (then CEO of Antelope) and other Antelope board members began discussions with Genssler. He was provided access to highly confidential business information regarding the Antelope core, its

market potential, and the Swiss production facility. To protect this information, Genssler was required to sign a "Mutual Nondisclosure & Non-Compete Agreement," which he executed as President of Scaltech International, Inc. on July 4, 2004.

31.     Genssler immediately recognized the huge potential of this revolutionary product and, instead of investing in the company, began steps, in combination with other named defendants, to seize the technology for themselves. Genssler agreed to a $250,000 loan to Antelope, to meet short-term obligations, but insisted that Antelope deliver (to his office) 75 of the completed cores to serve as collateral for the loan. This transfer occurred around July 23, 2004.

32.     Genssler also took steps to gain control of Antelope for himself. At a meeting on August 4, 2004, he discussed with Alan Taylor and others a plan whereby the company could file bankruptcy and shed itself of many small investors, thereby increasing the ownership percentage for himself and others who would participate in the scheme. Alan Taylor rejected this idea and later reported it to the Antelope board of directors, along with a recommendation that Antelope stop dealing with Genssler due to his unethical conduct. As an alternative source of capital, Taylor and a select committee of board members began discussions with another high-tech firm, Xybernaut.

33.     After a brief negotiation, Xybernaut and the Antelope committee drafted an investment proposal to present to the respective boards of each company for approval. Once Genssler found out about the competing investor, he immediately retained legal counsel and filed a temporary restraining order in state district court in Texas, preventing the Antelope board from consummating the Xybernaut deal. Genssler never funded the bond required by the Texas court, proving that this was merely a tactic to scuttle the competitor's bid. In the mean time,

Genssler purchased enough stock and proxy votes of Antelope shareholders to obtain effective control of the corporation (51%).

34.     Shortly thereafter, Alan Taylor resigned from Antelope and an interim CEO, was elected by the Antelope Board to replace Taylor.  During the next few months Antelope was effectively raided of assets and placed in a precarious financial position, paving the way for Genssler's bankruptcy plan.  Several former Antelope officers, employees, shareholders and board members were complicit in this activity.  Included among them were Anna Cole, Ivan Cardenas, Thomas Scott and Kenneth Geyer.  With the help of these individuals and others, who backed them financially, Genssler created a competing company incorporated in Delaware on October 27, 2004 under the name of MCC Computer Company, LLC ("MCC").

35.     While either employed by Antelope or in their capacity as Antelope insiders, shareholders, officers and directors, Defendants Cardenas (Ivan and Victor), Cole, Klaus Genssler ("Antelope/MCC Conspirators") acted with complete disregard for their fiduciary obligations to Antelope and its shareholders.  While still employed or affiliated with Antelope and prior to the formal incorporation of MCC, these Antelope/MCC Conspirators aided and abetted by the other Defendants systematically converted Antelope assets and customers to MCC.  For example, Ivan Cardenas and Victor Cardenas, Jr., were dispatched to Switzerland to shut down the Antelope manufacturing facility and take (without Antelope's permission) the computer hard drives containing Antelope's design and production information.  This theft has resulted in a criminal complaint being filed in Switzerland against Ivan Cardenas, Klaus Genssler and others who participated in this scheme.  The stolen technology was transported by Victor Cardenas, Jr. back to the State of Texas and was used by MCC and thereby provided

MCC the parts, computer modules technology, and sales and marketing professionals to debilitate Antelope so that it could no longer conduct business.

36.    Another Antelope former employee and board member, Anna Cole, was employed by MCC and marketed the Antelope core technology to Antelope's former clients as an MCC product. Even before resigning her position with Antelope she began to convert Antelope customers to MCC. Anna Cole, at the direction of Klaus and Rolf Genssler, directed the efforts of MCC to simply "re-label" the Antelope core technology with an MCC logo and pass/market the re-labeled Antelope core technology to Antelope's clients as MCC's product. She was likewise instrumental in creating the marketing campaign and website of MCC, while she remained a board member of Antelope. Her blatant disregard for Antelope is well demonstrated by the fact that the MCC website was initially only a copy of the Antelope site, with a touched-up photo that merely changed the logo on the core to that of MCC. Through the efforts of Anna Cole, Ivan Cardenas and the other named defendants, MCC has succeeded in obtaining orders from numerous Antelope customers.

37.    Despite his execution of a non-compete agreement with Antelope, Klaus Genssler incorporated MCC which (the Plaintiffs recently discovered) utilized the assistance and financial backing of Technology Investors Trust, the Wells family Trust, NAHA Holdings LP, Genssler Investment Partnership, LLP, Jacquline Genssler (Klaus Genssler's spouse or former spouse), Patricia Cardenas and Thomas K. Donaldson (collectively the "MCC Computer Company LLC Financiers"). With the financial support of the MCC Computer Company LLC Financiers, Cole, Newton, Ivan and Victor Cardenas, Rolf Genssler and the employment of the Antelope/MCC Conspirators with their unique knowledge of the manufacturing requirement to build the computer, Klaus Genssler executed his premeditated plan to systematically deprive

Antelope of the financial and human capital that it required to locate the financial and managerial resources needed to ensure the viability of Antelope. The efforts of Anna Cole were directly supported by her father, John Gary Newton, who has and continues to profit from her illegal activities as an owner of MCC. Ivan Cardenas also received financial backing and other support from Rodolfo Fabre and Victor Cardenas, Jr., each of whom have profited individually from this unlawful scheme. The efforts of Klaus Genssler were directly supported and at times directed by his father, Rolf Genssler, former officer of Scaltech International, Inc.

38.     Once the Defendants controlled certain of Antelope's hard assets and intellectual property and technology, they soon realized that they could not fully exploit the potential of the Antelope core without production assistance from former Antelope personnel. The Defendants approached Pierre Stirnweiss, Antelope's former production manager, and obtained his agreement to use Antelope's technology, including data on the stolen hard drives from the Swiss factory, to produce the Antelope core and pass it off as MCC's product. During this period, Mr. Stirnweiss resided at Klaus Genssler's home in Houston, Texas, while overseeing the piracy of Antelope's technology and the creation of an alternate production facility. The Genssler home in Houston and office in Pasadena, Texas, served as production sites at relevant times during MCC's initial start-up phase.

39.     Defendants also recognized another problem with their scheme - - the lack of a license for the underlying technology from IBM. The original license was granted to Antelope and is non-transferable. The license also contains a reversion provision that cancels the license if Antelope files for bankruptcy. These facts have left MCC in desperate need of a license to cover their product. IBM has refused to grant MCC a license, so MCC approached Eltan, B.V.

and obtained a license from them for the up-grades performed under contract with Antelope. MCC is now passing this off as a license for the core.

40.     By granting this "license" Eltan, B.V. has violated its agreement with Antelope, which merely allowed them to perform upgrades to the underlying IBM technology.  Eltan does not own and has no right to "license" the IBM technology that it was provided merely as a contractor of Antelope.  Eltan has "licensed" Antelope's technology to MCC, a direct competitor, without Antelope's permission and without any right to do so.

## DERIVATIVE ALLEGATIONS

41.     All the facts and allegations above are incorporated herein by reference as if fully set out.  Plaintiffs are shareholders of Antelope Technologies, Inc. and bring this action derivatively on behalf of the nominal defendant Antelope against several directors and officers of Antelope who have participated in the course of conduct alleged in this complaint, to the detriment of Antelope and in contravention of their fiduciary duties to Antelope and Plaintiffs. Plaintiffs have on many occasions voiced displeasure and concern to the Defendants regarding the actions complained of herein.  A formal demand to the board of directors was not made by Plaintiffs regarding this suit as the board is controlled by Defendants who are acting contrary to Antelope's interest, rendering such a demand futile.  Further, the acts of which Plaintiffs complain constitute breaches of fiduciary duty by the board members that cannot be ratified by a majority vote of the board.  Further, several of the acts of which Plaintiffs complain are illegal and incapable of ratification.  In addition, the Antelope board lacks the necessary independence to act as its majority shareholders took steps to ensure that Klaus and Rolf Genssler and their affiliates conspired with Cardenas, Cole, Newton, Fabre and their affiliates to take control of Antelope, its assets, key employees and starve it from the funds it needed so

that the board was not willing or capable of functioning as an independent decision maker for

Antelope's shareholders.

## FIRST CAUSE OF ACTION
## LANHAM ACT VIOLATIONS

42.     The factual allegations presented above are incorporated herein by reference.  This

cause of action is brought against Defendants MCC Computer Company, LLC, Klaus

Genssler, Rolf Genssler, the Antelope /MCC Conspirators, The MCC Computer Company

LLC Financiers, Anna Cole, John Gary Newton, Ivan Cardenas, Victor Cardenas, Jr., and

Pierre Stirnweiss.

43.     The Lanham Act provides, in relevant portion, "Any person who, on or in connection

with any goods or services . . . uses in commerce any word, term, name, symbol, or device . . .

or any false designation of origin, false or misleading description of fact, or false or misleading

representation of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive

as to the affiliation, connection, or association of such person with another person, or as to the

origin, sponsorship, or approval of his or her goods, services, or commercial activities by

another person . . . shall be liable in a civil action by any person who believes that he or she is

or is likely to be damaged by such act." 15 U.S.C. § 1125.  The Defendants acting individually

and together in concerted action violated the Lanham Act by misrepresenting the Antelope

core technology as their own product.  Particularly, MCC Computer Company, LLC, and its

agents, employees and principles, advertised the product as its own at the MCC Computer

Company website (**www.modular-pc.com**) with the only notable difference being that the

name printed on the picture of the core has been changed from Antelope to MCC's logo.  Also,

during the Consumer Electronics Show in Las Vegas, Nevada, Defendant Genssler, speaking

as President of MCC, issued a press release claiming that the Antelope core technology was MCC's product. This press release was also posted on the MCC company website.

44.     These actions and others perpetrated by the Defendants caused actual confusion regarding the ownership, affiliation and connection of the Antelope's core technology product with MCC. These actions are also likely to cause continued confusion among prospective customers of Antelope and to deceive such customers as to the origin, sponsorship and approval of Antelope with regard to the Antelope core technology product. As a result, Antelope and its shareholders, including Plaintiffs, have been harmed through lost sales, lost business opportunities and lost product recognition in the market place.

45.     Under the Lanham Act, Plaintiffs are entitled to seek, and hereby plead for injunctive relief to prevent further harm. Plaintiffs also are entitled to recover all profits earned by Defendants as a result of their conduct, attorney's fees and costs of this action, and an amount up to three times Plaintiffs' actual damages. Plaintiffs hereby request the Court to render such judgment.

## SECOND CAUSE OF ACTION
## RICO ACT VIOLATIONS

46.     The factual allegations presented above are incorporated herein by reference. This cause of action is brought against all Defendants.

47.     As set forth in greater detail below, in connection with the acts, conduct, combination and conspiracy alleged herein, the Defendants and their co-conspirators, directly and indirectly, have used the means and instrumentalities of interstate and foreign commerce, including travel in interstate and foreign commerce and have used the United States mail and interstate and international wire facilities in furtherance of their unlawful scheme.

48.     At all relevant times, the Defendants have pursued a common course of conduct, acted in concert and conspired with, and aided and abetted one another to accomplish the wrongs complained of herein. Each Defendant was the agent of each of the remaining Defendants, and was acting within the course and scope of said agency at the relevant times.    Each of the Defendants is liable as a direct participant in, a co-conspirator and an aider and abettor of, the wrongs alleged in this Complaint.

49.     Beginning in July of 2004 and continuing to the present, the Defendants formed a corrupt enterprise and have engaged in a pattern of racketeering activity, whose objective was the theft and marketing of the Antelope core as the Defendants' product.  Defendants through their individual agreements formed an association in fact with the sole objective of seizing control of Antelope Technologies, Inc. and taking from it the valuable modular computer cores and their underlying technology.  This has been accomplished through an ongoing scheme of illegal activity as described herein, regarding Antelope and Antelope shareholders and its intellectual property and confidential business information.

50.     Defendants also have created and funded MCC Computer Company, LLC ("MCC") for the sole purpose of receiving stolen Antelope technology and proprietary business information, with the specific intent of copying Antelope's modular computer design technology and passing it off as MCC's own.  While still holding positions with Antelope, including serving as a member of the board of directors, Defendants Rodolfo Fabre and Anna Cole conspired among themselves and with others, including Klaus Genssler, Rolf Gennsler, John Gary Newton, Victor Cardenas, The MCC Computer Company LLC Financiers and Ivan Cardenas, to form a competing company (MCC) and unlawfully obtain and provide to MCC the confidential business information and intellectual property (technology) of Antelope.

14

Particularly, Rodolfo Fabre, Anna Cole, John Gary Newton, Klaus Genssler (with the knowledge, approval and at certain times under the direction of Rolf Gennsler) met on August 30, 2004, and at various other times to discuss this scheme. The very next day, Rodolfo Fabre resigned from the Board of Directors at Antelope, but within days had rescinded his resignation and participated in the Antelope board meeting held on September 4, 2004. Thereafter, Rodolfo Fabre, in an effort to conceal his involvement in this scheme, invested approximately $100,000 in MCC, but had the stock certificates registered in this wife's name.

51.    In furtherance of this unlawful conspiracy, Defendants have engaged in a series of illegal acts including the theft of corporate assets from Antelope's Swiss production facility, which stolen property was transported into the United States by Victor Cardenas at the behest of Ivan Cardenas and other named Defendants, in violation of 18 U.S.C. §2314. This theft is the subject of a criminal complaint filed in Switzerland against several named Defendants in this Complaint. Once transported to the United States, these stolen goods were received and used by other named Defendants, including Klaus Genssler and Pierre Stirnweiss, in furtherance of their plan to unlawfully produce copies of the Antelope core technology for MCC, in violation of 18 U.S.C. §2315. Further, the Defendants have converted actual Antelope cores and re-labeled them to fraudulently conceal their true identity as Antelope's products. Defendants then transported these cores in interstate and/or international commerce in violation of 18 U.S.C. §2314. This pattern of racketeering activity is ongoing as Defendants continue to unlawfully exploit the business assets of Antelope and convert them to their own use, to produce copies of the Antelope core, and to market them through interstate and international commerce.

52.     The above predicate acts all occurred after the effective date of RICO (October 15, 1970) and within 10 years of each other. Each of the Defendants' racketeering activities were undertaken for the purpose of furthering their common scheme to unlawfully seize Antelope's proprietary business technology and convert it for their own profit. The acts described above are part of a recurring pattern of racketeering as defined in 18 U.S.C. §1961(5) and are ongoing at this time.

53.     As a direct and proximate result of Defendants' acts and conduct in violation of RICO §1962(a) and (d), Plaintiffs have been injured in their business and property. Under RICO §1964(c), Plaintiffs seek to recover treble damages and the costs of bringing this suit, including attorneys' fees.

**THIRD CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**

54.     The factual allegations presented above are incorporated herein by reference. This cause of action is brought against Defendants Anna Cole, Ivan Cardenas, Kenneth Geyer, Thomas Scott, John Gary Newton, Klaus Genssler and Rolf Genssler.

55.     These Defendants were at the relevant times employees, officers, directors and/or insiders of Antelope Technologies, Inc. As such, each of these individuals owed a fiduciary duty to Antelope and its shareholders, including the Plaintiffs. Each of these individuals acted without regard to their fiduciary duties to Antelope and its shareholders. They directly transferred assets of the company to a competitor and assisted others in doing so. They created and/or assisted in the creation of MCC, a direct competitor of Antelope. They solicited and assisted others in soliciting the customers of Antelope on behalf of its rival MCC. They converted corporate opportunities which were the property of Antelope and its shareholders to their own benefit and to the benefit of a rival company. As a direct and proximate result of

these alleged breaches of fiduciary duty, Antelope and its shareholders, including Plaintiffs, have suffered damages including the loss of business assets, loss of business opportunities and loss of revenue and profits.

56.     In addition to the foregoing, Defendants acted without regard to their fiduciary duties to Antelope and its shareholders.  Klaus Genssler and Rolf Genssler directed the management of Antelope to file bankruptcy proceedings which the court eventually dismissed, finding that the Chapter 11 proceeding was filed in an **attempt to gain an unfair advantage in this litigation**. *See Antelope Techs., Inc. v. Lowe (In re Antelope Techs., Inc.)*, Case No. 07-31159-H3-11, Civil Action No. H-10-0205, 2010 U.S. Dist. LEXIS 73456 (S.D. Tex. July 21, 2010).  As a direct and proximate result of the bankruptcy filing, Antelope and its employees and shareholders, including Plaintiffs, have suffered damages.

## FOURTH CAUSE OF ACTION
## CIVIL CONSPIRACY

57.     The factual allegations presented above are incorporated herein by reference.  This cause of action is brought against all Defendants.

58.     All Defendants conspired among themselves to achieve the unlawful objectives detailed above.  Particularly, the named Antelope/MCC Conspirators met and conspired among themselves and with other named Defendants to breach their fiduciary duties to Antelope and its shareholders and to divert Antelope's customers, business opportunities and business assets to MCC and other named Defendants.  Defendant, Klaus Genssler, met and conspired with each of the individual Defendants to achieve his ultimate goal of seizing Antelope's technology and the Antelope core for himself, to market as MCC's own product.  This conspiracy included among other things the above-described interference with Antelope customers, the alteration of Antelope's products and marketing material, the theft of

17

Antelope's computer hard drives and the re-labeling of the Antelope core as an MCC product. To achieve his objectives, Klaus Genssler, with the knowledge and approval of Rolf Genssler who, along with the Genssler affiliates, provided funding that allowed them to conspire with the Antelope/MCC Conspirators, and enabled the Gensslers to entice the Antelope/MCC Conspirators to breach their fiduciary duties toward Antelope and its shareholders. Further, each of the named Defendants joined in the ultimate conspiracy to take the modular core computer technology from Antelope and to produce and market it as the product of MCC, in complete disregard for the rights of Antelope and its shareholders.

59.     In furtherance of the above unlawful agreements, the Defendants committed numerous unlawful acts, including the theft of Antelope's property, business information and customer contacts.   The Defendants also unlawfully altered Antelope's products by removing the Antelope logo and placing an MCC logo on the product and marketing it as their own. Defendants also committed other unlawful acts as detailed above, in furtherance of this conspiracy.   As a direct and proximate result of this conspiracy and the unlawful acts of the Defendants, Antelope and its shareholders, including Plaintiffs, have suffered damages.

## FIFTH CAUSE OF ACTION
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

60.     The factual allegations presented above are incorporated herein by reference.   This cause of action is brought against all the Defendants except Jacqueline Genssler.

61.     As detailed above, the named Antelope/MCC Conspirators met and conspired among themselves and with other named Defendants to breach their fiduciary duties to Antelope and its shareholders and to divert Antelope's customers, business opportunities and business assets to MCC and other named Defendants thereby debilitating Antelope and leaving it with no alternative other than dissolution or bankruptcy. Consequently, each of the Antelope/MCC

Conspirators knowingly participated in and substantially assisted each other's breaches of their fiduciary duties. In addition, Klaus Genssler and Rolf Genssler , both individually and on behalf of the entities they represent and/or control, including but without limitation to Scaltech International, Inc., Defendants and MCC participated in and substantially assisted the breaches of fiduciary duties by conspiring with each of the Antelope/MCC Conspirators and the board members and shareholders of MCC to achieve the ultimate goal of seizing Antelope's technology and the Antelope core for MCC, and then market same as MCC's in total abrogation of the IBM licensing agreement.

62. Furthermore, through their participation in the above described conspiracy and assistance in furthering its goals, each of the Defendants aided and abetted the officer and/or director Defendants named above in breaching their fiduciary duties to the Plaintiffs by taking the modular computer technology from Antelope and using it to produce and market same as the product of MCC, in complete disregard for the rights of Antelope and its shareholders. As a direct and proximate result of all Defendants' participation in and assistance to the Antelope/MCC Conspirators and MCC board members and shareholders breaches of their fiduciary duties, Antelope and its shareholders, including Plaintiffs, have suffered damages.

## SIXTH CAUSE OF ACTION
## CONVERSION

63. The factual allegations presented above are incorporated herein by reference. This cause of action is brought against Defendants Klaus Genssler, MCC Computer Company, LLC, Scaltech International, Inc., Scaltech International, L.L.C., Rolf Genssler and the affiliated Defendants who the Gensslers control or which benefited from the conversion of Antelope's assets, Anna Cole, Ivan Cardenas, and John Gary Newton.

64.    These Defendants have converted the business assets of Antelope to their own individual use and the use of a competing company, MCC, a company that is owned by several of these individual Defendants or their affiliates.  The conversion of assets includes the theft of Antelope's business information from the computer hard drives stolen by Ivan Cardenas and Victor Cardenas, Jr. from the Switzerland production facility.  The Defendants also have converted confidential business information, including client lists and client contact information in a similar manner.  This business information was the property of Antelope and its shareholders.  Likewise, the Defendants have converted Antelope's proprietary business information and "know-how" with regard to designing, producing and marketing the Antelope core technology.  The MCC modular computer is merely a copy of the Antelope core technology with a different logo painted on its cover.  The various application shells offered by MCC are also simply copies of Antelope designs.  Defendants also physically converted several existing Antelope cores by simply putting stickers over the Antelope name and re-labeling them as MCC's products and passing them off to customers as such.  As a direct result of these acts, Antelope and its shareholders, including Plaintiffs, have suffered and continue to suffer damages.

## SEVENTH CAUSE OF ACTION
## CIVIL THEFT

65.    The factual allegations presented above are incorporated herein by reference.  This cause of action is brought against Defendants Klaus Genssler, MCC Computer Company, LLC, Scaltech International, Inc., Scaltech International, L.L.C., Rolf Genssler and the affiliates which he and/or Klaus Genssler may control, Anna Cole, Ivan Cardenas, and John Gary Newton.

66.     These Defendants' conduct constitutes civil theft, for which a remedy may be had under COLO. REV. STAT. § 18-4-405, or, in the alternative, under the Texas Theft Liability Act, TEX. CIV. PRAC. & REM. CODE § 134.001, *et seq*. Defendants have stolen the business assets of Antelope for their own individual use and the use of a competing company, MCC, a company that is owned by several of these Defendants. This theft of assets includes the theft of Antelope's business information from the computer hard drives stolen by Ivan Cardenas and Victor Cardenas, Jr. from the Switzerland production facility. These Defendants also have stolen confidential business information, including client lists and client contact information in a similar manner. This business information was the property of Antelope and its shareholders. Likewise, the Defendants have stolen Antelope's proprietary business information and "know-how" with regard to designing, producing and marketing the Antelope core technology. The MCC modular computer is merely a copy of the Antelope core technology with a different logo painted on its cover. The various application shells offered by MCC are also simply copies of Antelope's designs. These Defendants also physically converted several existing Antelope cores by simply putting stickers over the Antelope name and re-labeling them as MCC's product and passing them off to customers as such. As a direct result of these acts, Antelope and its shareholders, including Plaintiffs, have suffered and continue to suffer damages. Plaintiffs are therefore entitled under COLO. REV. STAT. § 18-4-405 to recover three times the amount of the actual damages sustained by them, and to recover costs of the action and reasonable attorney fees.

## EIGHTH CAUSE OF ACTION
## BREACH OF CONTRACT

67.     The factual allegations presented above are incorporated herein by reference. This cause of action is brought against Defendants Klaus Genssler, Scaltech International, Inc. and

21

Scaltech International, L.L.C. (the corporation and L.L.C. referred to collectively as "Scaltech International")

68.     Defendants Klaus Genssler and Scaltech International breached material terms of the Mutual Nondisclosure & Non-Compete Agreement executed on July 4, 2004. Particularly, the contract provides, "During the term of and for a period of three years after the termination of this Agreement, Participant, for itself and for its affiliates, associates, successors and assigns, agrees not to directly or indirectly finance, acquire, own, lease, manage, operate or control, or participate in the financing, acquisition, ownership, lease, management, operation or control of, or otherwise be an investor in or a consultant or adviser to, any business, firm, corporation or entity that is a direct competitor of Antelope Technologies, Inc. in modular computing." (Paragraph 8).    Klaus Genssler, who executed this agreement on behalf of Scaltech International currently is serving as the President of MCC Computer Company, LLC, and is attempting to market as its own product the Antelope modular computer technology.   This breach has caused Antelope and its shareholders, including Plaintiffs, harm through lost sales, misuse of proprietary business information and unfair competition.

69.     The Mutual Nondisclosure & Non-Compete Agreement also provides that any party who is injured by the other's violation of the agreement is entitled to injunctive relief.   Both parties to the Agreement recognized that a violation of the confidentiality and non-compete covenants would cause immediate and irreparable harm.   Plaintiffs are entitled to injunctive relief against Klaus Genssler and Scaltech International under the Mutual Nondisclosure & Non-Compete Agreement.   Likewise, Plaintiffs are entitled to injunctive relief against the remaining Defendants who have conspired to violate these contractual provisions and who

have improperly benefited from the contractual breach. Plaintiffs request that the Court enter an appropriate preliminary and permanent injunction.

### NINTH CAUSE OF ACTION
### INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

70.     The factual allegations presented above are incorporated herein by reference. This cause of action is brought against Defendants Klaus Genssler and Rolf Genssler and the affiliated entities which they control, the Antelope/MCC Conspirators, and MCC Board members and shareholders.

71.     Klaus and Rolf Genssler devised a scheme for Antelope to rid itself of this lawsuit and shed itself of many small investors and creditors, thereby increasing the ownership percentage for himself, the Antelope/MCC Conspirators and the MCC board members and shareholders who would participate in the scheme. In an attempt to prevent Klaus Genssler from bringing the scheme to fruition, Alan Taylor and other board members negotiated a deal with an alternative source of capital. Once Klaus Genssler learned about the competing investor (Xybernaut), he (with the assistance of Defendants Rolf Genssler, Anna Cole and John Gary Newton) retained legal counsel and filed an application for a temporary restraining order in State district court in Texas, intending to prevent the Antelope board from consummating the Xybernaut deal. But for the Gensslers' and the other Defendants' actions, the transaction would most likely have been consummated, and Antelope's bankruptcy averted. At the direction and approval of Rolf Genssler, Klaus Genssler filed the temporary restraining order in merely a bad faith tactic to scuttle attempts to find an alternative source of capital since he knew that (at that time) Antelope had insufficient funds to fight such battles, and other potential investors would be dissuaded from pursuing a transaction where a major shareholder

was taking steps to frustrate the completion of an investment from any alternative source. The Gensslers' actions were the proximate cause of Plaintiffs damages.

### TENTH CAUSE OF ACTION
### INJUNCTIVE RELIEF

72.     In addition to all other legal, equitable and injunctive relief to which they are entitled, individually and derivatively as a shareholders of Antelope, Plaintiffs request the Court to enter a preliminary and permanent injunction against all named Defendants restraining them from:

    a.  Marketing Antelope's modular computer as a product of MCC or any other unauthorized person or entity;

    b.  Using Antelope's technology and proprietary business information to produce modular computers for any person or entity other than Antelope;

    c.  Misrepresenting to Antelope's customers that MCC is licensed to use the underlying technology which is the property of Antelope;

    d.  Mislabeling Antelope's products;

    e.  Shipping any such mislabeled Antelope products in interstate commerce;

    f.  Engaging in any other act which is likely to lead to confusion or mistake regarding the affiliation, connection or association of any person or entity with Antelope or any of its products; and

    g.  All further illegal or fraudulent activities subject to this Court's inherent injunctive power or as permitted by the Lanham Act, RICO Act or other federal statute.

### PRAYER FOR RELIEF

73.     As a direct and proximate result of each of the foregoing acts, Plaintiffs have suffered and continue to suffer damages.  Plaintiffs hereby seek all legal and equitable relief to which they are entitled individually or as shareholders of Antelope Technologies, Inc., including the following:

a.   All actual damages resulting from Defendants' actions;

b.   Treble damages under the Lanham Act and/or RICO Act and/or COLO. REV. STAT. § 18-4-405;

c.   Punitive damages;

d.   Injunctive and/or declaratory relief as deemed appropriate by this Court;

e.   Judgment for costs of the suit incurred, including attorneys' fees;

f.   Interest on all such amounts permitted by law; and

g.   Such other relief Plaintiff's show themselves entitled at law or equity.

Respectfully submitted,
Attorneys for Plaintiffs
**George O. Mejlænder, P.C.**

By:_____**"/s/"**_____

**George O. Mejlænder** - Attorney at Law
State of Texas Bar No. 24004814
Post Office Box 801261
Houston, Texas  77280-1261
281-376-9200 - Phone
281-376-9201 – Facsimile
E-Mail: gom@gmtxlaw.com

# ATTACHMENT # 3



3 May 2004

# SUMMARY

# LEGAL AND FINANCIAL INFORMATION

- Antelope Technologies, inc. is a "C" Colorado Corporation
- Formed May 15, 2002

- Antelope Technologies (Suisse) SA is a Swiss *Sociéte  Anonyme*

- 100% of the stock of the SA is held by Antelope Technologies, Inc. (USA)
    Therefore, Antelope SA is shown as an asset of the USA Company. Furthermore, the Swiss entity is exempt from income taxes for 10 years; a 39% savings to net income

- There are 5 directors for the Swiss entity, they are:
    Alan Taylor, (also a director and CEO of Antelope USA)
    David E. Witt, (also a director of Antelope USA)
    Guy Fischer, a Swiss national and shareholder of Antelope USA
    Daniel Burki, a Swiss national and shareholder of Antelope USA
    Claude Frey, retired president of Swiss Parliament and shareholder of Antelope USA

- The USA board consists of 9 people, the seven founders plus two independent directors

- All equity has been issued by the USA corporation pursuant to Regulation D, rule 504 or 506

- There are two classes of common stock, voting and non-voting

- All debt is held by the Swiss entity

Capital structure is:

| Equity: | As of 3/2/2004 | | | |
|---|---|---|---|---|
| | Original Issue | $ | 144,045 | |
| | Additional Paid in Capital | $ | 2,345,967 | |
| | | $ | 2,490,012 | 49.2% |
| **Debt:** | | | | |
| | Bank loan | $ | 2,573,980 | |
| | | $ | 2,573,980 | 50.8% |
| | | | | |
| **Total Capitalization** | | $ | 5,063,992 | 100% |

| Equity Ownership Summary: (current) | Percent | No. of Shares | Number |
|---|---|---|---|
| Founders | 72.33% | 2,748,592 | 7 |
| Outside Director | 6.68% | 243,150 | 1 |
| Stockholders holding less than 5% each | 17.83% | 808,089 | 40 |
| | 100.00% | 3,799,831 | 48 |
| | | - | |

All shareholders are natural persons except one self-directed IRA.   There are no outstanding convertible notes or warrants.  The company has adopted a non-qualified

stock option plan and has committed to issue between 10,000 and 50,000 shares to key employees.  Directors hold more than 80% of the voting stock

Funds pass between the two entities pursuant to arms-length agreements in accordance with guidelines published by the international Organization for Economic Co-operation and Development.  The agreements are:

- Technology and Patent Sub-License Agreement
- Business Management Services Agreement
- Exclusive Distributorship Agreement
- Procurement Agreement (contemplated)

Total employees within the Swiss entity: 8

Total employees within the USA organization:  7

| Use of Proceeds | |
|---|---:|
| Capital Expenditures: | |
|     Development and redesign | $  500,000 |
|     Equipment | 200,000 |
| Total Capital Expenditures | 700,000 |
| | |
| Components for the first units  (1) | 1,200,000 |
| | |
| Operating Requirements: | |
|     Additional executive management (2) | 80,000 |
|     Additional technical personnel | 100,000 |
|     Additional support staff & consulting (3) | 100,000 |
|     Operating personnel | 120,000 |
|     General & administrative | 100,000 |
| Total start-up operating expenses | 500,000 |
| | |
| Contingency | 100,000 |
| Total | $2,500,000 |

Note 1:   Includes some inventory already purchased

Note 2:   Six months of operations

Note 3:   Includes legal and audit

## Per Unit Summary

| | |
|---|---|
| **CORES PER MONTH** | **6,000** |
| **CUMULATIVE CORES SOLD** | **44,595** |

**Revenue:**

| | |
|---|---|
| Sales | $2,331 |
| Secondary sales | - |
| **Total Revenue per unit** | 2,331 |

**Costs and Expenses (per unit):**

| | |
|---|---|
| Compensation of Officers & Bonuses | 8 |
| Operating: | |
|     Fixed | 4 |
|     Cost of Goods Sold | 1,675 |
|     Variable | 53 |
| Total Operating | 1,732 |
| Operating Margin | 26% |
| | |
| Selling: | |
|     Fixed | 11 |
|     Variable | 18 |
| Total Selling | 29 |
| General & Administrative: | |
|     Fixed | 25 |
|     Variable | 67 |
| Total General & Administrative | 92 |
| Depreciation & Amortization: | |
|     Depreciation | 19 |
| **Total Costs and Expenses** | 1,880 |
| | |
| **Income Before Interest & Taxes** | 451 |

**Other Income (Expense)**

| | |
|---|---|
| Interest Expense | - |
| Interest Income | 3 |
| Accrued expenses | - |
| **Pre Tax Net Income (Loss)** | $453 |
| | 19.5% |

The following are some highlights of operations and the position of the firm.  There are of course many other factors to be considered when evaluating the state of the company, including: consolidation methods, differences between US GAAP and IAS, accumulated net losses from start-up operations, accrued salaries and benefits, valuation methods of the Technology license.

Nevertheless, the following shows an organization with strong potential for success. Management remains willing available for detail explanation and discussion.

**Since January 1, 2004 through March 31, 2004**

| | | |
|---|---|---:|
| Units produced | | 150 |
| Units sold to end-users | | 130 |
| Revenue | $ | 278,000 |
| Revenue per unit | | 3,125 |
| Gross profit | $ | 75,950 |

**Disclosures**

The Company is exposed to asserted and unasserted legal claims encountered in the normal course of business. We believe that the ultimate resolution of any such matters will not have a material adverse effect on the operating results or the financial position of the Company.

In December 2003, the Company was named as an *additional* defendant in the lawsuit captioned Michael R. Guzofsky And Robert W. Southard, Plaintiffs and Nominal plaintiffs: Liteye Microdisplay Systems, LLC, vs. Tom P. Scott, Kenneth A. Geyer, Liteye Systems, LLC and GCSW Technologies, LLC formerly known as Antelope Technologies, LLC, and Antelope Technologies, Inc., Defendants, Case No.02 CV 1202, In the United States District Court for the District of Douglas County, Colorado. The case involves claims of derrative action, fiduciary duty, and interference with contractual opportunities.   Plaintiffs were members of an LLC two-generations removed from Antelope Technologies, Inc.

Although no assurances can be given that this matter will be resolved in the Company's favor, we believe that the case is without merit, and that the ultimate resolution of the lawsuit will not have a material adverse effect on the operating results or the financial position of the Company. We intend to vigorously defend against this claim.

# ATTACHMENT # 4

# Business Plan Executive Summary
## December 2003 - Revision 2.3





*Computing… Anytime, Anywhere*



## <u>CONFIDENTIALITY NOTICE</u>

This document contains proprietary information of Antelope Technologies of Highland Ranch, Colorado.  The information contained in this document is for the sole use of the party receiving this document.  Acceptance of this document or its attachments by the receiving party constitutes agreement by that party that they shall not disclose proprietary information contained herein to any third party and shall not transmit any documents or copies thereof containing proprietary information to any third party except as may be authorized in writing by Antelope Technologies, Inc.

This business plan is intended solely for informational purposes to assist the recipient with a due-diligence investigation of this project.  The information contained herein is believed to be reliable, but the management team makes no representations or warranties with respect to this information.  Any financial projections that are part of this plan represent estimates based on extensive research and on assumptions considered reasonable, but they are not guaranteed.

For additional information, contact:

     C. Stephen Guyer, CFO
     Antelope Technologies, Inc.
     8955 South Ridgeline Boulevard
     Suite 1000
     Highlands Ranch, CO  80129-2362
     Phone: (720) 344-4313, main; (303) 683-3338 Direct anytime
     Email: csguyer@Antelopetech.com

# Executive Summary

Antelope Technologies, Inc. of Highlands Ranch, Colorado is producing the world's most advanced *mobile modular computer* in Neuchatel, Switzerland. This new computer uses patented technology from the world's premier technology company, IBM. In addition to its revolutionary technology, Antelope has several strategic advantages as a business including a 10 year tax holiday on earnings in Switzerland and a reciprocal marketing, sales and service relationship with IBM.



Antelope completed first round funding in April of 2003 totaling **$4.52 million.** This first round funding consisted of a $2.57 million working capital credit facility issued by a Swiss bank and $1.95 million in privately placed equity from investors in Texas, Colorado, North Carolina and Switzerland.

Antelope is now in production and is **seeking an additional $1.5 to $2 million** in new equity investment or financing facilities to fund accelerated growth. Profitability is estimated for early Second quarter, 2004. By January 31, 2004, Antelope will have shipped approximately 75 units generating $255,000 in gross revenue. An additional 200 units ($680,000 gross revenue) are awaiting release upon payment for certain components. Weighted average price is $3,400 per unit. Profit margin per unit is about 35 percent or $1,190.

Antelope Technologies holds the only technology license to produce the Modular Computer Core (MCC) ultra-mobile computer from IBM. While this license is not written as exclusive, Antelope remains the only licensee after two years. IBM continues to refer interested potential licensees directly to Antelope. Furthermore, Antelope has developed its own intellectual property far beyond the original IBM design.

This device, formerly known as the IBM MetaPad, won the *Popular Science* product of the year in 2002. This revolutionary computer was developed over 4 years by IBM Watson Research. The advances in design, manufacture and configuration provides new capabilities for efficiency and productivity-- *computing anytime, anywhere.*

The main element of the product line is an ultra-compact **Mobile Computing Core** ("MCC") that is about the size of a small stack of 3x5 inch business cards.

Among mobile devices, the MCC has the



Highest Power to Mobility Factor
Lowest Total Cost of Ownership Model
Greatest Configuration Versatility

The MCC is a FULL POWERED COMPUTER WORKSTATION (not a PDA)

The core can be inserted into a variety of form factors including:
- handheld mini-tablets (ruggedized version shown above)
- desktop cradles
- laptop shells
- many other potential applications including vehicles and robotics.

**Review of Operations to Date**

- April 2003 – Completion of 1st round financing.  Antelope Technologies (Suisse), S.A. is formed in Switzerland

- May 2003 – Operations begin in Neuchatel, Switzerland

- June 2003 – Updated core design is initiated with IBM Watson Research.

- July 2003 - Antelope adds its Director of Operations.

- August 2003 - Antelope adds its Executive Worldwide Sales Director (former IBM division leader)



- September 2003 - Antelope begins Operations in its permanent Class AAA facility in Neuchatel, Switzerland.

- September 2003 - Antelope announces the New MCC at DemoMobile in San Diego

- November 2003 – First units shipped

- December 2003 – Next 25 units shipped, customer invoicing commences

- January 2004 – Next 50 units shipped

- February 2004 – 1200 units projected

**Business Overview and Funding Objectives**

Antelope Technologies believes it has an outstanding opportunity for growth. Mark Jensen, US manager for venture activities at Deloitte and Touch, says that initiatives worth funding are:

> *"Anything that deals with the cost of ownership of technology-- A good laptop costs about $3,000 to buy, and it costs about five times that over its life to support it and maintain it. Anything that would reduce the cost of ownership of that equipment would do extremely well."*

Reducing the cost of ownership for a Windows or Linux platform is precisely what the Antelope MCC offers as a distinguishing benefit against the current market.  This is due to the "one system, one place for data, and only one set of software licenses for all user form factors".

**This round of funding will be used for:**

1. Component financing for initial production.

2. Engineering for second tier products such as laptop shells, executive PDA and ultra-ruggedized models for the petrochemical, fire fighting/EMT/SWAT/Special Forces and Military sectors.

3. Accelerating the product rollout to capture a larger immediate share of the predicted market of 15 million over the next 4 years.

4. Improving the design of the high-technology head-mounted display peripherals.

5. General working capital ($500,000)

Antelope's initial funding plan was based on a conservative estimate of production that would still allow for preferred pricing on components. The pro-forma production rate is 10,000 units for the first 12 months. However the sales pipe-line is much larger. The market for MCC devices is estimated to be **940,000 units in 2003 ramping to 15 million units in 2006** (Giga Information Group, July 2002).

**Some of Antelope's differential advantages are:**

1) Strong and reciprocal involvement with  IBM
2) Cooperative support of Transmeta (microprocessor manufacturer), who spent well over $50,000 for co-marketing and engineering support of Antelope this past year.
3) Ability to form a partnership with Microsoft for marketing.
4) Strong interest from prospective customers who have examined pre-production
5) Technical strength of IBM patented products.
6) Excellent business environment of Switzerland
   a. Government support including a 10 year tax holiday from all levels of taxation if certain employment milestones are met
   b. Swiss craftsmanship (necessary for the ruggedized nature of this product)
   c. Swiss business positioning including free trade agreements with the European Union, and many other countries in Asia and the Middle East

Here is a look at the summary sales across the company

Note that the "units pending delivery" are included in the "units sold"

**Sales Forecast and Pipeline**



The following chart shows revenue potential for 2004 based on currently *identified* opportunities.



**Detailed Sales Pipeline with Probability Weighted Revenue Projection**
**(Customer names are omitted for confidentiality reasons.)**

| Project/Use | Stage | Units | AT Revenue | Weighted Average Rev |
|---|---|---|---|---|
| Sales support and early adopter projects | 90% | 2 | $5,959 | $5,363 |
| Federal contract for mobility | 40% | 10 | $31,000 | $12,400 |
| Federal contract for mobility | 40% | 10,000 | $14,000,000 | $5,600,000 |
| Evaluation of handheld for construction | 80% | 1 | $4,020 | $3,216 |
| Evaluation of handheld for insurance | 80% | 1 | $3,784 | $3,027 |
| Evaluation for applications | 100% | 1 | $4,020 | $4,020 |
| Evaluation of handheld for ground operations | 80% | 1 | $4,020 | $3,216 |
| Evaluation of handheld | 100% | 1 | $4,020 | $4,020 |
| Tablet deployment | 10% | 10 | $36,000 | $3,600 |
| Evaluation of handheld for healthcare | 100% | 2 | $4,000 | $4,000 |
| Pilot: Dealer service FFA | 90% | 10 | $23,750 | $21,375 |
| Deployment for Dealer services | 70% | 380 | $950,000 | $665,000 |
| Military Evaluation for wearable computing | 90% | 4 | $15,880 | $14,292 |
| Military Evaluation for wearable computing | 90% | 5 | $30,445 | $27,401 |
| Handheld Evaluation for refinery operations | 90% | 1 | $3,970 | $3,573 |
| Handheld Evaluation for in-building and in-flight healthcare | 100% | 1 | $3,970 | $3,970 |
| Handheld Evaluation | 100% | 2 | $7,000 | $7,000 |
| Evaluation of wearable for military combat | 100% | 1 | $3,970 | $3,970 |
| Evaluation of wearable for military combat | 40% | 4 | $14,000 | $5,600 |
| Evaluation of wearable for military combat | 20% | 25 | $50,000 | $10,000 |
| Evaluation of wearable for military combat | 20% | 1,600 | $3,200,000 | $640,000 |
| Testing | 100% | 1 | $3,970 | $3,970 |
| Reseller sales tool | 100% | 1 | $2,770 | $2,770 |
| Evaluation for education | 100% | 2 | $7,940 | $7,940 |
| Evaluation for automotive applications | 100% | 1 | $3,730 | $3,730 |
| Customer Evaluation for in-store applications | 80% | 2 | $6,360 | $5,088 |
| Tablet Evaluation | 90% | 2 | $3,970 | $3,573 |
| Tablet Evaluation | 90% | 1 | $3,970 | $3,573 |
| Tablet Evaluation | 90% | 1 | $3,970 | $3,573 |
| Military Evaluation | 90% | 1 | $3,772 | $3,395 |

| | | | | |
|---|---|---|---|---|
| Evaluation | 90% | 4 | $15,943 | $14,349 |
| Rugged devices for site survey | 90% | 2 | $8,003 | $7,203 |
| Rugged devices for military applications | 90% | 7 | $26,165 | $23,549 |
| Military | 90% | 2 | $8,465 | $7,619 |
| Evaluation for mobility | 90% | 1 | $2,970 | $2,673 |
| Military combat | 100% | 1 | $9,395 | $9,395 |
| Evaluation | 100% | 1 | $3,970 | $3,970 |
| Evaluation | 100% | 2 | $9,080 | $9,080 |
| Evaluation for mobile operations | 100% | 1 | $4,033 | $4,033 |
| NDA Military | 100% | 2 | $7,940 | $7,940 |
| NDA Military wearable | 60% | 1,000 | $2,500,000 | $1,500,000 |
| NDA Military embedded | 60% | 2,500 | $6,250,000 | $3,750,000 |
| Military | 100% | 1 | $3,742 | $3,742 |
| Evaluation for physicians | 100% | 1 | $4,033 | $4,033 |
| Evaluation for shop floor | 100% | 1 | $3,970 | $3,970 |
| Tablet evaluation for mobile employees | 100% | 1 | $3,673 | $3,673 |
| NDA, combat | 100% | 1 | $4,020 | $4,020 |
| NDA, combat | 20% | 500 | $1,500,000 | $300,000 |
| Military, battle management software | 100% | 2 | $7,990 | $7,990 |
| Military, battle management software | 80% | 4 | $16,000 | $12,800 |
| Military, battle management software | 60% | 5,000 | $12,500,000 | $7,500,000 |
| Evaluation | 90% | 1 | $4,000 | $3,600 |
| In store | 80% | 1 | $3,100 | $2,480 |
| Research | 90% | 1 | $2,500 | $2,250 |
| Evaluation for military apps | 90% | 1 | $3,970 | $3,573 |
| Evaluation Speech to text for hearing impaired | 0% | 1 | $4,033 | $0 |
| Evaluation Speech to text for hearing impaired | 50% | 1 | $2,000 | $1,000 |
| NDA, flight control | 60% | 1 | $4,000 | $2,400 |
| NDA, flight control | 60% | 50 | $150,000 | $90,000 |
| Evaluation: Flight check in, pilot support | 60% | 2 | $7,000 | $4,200 |
| Production: Flight check in, pilot support | 60% | 65 | $162,500 | $97,500 |
| Consulting demos | 60% | 5 | $12,500 | $7,500 |
| Evaluation | 80% | 3 | $11,835 | $9,468 |
| Evaluation: Shop floor | 90% | 2 | $8,000 | $7,200 |
| Pilot: Shop floor | 20% | 100 | $300,000 | $60,000 |

| | | | | |
|---|---|---|---|---|
| Evaluation | 60% | 2 | $8,000 | $4,800 |
| Evaluation for in building service | 60% | 3 | $9,300 | $5,580 |
| Evaluation for in building service | 20% | 800 | $2,480,000 | $496,000 |
| Evaluation for Field Service | 60% | 2 | $6,200 | $3,720 |
| Evaluation for Field Service | 20% | 1,500 | $4,650,000 | $930,000 |
| Voice transcription, patient mgmt in hospitals | 60% | 1 | $4,000 | $2,400 |
| Reseller: Voice transcription, patient mgmt in hospitals | 40% | 25 | $75,000 | $30,000 |
| Evaluation: Mobile manager | 40% | 3 | $12,000 | $4,800 |
| Evaluation: Mobile manager | 40% | 3 | $12,000 | $4,800 |
| Evaluation: Homeland security testing equipment | 80% | 3 | $12,000 | $9,600 |
| Evaluation: Homeland security testing equipment | 60% | 300 | $840,000 | $504,000 |
| SFA | 20% | 200 | $620,000 | $124,000 |
| Evaluation: Mobile bank management | 40% | 2 | $8,000 | $3,200 |
| Pilot: Mobile bank management | 20% | 200 | $600,000 | $120,000 |
| Production: General military use, Speech-Speech translation | 20% | 2,000 | $2,600,000 | $520,000 |
| Patient and shift management | 20% | 5 | $20,000 | $4,000 |
| Evaluation | 10% | 1 | $4,000 | $400 |
| Surgical procedures with heads up display | 10% | 1 | $4,000 | $400 |
| Evaluation: Shop floor | 80% | 1 | $4,000 | $3,200 |
| Evaluation: Integration into plane for monitoring and control | 50% | 1 | $4,000 | $2,000 |
| Evaluation | 20% | 1 | $4,000 | $800 |
| Evaluation: Wearable for military | 80% | 1 | $4,000 | $3,200 |
| Evaluation: Wearable for military | 70% | 25 | $87,500 | $61,250 |
| Evaluation: Wearable for military | 50% | 126 | $441,000 | $220,500 |
| Wearable for military | 40% | 5,000 | $10,000,000 | $4,000,000 |
| **Totals** | | **31,548** | **$64,514,090** | **$27,612,513** |

## Principals

### *Alan H. Taylor - Chief Executive Officer*

Alan Taylor's formal education was in England as a mechanical engineer. For ten years, he focused on design engineering. Working with a British medical instrumentation company, he designed and built fetal pulse monitors and heart monitoring equipment. Alan moved to South Africa and continued in the mechanical design field. After moving to the United States he has worked at the executive level in the Aerospace industry, including the Space Shuttle Program, communications satellites and current commercial and defense flight simulators. Alan has served as a management consultant for various petrochemical companies where he has developed staff reengineering strategies for field operations. In 1991 Alan started Oxford Technologies, Inc a Texas Based corporation providing management consulting to a diverse group of corporation both national and international.

### *Kenneth A. Geyer - President*

One of the original founders of Antelope Technologies, Kenneth Geyer's experience is in management, marketing, business development, supplier partnerships, and sales on a national and international level. After some time in securities and investment banking, he served as vice president of The Virtual Reality Source before forming Liteye Systems. As founder and Vice President of Development, Ken penetrated several sophisticated niche markets with Liteye's industry superior microdisplay and thermal imaging products.

### *Thomas P. Scott - Chief Technology Officer*

As a co-founder of Antelope Technologies along with being a co-founder of Liteye Systems, Tom Scott brings his technical experience to bear specifically in developing and creating promising technologies. His process methods and concurrent integration models were central to the creation of new industry standards in micro-display and thermal imaging products.

### *David E. Witt - Director General*

With 22 years of experience in all phases of manufacturing, David Witt brings valuable hands-on experience to the manufacturing process, particularly with new and innovative products. Along with being one of the original founders of Antelope Technologies, he is the founder of a successful technology manufacturing firm and was crucial to the growth of Liteye Systems, LaBac Systems and Superior Metal Products.

### *Anna C. Cole - Director of European Sales*

An extensive background in business development, national and international sales, management and marketing makes Anna Cole uniquely qualified to lead the revenue generation effort of Antelope's national and international sales force. She is a co-founder of Antelope Technologies. She earned her B.A. from Emory University and an M.A. from the University of Colorado. She previously served as Vice President of Senior Visions Inc., and also as a manufacturer's representative for Liteye Systems.

### Stephen Guyer - Chief Financial Officer

Stephen Guyer taps over 30 years of experience in corporate management, finance, operations, strategic development, process improvement, IT oversight and accounting to effectively manage high growth enterprises. He holds an M.B.A. and an M.A. from the University of Denver, a B.A. from Metropolitan State College of Denver and a B.S. from McPherson College. Stephen is the founder and president of two companies and has served as CFO for both private and public companies.

### Ivan R. Cardenas, P.E. - Vice President of Product Development

Ivan Cardenas has over 14 years of experience in the process control field. As a licensed chemical engineer, he has worked in process control automation with global leaders in the petrochemical field including DuPont (U.S.) and Solvay (Belgium). Ivan has a B.S. in Chemical Engineering from the University of Houston. He was formerly the director of process applications for Oxford Technologies and continues to sit on the Board of Directors.

## Senior Management

### Robert S. Lovelace - Director of Operations

Robert Lovelace brings world scale management skills to Antelope S.A. in the role of Director of Operations.  In past positions he has lead teams to set up, develop and operate large businesses in the electronic, automotive and telecommunications industries with companies including Tyco Corporation and the Thomson and Labinal groups.  Mr. Lovelace will be a key player in fully developing Antelope into a global enterprise technology provider for advanced mobile computing.

### Scott M. Carlin - Director, Worldwide Sales

With 17 years of enterprise consulting experience, Scott Carlin is responsible for leading Antelope's global go-to-market organization. Having recently joined the Antelope team from IBM, he has been focused for more than a year exclusively on bringing Antelope's Modular Computing technologies to bear in customer engagements. He has undergraduate and Master's degrees in Finance and Marketing, and has led many consulting organizations in building Microsoft application development teams.

### Pierre Stirnweiss – Production and Quality Control Manager

Pierre has an extensive background in quality assurance in the electrical and mechanical assembly industries. He previously served as Quality Assurance Manager for Tyco Electronics Corporation and Sylea Labauto Ltd. He is a graduate of Ecole Nationale Suprieue des Arts et Mtiers, one of the top engineering schools in France, with a specialty in production flow control.

## Summary Income Statement Pro Forma:

**INCOME STATEMENT SUMMARY**

| | Fiscal Yr 1 | Fiscal Yr 2 | Fiscal Yr 3 |
|---|---|---|---|
| **CORES PER YEAR** | 8,840 | 64,755 | 135,000 |
| **CUMULATIVE CORES SOLD** | 8,840 | 73,595 | 208,595 |
| | | | |
| **Total Revenue** | 26,270,228 | 151,848,298 | 276,609,600 |
| | | | |
| **Costs and Expenses:** | | | |
| Manufacturing Costs | | | |
|     Fixed | 189,454 | 328,762 | 448,470 |
|     Cost of Goods Sold | 19,817,498 | 109,171,275 | 196,954,081 |
|     Variable | 1,035,679 | 3,505,822 | 6,349,922 |
| Total Manufacturing Costs | 21,042,631 | 113,005,858 | 203,752,473 |
| Gross Margin | 20% | 26% | 26% |
| Selling: | | | |
|     Fixed | 137,400 | 731,550 | 1,434,000 |
|     Variable | 234,776 | 1,210,087 | 2,227,824 |
| Total Selling | 372,176 | 1,941,637 | 3,661,824 |
| General & Administrative: | | | - |
|     Fixed | 688,047 | 1,687,725 | 2,829,507 |
|     Variable | 1,833,468 | 4,579,554 | 7,628,511 |
| Total General & Administrative | 2,521,515 | 6,267,279 | 10,458,017 |
| Depreciation & Amortization: | - | | - |
|     Depreciation | 346,237 | 1,214,674 | 3,377,357 |
|     Amortization | | | - |
| **Total Costs and Expenses** | 24,282,559 | 122,429,449 | 221,249,671 |
| | | | - |
| **Income Before Interest & Taxes** | 1,987,670 | 29,418,849 | 55,359,929 |
| | | | - |
| **Other Income (Expense)** | | | - |
| Interest Expense | (66,140) | (85,538) | (63,882) |
| Interest Income | 39,428 | 180,642 | 831,169 |
| Accrued expenses | - | - | - |
| **Pre Tax Net Income (Loss)** | 1,960,958 | 29,513,952 | 56,127,215 |
| | 7.5% | 19.4% | 20.3% |
| Federal Income Tax | - | - | - |
| State Income Tax | - | - | - |
| **Net Income (loss) to Common Shareholders** | 1,960,958 | 29,513,952 | 56,127,215 |
| Net Profit Margin | 7.5% | 19.4% | 20.3% |

# Industry Overview

The ANTELOPE Mobile Computer Core (MCC) and its related accessories are part of the personal computer industry, within a highly anticipated segment known as "modular computing." Modular computing goes beyond "mobile computing" by providing not only the ability to access one's data outside of a traditional office setting, but the ability to mix and match components to create a variety of computing configurations based around a single processing and storage device.

> *"Performance is no longer driving the [PC] market, users increasingly need their technology to be where they are and the market is stagnating because potential customers no longer see the need for staying current with their technology."*– Giga Information Group, April 2002

A number of issues are driving the industry toward modular computing, including the decreasing demand for the marginal improvements being offered by PC manufacturers, the cost associated with deploying and managing large numbers of desktop devices in enterprise environments, and the complexity of PC-related products. Modular computers are expected to address these issues by:

- providing a completely new option that will excite PC users and generate demand;

- offering large IT departments a simpler, more cost-effective way to address the needs of their increasingly mobile employee users; and

- Removing the hassle of integrating and synchronizing various computer devices.

From desktop to notebook to PDA to headset, the MCC allows the user to choose the form, with no compromises in functionality, and no rebooting or re-synchronizing required. The MCC is the embodiment of the "next iteration of personal computer" described by modular computing guru Rob Enderle of Giga earlier this year:

> *"It will be a configuration that can be updated in components, where the buyer only has to upgrade the part that is out of date without wasting money and harming the environment by disposing of parts* that are still serviceable. And it will be a concept that provides for a *single image covering all employees that can be inexpensively and quickly updated simply by replacing the core module. It will be a solution that can move from the living room, to the automobile, to the airplane and to the office by morphing into the productivity device, entertainment device and communication tool – whichever is ideal for each environment. It will be a truly personal computer that represents the future we see as modular computing."* - Giga Information Group, 2002

Giga estimates that sales of modular computers will reach 500 thousand units in 2002 and almost 1 million units in 2003, and that this number will be constrained by supply, not demand. Total demand is now estimated at approximately **1.5 million units over the next 18 months.** At conservative pricing, that represents total market potential of **$7.5 billion**.

# Product Features, Strategic Position and Potential

**Product Description**

The MCC Mobile Computer Core is a portable computer that weighs 9 ounces and measures 3" x 5" x ¾" – about the size of a deck of cards. The unit contains a processor, internal battery, data storage and **full-version Microsoft Windows**. The MCC runs on a TransMeta Crusoe processor and features a minimum of a 10 GB hard disk and 256Mb of



RAM. The processor features a patented "throttling" capability that enables it to run at different clock speeds (300MHz to 1 GHz) depending on the current load. The MCC can be plugged into a variety of accessories, including a hand-held device, a laptop device, a desktop workstation and a wearable headset, depending on the needs of the user. It can be "hot-swapped" (switched from one accessory to another without rebooting the device) and does not require any kind of re-synchronizing, since the user's data is stored in just one place; the MCC's hard drive.

MCC's most important features are its portability and its cost savings. Current mobile computing solutions consist of separate devices that are used separately and then re-synchronized on a regular basis. Data applications are stored on each device, and not all devices are capable of running full versions of the most common software applications used for business. The modular system solves these problems by keeping all of the user's data and applications in one portable device. Capital costs are lowered by 30-40% because it is no longer necessary to purchase multiple computing devices for a single user – simply purchase one MCC and the desired accessories. In addition, there are significant labor savings achieved by eliminating the synchronization process.



Notebook Computer     Handheld Computer

Desktop Computer     Wearable Computer

> *"The concept of personal computing 'anytime, anywhere, any way' is truly brought closer to reality by permitting the users' data and computing environments to be with them at all times and available in different forms or configurations."* – Randy Moulic,
> IBM Senior Manager of Client Systems

**Strategic Position**

ANTELOPE SA through Antelope Technologies is the only company licensed to manufacture and market IBM's new Meta Pad technology, which is the essence of the MCC system. This technology was developed at IBM's New York research facility over a period of several years, and was the result of efforts by IBM researchers to understand how humans interact with computers and to test various technologies for future handheld devices. This technology, including the head-mounted display device, is protected by over 20 patents.

Because modular computing is a highly anticipated leap in the evolution of personal computing, there are several other companies that have announced that they will be developing modular technology (see the competitive section, below). However, ANTELOPE is the only company that will be able to feature IBM's Meta Pad technology (think "IBM Inside"). This will be a distinct advantage in targeting the enterprise and military markets; purchasers will get the benefit of an exciting new technology with the security of a global leader in computing platforms and applications. The technology license with IBM Research consists of an up-front fee and a royalty fee per unit sale.

In addition to this technology licensing relationship, ANTELOPE has secured reciprocal marketing and sales partnerships with IBM that will allow:

- The MCC and its accessories to be sold by IBM's 1000+ member sales force;

- IBM's Global Services division to resell the MCC solution in a series of industry solutions, and support ANTELOPE through consulting services, with Global Services paying ANTELOPE an 8% referral fee for each client;

- IBM's Global Services division to support ANTELOPE with integrated solutions, help desk and field service globally;

- IBM's Pervasive Technology Group to incorporate MCC systems with a robust wireless architecture;

- ANTELOPE to obtain assistance with vendor and sourcing decisions from IBM Global Services

Other partnerships include co-marketing agreements with:

- TransMeta, the producer of the chip that powers the MCC;

*Antelope Technologies*

- Toshiba, maker of the MCC's hard drive and display panel; and

- Microvision, producer of a see-through, daylight-readable, head-mounted retinal imaging display accessory for the MCC.

While it is not guaranteed that the 10-year license will remain exclusive, the company has so far enjoyed a very close relationship with IBM. IBM has consistently referred inquiries about the Meta Pad/MCC technology to ANTELOPE. These orders can be seen in the sales pipeline, many of which are IBM accounts.

**Potential**

The full MCC kit will initially consist of the Mobile Computer Core, the MCC Hand Held and the MCC Dockit desktop (workstation docking unit). The advanced Liteye



head mounted display will be sold separately. Due to the flexibility of the system, there are many possibilities for developing additional accessories for the MCC. Potential accessories include a laptop device (already in development), a large pen-based tablet device, a personal server, an ultra-dense server (with slots for multiple MCCs) and an automobile cradle. In addition, ANTELOPE anticipates that there will be lucrative opportunities to develop custom accessories for individual clients. An example of this is the Oxford AFZ-40 wearable camera for telecollaboration applications.





# **Market Analysis**

## Customers

ANTELOPE will initially focus on providing modular computing for enterprise, military and government customers. Sales efforts will be targeted at organizations with large numbers of mobile employees, where the MCC's core benefits – portability and cost savings – will be valued most. Early sales success with customers in these areas has proven the logic of this market entry strategy.

As seen in the sales pipeline in the Financial Summary, ANTELOPE's customers are *not* individual consumers who make single-unit purchases and require the development of huge marketing, sales and customer support organizations.

ANTELOPE's initial target verticals will be industrial, military and government organizations. Other verticals that have expressed interest in MCC technology include oil and gas, pharmaceutical, security, law enforcement, auto manufacturing, medical and aviation. In addition, while ANTELOPE did not initially anticipate interest from the education market, it has received serious inquiries from several universities who wish to outfit their students with MCC computers from ANTELOPE. In response, the company has developed a "MCC University" program and has signed up Wake Forest University to be the first participant.

## Market Size and Trends

Estimated Market for Modular Computers (in Thousands):

| 2002 | 2003 | 2004 | 2005 | 2006 |
|------|------|------|------|------|
| 0.5 | 940 | 3,300 | 6,500 | 14,700 |

– Giga Information Group, July 2002

These numbers aren't surprising given today's technological environment, where desktop computers don't meet the needs of mobile users, and PDAs aren't powerful enough for use in the office. Corporations have tried to remedy the situation by purchasing a PDA, cell phone and laptop for each mobile employee, to supplement their desktop computer. But purchasing and maintaining all of these devices is increasingly burdensome. The capital outlay is high, the software upgrade and hardware maintenance issues are extremely complex, and the productivity lost due to the constant need for re-synchronizing data across the various devices is a serious drain.

Thus, the drivers behind the growth in the modular computing market include:

- **Increasingly mobile workforces** Thirty percent of employees can be considered mobile, which means they are out of the office at least 20% of the time.[1]

- **Complex upkeep** By year-end 2002, the average IT-enabled user will use at least three portable devices and will spend more than one hour per day trying to maintain synchronization among their "personal network" of devices.[2]

- **Lost productivity** An industry study showed the MCC system can save up to $16,000 per employee per year in time spent transferring information from field computers to desktops. [3]

- **Unacceptable capital costs for multiple devices** The cost of the MCC kit is about 30 to 40 percent less than the combined cost of a PDA, laptop and desktop.[4]

Beyond the generic market for modular computers, there also exists a great deal of potential in markets which require computers that are not only mobile and modular, but also ruggedized. Rugged wearable computers are finding traction with customers as far ranging as retail, distribution/warehousing, forestry, agriculture, manufacturing, military, field service, hospitality, healthcare, utilities, government and transportation.

Worldwide Shipments of Ruggedized Wearable Computers (Dollars in Millions):

| 2002 | 2003 | 2004 | 2005 |
|------|------|------|------|
| $92 | $130 | $183 | $258 |

–Venture Development Group, 2001

The ANTELOPE Mobile Computer Core has been tested and found operational at 400 Gs (disk drives running). In addition, the unit can survive at nearly twice that force with the disk drives idle. By way of comparison, 200 Gs is the approximate deceleration encountered by a race car hitting a cement wall at speed. The company has already garnered contracts with a branch of the US military that desires ruggedized units, and is working with this customer to design appropriate external protection for the units. For this reason, ANTELOPE believes that it will be able to make substantial inroads with customers whose requirements include ruggedization.

---

[1] Gartner, August 2001
[2] Gartner, December 2001
[3] Productivity savings figures provided by a Fortune 50 company that has signed a purchase order for 1,512 MCC kits.
[4] Assumes mid-level PDA, laptop, and desktop combined purchase cost versus cost of MCC and accessories.

## Competition

Due to the growing popularity of mobile computing, and the wellspring of interest in modular computing, there are several companies developing and/or marketing systems that may compete with the ANTELOPE SA produced MCC system. Of particular interest are OQO and Xybernaut, which have developed modular computing devices built around a computing core. Of these, OQO is thus far the only competitor with a product with features and functions comparable to ANTELOPE Mobile Computer Core.

**OQO**   This San Francisco, CA firm was created by Jory Bell and Joe Betts-Lacroix, along with other members of the team that developed the Apple Titanium. The company was founded in 1999 and includes executives, engineers, and designers who have held key positions at Apple Computer, Caltech, IBM, MIT, Oracle, and TransMeta. A July 2, 2002 Dow Jones article about OQO said that the company is hoping to have its device in stores by the end of 2002, at a price of about $1,200 to $1,500 for the core unit. As of December 2002, however, OQO did not have production capabilities beyond Beta hand builds.[5] The company appears to be targeting the consumer market.  Recent intelligence suggests that the original price quotes were much lower than the actual go-to-market price.

**Xybernaut**   This Fairfax, VA firm focuses on research, development and commercialization of mobile, wearable computing and communication systems along with related software for wearable systems. The Xybernaut Mobile Assistant Series targets workers who have data requirements while performing hands-on activities. Customers include businesses, industries and governments around the world. Hardware and software products accounted for 60% of 2001 ($9.2MM) revenues and consulting, licensing and other, 40%. The company's wearable systems utilize a transferable core computer.

**Paravant**   This Palm Bay, FL firm is a defense electronics company which designs, develops, produces and sells electronic hardware for military and intelligence applications. Products include C4 systems, specializing in rugged, hand-held and laptop computer products primarily for military applications; airborne and avionics systems for the U.S. Department of Defense and allies of the U.S.; and electronic signal conditioning and analysis systems for foreign and domestic intelligence agencies. Customers are the US and foreign military and large aerospace and military contractors. Tactical systems accounted for 59% of fiscal 2001 revenues ($51.8MM), intelligence systems, 39% and medical products, 2%.

**Tiqit**   This Redwood City, CA firm is dedicated to developing a new class of x86-based hand held computers that meet today's enterprise mobile computing needs. Tiqit (short for Tiny Ubiquitous Technology) is currently seeking an OEM partnership for branding and mass production of its device. The company's first product, the

---

[5] Giga, March 2002

Matchbox PC, is recognized by the Guinness Book of World Records as the world's smallest web server. 2001

**Kontron Mobile Computing, Inc** (Formerly known as FieldWorks, Incorporated) This Eden Prairie, MN firm's principal activity is the development and sale of rugged portable computing products for demanding field environments, meeting military test standards for shock, vibration, moisture and temperature extremes. In 2001, the firm introduced four new products, the EnVoy, Power Lite, 2000 Series III and the Field Lite. In addition, the firm provides consulting services relating to product application, technical support, project management, product implementation and troubleshooting on post-installation questions. Kontron 2001 revenues were $17.3MM.

*Antelope Technologies*

## Competitive Product Matrix

| Company/Product | Display | Keyboard/Input | CPU/Processor | Storage/Memory | Power/Battery | Software | Durability | Vertical | Size | Weight |
|---|---|---|---|---|---|---|---|---|---|---|
| Antelope/MCC | Integrated | Integrated | 300 MHZ-1GHz Transmeta Crusoe TM5800 processor (.9 to 1.3 volt) | 256 MB SDRAM; 10GB 1.8" ATA-5 Disk | 10.8V 1400mAh 15.1Wh Battery Life:2-3 hours | Windows XP, Windows 2000, Linux | Rugged | Commercial Military | .73" x 2.8' x 5" | 257 g (9.1 oz) |
| OQO/unknown | Integrated | Touchscreen | 1-GHz Crusoe TM5800 processor | 256MB SDRAM; 10GB 1.8" HD | Lithium Polymer Battery | Windows XP | n/a | Consumer | 4.9" x 2.9" x .9" | .9 ounces |
| Kontron/Field Lite | Integrated | Programmable function keys | Intel Pentium 266 Tillamook (1.9V) | up to 256 MB; 2.5", 4GB or higher | 12VDC: Duracell Smart Battery 36 or equiv. | PC and MS Dos, Windows 95/98/NT 4.0 | Ruggedized | Commercial, Military | 7" x 9" 3" | <2.0 kg without battery, <2.6 kg with battery |
| Xybernaut/ Mobile Assistant V | Integrated | Onscreen, built-in handwriting recognition | 500 MHz Intel Mobile Celeron, 1.1V | 128 MB SDRAM, or 256 MB (not upgradable) 5 GB internal HDD; 1 GB removable HDD through use of Compact Flash Card | Primary and Secondary Lithium-ion batteries, Hot-swappable | Window 2000, 98, XP or Linux, CIC JOT Handwriting Recognition | Durable magnesium alloy case | Government, Commercial | 5.9" x 3.5" x 2" | 455 g |
| Paravant/RHC-1000 | Integrated | Touchscreen; multifunction keypad | Intel StrongArm 206Mhz 32 Bit RISC Processor | 64 MB DRAM, expandable to 64 MB | Internal Rechargable Lithium Ion Primary | WinCE | Ruggedized, MIL-STD-8010E | Military, Intelligence, Aerospace | 6.5" x 3.38" x 1" | 11oz with Internal Battery |
| Tiqit/eightythree | Integrated | 56-key thumb keyboard, touchscreen, thumb joystick | 300 MHz Pentium-class National Geode | 256 MB RAM;5,10 or 20GB Hard Disk Drive | Internal Rechargable Lithium Ion Battery | n/a | n/a | Consumer | 5.9" x 4" x 1.1" | 20oz, 567g |

*Antelope Technologies*

**Overview of Intrinsically Safe and Non-Incendive Modular Computer Market**

- Non-incendive (NI or Class I Division II) and Intrinsically Safe (IS or Class 1 Division 1) ratings are given to electrical devices that are to be used in areas where explosive mixtures are normally present (Class 1 Division 1) or possibly present in abnormal circumstances (Class 1 Division 2). An NI or IS MCC computer would have to be constructed with a ruggedized case and cabling that will expose no sparks, arcs or hot surfaces (NI) or be designed such that no ignition source can possible emit from the unit should the case or cable encounter a fault of some kind (IS).

- Principal markets for NI and IS MCC's are technical personnel for the petroleum, petrochemical and natural gas operations. Other markets include construction, military, aerospace and pharmaceuticals. ANTELOPE's market estimates are scaled up from data from the US Bureau of Labor Statistics. Our world market estimate (at full maturity) for this type of computer is estimated at roughly **360,000 units**. world energy consumption as a scaling factor (world consumption = 4X US consumption). Other firms that have purchased research in this regard have put the number at 500,000.

| US C1D2 Sector Totals | Employees | Sales into Market | Positions |
|---|---|---|---|
| **Power, Chemical and Refining and Operators** | **191,060** | **9,458** | **63,050** |
| **Power, Chemical and Refining Plant Inspectors and Testers (indexed to Operators)** | **393,583** | **19,482** | **129,882** |
| **Petroleum Upstream** | **156,560** | **7,729** | **51,528** |
| **Pipeline Operations** | **93,690** | **4,638** | **30,917** |
| **Firefighter Response** | **322,460** | **31,923** | **106,411** |
| **Chemical, Nuclear, EH&S Technicians** | **102,980** | **5,097** | **33,983** |
| **Coast Guard** | **12,000** | **950** | **3,168** |
| **TOTALS** | **1,272,333** | **79,277** | **418,051** |

- Qualitatively, the process/petrochemical industry is an ideal customer for modular computing because of its needs for timely, mobile and powerful access to information and information integration and collection tools. Field personnel in this industry (especially the maintenance personnel) are called upon to do such a wide variety of tasks that point solutions such as PDAs are not capable of implementing fully. There are also severe time pressures when plants or platforms are idled to expedite turnaround activities, and MCC type computers can play a significant role in improving this crucial activity. Due to the specialized nature of this product, it is expected to produce significantly better margins than non-certified products.

# Marketing and Sales Strategies

> *"I've been an advocate for modular computers for three years now, and every time we've done a survey with IT folks, the largest percentage has said that if somebody can build this right, they'd buy it."*
>
> Rob Enderle, Vice President of Desktop and Mobile Technology,
>
> Giga Information Group

ANTELOPE's goal is to be the premier provider of modular computing hardware for Fortune 500 enterprises that have significant numbers of mobile employees. The firm also seeks to dominate several specific vertical markets that have data-intensive mobile computing needs: military, government, oil and gas, pharmaceutical, security and law enforcement, auto, medical and aviation.

There is currently no firm that is capable of manufacturing mass quantities of modular computers. So, while there is sizeable demand for these items, there is no "market leader." ANTELOPE believes that this situation will change dramatically in the next 12 months, as several companies are currently finalizing product development and moving rapidly into initial and then mass production.

## Strategy

ANTELOPE intends to become the market leader within a year by:

- Partnering with the best
- Offering the right product at the right time
- Ramping up quickly
- Focusing on large corporate and government customers
- Excelling at service without eroding revenues
- Having a global reach

**Partnering with the Best** Unlike other companies that are hoping to introduce modular technology in the next 12 months, ANTELOPE has the backing of an industry giant. While other companies are struggling to achieve name recognition and acceptance for their start-up brands, ANTELOPE will be selling modular computers sporting the familiar, and trusted, IBM logo. The company's ten-year licensing agreement with IBM gives it a distinct advantage when selling into its target markets. That old adage, "Nobody ever got fired for buying IBM," will help get ANTELOPE in the door, and the superior Meta Pad technology inside the units will help close sales.

**Offering The Right Product at the Right Time** With more than 30% of corporate workforces now considered "mobile," the time is right for ANTELOPE's mobile and

modular MCC system. Unlike current mobile computing options, the MCC is powerful enough to run Linux, Windows XP or Windows 2000 operating systems, and to support full-version software applications. With the MCC, mobile users can jump between desktop, laptop and PDA computing environments in just seconds. Performance enhancements are not enough to lure corporate buyers to upgrade right now, but portability and cost savings are – and that's what ANTELOPE will be selling.

**Ramping Up Quickly** ANTELOPE believes that with its management team's experience in the manufacturing arena, it can beat its competitors to market. Because the company has orders in the pipeline already, there is no guesswork about how much inventory to initially produce – the company can jump into full production as fast as it can physically manage it, knowing that the units are already spoken for. The company already has almost all of the necessary supplier relationships in place, and has ample assembly space in its Neuchatel facility to accommodate upto 250,000 units per year.

**Focusing on Large Corporate and Government Customers** ANTELOPE's main competitor, OQO, appears to be focusing its efforts on the consumer market. In contrast, ANTELOPE believes that focusing on large corporate and government customers, who order hundreds or thousands of units at one time, is a more lucrative strategy. ANTELOPE will be able to reach these customers with a relatively small internal sales force (plus the added muscle of IBM's established sales organization) and will not be forced to make excessive capital expenditures on sales, marketing and customer support initiatives. The company has already been invited by a number of large and well-known organizations to come and demonstrate its MCC technology. And of course, some of these demonstrations have already resulted in signed purchase orders.

**Having a Global Reach** ANTELOPE will sell its MCC kits and accessories to corporations and entities located domestically and internationally. An international reach is critical to capitalize on the above-average PC growth rates predicted in countries such as China, Thailand, and Malaysia.[6] As mentioned elsewhere, the ANTELOPE MCC will be sold through IBM's worldwide sales channels.

---

[6] Brian Morrissey, April 2002

## Pricing

Initially, ANTELOPE will be selling a kit that will include: the Mobile Computer Core, MCC Dockit desktop computing station, desktop peripherals and MCC Hand Held. These kits will be priced at $3,970 during initial production runs in late 2003 and early 2004. Additional accessories will be sold separately. Prices for the MCC kit will drop as the product ramps to its market potential within a year. The financial pro formas are based on this kit average.

## Sales Tactics

**Channel Sales** - ANTELOPE, through its relationship with IBM, will be able to sell its products through IBM's sales organization. As a result, the MCC will be sold directly to our target markets through direct sales rep interaction. Antelope's marketing strategy and IBM's sales matrix organizational design align themselves efficiently.

IBM sales professionals include what are called "Client Managers" or "Customer Managers" who own one or two specific corporate relationships. As such, ANTELOPE will have access to large companies which can support a large-volume sales strategy. Additionally, IBM sales professionals are also aligned vertically along industry lines. As such, we will have C-level access to those customers in our chosen industries.

Sales representatives will be compensated for all MCC sales through our IBM reseller agreement. These sales will count directly against the IBM's sales reps' sales quotas.

Microsoft partnerships are in formation as well. Microsoft has organizational mechanisms to bring solution partners into major accounts in order to facilitate the sales of Microsoft products. Microsoft has a vested interest in the MCC as it increases the overall number of clients with the flagship XP Pro operating system as opposed to CE or Pocket PC. Discussions with Microsoft are in progress and proceeding well.

**Direct Sales and Sales Support** – ANTELOPE will soon employ approximately half a dozen sales and sales support people to lead sales efforts on in-bound leads and act as marketing liaisons to the IBM direct sales team. These staff members will be technically verse in the MCC product line and will lead presentations at enterprise and government sales meetings and events.

**International Sales -** International sales will be coordinated out of Neuchatel, Switzerland and will include reseller arrangements. ANTELOPE SA's first international reseller agreement is with BFI Optalis, a German optics firm.

## Advertising, Public Relations, and Promotion

**Branding/Advertising**   The MCC and accessories will be sold as ANTELOPE products, and will also feature the IBM logo on the products. The tag line "IBM Mobile Architecture Inside" will be used to differentiate ANTELOPE products from the competition. Because the company will focus on large-unit sales to enterprise, military and government customers, ANTELOPE does not plan to initiate major advertising or branding campaigns to establish general public awareness of the brand. Some targeted advertising in trade publications may be used to build brand awareness in specific vertical markets.

**Co-Marketing Agreements**   ANTELOPE has entered into joint marketing agreements with IBM, Toshiba, MicroVision and TransMeta Corporations. ANTELOPE will enjoy the benefit of shared marketing efforts and exposure at the national and international levels through these agreements. For example, ANTELOPE has demonstrated its MCC system at the COMDEX in partnership with Transmeta.  COMDEX is the most significant information technology show and conference in the United States and has a high global profile.  Antelope can also leverage the IBM Zurich Research Center for joint Antelope/IBM presentations in Europe.

*Antelope Technologies*

# Operations Plan

**Strategy and Plans**

In order to ramp up quickly and maintain maximum flexibility, ANTELOPE SA will not be setting up a component level manufacturing operation. Instead, the company's production operations will consist of assembly-level manufacturing.  The company has already secured supplier relationships for most of the components it needs. These suppliers include Toshiba Information Systems, Toshiba Display, Varta Batteries, and TransMeta.

For ANTELOPE SA, assembly location is flexible for several reasons:

- The amount of labor required to complete the assembly process is relatively minor. For example, the MCC itself consists of only half a dozen parts, and can be assembled in about 3.5 minutes. Since inexpensive labor is the major advantage provided by Asian operations for example, there is little advantage in pursuing this option.

- The company operates primarily in the higher margin arena of business-to-business sales, where speed and flexibility justify price premiums.  The company does, however, foresee that its production needs will change over time, and that versatility and efficiency will be important.

- Producing accessory products such as the handheld and wearable devices is more labor-intensive than producing the core (MCC). As sales of these accessory devices increase (as add-ons for MCCs purchased earlier), labor costs will become a more important issue.

- The company plans to eventually broaden its focus to include consumer sales. Combined with the natural price erosion of technology products over time, these consumer sales will decrease the company's margins and make high cost efficiency in assembly a requirement.

- Starting in 2004, It is anticipated that ANTELOPE SA will ramp up to production levels of 8,000-10,000 cores per month, and perhaps higher, plus corresponding levels of accessories.

**Labor Force**

ANTELOPE SA expects to add approximately 60 production employees by mid 2004 to support two assembly shifts. In addition, approximately 15-18 support staff will be hired to perform receiving, stocking, packing and quality assurance duties in conformance with ISO9002 standards. Supervisors and some assemblers will be hired directly.  Some workers will be obtained through a staffing company on a temp-to-hire basis to allow for adjustments to the product demand cycle. Even the lowest-level assemblers will be expected to have some high-tech assembly experience.



# Preliminary Block Layout for ANTELOPE SA Plant



# Potential Risks and Problems

## Production

ANTELOPE's business strategy relies on the company's ability to be the first mass supplier of a modular computing solution aimed at the enterprise, military and government markets. While ANTELOPE has secured most of the needed supplier there are still significant risks involved in starting up our manufacturing operations. Personnel will have to be hired and trained, procedures will have to be documented and implemented, suppliers will have to continue to perform as expected and high expectations for production capacity and quality will have to be met. This is also a breakthrough technology that may require some measure of redesign based on customer trial feedback.

Mitigating factors are our management team's strong high-tech manufacturing experience, a relatively loose labor market, the incipient production state the company is in, and the strong support ANTELOPE is receiving from Transmeta and IBM.

## Financial

Antelope must maintain independent operating status from a management perspective between Antelope Technologies, Inc. and its subsidiary Antelope Technologies (Suisse), S.A. This is a requirement of Swiss law in order to maintain the 10 year tax holiday. Major corporations have relocated to Switzerland such as Baxter Pharmaceutical and Phillip Morris to take advantage of Swiss financial incentives as well as many smaller companies and the record is good for the support of the holiday. However, though small, there is a risk that that the tax holiday can be revoked if reporting requirements and managerial procedures are not met.

## Competition

ANTELOPE's management team believes that the company has only a 24-month window of opportunity to establish its production operations and gain the market traction that will be necessary for long-term success. There are several other companies getting ready to introduce modular computing products to the marketplace, and ANTELOPE cannot afford to wait and allow those companies to become established prior to launching its own products.

However, ANTELOPE's time to market advantage allows the company to immediately focus on profitable production rather than expensive sales and marketing ramp-ups. Our expectation is that while our competitors are busy educating the broader marketplace about the advantages of modular computing, ANTELOPE will be making large-scale sales to enterprises that are already well aware of their own need for modular computing solutions.

A second competitive risk is the possibility that IBM will license its Meta Pad technology to other companies, or decide to manufacture the technology itself. ANTELOPE is currently the sole licensee of this technology, but does not have an

*Antelope Technologies*

exclusive contract for it. The company plans to mitigate the threat of future MCC competitors by scaling up its operations quickly and establishing itself as the leading supplier of this technology before other companies have a chance to secure a license and/or begin manufacturing. While first-mover advantage is not a guarantee of success in this situation, it is certainly a strong asset.

*Antelope Technologies*

## **DETAILED FINANCIAL PRO FORMAS**

Income Statement

| CORES PER MONTH | Time 0 | May-03 | Jun-03 | Jul-03 | Aug-03 | Sep-03 | Oct-03 | Nov-03 | Dec-03 | Jan-04 | Feb-04 | Mar-04 | Apr-04 | May-04 | Jun-04 | Jul-04 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CUMULATIVE CORES SOLD | | * - | * - | * - | * - | * - | * - | * 325 | * 850 | * 1,270 | * 1,710 | * 2,125 | * 2,560 | * 3,000 | * 3,425 | * 3,850 |
| | | * - | * - | * - | * - | * - | * - | * 325 | * 1,175 | * 2,445 | * 4,155 | * 6,280 | * 8,840 | * 11,840 | * 15,265 | * 19,115 |
| **Revenue:** | | | | | | | | | | | | | | | | |
| Sales | | * - | * - | * - | * - | * - | * - | * 1,082,107 | * 2,830,126 | * 3,903,269 | * 5,255,582 | * 5,986,805 | * 7,212,339 | * 7,453,092 | * 8,508,947 | * 9,564,801 |
| Secondary sales | | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| **Total Revenue** | | * - | * - | * - | * - | * - | * - | * 1,082,107 | * 2,830,126 | * 3,903,269 | * 5,255,582 | * 5,986,805 | * 7,212,339 | * 7,453,092 | * 8,508,947 | * 9,564,801 |
| **Costs and Expenses:** | | | | | | | | | | | | | | | | |
| Manufacturing Costs | | | | | | | | | | | | | | | | |
| Fixed | | * - | * 1,460 | * 3,000 | * 3,000 | * 21,810 | * 21,810 | * 22,086 | * 22,533 | * 22,890 | * 23,264 | * 23,616 | * 23,986 | * 24,360 | * 24,721 | * 25,083 |
| Cost of Goods Sold | | * - | * 594,552 | * 25,000 | * 25,000 | * 15,000 | * - | * 751,448 | * 2,053,002 | * 2,850,997 | * 3,867,828 | * 4,370,048 | * 5,264,622 | * 5,382,225 | * 6,144,707 | * 6,907,189 |
| Variable | | * - | * 9,075 | * 27,225 | * 27,225 | * 46,383 | * 46,383 | * 93,395 | * 128,945 | * 147,464 | * 156,300 | * 169,727 | * 183,555 | * 192,392 | * 205,919 | * 214,605 |
| Total Manufacturing Costs | | * - | * 605,087 | * 55,225 | * 55,225 | * 83,193 | * 68,193 | * 866,929 | * 2,204,480 | * 3,021,351 | * 4,047,392 | * 4,563,391 | * 5,472,164 | * 5,598,977 | * 6,375,347 | * 7,146,877 |
| Gross Margin | | 0% | 0% | 0% | 0% | 0% | 0% | 20% | 22% | 23% | 23% | 24% | 24% | 25% | 25% | 25% |
| Selling: | | | | | | | | | | | | | | | | |
| Fixed | | * - | * - | * - | * - | * - | * 7,000 | * 10,250 | * 15,500 | * 19,700 | * 24,100 | * 28,250 | * 32,600 | * 37,000 | * 41,250 | * 45,500 |
| Variable | | * - | * - | * - | * 4,000 | * 4,000 | * 4,000 | * 6,705 | * 11,075 | * 41,992 | * 45,372 | * 57,284 | * 60,348 | * 60,949 | * 73,672 | * 76,312 |
| Total Selling | | * - | * - | * - | * 4,000 | * 4,000 | * 11,000 | * 16,955 | * 26,575 | * 61,692 | * 69,472 | * 85,534 | * 92,948 | * 97,949 | * 114,922 | * 121,812 |
| General & Administrative: | | | | | | | | | | | | | | | | |
| Compensation of Officers & Bonuses | | * 42,000 | * 42,000 | * 42,000 | * 42,000 | * 42,000 | * 42,000 | * 42,000 | * 42,000 | * 45,000 | * 45,000 | * 50,000 | * 50,000 | * 50,000 | * 50,000 | * 50,000 |
| Fixed | | * 42,000 | * 42,376 | * 42,250 | * 42,250 | * 42,150 | * 42,000 | * 47,884 | * 58,064 | * 68,449 | * 76,816 | * 88,013 | * 95,795 | * 100,869 | * 108,075 | * 115,281 |
| Variable | | * 90,000 | * 99,000 | * 108,088 | * 108,088 | * 108,088 | * 108,088 | * 132,846 | * 155,957 | * 198,996 | * 212,925 | * 246,984 | * 264,410 | * 266,890 | * 292,940 | * 308,618 |
| Total General & Administrative | | * 132,000 | * 141,376 | * 150,338 | * 150,338 | * 150,238 | * 150,088 | * 180,730 | * 214,021 | * 267,445 | * 289,741 | * 334,997 | * 360,205 | * 367,759 | * 401,015 | * 423,900 |
| Depreciation & Amortization: | | | | | | | | | | | | | | | | |
| Depreciation | | * 18,203 | * 18,499 | * 26,111 | * 26,389 | * 26,389 | * 26,500 | * 26,500 | * 28,013 | * 30,872 | * 34,791 | * 39,226 | * 44,743 | * 50,948 | * 57,214 | * 64,666 |
| Amortization | | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| **Total Costs and Expenses** | | * 150,203 | * 764,962 | * 231,674 | * 235,952 | * 263,820 | * 255,781 | * 1,091,115 | * 2,473,090 | * 3,381,359 | * 4,441,396 | * 5,023,148 | * 5,970,059 | * 6,115,633 | * 6,948,498 | * 7,757,254 |
| **Income Before Interest & Taxes** | | * (150,203) | * (764,962) | * (231,674) | * (235,952) | * (263,820) | * (255,781) | * (9,008) | * 357,036 | * 521,910 | * 814,187 | * 963,657 | * 1,242,280 | * 1,337,459 | * 1,560,449 | * 1,807,547 |
| Other Income (Expense) | | | | | | | | | | | | | | | | |
| Interest Expense | | * - | * - | * - | * - | * - | * - | * - | * (1,000) | * (3,500) | * (53,140) | * (5,250) | * (3,250) | * (1,750) | * (250) | * - |
| Interest Income | | * 2,775 | * 2,541 | * 4,745 | * 4,413 | * 4,071 | * 3,678 | * 3,301 | * 2,746 | * 2,711 | * 2,744 | * 2,797 | * 2,906 | * 3,236 | * 4,488 | * 5,850 |
| Accrued expenses | | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Pre Tax Net Income (Loss) | | * (147,428) | * (762,420) | * (226,929) | * (231,539) | * (259,749) | * (252,103) | * (5,707) | * 358,782 | * 521,121 | * 763,791 | * 961,204 | * 1,241,936 | * 1,338,945 | * 1,564,686 | * 1,813,397 |
| | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.5% | 12.7% | 13.4% | 14.5% | 16.1% | 17.2% | 18.0% | 18.4% | 19.0% |
| Preferred Stock Dividends | | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Federal Income Tax | | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| State Income Tax | | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Net Income (loss) to Common Shareholders | | * (147,428) | * (762,420) | * (226,929) | * (231,539) | * (259,749) | * (252,103) | * (5,707) | * 358,782 | * 521,121 | * 763,791 | * 961,204 | * 1,241,936 | * 1,338,945 | * 1,564,686 | * 1,813,397 |
| Net Profit Margin | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.5% | 12.7% | 13.4% | 14.5% | 16.1% | 17.2% | 18.0% | 18.4% | 19.0% |
| **Weighted Average Common Shares Outstanding** | | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 |
| **Basic and Diluted Income (loss) per Common Sh** | | * (0.07) | * (0.36) | * (0.11) | * (0.11) | * (0.12) | * (0.12) | * (0.00) | * 0.17 | * 0.25 | * 0.36 | * 0.45 | * 0.58 | * 0.63 | * 0.74 | * 0.85 |

Income Statement

| | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CORES PER MONTH** | * 4,280 | * 4,700 | * 5,000 | * 5,500 | * 6,000 | * 6,500 | * 7,000 | * 7,500 | * 8,000 | * 8,500 | * 9,000 | * 9,500 | * 10,000 | * 10,500 | * 11,000 |
| **CUMULATIVE CORES SOLD** | * 23,395 | * 28,095 | * 33,095 | * 38,595 | * 44,595 | * 51,095 | * 58,095 | * 65,595 | * 73,595 | * 82,095 | * 91,095 | * 100,595 | * 110,595 | * 121,095 | * 132,095 |
| **Revenue:** | | | | | | | | | | | | | | | |
| Sales | * 10,304,220 | * 11,315,382 | * 12,037,640 | * 12,818,806 | * 13,984,152 | * 15,149,498 | * 15,776,992 | * 16,903,920 | * 18,030,848 | * 18,504,670 | * 19,593,180 | * 20,681,690 | * 21,001,840 | * 22,051,932 | * 23,102,024 |
| Secondary sales | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| **Total Revenue** | * 10,304,220 | * 11,315,382 | * 12,037,640 | * 12,818,806 | * 13,984,152 | * 15,149,498 | * 15,776,992 | * 16,903,920 | * 18,030,848 | * 18,504,670 | * 19,593,180 | * 20,681,690 | * 21,001,840 | * 22,051,932 | * 23,102,024 |
| **Costs and Expenses:** | | | | | | | | | | | | | | | |
| **Manufacturing Costs** | | | | | | | | | | | | | | | |
| Fixed | * 25,448 | * 25,805 | * 26,060 | * 26,485 | * 26,910 | * 27,335 | * 27,760 | * 34,185 | * 34,610 | * 35,035 | * 35,460 | * 35,885 | * 36,310 | * 36,735 | * 37,160 |
| Cost of Goods Sold | * 7,422,610 | * 8,150,997 | * 8,671,273 | * 9,210,909 | * 10,048,265 | * 10,885,620 | * 11,308,105 | * 12,115,827 | * 12,923,549 | * 13,229,851 | * 14,008,077 | * 14,786,304 | * 14,977,391 | * 15,726,260 | * 16,475,130 |
| Variable | * 273,608 | * 282,244 | * 289,681 | * 308,999 | * 318,436 | * 337,149 | * 346,586 | * 360,863 | * 375,341 | * 439,480 | * 448,916 | * 463,193 | * 472,630 | * 496,385 | * 505,821 |
| Total Manufacturing Costs | * 7,721,665 | * 8,459,046 | * 8,987,014 | * 9,546,393 | * 10,393,611 | * 11,250,104 | * 11,682,451 | * 12,510,874 | * 13,333,500 | * 13,704,365 | * 14,492,453 | * 15,285,382 | * 15,486,330 | * 16,259,380 | * 17,018,111 |
| Gross Margin | 25% | 25% | 25% | 26% | 26% | 26% | 26% | 26% | 26% | 26% | 26% | 26% | 26% | 26% | 26% |
| **Selling:** | | | | | | | | | | | | | | | |
| Fixed | * 49,800 | * 54,000 | * 57,000 | * 62,000 | * 67,000 | * 72,000 | * 77,000 | * 82,000 | * 87,000 | * 92,000 | * 97,000 | * 102,000 | * 107,000 | * 112,000 | * 117,000 |
| Variable | * 88,244 | * 90,772 | * 92,577 | * 104,614 | * 107,527 | * 120,524 | * 122,092 | * 134,993 | * 137,810 | * 149,078 | * 151,800 | * 164,604 | * 165,405 | * 178,113 | * 180,738 |
| Total Selling | * 138,044 | * 144,772 | * 149,577 | * 166,614 | * 174,527 | * 192,524 | * 199,092 | * 216,993 | * 224,810 | * 241,078 | * 248,800 | * 266,604 | * 272,405 | * 290,113 | * 297,738 |
| **General & Administrative:** | | | | | | | | | | | | | | | |
| Compensation of Officers & | * 50,000 | * 50,000 | * 50,000 | * 50,000 | * 50,000 | * 50,000 | * 55,000 | * 55,000 | * 55,000 | * 55,000 | * 55,000 | * 55,000 | * 60,000 | * 60,000 | * 60,000 |
| Fixed | * 121,652 | * 128,683 | * 133,705 | * 140,893 | * 149,156 | * 157,419 | * 169,176 | * 177,331 | * 185,486 | * 191,813 | * 199,861 | * 207,909 | * 218,805 | * 226,745 | * 234,686 |
| Variable | * 342,762 | * 353,177 | * 365,419 | * 388,640 | * 400,643 | * 439,173 | * 450,440 | * 477,221 | * 493,632 | * 531,590 | * 542,801 | * 569,187 | * 577,288 | * 614,632 | * 630,251 |
| Total General & Administrative | * 464,414 | * 481,860 | * 499,125 | * 529,532 | * 549,798 | * 596,592 | * 619,615 | * 654,552 | * 679,118 | * 723,403 | * 742,662 | * 777,096 | * 796,093 | * 841,377 | * 864,937 |
| **Depreciation & Amortization:** | | | | | | | | | | | | | | | |
| Depreciation | * 72,776 | * 82,335 | * 91,820 | * 101,990 | * 113,089 | * 124,798 | * 138,006 | * 151,292 | * 165,740 | * 180,960 | * 197,492 | * 213,875 | * 231,471 | * 249,111 | * 268,127 |
| Amortization | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| **Total Costs and Expenses** | * 8,396,898 | * 9,168,012 | * 9,727,536 | * 10,344,529 | * 11,231,025 | * 12,164,018 | * 12,639,165 | * 13,533,712 | * 14,403,168 | * 14,849,807 | * 15,681,407 | * 16,542,957 | * 16,786,299 | * 17,639,981 | * 18,448,913 |
| **Income Before Interest & Ta** | * 1,907,322 | * 2,147,370 | * 2,310,104 | * 2,474,277 | * 2,753,127 | * 2,985,480 | * 3,137,827 | * 3,370,208 | * 3,627,680 | * 3,654,863 | * 3,911,773 | * 4,138,733 | * 4,215,541 | * 4,411,951 | * 4,653,111 |
| **Other Income (Expense)** | | | | | | | | | | | | | | | |
| Interest Expense | * (44,226) | * - | * - | * - | * - | * - | * (39,312) | * - | * - | * - | * - | * - | * (34,398) | * - | * - |
| Interest Income | * 7,681 | * 9,394 | * 11,778 | * 14,636 | * 17,688 | * 20,895 | * 24,428 | * 28,192 | * 32,377 | * 36,973 | * 42,078 | * 47,177 | * 52,618 | * 58,366 | * 64,286 |
| Accrued expenses | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| **Pre Tax Net Income (Loss)** | * 1,870,777 | * 2,156,763 | * 2,321,882 | * 2,488,912 | * 2,770,815 | * 3,006,375 | * 3,122,943 | * 3,398,400 | * 3,660,056 | * 3,691,837 | * 3,953,851 | * 4,185,910 | * 4,233,762 | * 4,470,316 | * 4,717,398 |
| | 18.2% | 19.1% | 19.3% | 19.4% | 19.8% | 19.8% | 19.8% | 20.1% | 20.3% | 20.0% | 20.2% | 20.2% | 20.2% | 20.3% | 20.4% |
| Preferred Stock Dividends | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Federal Income Tax | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| State Income Tax | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| **Net Income (loss) to Common S** | * 1,870,777 | * 2,156,763 | * 2,321,882 | * 2,488,912 | * 2,770,815 | * 3,006,375 | * 3,122,943 | * 3,398,400 | * 3,660,056 | * 3,691,837 | * 3,953,851 | * 4,185,910 | * 4,233,762 | * 4,470,316 | * 4,717,398 |
| Net Profit Margin | 18.2% | 19.1% | 19.3% | 19.4% | 19.8% | 19.8% | 19.8% | 20.1% | 20.3% | 20.0% | 20.2% | 20.2% | 20.2% | 20.3% | 20.4% |
| **Weighted Average Common Sh** | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 |
| **Basic and Diluted Income (loss)** | * 0.88 | * 1.01 | * 1.09 | * 1.17 | * 1.30 | * 1.41 | * 1.47 | * 1.60 | * 1.72 | * 1.74 | * 1.86 | * 1.97 | * 1.99 | * 2.10 | * 2.22 |

Income Statement

| | Nov-05 | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 | Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CORES PER MONTH** | * 11,500 | * 12,000 | * 12,500 | * 13,000 | * 13,500 | * 14,000 | * 14,500 | * 15,000 | * 15,500 | * 16,000 | * 16,500 | * 17,000 | * 17,500 |
| **CUMULATIVE CORES SOLD** | * 143,595 | * 155,595 | * 168,095 | * 181,095 | * 194,595 | * 208,595 | * 223,095 | * 238,095 | * 253,595 | * 269,595 | * 286,095 | * 303,095 | * 320,595 |
| **Revenue:** | | | | | | | | | | | | | |
| Sales | * 23,268,502 | * 24,280,176 | * 25,291,850 | * 25,304,656 | * 26,277,912 | * 27,251,168 | * 27,110,302 | * 28,045,140 | * 28,979,978 | * 29,095,232 | * 30,004,458 | * 30,913,684 | * 30,478,280 |
| Secondary sales | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| **Total Revenue** | * 23,268,502 | * 24,280,176 | * 25,291,850 | * 25,304,656 | * 26,277,912 | * 27,251,168 | * 27,110,302 | * 28,045,140 | * 28,979,978 | * 29,095,232 | * 30,004,458 | * 30,913,684 | * 30,478,280 |
| **Costs and Expenses:** | | | | | | | | | | | | | |
| **Manufacturing Costs** | | | | | | | | | | | | | |
| Fixed | * 37,585 | * 38,010 | * 38,435 | * 38,860 | * 39,285 | * 39,710 | * 40,135 | * 40,560 | * 40,985 | * 41,410 | * 41,835 | * 42,260 | * 42,685 |
| Cost of Goods Sold | * 16,551,969 | * 17,271,620 | * 17,991,271 | * 17,954,832 | * 18,645,403 | * 19,335,973 | * 19,187,224 | * 19,848,852 | * 20,510,481 | * 20,557,137 | * 21,199,547 | * 21,841,958 | * 21,479,464 |
| Variable | * 520,098 | * 529,535 | * 598,110 | * 612,588 | * 626,865 | * 636,302 | * 655,015 | * 664,452 | * 683,770 | * 693,207 | * 757,345 | * 766,782 | * 781,059 |
| Total Manufacturing Costs | * 17,109,652 | * 17,839,165 | * 18,627,816 | * 18,606,281 | * 19,311,553 | * 20,011,985 | * 19,882,374 | * 20,553,864 | * 21,235,236 | * 21,291,754 | * 21,998,728 | * 22,651,000 | * 22,303,208 |
| **Gross Margin** | 26% | 27% | 26% | 26% | 27% | 27% | 27% | 27% | 27% | 27% | 27% | 27% | 27% |
| **Selling:** | | | | | | | | | | | | | |
| Fixed | * 122,000 | * 127,000 | * 132,000 | * 137,000 | * 142,000 | * 147,000 | * 152,000 | * 157,000 | * 162,000 | * 167,000 | * 172,000 | * 177,000 | * 182,000 |
| Variable | * 191,238 | * 193,767 | * 206,380 | * 206,412 | * 218,928 | * 221,361 | * 231,092 | * 233,430 | * 245,850 | * 246,138 | * 258,494 | * 260,768 | * 269,762 |
| Total Selling | * 313,238 | * 320,767 | * 338,380 | * 343,412 | * 360,928 | * 368,361 | * 383,092 | * 390,430 | * 407,850 | * 413,138 | * 430,494 | * 437,768 | * 451,762 |
| **General & Administrative:** | | | | | | | | | | | | | |
| Compensation of Officers & | * 60,000 | * 60,000 | * 60,000 | * 60,000 | * 60,000 | * 60,000 | * 60,000 | * 70,000 | * 70,000 | * 70,000 | * 70,000 | * 70,000 | * 70,000 |
| Fixed | * 240,152 | * 247,984 | * 255,817 | * 260,853 | * 268,578 | * 276,303 | * 280,909 | * 298,526 | * 306,144 | * 311,467 | * 319,012 | * 326,558 | * 330,339 |
| Variable | * 647,140 | * 657,560 | * 694,508 | * 699,443 | * 724,642 | * 739,470 | * 764,546 | * 774,175 | * 798,978 | * 804,968 | * 847,411 | * 861,579 | * 872,269 |
| Total General & Administrative | * 887,292 | * 905,544 | * 950,325 | * 960,296 | * 993,220 | * 1,015,773 | * 1,045,455 | * 1,072,701 | * 1,105,122 | * 1,116,435 | * 1,166,423 | * 1,188,138 | * 1,202,608 |
| **Depreciation & Amortization:** | | | | | | | | | | | | | |
| Depreciation | * 287,517 | * 307,269 | * 327,558 | * 349,718 | * 371,000 | * 393,259 | * 397,904 | * 420,783 | * 436,597 | * 460,886 | * 485,271 | * 511,275 | * 537,175 |
| Amortization | | | | | | | | | | | | | |
| **Total Costs and Expenses** | * 18,597,699 | * 19,372,745 | * 20,244,079 | * 20,259,706 | * 21,036,700 | * 21,789,378 | * 21,708,826 | * 22,437,778 | * 23,184,805 | * 23,282,213 | * 24,080,917 | * 24,788,180 | * 24,494,753 |
| **Income Before Interest & Ta** | * 4,670,803 | * 4,907,431 | * 5,047,771 | * 5,044,950 | * 5,241,212 | * 5,461,790 | * 5,401,476 | * 5,607,362 | * 5,795,173 | * 5,813,019 | * 5,923,541 | * 6,125,504 | * 5,983,527 |
| **Other Income (Expense)** | | | | | | | | | | | | | |
| Interest Expense | * - | * - | * - | * (29,484) | * - | * - | * - | * - | * - | * (24,570) | * - | * - | * - |
| Interest Income | * 70,625 | * 77,695 | * 84,520 | * 91,519 | * 98,937 | * 106,374 | * 114,191 | * 122,767 | * 130,894 | * 139,308 | * 148,015 | * 156,685 | * 165,755 |
| Accrued expenses | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| **Pre Tax Net Income (Loss)** | * 4,741,427 | * 4,985,125 | * 5,132,291 | * 5,106,985 | * 5,340,149 | * 5,568,164 | * 5,515,667 | * 5,730,129 | * 5,926,068 | * 5,927,757 | * 6,071,556 | * 6,282,189 | * 6,149,281 |
| | 20.4% | 20.5% | 20.3% | 20.2% | 20.3% | 20.4% | 20.3% | 20.4% | 20.4% | 20.4% | 20.2% | 20.3% | 20.2% |
| Preferred Stock Dividends | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Federal Income Tax | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| State Income Tax | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| **Net Income (loss) to Common S** | * 4,741,427 | * 4,985,125 | * 5,132,291 | * 5,106,985 | * 5,340,149 | * 5,568,164 | * 5,515,667 | * 5,730,129 | * 5,926,068 | * 5,927,757 | * 6,071,556 | * 6,282,189 | * 6,149,281 |
| Net Profit Margin | 20.4% | 20.5% | 20.3% | 20.2% | 20.3% | 20.4% | 20.3% | 20.4% | 20.4% | 20.4% | 20.2% | 20.3% | 20.2% |
| **Weighted Average Common Sh** | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 | * 2,125,000 |
| **Basic and Diluted Income (loss)** | * 2.23 | * 2.35 | * 2.42 | * 2.40 | * 2.51 | * 2.62 | * 2.60 | * 2.70 | * 2.79 | * 2.79 | * 2.86 | * 2.96 | * 2.89 |

Cash Flow Statement

| | Time 0 | May-03 | Jun-03 | Jul-03 | Aug-03 | Sep-03 | Oct-03 | Nov-03 | Dec-03 | Jan-04 | Feb-04 | Mar-04 | Apr-04 | May-04 | Jun-04 | Jul-04 | Aug-04 | Sep-04 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | | | | | | | | | | | | | | |
| Net Income | | * (147,428) | * (762,420) | * (226,929) | * (231,539) | * (259,749) | * (252,103) | * (5,707) | * 358,782 | * 521,121 | * 763,791 | * 961,204 | * 1,241,936 | * 1,338,945 | * 1,564,686 | * 1,813,397 | * 1,870,777 | * 2,156,763 |
| Items not requiring cash: | | | | | | | | | | | | | | | | | | |
| Depreciation | | * 18,203 | * 18,499 | * 26,111 | * 26,389 | * 26,389 | * 26,500 | * 26,500 | * 28,013 | * 30,872 | * 34,791 | * 39,226 | * 44,743 | * 50,948 | * 57,214 | * 64,666 | * 72,776 | * 82,335 |
| Amortization | | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Stock transactions | | | | | | | | | | | | | | | | | | |
| Changes in operating assets and liabilities: | | | | | | | | | | | | | | | | | | |
| Trade receivables | | * - | * - | * - | * - | * - | * - | * - | * (541,054) | * (874,010) | * (536,571) | * (676,157) | * (365,611) | * (612,767) | * (120,376) | * (527,927) | * (527,927) | * (369,709) | * (505,581) |
| Prepaid expenses | | | | | | | | | | | | | | | | | | |
| Account payable | | * - | * - | * 11,584 | * 214 | * 1,393 | * (402) | * 41,767 | * 69,099 | * 45,413 | * 53,002 | * 29,088 | * 47,346 | * 7,279 | * 41,643 | * 40,438 | * 31,982 | * 38,556 |
| Deferred revenue | | | | | | | | | | | | | | | | | | |
| Accruals | | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| **Net cash generated (used) from operating activities** | | * (129,225) | * (743,921) | * (189,234) | * (204,936) | * (231,966) | * (226,005) | * (478,493) | * (418,115) | * 60,835 | * 175,427 | * 663,906 | * 721,257 | * 1,276,795 | * 1,135,616 | * 1,390,573 | * 1,605,825 | * 1,772,073 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | | | | | | | | | | | | | | |
| Capital expenditures | * (655,294) | * (10,677) | * (274,041) | * (10,000) | * - | * (4,000) | * - | * (54,463) | * (102,904) | * (141,098) | * (159,667) | * (198,604) | * (223,370) | * (225,593) | * (268,268) | * (291,944) | * (344,127) | * (341,461) |
| Cash paid for investments and acquisitions | | | | | | | | | | | | | | | | | | |
| Deferred acquisition costs | | | | | | | | | | | | | | | | | | |
| Capitalized assets | | | | | | | | | | | | | | | | | | |
| **Net cash generated (used) from investing activities** | * (655,294) | * (10,677) | * (274,041) | * (10,000) | * - | * (4,000) | * - | * (54,463) | * (102,904) | * (141,098) | * (159,667) | * (198,604) | * (223,370) | * (225,593) | * (268,268) | * (291,944) | * (344,127) | * (341,461) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | | | | | | | | | | | | | | |
| Net proceeds from financing arrangements | * 1,160,000 | * - | * 2,340,000 | * - | * - | * - | * - | * 200,000 | * 500,000 | * 100,000 | * 250,000 | * - | * - | * - | * - | * - | * - | * - |
| Net proceeds from issuing common stock | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Proceeds from exercising options and warrants | | | | | | | | | | | | | | | | | | |
| Payments on long term debt and leases | | * - | * - | * - | * - | * - | * - | * - | * - | * - | * (234,000) | * (400,000) | * (300,000) | * (300,000) | * (50,000) | * - | * (234,000) | * - |
| **Net cash generated (used) from financing activities** | * 1,160,000 | * - | * 2,340,000 | * - | * - | * - | * - | * 200,000 | * 500,000 | * 100,000 | * 16,000 | * (400,000) | * (300,000) | * (300,000) | * (50,000) | * - | * (234,000) | * - |
| **INCREASE (DECREASE) IN CASH** | * 504,706 | * (139,902) | * 1,322,038 | * (199,234) | * (204,936) | * (235,966) | * (226,005) | * (332,956) | * (21,019) | * 19,737 | * 31,759 | * 65,302 | * 197,887 | * 751,202 | * 817,348 | * 1,098,629 | * 1,027,699 | * 1,430,611 |
| **CASH AT BEGINNING OF PERIOD** | * 1,160,000 | * 1,664,706 | * 1,524,804 | * 2,846,841 | * 2,647,607 | * 2,442,671 | * 2,206,705 | * 1,980,700 | ######### | * 1,626,724 | * 1,646,461 | * 1,678,220 | * 1,743,523 | * 1,941,410 | * 2,692,612 | * 3,509,959 | * 4,608,589 | * 5,636,288 |
| **CASH AT END OF PERIOD** | * 1,664,706 | * 1,524,804 | * 2,846,841 | * 2,647,607 | * 2,442,671 | * 2,206,705 | * 1,980,700 | * 1,647,744 | ######### | * 1,646,461 | * 1,678,220 | * 1,743,523 | * 1,941,410 | * 2,692,612 | * 3,509,959 | * 4,608,589 | * 5,636,288 | * 7,066,899 |
| proof to SU | | * - | * - | * - | * - | * - | * - | * - | * - | * - | * (0) | * - | * - | * - | * - | * - | * - | * - |

Cash Flow Statement

| | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | Jan-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | | | | | | | | | | | | |
| Net Income | * 2,321,882 | * 2,488,912 | * 2,770,815 | * 3,006,375 | * 3,122,943 | * 3,398,400 | * 3,660,056 | * 3,691,837 | * 3,953,851 | * 4,185,910 | * 4,233,762 | * 4,470,316 | * 4,717,398 | * 4,741,427 | * 4,985,125 | * 5,132,291 |
| Items not requiring cash: | | | | | | | | | | | | | | | | |
| Depreciation | * 91,820 | * 101,990 | * 113,089 | * 124,798 | * 138,006 | * 151,292 | * 165,740 | * 180,960 | * 197,492 | * 213,875 | * 231,471 | * 249,111 | * 268,127 | * 287,517 | * 307,269 | * 327,558 |
| Amortization | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Stock transactions | | | | | | | | | | | | | | | | |
| Changes in operating assets and liabilities: | | | | | | | | | | | | | | | | |
| Trade receivables | * (361,129) | * (390,583) | * (582,673) | * (582,673) | * (313,747) | * (563,464) | * (563,464) | * (236,911) | * (544,255) | * (544,255) | * (160,075) | * (525,046) | * (525,046) | * (83,239) | * (505,837) | * (505,837) |
| Prepaid expenses | | | | | | | | | | | | | | | | |
| Account payable | * 27,976 | * 30,850 | * 44,325 | * 46,650 | * 23,757 | * 44,727 | * 43,473 | * 22,332 | * 41,580 | * 43,077 | * 12,167 | * 42,684 | * 40,447 | * 7,439 | * 38,752 | * 43,567 |
| Deferred revenue | | | | | | | | | | | | | | | | |
| Accruals | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| **Net cash generated (used) from operating activities** | * 2,080,549 | * 2,231,169 | * 2,345,556 | * 2,595,150 | * 2,970,959 | * 3,030,956 | * 3,305,805 | * 3,658,218 | * 3,648,668 | * 3,898,607 | * 4,317,325 | * 4,237,066 | * 4,500,925 | * 4,953,145 | * 4,825,310 | * 4,997,578 |
| | | | | | | | | | | | | | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | | | | | | | | | | | | |
| Capital expenditures | * (366,129) | * (399,564) | * (421,525) | * (475,485) | * (478,310) | * (520,118) | * (547,925) | * (595,140) | * (589,795) | * (633,451) | * (635,055) | * (684,558) | * (698,061) | * (711,055) | * (730,405) | * (797,756) |
| Cash paid for investments and acquisitions | | | | | | | | | | | | | | | | |
| Deferred acquisition costs | | | | | | | | | | | | | | | | |
| Capitalized assets | | | | | | | | | | | | | | | | |
| **Net cash generated (used) from investing activities** | * (366,129) | * (399,564) | * (421,525) | * (475,485) | * (478,310) | * (520,118) | * (547,925) | * (595,140) | * (589,795) | * (633,451) | * (635,055) | * (684,558) | * (698,061) | * (711,055) | * (730,405) | * (797,756) |
| | | | | | | | | | | | | | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | | | | | | | | | | | | |
| Net proceeds from financing arrangements | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Net proceeds from issuing common stock | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Proceeds from exercising options and warrants | | | | | | | | | | | | | | | | |
| Payments on long term debt and leases | * - | * - | * - | * - | * (234,000) | * - | * - | * - | * - | * - | * - | * (234,000) | * - | * - | * - | * - |
| **Net cash generated (used) from financing activities** | * - | * - | * - | * - | * (234,000) | * - | * - | * - | * - | * - | * - | * (234,000) | * - | * - | * - | * - |
| | | | | | | | | | | | | | | | | |
| **INCREASE (DECREASE) IN CASH** | * 1,714,420 | * 1,831,605 | * 1,924,032 | * 2,119,665 | * 2,258,650 | * 2,510,838 | * 2,757,880 | * 3,063,078 | * 3,058,873 | * 3,265,157 | * 3,448,269 | * 3,552,508 | * 3,802,865 | * 4,242,090 | * 4,094,904 | * 4,199,823 |
| | | | | | | | | | | | | | | | | |
| **CASH AT BEGINNING OF PERIOD** | * 7,066,899 | * 8,781,319 | * 10,612,924 | * 12,536,955 | * 14,656,620 | * 16,915,270 | * 19,426,108 | * 22,183,988 | * 25,247,065 | * 28,305,938 | * 31,571,095 | * 35,019,364 | * 38,571,872 | * 42,374,737 | * 46,616,827 | * 50,711,731 |
| | | | | | | | | | | | | | | | | |
| **CASH AT END OF PERIOD** | * 8,781,319 | * 10,612,924 | * 12,536,955 | * 14,656,620 | * 16,915,270 | * 19,426,108 | * 22,183,988 | * 25,247,065 | * 28,305,938 | * 31,571,095 | * 35,019,364 | * 38,571,872 | * 42,374,737 | * 46,616,827 | * 50,711,731 | * 54,911,554 |

Cash Flow Statement

| | Feb-06 | Mar-06 | Apr-06 | May-06 | Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 |
|---|---|---|---|---|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | | | | | | |
| Net Income | * 5,106,985 | * 5,340,149 | * 5,568,164 | * 5,515,667 | * 5,730,129 | * 5,926,068 | * 5,927,757 | * 6,071,556 | * 6,282,189 | * 6,149,281 |
| Items not requiring cash: | | | | | | | | | | |
| Depreciation | * 349,718 | * 371,000 | * 393,259 | * 397,904 | * 420,783 | * 436,597 | * 460,886 | * 485,271 | * 511,275 | * 537,175 |
| Amortization | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Stock transactions | | | | | | | | | | |
| Changes in operating assets and liabilities: | | | | | | | | | | |
| Trade receivables | * (6,403) | * (486,628) | * (486,628) | * 70,433 | * (467,419) | * (467,419) | * (57,627) | * (454,613) | * (454,613) | * 217,702 |
| Prepaid expenses | | | | | | | | | | |
| Account payable | * 781 | * 38,850 | * 37,634 | * (4,028) | * 36,448 | * 37,351 | * 4,870 | * 39,935 | * 35,363 | * (14,671) |
| Deferred revenue | | | | | | | | | | |
| Accruals | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| **Net cash generated (used) from operating activities** | * 5,451,081 | * 5,263,370 | * 5,512,429 | * 5,979,977 | * 5,719,941 | * 5,932,597 | * 6,335,887 | * 6,142,149 | * 6,374,214 | * 6,889,487 |
| | | | | | | | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | | | | | | |
| Capital expenditures | * (766,140) | * (801,337) | * (822,535) | * (834,309) | * (843,354) | * (884,399) | * (877,857) | * (940,134) | * (932,411) | * (927,348) |
| Cash paid for investments and acquisitions | | | | | | | | | | |
| Deferred acquisition costs | | | | | | | | | | |
| Capitalized assets | | | | | | | | | | |
| **Net cash generated (used) from investing activities** | * (766,140) | * (801,337) | * (822,535) | * (834,309) | * (843,354) | * (884,399) | * (877,857) | * (940,134) | * (932,411) | * (927,348) |
| | | | | | | | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | | | | | | |
| Net proceeds from financing arrangements | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Net proceeds from issuing common stock | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Proceeds from exercising options and warrants | | | | | | | | | | |
| Payments on long term debt and leases | * (234,000) | * - | * - | * - | * - | * - | * (234,000) | * - | * - | * - |
| **Net cash generated (used) from financing activities** | * (234,000) | * - | * - | * - | * - | * - | * (234,000) | * - | * - | * - |
| | | | | | | | | | | |
| **INCREASE (DECREASE) IN CASH** | * 4,450,942 | * 4,462,033 | * 4,689,894 | * 5,145,668 | * 4,876,587 | * 5,048,198 | * 5,224,030 | * 5,202,016 | * 5,441,803 | * 5,962,139 |
| | | | | | | | | | | |
| **CASH AT BEGINNING OF PERIOD** | * 54,911,554 | * 59,362,495 | * 63,824,529 | * 68,514,423 | * 73,660,091 | * 78,536,677 | * 83,584,875 | * 88,808,905 | * 94,010,921 | * 99,452,724 |
| | | | | | | | | | | |
| **CASH AT END OF PERIOD** | * 59,362,495 | * 63,824,529 | * 68,514,423 | * 73,660,091 | * 78,536,677 | * 83,584,875 | * 88,808,905 | * 94,010,921 | * 99,452,724 | * 105,414,863 |
| | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |

Sources & Uses of Funds

| | Factor | Rate | Time 0 | May-03 | Jun-03 | Jul-03 | Aug-03 | Sep-03 | Oct-03 | Nov-03 | Dec-03 | Jan-04 | Feb-04 | Mar-04 | Apr-04 | May-04 | Jun-04 | Jul-04 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CORES PER MONTH** | | | | * - | * - | * - | * - | * - | * - | * 325 | * 850 | * 1,270 | * 1,710 | * 2,125 | * 2,560 | * 3,000 | * 3,425 | * 3,850 |
| **CUMULATIVE CORES SOLD** | | | | * - | * - | * - | * - | * - | * - | * 325 | * 1,175 | * 2,445 | * 4,155 | * 6,280 | * 8,840 | * 11,840 | * 15,265 | * 19,115 |
| | | | | | | | | | | | | | | | | | | |
| **BEGINNING CASH** | | | * 1,160,000 | * 1,664,706 | * 1,524,804 | * 2,846,841 | * 2,647,607 | * 2,442,671 | * 2,206,705 | * 1,980,700 | * 1,647,744 | * 1,626,724 | * 1,646,461 | * 1,678,220 | * 1,743,523 | * 1,941,410 | * 2,692,612 | * 3,509,959 |
| | | | | | | | | | | | | | | | | | | |
| **SOURCES OF FUNDS** | | | | | | | | | | | | | | | | | | |
| Income Before Interest & Taxes plus COGS | | | | * (150,203) | * (170,410) | * (206,674) | * (210,952) | * (248,820) | * (255,781) | * 742,440 | * 2,410,038 | * 3,372,907 | * 4,682,015 | * 5,333,705 | * 6,506,902 | * 6,719,684 | * 7,705,155 | * 8,714,736 |
| Interest Income | | | | * 2,775 | * 2,541 | * 4,745 | * 4,413 | * 4,071 | * 3,678 | * 3,301 | * 2,746 | * 2,711 | * 2,744 | * 2,797 | * 2,906 | * 3,236 | * 4,488 | * 5,850 |
| Non-cash add backs | | | | * 18,203 | * 18,499 | * 37,695 | * 26,603 | * 27,783 | * 26,098 | * (472,786) | * (776,898) | * (460,286) | * (588,364) | * (297,297) | * (520,679) | * (62,150) | * (429,070) | * (422,823) |
| Tax Accrual | | | | * - | * - | * - | * - | * - | * - | | | | | | | | | |
| **Net operating sources** | | | | * (129,225) | * (149,369) | * (164,234) | * (179,936) | * (216,966) | * (226,005) | * 272,955 | * 1,635,887 | * 2,915,332 | * 4,096,395 | * 5,039,204 | * 5,989,130 | * 6,660,770 | * 7,280,573 | * 8,297,762 |
| | | | | | | | | | | | | | | | | | | |
| Sourced Funding | | | | | | | | | | | | | | | | | | |
| Operations Loan | * 2,340,000 | | * - | | * 2,340,000 | | | | | | | | | | | | | |
| Paid in Capital | | | * 1,160,000 | | | | | | | | | | | | | | | |
| Inventory Loans (MAX) | * 1,050,000 | | | | | | | | * - | * 200,000 | * 500,000 | * 100,000 | * 250,000 | | | | | |
| **TOTAL SOURCES OF FUNDS** | | | * 1,160,000 | * (129,225) | * 2,190,631 | * (164,234) | * (179,936) | * (216,966) | * (226,005) | * 472,955 | * 2,135,887 | * 3,015,332 | * 4,346,395 | * 5,039,204 | * 5,989,130 | * 6,660,770 | * 7,280,573 | * 8,297,762 |
| | | | | | | | | | | | | | | | | | | |
| **USES OF FUNDS:** | | | | | | | | | | | | | | | | | | |
| PP&E and Capitalized R&D | | | * 655,294 | * 10,677 | * 274,041 | * 10,000 | * - | * 4,000 | * - | * 54,463 | * 102,904 | * 141,098 | * 159,667 | * 198,604 | * 223,370 | * 225,593 | * 268,268 | * 291,944 |
| Operations Debt Service | * 2,340,000 | 4.20% | | | | * 2,340,000 | * 2,340,000 | * 2,340,000 | * 2,340,000 | * 2,340,000 | * 2,340,000 | * 2,340,000 | * 2,340,000 | * 2,106,000 | * 2,106,000 | * 2,106,000 | * 2,106,000 | * 2,106,000 |
| Interest | | | | | | | | | | | | | | * 49,140 | | | | | |
| Principle | | | | | | | | | | | | | | * 234,000 | | | | | |
| | | | | | | | | | | | | | | | | | | |
| Inventory Debt Service | | 6.00% | 0.75 | * - | * - | * - | * - | * - | * - | * - | * 200,000 | * 700,000 | * 800,000 | * 1,050,000 | * 650,000 | * 350,000 | * 50,000 | * - |
| Interest | | | | | | | | | | | * 1,000 | * 3,500 | * 4,000 | * 5,250 | * 3,250 | * 1,750 | * 250 | * - |
| Principle | | | | | | | | | | | | | * - | * 400,000 | * 300,000 | * 300,000 | * 50,000 | |
| | | | | | | | | | | | | | | | | | | |
| Cost OF Goods Sold | | | | * - | * 594,552 | * 25,000 | * 25,000 | * 15,000 | * - | * 751,448 | * 2,053,002 | * 2,850,997 | * 3,867,828 | * 4,370,048 | * 5,264,622 | * 5,382,225 | * 6,144,707 | * 6,907,189 |
| | | | | | | | | | | | | | | | | | | |
| **TOTAL USES OF FUNDS** | | | * 655,294 | * 10,677 | * 868,593 | * 35,000 | * 25,000 | * 19,000 | * - | * 805,911 | * 2,156,906 | * 2,995,595 | * 4,314,635 | * 4,973,902 | * 5,791,243 | * 5,909,568 | * 6,463,225 | * 7,199,133 |
| | | | | | | | | | | | | | | | | | | |
| **NET SOURCES & USES** | | | | * 504,706 | * (139,902) | * 1,322,038 | * (199,234) | * (204,936) | * (235,966) | * (226,005) | * (332,956) | * (21,019) | * 19,737 | * 31,759 | * 65,302 | * 197,887 | * 751,202 | * 817,348 | * 1,098,629 |
| | | | | | | | | | | | | | | | | | | |
| **ENDING CASH (Minimum)** | * 1,524,804 | | | * 1,664,706 | * 1,524,804 | * 2,846,841 | * 2,647,607 | * 2,442,671 | * 2,206,705 | * 1,980,700 | * 1,647,744 | * 1,626,724 | * 1,646,461 | * 1,678,220 | * 1,743,523 | * 1,941,410 | * 2,692,612 | * 3,509,959 | * 4,608,589 |
| proof to BS | | | | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| | | | | | | | | | | | | | | | | | | |
| Suisse CHF | * 2,088,981 | | | | | | | | | | | | | | | | | |

Sources & Uses of Funds

| | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CORES PER MONTH** | 4,280 | 4,700 | 5,000 | 5,500 | 6,000 | 6,500 | 7,000 | 7,500 | 8,000 | 8,500 | 9,000 | 9,500 | 10,000 | 10,500 | 11,000 | 11,500 |
| **CUMULATIVE CORES SOLD** | 23,395 | 28,095 | 33,095 | 38,595 | 44,595 | 51,095 | 58,095 | 65,595 | 73,595 | 82,095 | 91,095 | 100,595 | 110,595 | 121,095 | 132,095 | 143,595 |
| **BEGINNING CASH** | 4,608,589 | 5,636,288 | 7,066,899 | 8,781,319 | 10,612,924 | 12,536,955 | 14,656,620 | 16,915,270 | 19,426,108 | 22,183,988 | 25,247,065 | 28,305,938 | 31,571,095 | 35,019,364 | 38,571,872 | 42,374,737 |
| **SOURCES OF FUNDS** | | | | | | | | | | | | | | | | |
| Income Before Interest & Taxes | 9,329,931 | 10,298,366 | 10,981,377 | 11,685,186 | 12,801,392 | 13,871,100 | 14,445,932 | 15,486,035 | 16,551,228 | 16,884,714 | 17,919,850 | 18,925,037 | 19,192,932 | 20,138,211 | 21,128,241 | 21,222,772 |
| Interest Income | 7,681 | 9,394 | 11,778 | 14,636 | 17,688 | 20,895 | 24,428 | 28,192 | 32,377 | 36,973 | 42,078 | 47,177 | 52,618 | 58,366 | 64,286 | 70,625 |
| Non-cash add backs | (264,951) | (384,690) | (241,333) | (257,743) | (425,259) | (411,225) | (151,984) | (367,444) | (354,251) | (33,619) | (305,183) | (287,302) | 83,563 | (233,251) | (216,473) | 211,718 |
| Tax Accrual | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net operating sources | 9,072,661 | 9,923,069 | 10,751,822 | 11,442,078 | 12,393,821 | 13,480,770 | 14,318,376 | 15,146,783 | 16,229,354 | 16,888,068 | 17,656,745 | 18,684,911 | 19,329,113 | 19,963,326 | 20,976,055 | 21,505,115 |
| Sourced Funding | | | | | | | | | | | | | | | | |
| Operations Loan | | | | | | | | | | | | | | | | |
| Paid in Capital | | | | | | | | | | | | | | | | |
| Inventory Loans (MAX) | - | - | | | | | | | | | | | | | | |
| **TOTAL SOURCES OF FUNDS** | 9,072,661 | 9,923,069 | 10,751,822 | 11,442,078 | 12,393,821 | 13,480,770 | 14,318,376 | 15,146,783 | 16,229,354 | 16,888,068 | 17,656,745 | 18,684,911 | 19,329,113 | 19,963,326 | 20,976,055 | 21,505,115 |
| **USES OF FUNDS:** | | | | | | | | | | | | | | | | |
| PP&E and Capitalized R&D | 344,127 | 341,461 | 366,129 | 399,564 | 421,525 | 475,485 | 478,310 | 520,118 | 547,925 | 595,140 | 589,795 | 633,451 | 635,055 | 684,558 | 698,061 | 711,055 |
| Operations Debt Service | 2,106,000 | 1,872,000 | 1,872,000 | 1,872,000 | 1,872,000 | 1,872,000 | 1,872,000 | 1,638,000 | 1,638,000 | 1,638,000 | 1,638,000 | 1,638,000 | 1,638,000 | 1,404,000 | 1,404,000 | 1,404,000 |
| Interest | 44,226 | | | | | | 39,312 | | | | | | 34,398 | | | |
| Principle | 234,000 | | | | | | 234,000 | | | | | | 234,000 | | | |
| Inventory Debt Service | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Principle | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cost OF Goods Sold | 7,422,610 | 8,150,997 | 8,671,273 | 9,210,909 | 10,048,265 | 10,885,620 | 11,308,105 | 12,115,827 | 12,923,549 | 13,229,851 | 14,008,077 | 14,786,304 | 14,977,391 | 15,726,260 | 16,475,130 | 16,551,969 |
| **TOTAL USES OF FUNDS** | 8,044,962 | 8,492,458 | 9,037,402 | 9,610,473 | 10,469,789 | 11,361,105 | 12,059,727 | 12,635,945 | 13,471,474 | 13,824,991 | 14,597,873 | 15,419,754 | 15,880,844 | 16,410,818 | 17,173,190 | 17,263,025 |
| **NET SOURCES & USES** | 1,027,699 | 1,430,611 | 1,714,420 | 1,831,605 | 1,924,032 | 2,119,665 | 2,258,650 | 2,510,838 | 2,757,880 | 3,063,078 | 3,058,873 | 3,265,157 | 3,448,269 | 3,552,508 | 3,802,865 | 4,242,090 |
| **ENDING CASH (Minimum)** | 5,636,288 | 7,066,899 | 8,781,319 | 10,612,924 | 12,536,955 | 14,656,620 | 16,915,270 | 19,426,108 | 22,183,988 | 25,247,065 | 28,305,938 | 31,571,095 | 35,019,364 | 38,571,872 | 42,374,737 | 46,616,827 |
| proof to BS | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

Suisse CHF

Sources & Uses of Funds

| | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 | Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CORES PER MONTH** | * 12,000 | * 12,500 | * 13,000 | * 13,500 | * 14,000 | * 14,500 | * 15,000 | * 15,500 | * 16,000 | * 16,500 | * 17,000 | * 17,500 |
| **CUMULATIVE CORES SOLD** | * 155,595 | * 168,095 | * 181,095 | * 194,595 | * 208,595 | * 223,095 | * 238,095 | * 253,595 | * 269,595 | * 286,095 | * 303,095 | * 320,595 |
| | | | | | | | | | | | | |
| **BEGINNING CASH** | * 46,616,827 | * 50,711,731 | * 54,911,554 | * 59,362,495 | * 63,824,529 | * 68,514,423 | * 73,660,091 | * 78,536,677 | * 83,584,875 | * 88,808,905 | * 94,010,921 | * 99,452,724 |
| | | | | | | | | | | | | |
| **SOURCES OF FUNDS** | | | | | | | | | | | | |
| Income Before Interest & Taxes p | * 22,179,051 | * 23,039,042 | * 22,999,782 | * 23,886,615 | * 24,797,763 | * 24,588,700 | * 25,456,214 | * 26,305,654 | * 26,370,156 | * 27,123,089 | * 27,967,462 | * 27,462,991 |
| Interest Income | * 77,695 | * 84,520 | * 91,519 | * 98,937 | * 106,374 | * 114,191 | * 122,767 | * 130,894 | * 139,308 | * 148,015 | * 156,685 | * 165,755 |
| Non-cash add backs | * (159,816) | * (134,712) | * 344,096 | * (76,779) | * (55,735) | * 464,310 | * (10,188) | * 6,530 | * 408,130 | * 70,593 | * 92,025 | * 740,206 |
| Tax Accrual | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- |
| Net operating sources | * 22,096,930 | * 22,988,850 | * 23,435,398 | * 23,908,773 | * 24,848,402 | * 25,167,201 | * 25,568,793 | * 26,443,078 | * 26,917,594 | * 27,341,697 | * 28,216,172 | * 28,368,951 |
| | | | | | | | | | | | | |
| Sourced Funding | | | | | | | | | | | | |
| Operations Loan | | | | | | | | | | | | |
| Paid in Capital | | | | | | | | | | | | |
| Inventory Loans (MAX) | | | | | | | | | | | | |
| **TOTAL SOURCES OF FUNDS** | * 22,096,930 | * 22,988,850 | * 23,435,398 | * 23,908,773 | * 24,848,402 | * 25,167,201 | * 25,568,793 | * 26,443,078 | * 26,917,594 | * 27,341,697 | * 28,216,172 | * 28,368,951 |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **USES OF FUNDS:** | | | | | | | | | | | | |
| PP&E and Capitalized R&D | * 730,405 | * 797,756 | * 766,140 | * 801,337 | * 822,535 | * 834,309 | * 843,354 | * 884,399 | * 877,857 | * 940,134 | * 932,411 | * 927,348 |
| Operations Debt Service | * 1,404,000 | * 1,404,000 | * 1,404,000 | * 1,170,000 | * 1,170,000 | * 1,170,000 | * 1,170,000 | * 1,170,000 | * 1,170,000 | * 936,000 | * 936,000 | * 936,000 |
| Interest | | | * 29,484 | | | | | | * 24,570 | | | |
| Principle | | | * 234,000 | | | | | | * 234,000 | | | |
| | | | | | | | | | | | | |
| Inventory Debt Service | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- |
| Interest | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- |
| Principle | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Cost OF Goods Sold | * 17,271,620 | * 17,991,271 | * 17,954,832 | * 18,645,403 | * 19,335,973 | * 19,187,224 | * 19,848,852 | * 20,510,481 | * 20,557,137 | * 21,199,547 | * 21,841,958 | * 21,479,464 |
| | | | | | | | | | | | | |
| **TOTAL USES OF FUNDS** | * 18,002,026 | * 18,789,027 | * 18,984,456 | * 19,446,740 | * 20,158,508 | * 20,021,533 | * 20,692,206 | * 21,394,880 | * 21,693,564 | * 22,139,681 | * 22,774,368 | * 22,406,812 |
| | | | | | | | | | | | | |
| **NET SOURCES & USES** | * 4,094,904 | * 4,199,823 | * 4,450,942 | * 4,462,033 | * 4,689,894 | * 5,145,668 | * 4,876,587 | * 5,048,198 | * 5,224,030 | * 5,202,016 | * 5,441,803 | * 5,962,139 |
| | | | | | | | | | | | | |
| **ENDING CASH (Minimum)** | * 50,711,731 | * 54,911,554 | * 59,362,495 | * 63,824,529 | * 68,514,423 | * 73,660,091 | * 78,536,677 | * 83,584,875 | * 88,808,905 | * 94,010,921 | * 99,452,724 | * 105,414,863 |
| proof to BS | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- | *.- |

Suisse CHF

Balance Sheet

| | Time 0 | May-03 | Jun-03 | Jul-03 | Aug-03 | Sep-03 | Oct-03 | Nov-03 | Dec-03 | Jan-04 | Feb-04 | Mar-04 | Apr-04 | May-04 | Jun-04 | Jul-04 | Aug-04 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS:** | | | | | | | | | | | | | | | | | |
| **CURRENT ASSETS:** | | | | | | | | | | | | | | | | | |
| Cash (1) | 1,664,706 | 1,524,804 | 2,846,841 | 2,647,607 | 2,442,671 | 2,206,705 | 1,980,700 | 1,647,744 | 1,626,724 | 1,646,461 | 1,678,220 | 1,743,523 | 1,941,410 | 2,692,612 | 3,509,959 | 4,608,589 | 5,636,288 |
| Cash equivalents | | - | - | - | - | - | - | 541,054 | 1,415,063 | 1,951,634 | 2,627,791 | 2,993,403 | 3,606,170 | 3,726,546 | 4,254,473 | 4,782,401 | 5,152,110 |
| Trade receivables | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Current Assets** | 1,664,706 | 1,524,804 | 2,846,841 | 2,647,607 | 2,442,671 | 2,206,705 | 1,980,700 | 2,188,797 | 3,041,787 | 3,598,095 | 4,306,012 | 4,736,925 | 5,547,579 | 6,419,158 | 7,764,433 | 9,390,990 | 10,788,397 |
| | | | | | | | | | | | | | | | | | |
| **LONG TERM ASSETS** | | | | | | | | | | | | | | | | | |
| PP&E and Capitalized R&D | 655,294 | 665,971 | 940,012 | 950,012 | 950,012 | 954,012 | 954,012 | 1,008,475 | 1,111,379 | 1,252,477 | 1,412,145 | 1,610,749 | 1,834,119 | 2,059,712 | 2,327,980 | 2,619,924 | 2,964,051 |
| Accumulated depreciation | | (18,203) | (36,702) | (62,813) | (89,202) | (115,592) | (142,092) | (168,592) | (196,606) | (227,477) | (262,268) | (301,494) | (346,237) | (397,185) | (454,399) | (519,066) | (591,841) |
| Net PP&E and R&D | 655,294 | 647,768 | 903,310 | 887,199 | 860,810 | 838,420 | 811,920 | 839,883 | 914,773 | 1,025,000 | 1,149,876 | 1,309,254 | 1,487,881 | 1,662,526 | 1,873,581 | 2,100,859 | 2,372,209 |
| Other (net) | 4,327,400 | 4,327,400 | 4,327,400 | 4,327,400 | 4,327,400 | 4,327,400 | 4,327,400 | 4,327,400 | 4,327,400 | 4,327,400 | 4,327,400 | 4,327,400 | 4,327,400 | 4,327,400 | 4,327,400 | 4,327,400 | 4,327,400 |
| **Total Long Term Assets** | 4,982,694 | 4,975,168 | 5,230,710 | 5,214,599 | 5,188,210 | 5,165,820 | 5,139,320 | 5,167,283 | 5,242,173 | 5,352,400 | 5,477,276 | 5,636,654 | 5,815,281 | 5,989,926 | 6,200,981 | 6,428,259 | 6,699,609 |
| | | | | | | | | | | | | | | | | | |
| **TOTAL ASSETS** | 6,647,400 | 6,499,972 | 8,077,552 | 7,862,206 | 7,630,881 | 7,372,525 | 7,120,020 | 7,356,080 | 8,283,961 | 8,950,495 | 9,783,288 | 10,373,579 | 11,362,861 | 12,409,084 | 13,965,413 | 15,819,248 | 17,488,007 |
| | | | | | | | | | | | | | | | | | |
| **LIABILITIES** | | | | | | | | | | | | | | | | | |
| **CURRENT LIABILITIES** | | | | | | | | | | | | | | | | | |
| Trade payables | | - | - | 11,584 | 11,798 | 13,191 | 12,789 | 54,556 | 123,655 | 169,068 | 222,070 | 251,157 | 298,503 | 305,782 | 347,425 | 387,863 | 419,845 |
| Inventory financing facility | - | - | - | - | - | - | - | 200,000 | 700,000 | 800,000 | 1,050,000 | 650,000 | 350,000 | 50,000 | - | - | - |
| Current maturities of liabilities | | | | | | | | | | | | | | | | | |
| Deferred revenue | | | | | | | | | | | | | | | | | |
| Accrued payroll & related taxes | | | | | | | | | | | | | | | | | |
| Accrued expenses | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Accrued Income Taxes | | | | | | | | | | | | | | | | | |
| **Total Current Liabilities** | - | - | - | 11,584 | 11,798 | 13,191 | 12,789 | 254,556 | 823,655 | 969,068 | 1,272,070 | 901,157 | 648,503 | 355,782 | 347,425 | 387,863 | 419,845 |
| | | | | | | | | | | | | | | | | | |
| **LONG TERM LIABILITIES** | | | | | | | | | | | | | | | | | |
| Senior Debt | - | - | 2,340,000 | 2,340,000 | 2,340,000 | 2,340,000 | 2,340,000 | 2,340,000 | 2,340,000 | 2,340,000 | 2,106,000 | 2,106,000 | 2,106,000 | 2,106,000 | 2,106,000 | 2,106,000 | 1,872,000 |
| Other | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Long Term Liabilities** | - | - | 2,340,000 | 2,340,000 | 2,340,000 | 2,340,000 | 2,340,000 | 2,340,000 | 2,340,000 | 2,340,000 | 2,106,000 | 2,106,000 | 2,106,000 | 2,106,000 | 2,106,000 | 2,106,000 | 1,872,000 |
| | | | | | | | | | | | | | | | | | |
| **STOCKHOLDER'S EQUITY** | | | | | | | | | | | | | | | | | |
| Common stock | 1,160,000 | 1,160,000 | 1,160,000 | 1,160,000 | 1,160,000 | 1,160,000 | 1,160,000 | 1,160,000 | 1,160,000 | 1,160,000 | 1,160,000 | 1,160,000 | 1,160,000 | 1,160,000 | 1,160,000 | 1,160,000 | 1,160,000 |
| Additional paid in capital | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Flow proof (s/b zero) | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Accumulated retained earnings | 5,487,400 | 5,339,972 | 4,577,552 | 4,350,622 | 4,119,083 | 3,859,334 | 3,607,231 | 3,601,524 | 3,960,306 | 4,481,427 | 5,245,218 | 6,206,422 | 7,448,358 | 8,787,302 | 10,351,989 | 12,165,385 | 14,036,162 |
| **Total Stockholder's equity** | 6,647,400 | 6,499,972 | 5,737,552 | 5,510,622 | 5,279,083 | 5,019,334 | 4,767,231 | 4,761,524 | 5,120,306 | 5,641,427 | 6,405,218 | 7,366,422 | 8,608,358 | 9,947,302 | 11,511,989 | 13,325,385 | 15,196,162 |
| | | | | | | | | | | | | | | | | | |
| **TOTAL LIABILITIES & STOCKHOLDER EQUITY** | - | 6,499,972 | 8,077,552 | 7,862,206 | 7,630,881 | 7,372,525 | 7,120,020 | 7,356,080 | 8,283,961 | 8,950,495 | 9,783,288 | 10,373,579 | 11,362,861 | 12,409,084 | 13,965,413 | 15,819,248 | 17,488,007 |
| Proof | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| IS Proof | | - | (0) | (0) | 0 | (0) | 0 | (0) | 0 | - | - | - | - | - | - | - | - |

(1) Includes cash identified specifically for this venture

Balance Sheet

| | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS:** | | | | | | | | | | | | | | | |
| **CURRENT ASSETS:** | | | | | | | | | | | | | | | |
| Cash (1) | * 7,066,899 | * 8,781,319 | * 10,612,924 | * 12,536,955 | * 14,656,620 | * 16,915,270 | * 19,426,108 | * 22,183,988 | * 25,247,065 | * 28,305,938 | * 31,571,095 | * 35,019,364 | * 38,571,872 | * 42,374,737 | * 46,616,827 |
| Cash equivalents | | | | | | | | | | | | | | | |
| Trade receivables | * 5,657,691 | * 6,018,820 | * 6,409,403 | * 6,992,076 | * 7,574,749 | * 7,888,496 | * 8,451,960 | * 9,015,424 | * 9,252,335 | * 9,796,590 | * 10,340,845 | * 10,500,920 | * 11,025,966 | * 11,551,012 | * 11,634,251 |
| **Total Current Assets** | * 12,724,590 | * 14,800,139 | * 17,022,327 | * 19,529,031 | * 22,231,369 | * 24,803,766 | * 27,878,068 | * 31,199,412 | * 34,499,400 | * 38,102,528 | * 41,911,940 | * 45,520,284 | * 49,597,838 | * 53,925,749 | * 58,251,078 |
| **LONG TERM ASSETS** | | | | | | | | | | | | | | | |
| PP&E and Capitalized R&D | * 3,305,512 | * 3,671,641 | * 4,071,205 | * 4,492,730 | * 4,968,215 | * 5,446,525 | * 5,966,642 | * 6,514,568 | * 7,109,708 | * 7,699,503 | * 8,332,954 | * 8,968,009 | * 9,652,567 | * 10,350,628 | * 11,061,683 |
| Accumulated depreciation | * (674,176) | * (765,996) | * (867,986) | * (981,075) | * (1,105,873) | * (1,243,879) | * (1,395,171) | * (1,560,911) | * (1,741,871) | * (1,939,363) | * (2,153,238) | * (2,384,709) | * (2,633,821) | * (2,901,948) | * (3,189,465) |
| Net PP&E and R&D | * 2,631,336 | * 2,905,646 | * 3,203,220 | * 3,511,655 | * 3,862,342 | * 4,202,646 | * 4,571,471 | * 4,953,657 | * 5,367,836 | * 5,760,140 | * 6,179,716 | * 6,583,300 | * 7,018,746 | * 7,448,680 | * 7,872,218 |
| Other (net) | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 |
| **Total Long Term Assets** | * 6,958,736 | * 7,233,046 | * 7,530,620 | * 7,839,055 | * 8,189,742 | * 8,530,046 | * 8,898,871 | * 9,281,057 | * 9,695,236 | * 10,087,540 | * 10,507,116 | * 10,910,700 | * 11,346,146 | * 11,776,080 | * 12,199,618 |
| **TOTAL ASSETS** | * 19,683,326 | * 22,033,185 | * 24,552,946 | * 27,368,087 | * 30,421,111 | * 33,333,812 | * 36,776,939 | * 40,480,468 | * 44,194,637 | * 48,190,068 | * 52,419,055 | * 56,430,984 | * 60,943,984 | * 65,701,829 | * 70,450,695 |
| **LIABILITIES** | | | | | | | | | | | | | | | |
| **CURRENT LIABILITIES** | | | | | | | | | | | | | | | |
| Trade payables | * 458,401 | * 486,377 | * 517,226 | * 561,551 | * 608,201 | * 631,958 | * 676,686 | * 720,158 | * 742,490 | * 784,070 | * 827,148 | * 839,315 | * 881,999 | * 922,446 | * 929,885 |
| Inventory financing facility | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Current maturities of liabilities | | | | | | | | | | | | | | | |
| Deferred revenue | | | | | | | | | | | | | | | |
| Accrued payroll & related taxes | | | | | | | | | | | | | | | |
| Accrued expenses | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Accrued Income Taxes | | | | | | | | | | | | | | | |
| **Total Current Liabilities** | * 458,401 | * 486,377 | * 517,226 | * 561,551 | * 608,201 | * 631,958 | * 676,686 | * 720,158 | * 742,490 | * 784,070 | * 827,148 | * 839,315 | * 881,999 | * 922,446 | * 929,885 |
| **LONG TERM LIABILITIES** | | | | | | | | | | | | | | | |
| Senior Debt | * 1,872,000 | * 1,872,000 | * 1,872,000 | * 1,872,000 | * 1,872,000 | * 1,638,000 | * 1,638,000 | * 1,638,000 | * 1,638,000 | * 1,638,000 | * 1,638,000 | * 1,404,000 | * 1,404,000 | * 1,404,000 | * 1,404,000 |
| Other | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| **Total Long Term Liabilities** | * 1,872,000 | * 1,872,000 | * 1,872,000 | * 1,872,000 | * 1,872,000 | * 1,638,000 | * 1,638,000 | * 1,638,000 | * 1,638,000 | * 1,638,000 | * 1,638,000 | * 1,404,000 | * 1,404,000 | * 1,404,000 | * 1,404,000 |
| **STOCKHOLDER'S EQUITY** | | | | | | | | | | | | | | | |
| Common stock | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 |
| Additional paid in capital | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Flow proof (s/b zero) | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Accumulated retained earnings | * 16,192,925 | * 18,514,808 | * 21,003,720 | * 23,774,535 | * 26,780,910 | * 29,903,853 | * 33,302,253 | * 36,962,310 | * 40,654,146 | * 44,607,998 | * 48,793,907 | * 53,027,669 | * 57,497,985 | * 62,215,383 | * 66,956,810 |
| **Total Stockholder's equity** | * 17,352,925 | * 19,674,808 | * 22,163,720 | * 24,934,535 | * 27,940,910 | * 31,063,853 | * 34,462,253 | * 38,122,310 | * 41,814,146 | * 45,767,998 | * 49,953,907 | * 54,187,669 | * 58,657,985 | * 63,375,383 | * 68,116,810 |
| **TOTAL LIABILITIES & STOCKHOLDER** | * 19,683,326 | * 22,033,185 | * 24,552,946 | * 27,368,087 | * 30,421,111 | * 33,333,812 | * 36,776,939 | * 40,480,468 | * 44,194,637 | * 48,190,068 | * 52,419,055 | * 56,430,984 | * 60,943,984 | * 65,701,829 | * 70,450,695 |
| | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |

(1) Includes cash identified specifically for

Balance Sheet

| | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 | Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS:** | | | | | | | | | | | | |
| **CURRENT ASSETS:** | | | | | | | | | | | | |
| Cash (1) | * 50,711,731 | * 54,911,554 | * 59,362,495 | * 63,824,529 | * 68,514,423 | * 73,660,091 | * 78,536,677 | * 83,584,875 | * 88,808,905 | * 94,010,921 | * 99,452,724 | * 105,414,863 |
| Cash equivalents | | | | | | | | | | | | |
| Trade receivables | * 12,140,088 | * 12,645,925 | * 12,652,328 | * 13,138,956 | * 13,625,584 | * 13,555,151 | * 14,022,570 | * 14,489,989 | * 14,547,616 | * 15,002,229 | * 15,456,842 | * 15,239,140 |
| **Total Current Assets** | * 62,851,819 | * 67,557,479 | * 72,014,823 | * 76,963,485 | * 82,140,007 | * 87,215,242 | * 92,559,247 | * 98,074,864 | * 103,356,521 | * 109,013,150 | * 114,909,566 | * 120,654,003 |
| **LONG TERM ASSETS** | | | | | | | | | | | | |
| PP&E and Capitalized R&D | * 11,792,088 | * 12,589,844 | * 13,355,983 | * 14,157,321 | * 14,979,856 | * 15,814,165 | * 16,657,519 | * 17,541,918 | * 18,419,775 | * 19,359,909 | * 20,292,320 | * 21,219,668 |
| Accumulated depreciation | * (3,496,734) | * (3,824,292) | * (4,174,010) | * (4,545,009) | * (4,938,268) | * (5,336,173) | * (5,756,956) | * (6,193,553) | * (6,654,440) | * (7,139,711) | * (7,650,986) | * (8,188,161) |
| Net PP&E and R&D | * 8,295,354 | * 8,765,552 | * 9,181,973 | * 9,612,311 | * 10,041,587 | * 10,477,992 | * 10,900,563 | * 11,348,365 | * 11,765,336 | * 12,220,198 | * 12,641,334 | * 13,031,507 |
| Other (net) | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 | * 4,327,400 |
| **Total Long Term Assets** | * 12,622,754 | * 13,092,952 | * 13,509,373 | * 13,939,711 | * 14,368,987 | * 14,805,392 | * 15,227,963 | * 15,675,765 | * 16,092,736 | * 16,547,598 | * 16,968,734 | * 17,358,907 |
| **TOTAL ASSETS** | * 75,474,573 | * 80,650,430 | * 85,524,197 | * 90,903,196 | * 96,508,994 | * 102,020,634 | * 107,787,210 | * 113,750,629 | * 119,449,257 | * 125,560,748 | * 131,878,300 | * 138,012,910 |
| **LIABILITIES** | | | | | | | | | | | | |
| **CURRENT LIABILITIES** | | | | | | | | | | | | |
| Trade payables | * 968,637 | * 1,012,204 | * 1,012,985 | * 1,051,835 | * 1,089,469 | * 1,085,441 | * 1,121,889 | * 1,159,240 | * 1,164,111 | * 1,204,046 | * 1,239,409 | * 1,224,738 |
| Inventory financing facility | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Current maturities of liabilities | | | | | | | | | | | | |
| Deferred revenue | | | | | | | | | | | | |
| Accrued payroll & related taxes | | | | | | | | | | | | |
| Accrued expenses | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Accrued Income Taxes | | | | | | | | | | | | |
| **Total Current Liabilities** | * 968,637 | * 1,012,204 | * 1,012,985 | * 1,051,835 | * 1,089,469 | * 1,085,441 | * 1,121,889 | * 1,159,240 | * 1,164,111 | * 1,204,046 | * 1,239,409 | * 1,224,738 |
| **LONG TERM LIABILITIES** | | | | | | | | | | | | |
| Senior Debt | * 1,404,000 | * 1,404,000 | * 1,170,000 | * 1,170,000 | * 1,170,000 | * 1,170,000 | * 1,170,000 | * 1,170,000 | * 936,000 | * 936,000 | * 936,000 | * 936,000 |
| Other | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| **Total Long Term Liabilities** | * 1,404,000 | * 1,404,000 | * 1,170,000 | * 1,170,000 | * 1,170,000 | * 1,170,000 | * 1,170,000 | * 1,170,000 | * 936,000 | * 936,000 | * 936,000 | * 936,000 |
| **STOCKHOLDER'S EQUITY** | | | | | | | | | | | | |
| Common stock | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 | * 1,160,000 |
| Additional paid in capital | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Flow proof (s/b zero) | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| Accumulated retained earnings | * 71,941,936 | * 77,074,226 | * 82,181,212 | * 87,521,361 | * 93,089,525 | * 98,605,192 | * 104,335,321 | * 110,261,389 | * 116,189,146 | * 122,260,702 | * 128,542,891 | * 134,692,172 |
| **Total Stockholder's equity** | * 73,101,936 | * 78,234,226 | * 83,341,212 | * 88,681,361 | * 94,249,525 | * 99,765,192 | * 105,495,321 | * 111,421,389 | * 117,349,146 | * 123,420,702 | * 129,702,891 | * 135,852,172 |
| **TOTAL LIABILITIES & STOCKHOLDER** | * 75,474,573 | * 80,650,430 | * 85,524,197 | * 90,903,196 | * 96,508,994 | * 102,020,634 | * 107,787,210 | * 113,750,629 | * 119,449,257 | * 125,560,748 | * 131,878,300 | * 138,012,910 |
| | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - |
| | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * - | * (0) |

(1) Includes cash identified specifically for

Composite Graph



Inventory Financing Graph



### Inventory Borrowings Balance

Breakeven Graph



R & D Expenditure



**Months**

# ATTACHMENT # 5

News room  News releases

# Antelope Announces Licensing Agreement for IBM's Meta Pad Prototype

**Nine-ounce, 3 x 5, 10 gig computer targets Industrial, medical and military handheld computing markets.**

## Select a topic or year

News release                                      Related resources

Related XML feeds

---

**Denver, CO, USA - 23 May 2002:** Antelope Technologies Corp. of Littleton, Colo. today announced it has signed a licensing agreement with IBM for "Meta Pad", a research prototype portable computing device that transforms in seconds into a personal digital assistant (PDA), desktop, laptop, tablet or wearable computer without having to be rebooted.

Antelope has secured a ten-year license agreement to manufacture and market its own version of the device, the Mobile Computer Core (MCC), using Meta Pad, developed by IBM researchers to better understand how humans interact with computers and test new technologies for future handheld computing devices. First production models of Antelope's Mobile Computer Core will be available this September.

"Antelope will be focusing on the industrial, commercial and military applications and with an eye on the consumer market for 2003," says Kenneth Geyer, president of Antelope Technologies. "The cost of the MCC will be far less than the combination of a PDA, laptop and desktop, resulting in a reduction of 30 to 40 percent in the total cost of ownership."

"People today have too many devices, with data spread out all over the place," says Randy Moulic, IBM senior manager of client systems. "This unit is unique from today's handheld devices because all of a user's data and applications remain inside the core, eliminating the need for 'synching' among multiple devices. The concept of true personal computing is brought closer to reality by permitting the user's data and computing environments to be with them at all times and available in many different forms or configurations."

The power supply, display and I/O connectors have been removed - leaving processor, memory, data and applications. Components removed from the MCC become accessories, allowing the device to be transformed into a handheld, desktop, laptop, tablet or wearable computer in seconds, without rebooting or synching. It can run a variety of operating systems that share the same data, including full Windows XP, Windows 2000 or Linux, allowing users to run any application which runs on those operating systems.

"Industry studies show this technology can save about $16,000 per employee per year in time spent transferring information from field computers to desktops," says Geyer. "Or, in terms of productivity, it translates into a savings of about 48 employee days per year."

**At a glance:**
Antelope Mobile Computer Core Specifications

Dimensions: 3" x 5" x 0.75"

Weight: 9.1 ounces

Hard drive: 10 GB

RAM: 256MB, future expansion to 512MB

Processor: 800 MHz Transmeta Crusoe 5800

Video Adapter: Silicon Motion Lynx 721 8MB 3D graphics chipset

Operating Systems: Windows XP, Windows 2000 or Linux

---

## Related resources

**Site links**

Antelope Technologies

Back to top

---

## Related XML feeds

| Topics | XML feeds |
|---|---|
| **Research**<br>Chemistry, computer science, electrical engineering, materials and mathematical sciences, physics and services science | Feed |

**Build your own feed**

New to RSS?

# ATTACHMENT # 6

## AFFIDAVIT OF C. STEPHEN GUYER

STATE OF COLORADO

ss.

COUNTY OF DOUGLAS

BEFORE ME, the undersigned authority, personally appeared C. Stephen Guyer, a person known to me who, by me being duly sworn, stated his oath the following:

1. My name is C. Stephen Guyer. I am more than eighteen (18) years of age; I am not disqualified for any reason in making this affidavit; I have personal knowledge of the facts set forth herein; and I know those facts to be true and correct.

2. In early July, I was made aware of Klaus Genssler's interest in investing in Antelope Technologies, Inc.

3. On July 6, 2004 I circulated the following for unanimous consent by the Board of Directors.

> **From:** Stephen Guyer [mailto:csguyer@antelopetech.com]
> **Sent:** Tuesday, July 06, 2004 2:07 PM
> **To:** rudy.fabre@argis.com; ahtaylor@antelopetech.com; Anna C. Cole (accole@antelopetech.ch); David E. Witt (dewitt@antelopetech.ch); ircardenas@antelopetech.com; rxfixer@aol.com; kageyer@antelopetech.com; TJHenderson@Houston.rr.com; tpscott@antelopetech.ch
> **Subject:** Re: Equity issue approval
> **Importance:** High
>
> Ladies and Gentlemen:
>
> As you know, we are at a critical juncture in terms of company growth; or even possibly survival. We have an accumulated loss of approximately $5 million dollars. Since we approaching the limit of the equity authorization resolved in December, I am asking for the board to approve an additional equity issue under the following terms and conditions.
>
> Limit:        $5,000,000
>
> Price:        $2.9412 or better
>
> Voting:       55.1% voting and 44.9% non voting shares; or all non-voting
>
> Restriction:   The Company is the only person which may register its Securities under the Act and it currently is not contemplating registering any of its Securities. Furthermore, the Company has not made any representations, warranties or covenants to the purchaser regarding the registration of the Securities or compliance with Regulation A or some other exemption under the Act.

Any and all certificates representing the Securities and any and all securities issued in replacement thereof or in exchange there for shall bear the following legend or one substantially similar thereto, which the purchaser has read and understands:

> The shares of stock represented by this certificate have not been registered under the Securities Act of 1933 or the laws of any state and have been issued pursuant to a private offering exemption from registration pertaining to such shares and pursuant to a representation by the shareholder named hereon that said shares have been acquired for purposes of investment and not for purposes of distribution or resale. These shares may not be sold, mortgaged, pledged, hypothecated or otherwise transferred except pursuant to registration as above described or exemption from such registration in fact and in law applicable to such shares in the opinion of counsel for the corporation.

Please indicate your approval by return email as soon as possible.

Sincerely,
**ANTELOPE TECHNOLOGIES, INC.**
C. Stephen Guyer, CFO

4. All directors approved the foregoing resolution.

5. On July 6, 2004 I reviewed a preliminary Term Sheet submitted to Alan Taylor by Klaus Genssler.

6. On July 7, 2004 as part of the due diligence process, I forwarded the following to Mr. Genssler, Doug Foote (attorney for Genssler), with a copy to Alan Taylor.

Gentlemen,

Regarding Doug's due diligence request, please see below.

1) IBM License agreement – See attached file, "MCC_License_small."

2) Employee agreements – See attached two file. This is the form of the new employment contracts to be executed shortly.

3) Loan documents with financial institutions – The only one is with the Swiss bank. See attached file "Bank_Contract."

4) Shareholder list – Attached as "Antelope Stock Ledger."

5) Corporate records, corporate bylaws, board minutes, etc of the US and Swiss companies – Attached. Minutes and subsequent actions need to be copied.

6) Any other major contracts of the company, such as supply contract for components, including payment terms and lead times – Very few. We can discuss directly

7) Most recent balance sheet for US and Swiss company and consolidating entries – Attached as "Shareholder Report."

8) Most recent federal income tax return – The return for 2003 is being prepared now. 2002 is available on paper.

9) Tax holiday document for Swill company – Attached as "Economic Council Letter" and "Federal_Decision."

10) List of purchase orders on hand not delivered – Being prepared

11) Number of computers in stock - Being prepared

12) Number of computers that can be built based on components presently on hand - Being prepared

13) Current A/R ageing - Being prepared

14) Current A/P Ageing - Being prepared

7. On July 8, 2004, I met with Foote personally in the Antelope offices for face-to-face due diligence discussions. We specifically reviewed the "corporate book," including all articles, bylaws, consents and minutes.

8. On July 11, 2004 I received a copy of a proposed agreement between Antelope and Scaltech International, Klaus Genssler, President.

9. I was first personally introduced to Klaus Genssler in Neuchâtel, Switzerland on July 17, 2004. During the meeting which also included Alan Taylor, Terry Henderson and Ivan Cardenas. With extreme bravado, Genssler queried me on various aspects of the state of the company, including: sales by item, IBM license indemnification, personal guarantees relating to the Swiss entity, and other miscellaneous matters.

10. On July 17, 2004 I sent the following email to Alan Taylor.

Alan,

Please except this email as confirmation that we have received proper confirmation for the board to issue the equity as described in my email of July 6, 2004.

Sincerely,
**ANTELOPE TECHNOLOGIES, INC.**
C. Stephen Guyer, CFO

11. On July 27, 2004, Foote sent our corporate counsel Ron Snow (with a copy to me) a memorandum describing the closing documents necessary to consummate an investing arrangement.

12. On July 28, 2004 the following series of emails were exchanged between myself and Kenneth Geyer. (Read from bottom up.)

Kenneth,

Let's Tom, Dave, you and me get together tomorrow about 9:00 am.

How about it?

Sincerely,

**ANTELOPE TECHNOLOGIES, INC.**
C. Stephen Guyer, CFO
8955 South Ridgeline Boulevard
Suite 1000
Highlands Ranch, CO  80129
(720) 344-4313
www.antelopetech.com

**From:** Kenneth Geyer
**Sent:** Wednesday, July 28, 2004 4:59 PM
**To:** Stephen Guyer
**Cc:** hagenlaw4biz@earthlink.net; Tom Scott
**Subject:** RE: Letter of Intent
**Importance:** High

Stephen,
There is nothing to discuss. Send the document. There is no reason to not comply with this formal request. You are shipping product down to Houston; transferring assets based upon this Letter of Intent. I protest this and want to see the Letter of Intent that was entered into. Your failure to comply too my request as President and Chairman of the Board will result in personal liability for any damages incurred.

fax number is 720-596-5219

Kenneth Geyer
Chairman of the Board, President
******************************************************
kageyer@antelopetech.com
**Antelope Technologies, Inc.**
**8955 South Ridgeline Blvd. Suite 1000**
**Highlands Ranch  CO   80129**
**720-344-4313**
**fax 303-470-8153**
**www.antelopetech.com**
******************************************

**From:** Stephen Guyer
**Sent:** Wednesday, July 28, 2004 4:01 PM
**To:** Kenneth Geyer
**Subject:** RE: Letter of Intent

Kenneth,

As a friend, I'm suggesting that we relax here.  I just got back from the doctor's. Maybe we could talk this evening?

Sincerely,
**ANTELOPE TECHNOLOGIES, INC.**
C. Stephen Guyer, CFO
8955 South Ridgeline Boulevard
Suite 1000
Highlands Ranch, CO  80129
(720) 344-4313
www.antelopetech.com

**From:** Kenneth Geyer
**Sent:** Wednesday, July 28, 2004 4:00 PM
**To:** Stephen Guyer
**Cc:** hagenlaw4biz@earthlink.net; Tom Scott
**Subject:** Letter of Intent
**Importance:** High

Stephen,
Fax me or Email me a copy of the Letter of Intent that you said was signed between Antelope and this potential investor within the next 30 minutes. This copy should be a copy of the signed document. I make this formal demand as President, Chairman of the Board, Shareholder, and Director of Antelope. Failure to supply this document immediately will force me to take further steps.

Kenneth Geyer
Chairman of the Board, President
*********************************************
kageyer@antelopetech.com
**Antelope Technologies, Inc.**
**8955 South Ridgeline Blvd. Suite 1000**
**Highlands Ranch CO  80129**
**720-344-4313**
**fax 303-470-8153**
**www.antelopetech.com**
*********************************************

13. On July 29, 2004 I met with Geyer, Scott and Witt at the Starbucks near the office. Scott became agitated and left the meeting early and abruptly. The thrust of the meeting was that Geyer, Scott and Witt felt they were being "screwed" and forced out of the company by Genssler. There was also discussion of the shipment of inventory and other Antelope property to Houston without a fully consummated understanding.

14. On July 30, 2004, Terry Henderson traveled to Denver and spent at least 4 hours with Geyer, Scott and Witt in an attempt to place perspective on the Genssler offer and shipment of items.

15. On July 31, 2004 I sent the following email to Genssler in response to the questions contained in the memorandum below.

    I am reviewing the P&L for the US and Switzerland and have the following questions:

    1)    What are the insurance programs in place in the US and Switzerland

    We recently renewed our USA policy with Sentry insurance. I will forward the latest certificate shortly. I assure you that products are covered when they are at other locations; such as your facility in Houston. We do not maintain Directors and Officers insurance. However, I have an application in progress.

    2)    For whom is medical insurance paid

3)    What is the true current cost of the Lease in Denver and how soon can we get out

4)    What is the actual personnel cost presently being paid for US and Swiss personnel by person?

| Name | Annual Salary | Health Insurance per month | Dental Insurance per month | Note |
|---|---|---|---|---|
| Cardenas, Ivan | $120,000.00 | $ 291.56 | $ 33.60 | |
| Carlin, Scott & Family | $130,000.00 | $ 919.68 | $ 116.56 | |
| Coie, Anna & Family | $120,000.00 | $ 847.56 | $ 116.56 | |
| Geyer, Kenneth | $120,000.00 | $ 260.37 | $ 33.60 | |
| Guyer, Stephen & Spouse | $120,000.00 | $ 893.82 | $ 66.36 | |
| Kaiser, Tom | N/A | N/A | $ 33.60 | Charged to Liteye |
| Kokaska, Marya | N/A | $ 531.10 | $ 33.60 | Terminated in July |
| Scott, Ashley | N/A | $ 189.99 | N/A | Charged to Liteye |
| Scott, Thomas | $120,000.00 | $ 352.78 | $ 33.60 | |
| Slaughter, Allison | N/A | $ 519.38 | $ 33.60 | Terminated in July |
| Sondag, Rick | N/A | $ 291.56 | $ 33.60 | Charged to Liteye |
| Taylor, Alan | $120,000.00 | N/A | $ 33.60 | |
| Witt, David & Spouse | $120,000.00 | $ 583.12 | $ 68.36 | |
| | | $ 5,680.92 | $ 636.64 | |

| | |
|---|---|
| **Gross Lease (with CAM)** | $ 11,716.22 |
| Sublease payment | $ (4,037.50) |
| Net lease payment | $ 7,678.72 |
| 11 payments remaining (total) | **$ 84,465.92**  Expires 6/30/2005 |

16. A Board of Directors meeting was held in the morning on August 2, 2004. Formal minutes of that meeting are not available at this time. To my best recollection and notes, the discussion centered primarily around the removal of Kenneth Geyer and Tom Scott (a requirement of the Genssler offer) from the board, the merits of the Genssler offer, and ensuring compliance with all legal requirements of the offer. The offer was accepted pending legal review.

17. On August 2, 2004, 3:00pm a meeting was held with Ron Snow, Randy Ernst, Terry Henderson (via telephone) and myself. We examined the Genssler Offer Agreement in great detail and discussed at length the offer's implications.

18. During this time, Scott and Geyer were threatening to damage Antelope based upon their unpaid wages; including forcing a bankruptcy filing.

19. On August 4, 2004 it came to my attention that Geyer and Scott had contacted attorney Glenn Hagan and that Hagan had contacted Genssler directly. It was later confirmed by Ron Snow that Hagan initiated the call to Foote.

20. On August 5, 2004, I learned that Genssler had terminated his offer.  In a memorandum of that date, Alan Taylor wrote:

> I regret to inform you that after many days and long hours by a few dedicated staff to secure the funds, Mr. Klaus Genssler, Scaltech International, Inc. has terminated his offer.

> The official reason for Mr. Genssler's termination of the Agreement was based on Section 6.4 regarding Payroll Taxes.  However, Mr. Genssler indicated the predominate factor for his decision was based on an attempt by Ken Guyer's attorney, Glenn Hagen, to circumvent this transaction.  Specifically, during the last two days, Glenn made two phone calls to both Mr. Genssler's attorney and to Mr. Genssler directly indicating that Kenneth Geyer, Tom Scott, and David Witt could make a deal to deliver the Company to him, that they had the Board votes to accomplish this.  This unsubstantiated offer to undermine the current agreement between ATI and Mr. Genssler was certainly a breach of protocol, if not tortuous interference with a contractual relationship.  I believe the Board should evaluate the merits of a variety of actions relating to this matter.

> I had already explained the critical situation of the company in my letter to the Board and choose not to be redundant in this regard.

> Earlier I forwarded the position from Legal Counsel that addresses the positions stated as objections at the beginning of the Board meeting.

> This was a very good offer for Antelope at this time and it is truly disappointing to lose it.

21. A Board of Director's meeting was held on August 6, 2004 to discuss the implications of this termination.  Minutes of that meeting are incorporated herein by reference.  Gary Newton suggested a pro rata contribution from each board member to over a $60,000 debt to the IRS for payroll.  During that meeting I offered to try and sell some of my shares to enable my contribution.  It was also resolved to call a shareholder's meeting to remove Geyer and Scott.

22. I received a phone call from Genssler later on August 6, 2004 offering to buy my shares.  The tone of the conversation left me feeling troubled and threatened.

23. On August 6, 2004, I received the following offer to purchase my shares by Genssler from attorney Foote.

> Dear Mr. Guyer,

> Mr. Genssler offers to purchase all of the Antelope stock, voting and non-voting, presently held by you (excluding only 10,000 shares of non-voting stock - that is, 210,000 voting shares and 170,000 non-voting shares) as well as all claims you may have against Antelope for deferred and past-due compensation and all other claims against Antelope, for an aggregate total price equaling US$400,000.

> If you bring other willing sellers so that Mr. Genssler can acquire not less than 51% of all of the issued and outstanding voting shares of Antelope and Mr.

Newton releases his purported non-dilution agreement, then all such shares (your voting and nonvoting shares and the other sellers' voting shares) (as well as the claims referred to above) would be acquired by Mr. Genssler or his designee at a price of US$1.25 per share ("bonus price").

Payment terms: $100,000 on closing, balance payable in four equal annual installments of $88,568 beginning on the first anniversary of closing (imputed interest on the unpaid balance at 7% per annum).  In the event the bonus price is payable, the four annual installments will be increased to account for the increased amount due and interest on the unpaid balance at 7%.

Conditions precedent: (1) You resign all positions you presently hold with Antelope.

All usual and customary terms and conditions will apply.  Agreement not binding until documented in an executed definitive contract.

This offer is open for acceptance until 5:00 p.m. Saturday, August 7, 2004, at which time it will expire.  Acceptance may be made orally by communication to Klaus Genssler or to myself.  My cell phone is 720-339-5616.

Sincerely,

*Douglas Foote*

Douglas D. Foote
Attorney at Law
357 So. McCaslin Blvd., Suite 100
Louisville, CO 80027-2932

Tel. 720-339-5616
Fax 303-926-9091
E-mail Doug@Foote.

24. On the evening of August 6, 2004 I telephoned Terry Henderson and described the offer made by Genssler.  I told Henderson that I would not be intimidated into making a deal with Genssler.

25. On August 7, 2004, I answered Genssler's offer for my personal shares as follows.
   Doug,

   Thank you for the offer to purchase my stock in Antelope Technologies, Inc.  However, I must decline the offer.

   Sincerely,
   **GUYER MANAGEMENT ASSISTANCE, INC.**
   C. Stephen Guyer, Chairman
   1708 Grizzly Gulch Court
   Highlands Ranch, CO  80129
   (303) 683-3338
   www.Guyermanagement.com

As you already know, I make no guaranties regarding actual or potential return. The stock is unregistered. This is a private transaction but will be executed within applicable federal and state securities laws.

Sincerely,
**GUYER MANAGEMENT ASSISTANCE, INC.**
C. Stephen Guyer, Chairman

28. On August 9, 2004 I had a lengthily conversation with David and Jan Witt regarding the situation with Genssler. David indicated that he had spoken directly with Genssler and was for all intents and purposes, threatened with "having nothing" unless he came to an agreement with Genssler. David indicated that Genssler had "very powerful" arguments.

29. In accordance with the board resolution of August 6, 2004, on August 10, 2004 I requested that all information and other items previously shipped to Houston be returned to the Denver office. The confirming email follows.

> **From:** Stephen Guyer
> **Sent:** Tuesday, August 10, 2004 11:15 AM
> **To:** 'Todd Curtis'
> **Cc:** Alan Taylor; 'Terry Henderson'; Scott Carlin
> **Subject:** Re: Confirming
> **Importance:** High
>
> Todd,
>
> This email will confirm our earlier conversation that all books, records and the laptop computer that was shipped to your location should be returned as soon as possible.
>
> As we discussed, we do not have a deal with Klaus and the one instrument that allowed the movement of records and inventory has been cancelled. Additionally, we are severely falling behind in customer invoicing and accounts payable. This situation is damaging Antelope.
>
> I would appreciate your arranging for overnight shipment even as soon as today if possible. Ship to the address below.
> Sincerely,
> **ANTELOPE TECHNOLOGIES, INC.**
> C. Stephen Guyer, CFO

30. On August 10, 2004 I sent the following email to Todd Curtis, controller for Genssler.

> Gentlemen,
>
> Below is a summary of accrued unpaid compensation by employee. Please see the attached workbook for additional details.
>
> **Todd - Note:** I've entered a pile of payables since yesterday and will be sending an updated QuickBooks file shortly.

| Name | Net | Unpaid Swiss earnings | Total |
|---|---|---|---|
| Alan H. Taylor | $ 205,000 | | 205,000 |
| Anna C. Cole | 187,350 | 70,000 | 257,350 |
| C. Stephen Guyer-GMA | 263,890 | | 263,890 |
| David E. Witt | 186,000 | 70,000 | 256,000 |
| Ivan R. Cardenas | 205,000 | | 205,000 |
| Janice K. Witt | 142,500 | 45,000 | 187,500 |
| Kenneth A. Geyer | 236,760 | | 236,760 |
| Scott M. Carlin | 29,583 | | 29,583 |
| Thomas P. Scott | 236,000 | 10,000 | 246,000 |
| **Totals (note)** | $ 1,692,083 | $ 195,000 | $1,887,083 |
| US Balance Sheet | 1,692,083 | | |
| Diff | (0) | | |

Notes: These amounts do **not** include the net due from the Swiss entity for:
Anna C. Cole
David E. Witt
Janice K. Witt
Thomas P. Scott

**Estimated Swiss unpaid compensation is shown
above**

I hope this is helpful.

Sincerely,
***ANTELOPE TECHNOLOGIES, INC.***
C. Stephen Guyer, CFO
8955 South Ridgeline Boulevard
Suite 1000
Highlands Ranch, CO  80129
(720) 344-4313
www.antelopetech.com

31. On August 11, 2004, I received an email from Todd Curtis with an invoice attached. The invoice was for various due diligence and consulting activities in connection with the withdrawn Genssler offer. The amount of the invoice was $12,799.40. In the email, Curtis wrote:
> **From:** Todd Curtis [mailto:toddc@usoilrecovery.com]
> **Sent:** Wednesday, August 11, 2004 12:43 PM
> **To:** Stephen Guyer
> **Subject:** RE: Confirming
>
> I have been instructed to overnight all referenced documents and equipment below to Antelope in Denver immediately upon receipt of a wire transfer from Antelope to Scaltech International in payment of the attached invoice regarding Doug Foote and Scaltech International's relationship with Antelope to date.

Thank you,
Todd Curtis

32. On August 12, 2004 Ron Snow received the following voice mail from one of Genssler's attorneys and communicated its contents to me.

> Ron, this is Charlie Parker with Locke, Liddell and Sapp in Houston. We present Klaus Genssler and he has bought 20% of Antelope, as you know. We understand there is a special shareholders' meeting set dealing with directors' vote on Monday. We've gone through the bylaws. It looks like all the corporate prerequisites have not occurred.

> I want to let you know that we'll be filing an injunction to halt that going forward and wondered if you'd voluntarily drop that down immediately tomorrow, and if so, we're willing to go into negotiations with you to buy that $5 million worth of stock which has been authorized by the board.

> But we're not going to do it under—we're not going to stand by as minority shareholder knowing that we have an improperly constituted meeting coming up on Monday.

> If you could please give me a call—Charlie Parker, Houston, 713-226-1469. If I'm not in, could you please recall back for my partner, Gene Lewis. He's my corporate partner in charge of all that securities aspect of it, and he will be in the office tomorrow morning in case your call is later than when I'm here, and his number is 226-1397. Gene Lewis, 713-226-1397. Thank you very much.

33. On August 12, 2004 I had a conversation with personnel at Xybernaut. I sent the following email.

> **From:** Stephen Guyer
> **Sent:** Thursday, August 12, 2004 1:24 PM
> **To:** Thomas Davies (tdavies@xybernaut.com)
> **Cc:** 'Terry Henderson'
> **Subject:** Re: Financial model

> Tom,

> Thank you for speaking with me yesterday. I hope you recovered from all the power problems. We had a outage here last night as well.

> Terry Henderson is sending a cash flow model directly to Steve Newman. I might suggest that you, Steve and Terry look at that one first. I will step in if needed.

> **Terry:** You may want to copy Tom Davies directly on your email to Steve Newman.

> Thanks again.

> Sincerely,
> **ANTELOPE TECHNOLOGIES, INC.**
> C. Stephen Guyer, CFO

34. On August 12, 2004 I sent the following due diligence information to Xybernaut.

> Gentlemen,
> Regarding your due diligence request, please see below.
>
> 1) Employee agreements -- See attached two files. Alan's is sent by way of example. The "v2" version is the one we are all going to be executing soon
>
> 2) Loan documents with financial institutions -- The only one is with the Swiss bank. See attached file "Bank_Contract."
>
> 3) Shareholder list -- Attached as "Antelope Stock Ledger."
>
> 4) Corporate records, corporate bylaws, board minutes, etc of the US and Swiss companies -- Attached. Minutes, two minor amendments, and subsequent actions need to be copied.
>
> 5) Most recent balance sheet for US and Swiss company and consolidating entries -- You already have via the "Shareholder Report."
>
> 6) Most recent federal income tax return -- The return for 2003 is being prepared now. 2002 is available on paper.
>
> 7) Tax holiday document for Swiss company -- Attached as "Economic Council Letter" and "Federal_Decision."
>
> I hope this is helpful. Please feel free to contact me directly with additional questions.
>
> Sincerely,
> ***ANTELOPE TECHNOLOGIES, INC.***
> C. Stephen Guyer, CFO

35. A Board of Directors meeting was held on August 13, 2004. The minutes are incorporated herein by reference. Of note was:

   a. Objection by Geyer and Scott to notice provisions; however, they subsequently continued to participate and vote on issues during the meeting.

   b. A resolution to <u>not</u> consider any further offers from Genssler; however, this motion was defeated and a Genssler Committee was formed

   c. A resolution that any offer over $1.5 million a single individual would require full board approval

36. On August 13, 2004 I had an extensive conversation with Ron Snow regarding the technical correctness of the balloting and voting procedures for the up-coming shareholders meeting of August 16, 2004. The ballots were revised and included with a reminder notice.

37. On August 13, 2004 I circulated minority shareholder protection documents that had been prepared by Ron Snow.

38. On August 13, 2004 I also circulated revised voting procedures and balloting forms.

39. On August 14, 2004 Genssler requested he be allowed to submit yet another proposal. Alan Taylor indicated in a memorandum:

**From:** Alan Taylor
**Sent:** Saturday, August 14, 2004 10:08 AM
**To:** Klaus Genssler
**Cc:** Anna Cole; Stephen Guyer; 'Ivan R. Cardenas (ircardenas@antelopetech.com)'; Terry Henderson; RXFIXER@aol.com; 'Rudy Fabre'; Dave Witt; 'Kenneth A. Geyer (kageyer@antelopetech.com)'; Tom Scott
**Subject:** Investment

Dear Klaus,

Per our last telephone conversation this past Thursday I informed the Board of Directors of your request to submit a proposal for consideration. A committee was formed to prepare and submit a proposal this coming week.

Alan

Sincerely,
***ANTELOPE TECHNOLOGIES, INC.***
Alan H. Taylor CEO

40. In response to that invitation, I submitted the following memorandum.

**From:** Stephen Guyer
**Sent:** Saturday, August 14, 2004 7:58 PM
**To:** Alan Taylor; 'Klaus Genssler'
**Cc:** Anna Cole; 'Ivan R. Cardenas (ircardenas@antelopetech.com)'; 'Terry Henderson'; 'RXFIXER@aol.com'; 'Rudy Fabre'; Dave Witt; 'Kenneth A. Geyer (kageyer@antelopetech.com)'; Tom Scott
**Subject:** RE: Investment

Dear Alan and Board,

Here are a few comments regarding our continuing involvement with Mr. Genssler.

- As directors we certainly have a fiduciary duty to preserve shareholder value, if not to maximize shareholder wealth.

- Antelope has already been damaged by Mr. Genssler's involvement. Virtually the entire active management team has been consumed with his attempts to acquire 51% control of the firm. I would estimate that the damages could well exceed $3 million by the end of next week.

- Apparently, he asserts that he already has over 20% control; without having placed a single dollar (or penny) into the organization.

- This process has gone on for more than 30 days with absolutely no benefit to the corporation. In fact, Antelope has incurred costs, fees and

lost revenue because of Mr. Genssler's behavior; including an arbitrary and capricious invoice from Mr. Genssler in excess of $12,000. Continuing to entertain Mr. Genssler's attempts to simply control and not invest in the entity is not preserving shareholder value.

- Upon information and belief, Mr. Genssler has stated publicly that his intentions are to force a creditor action to place the firm into a chapter proceeding. This is plainly unethical. The bankruptcy code in this country was never intended to be used simply to manipulate creditors such that debtors with an ability to pay could skip away from their own agreements. My belief is that this tactic would be at the least detrimental to existing shareholders, if not fatal to the company.

- In most states, including Colorado there is a presumption that all corporate dealings take place within a framework of *Good Faith* and *Fair Dealing*. The **covenant of good faith and fair dealing** is a general assumption of the law of contracts; that people will act in good faith and deal fairly without:
  - o breaking their word,
  - o using shifty means to avoid obligations;
  - o denying what the other party obviously understood.

  A lawsuit (or one of the causes of action in a lawsuit) based on the breach of this covenant is often brought when the other party has been claiming technical excuses for breaching the contract or using the specific words of the contract to refuse to perform when the surrounding circumstances or apparent understanding of the parties were to the contrary.

  - Mr. Genssler has demonstrated his deficiency of good faith and fair dealing by:
    - o Simultaneously and surreptitiously negotiating multiple agreements with the same intent
    - o Using innuendo and direct tête-à-tête to create duress among the directors of Antelope; threatening a variety of intimidating and vexatious civil and criminal charges against current management
    - o Stating to existing shareholders that his intent would be that "unless you deal with me, you will have nothing." If that is the case, then over 50 other individual shareholders would also have naught.
    - o Employing pseudo-legal bravado in the hopes of intimidating and disrupting the due process of the current board
    - o Receiving assets of the corporation under the veil of promise while at the same time maintaining his nefarious intent to other shareholders and directors
    - o Holding assets of the company, thereby delaying shipments to customers after the termination of the very agreement that might have given rise to his right to contain those assets
    - o Attempting to manipulate one director against another by individual prevarication to each

  o Stating to others on the board that he put forth a proposal he never intended to honor

  o Constructing proposals that are egregious, unconscionable, and that contain so many Juris Prudential technicalities as to make them almost incomprehensible

- It seems exceptionally unfathomable (and not without recourse) that this board could be accused of breaching their fiduciary duty in the face of such bad faith and unfair behavior by Mr. Genssler.

- Therefore, I suggest we submit but one more reasonable proposal to Mr. Genssler with a fixed expiration date and with the proviso that we will not consider any further dealings with him, except under terms that will preserve all shareholder value.

- This proposal will be submitted only after he has withdrawn his spurious invoice in the amount of $12,799.40, which is attached for your review.

- In the absence of any agreement with Mr. Genssler, our fiduciary responsibility is to our shareholders, not to Klaus Genssler. In my judgment, Mr. Genssler has shown himself to be a saponaceous, bottom-fishing scavenger with great talent for analysis and exploitation, but little regard for the operation of a successful firm and its shareholders.

- Just because something may be done legally, does not make it a proper business decision.

It is our duty to preserve shareholder value. And, not withstanding his predilection for evoking litigious process and threat, the time may come where an arrangement with Mr. Genssler would be in the best interest of the shareholders. However, my experience to date is to the contrary.

Sincerely,
**ANTELOPE TECHNOLOGIES, INC.**
C. Stephen Guyer, CFO

41. On August 14, 2004 I received another telephone call directly from Genssler in response to my attempts to sell some of my personal stock. He indicated he would be willing to buy 30,000 at $1 per share if I gave him my proxy for all voting shares. I declined this offer and we continued to discuss a possible transaction. He said:

 a. He wanted control of Antelope in exchange for his "investment."

 b. "Control" meant the ability to vote 51% of the voting shares; either through purchase of existing shares or acquisition of proxies.

 c. He revised his offer to $2 per share for a portion of my stock

42. A Board of Directors meeting was held on August 15, 2004. The minutes are incorporated herein by reference. Of note is the formation of:

 a. Operating committee consisting of Anna, Ivan, Terry, Alan and Scott

 b. Xybernaut committee consisting of: Gary, Anna, Terry, and Alan

 c. The Genssler committee was directed to report to the board at the next meeting

43. On Sunday August 15, 2004 I was invited by Kenneth Geyer to meet with himself and Tom Scott at Boston's Restaurant. During this meeting, I was fanatically encouraged to come to an agreement with Genssler. Scott and Geyer asserted:

- They had both come to an agreement with Genssler for their shares, wage claims and employment statuses

- Klaus will acquire this company one way or the other – "playing dirty" if he has to

- Mr. Scott insinuated that Genssler had said that because of my signature on many documents, I could face personal prison time for criminally falsifying information to government agencies.

- Wouldn't it be better to take a little money now, clean-up my personal life and move on?

- Scott said would like to tell Genssler that I was considering an offer

- I agreed that I would evaluate the offer, but made no commitments

44. One last reminder and voting ballot was sent to shareholders on August 15, 2004.

45. Minutes before the commencement of the August 16, 2004 shareholder meeting, Scott and Geyer emailed another offer from Genssler under the name of "MCC Computer Investor Group, LLP. The offer was in the form of Antelope's standard Subscription Agreement for the purchase of 884,238 voting and 720,549 non-voting shares at $2.9412 per share. The Agreement identified the investor as a "non-accredited investor," and provided for the following payment schedule. Total $4,720,000; $300,000 on August 20, 2004, $250,000 on August 31, 2004 and the balance on or before October 15, 2004. The offer was contingent upon Genssler receiving "proxies in excess of 50% voting control of the company." The Subscription Agreement had been signed "Agreed and Accepted by Kenneth Geyer, Chairman of the board."

46. Despite the distraction of the last minute "offer," a shareholders meeting was held on August 16, 2004. The minutes are incorporated herein by reference. As a result, Geyer, Scott and Witt were removed from the board.

47. Immediately following, a meeting of the newly formed board was held. The minutes are incorporated herein by reference.

48. On August 16, 2004 I sent the following to Genssler regarding his 11th hour offer.

> Klaus,
> I received your subscription agreement this morning. We appreciate your continued interest.
>
> The board reviewed the agreement at its meeting this morning and is evaluating an suitable and timely response. I suspect that you should hear from the board no later than Thursday or Friday of this week.

Since the full board must approve any single offer in excess of $1.5 million, Kenneth Geyer's signature on the agreement is improper and non-binding. Also, as a result of this morning's shareholder meeting, the Antelope Board of Directors now consists of:

1. Alan. H. Taylor, Chairman
2. C. Stephen Guyer, Secretary and Treasurer
3. Anna C. Cole
4. Ivan R. Cardenas
5. J. Gary Newton
6. Terry Henderson
7. Rudy Fabre

Again, thank you for your continued attention.

Sincerely,
**ANTELOPE TECHNOLOGIES, INC.**
C. Stephen Guyer, CFO

49. On August 17, 2004 I sent the following memorandum to the board.

**From:** Stephen Guyer [mailto:csguyer@antelopetech.com]
**Sent:** Tuesday, August 17, 2004 9:08 AM
**To:** ahtaylor@antelopetech.com; Anna C. Cole (accole@antelopetech.ch); ircardenas@antelopetech.com; rxfixer@aol.com; rons@mdsslaw.com; Rudy Fabre; TJHenderson@Houston.rr.com
**Subject:** Re: ANOTHER URGENT BOARD MEETING-TODAY!
**Importance:** High

Ladies and Gentlemen:

I just finished a conference with Alan. Alan informed me that Kenneth and Tom's attempt to disrupt the shareholder meeting with Klaus's "offer" has caused damaging repercussions in Switzerland. The Swiss board is now panicked that we are pulling out of their country.

Alan and I agree that we must put this issue to bed and stop any further destructive actions by Kenneth and Tom.

Therefore, I am convening a board meeting for **TODAY, 12 noon Mountain Time** for the purpose of resolving to terminate Kenneth and Tom as officers and employees. The second agenda item will be to evaluate the merits of an action against them.

Call in numbers are:
    800-373-0950 or 973-686-9828 (intl)
    Passcode: 413478

Thank you.

Sincerely,
**ANTELOPE TECHNOLOGIES, INC.**
C. Stephen Guyer, CFO

50. On August 17, 2004, a special board meeting was held. The minutes are incorporated herein by reference. Scott and Geyer were immediately terminated and email discontinued. I later received a letter from attorney Hagan discounting the termination. Also, it was suggested by Gardner Altman through Gary Newton that Antelope could quickly go into and come out of a chapter 11 bankruptcy for about $200,000.

51. On the morning of August 18, 2004 I received word through Ron Snow that Geyer, Scott and Genssler had filed and obtained a temporary restraining order and had filed a lawsuit against the company and remaining directors.

52. Antelope decided to retain Haynes and Boone (a Houston law firm) and $50,000 was collected from board members to cover the required retainer.

53. On August 19, 2004 Ron Snow received a letter from *Robbi J. Jackson* (attorney for Scaltech International) to transfer the majority of Geyer and Scott's shares. In response to that request, I sent the following memorandum.

> **From:** Stephen Guyer [mailto:csguyer@antelopetech.com]
> **Sent:** Tuesday, August 24, 2004 11:58 AM
> **To:** rons@mdsslaw.com; chris.wolfe@haynesboone.com
> **Cc:** ahtaylor@antelopetech.com; Anna.Cole@antelopetech.com; ircardenas@antelopetech.com; rxfixer@aol.com; Rudy Fabre; TJHenderson@Houston.rr.com
> **Subject:** Re: Stock Transfer
> **Importance:** High
>
> Ron,
>
> Please do **not** execute any Irrevocable Stock Powers or new Certificates to Scaltech International, Inc., Kenneth A. Geyer, Thomas P. Scott or Klaus Genssler at this time. We must consider compliance with Rule 144 before any transfers are made.
>
> As you recall, shares of Antelope Technologies, Inc. were issued under Regulation D and sales are governed by Rule 144.
>
> Rule 144 allows public resale of restricted and **control** securities if a number of conditions are met. Control securities are those held by an **affiliate** of the issuing company. An affiliate is a person, such as a director or large shareholder, in a relationship of control with the issuer.
>
> Control means the power to direct the management and policies of the company in question, whether through the ownership of voting securities, by contract, or otherwise. If you buy securities from a controlling person or "affiliate," you take restricted securities, even if they were not restricted in the affiliate's hands. Kenneth and Tom are **affiliates** of Antelope Technologies, Inc.
>
> Some, but not all of the compliance issues are:
>
> - At the time you place your order, you must file a notice with the SEC on Form 144 if the sale involves **more than 500** shares or the aggregate

dollar amount is greater than $10,000 in any three-month period. The sale must take place within three months of filing the Form and, if the securities have not been sold, you must file an amended notice.

- Even if you have met the conditions of Rule 144, you can't sell your restricted securities to the public until you've gotten **the legend** removed from the certificate. Only a transfer agent can remove a restrictive legend. But the transfer agent won't remove the legend unless you've **obtained the consent of the issuer**—usually in the form of an opinion letter from the issuer's counsel—that the restricted legend can be removed. Unless this happens, the transfer agent doesn't have the authority to remove the legend and execute the trade in the marketplace.

- To begin the process, an investor should contact the company that issued the securities, or the transfer agent of the company's securities, to ask about the procedures for removing a legend. Since removing the legend can be a complicated process, if you're considering buying or selling a restricted security, it would be wise for you to consult an attorney who specializes in securities law.

Further,

*Holding Period for Restricted Securities.* If the securities sold are restricted securities, the following provisions apply:

> (1) *General Rule.* A minimum of one year must elapse between the later of the date of the acquisition of the securities from the issuer or from an affiliate of the issuer, and any resale of such securities in reliance on this section for the account of either the acquirer or any subsequent holder of those securities. If the acquirer takes the securities by purchase, the one-year period shall not begin until the full purchase price or other consideration is paid or given by the person acquiring the securities from the issuer or from an affiliate of the issuer.

> (2) *Promissory Notes, Other Obligations or Installment Contracts.* Giving the issuer **or affiliate** of the issuer from whom the securities were purchased a **promissory note** or other obligation to pay the purchase price, or entering into an installment purchase contract with such seller, shall not be deemed full payment of the purchase price unless the promissory note, obligation or contract:
>> (i) provides for **full recourse against the purchaser** of the securities;
>>
>> (ii) **is secured by collateral**, other than the securities purchased, having a fair market value at least equal to the purchase price of the securities purchased; and
>>
>> (iii) shall have been discharged by payment in full prior to the sale of the securities.

I have attached the complete text of Rule 144 for your convenience. Jay Enyart will be reviewing this matter as quickly as possible.

Sincerely,
**ANTELOPE TECHNOLOGIES, INC.**
C. Stephen Guyer, CFO

54. On August 19, 2004 I received the following withdrawal of the $4.7 million Subscription Agreement from Genssler.

> **From:** Klaus Genssler [mailto:klausg@scaltechint.com]
> **Sent:** Thursday, August 19, 2004 1:22 PM
> **To:** Stephen Guyer
> **Cc:** Alan Taylor; 'Terry Henderson'
> **Subject:** RE: Investment offer
>
> Stephen
>
> I am herewith withdrawing the subscription agreement for $4.72 million dated August 15, 2004.
>
> Regards
> Klaus

55. On August 20, 2004 I received boxes of records from Todd Curtis. It was apparent that someone had copied all our paid vendor invoices. I asked him why, but never received a response.

56. On August 23, 2004 I discovered through the clerk of the court that the required bond for the TRO had never been posted; making the TRO invalid.

57. On August 23, 2004 an agreement was reached regarding the TRO.

58. On August 24, 2004 I sent the following memorandum in order to make continuing Board of Director's meetings more efficient and compliant.

> **From:** Stephen Guyer [mailto:csguyer@antelopetech.com]
> **Sent:** Tuesday, August 24, 2004 8:46 AM
> **To:** Terry Henderson
> **Subject:** RE: Gut Responses
>
> Terry,
>
> I think we might get a "blanket *Waiver of Notice*" from the 7 directors for specified period of time; like the next 60 days. The 48 rule is easily set aside by the waivers.
>
> If K & T prevail in their lawsuit, all our meetings will be set aside anyway; Waiver of Notice or not. However, if we prevail, then we have made progress efficiently.
>
> Sincerely,
> ***ANTELOPE TECHNOLOGIES, INC.***
> C. Stephen Guyer, CFO

59. On August 24, 2004 I reviewed the following copy of correspondence from Haynes & Boone.

> **From:** Huelbig, Larry [mailto:Larry.Huelbig@haynesboone.com]
> **Sent:** Tuesday, August 24, 2004 11:33 AM
> **To:** Alan Taylor

**Cc:** Wolfe, Chris E.; Terry Henderson
**Subject:** RE: Klaus

As I read and understand our agreement, plaintiffs cannot reurge their request for injunctive relief until after August 30, which I understand to be our critical date. If they proceed thereafter, they must give us reasonable prior notice. While I would like for the plaintiffs to forgo forever their request for injunctive relief, it is a bit much to expect if, in their opinion, there are no meaningful settlement negotiations. In summary, I feel that we substantially achieved our initial interim goal without having to do battle at the courthouse.

On other matters, I have spoken further today with Mssrs. Weisberg and Parker.

I explained the context of the Rule 11 agreement to Weisberg. He sounded neither pleased nor upset. He simply wants to be sure that Xybernaut is dealing with the proper board and that his company does not get embroiled in a family dispute.

Parker called to share his thoughts. (I sense that he is getting some flak from Genssler for giving up initially on the injunction request, especially since he has nothing yet to show for the concession.) His comments were:

- Alan is the problem.
- The board created a negotiating committee that should be fully informed and functioning, but is not.
- Plaintiffs want to know what Xybernaut is offering and the status of negotiations.
- Plaintiffs have adequate money to solve Antelope's financial problems immediately.

Plaintiffs are getting antsy. I suggest that as soon as possible that we contact Genssler and open discussions. People lash out when they get suspicious, and they get suspicious when there are no communications. I'm not saying that we should trust Genssler, nor am I saying that we should make a deal with him. I'm simply saying that we should pacify him with a call , inquiring generally what he is offering/requesting and giving him a vague update.

Larry Huelbig
Haynes and Boone, LLP

60. On August 24, 2004, I received the following correspondence from Ivan Cardenas.

I agree with Larry very much. I have taken the position that initiation of dialogue with Klaus should be pursued. It is over one week since his 4.75 million offer and he has no feedback from us. This feedback is also essential in our roles as directors to investigate. I also agree very much with Larry's recommendation that we find out what Klaus really wants. If we want a quick return, there may be a way to accommodate both his goals and ours.

I recommend we ask Larry to investigate what Klaus's goals are, and if reasonable and in the absence of a better X offer, we contract him to them and protect ourselves.

Ivan

61. On August 25, 2004 Genssler memorialized the terms under which he would continue to consider an investment in Antelope. I reviewed the following correspondence regarding the offer.

> **From:** Parker, Charles [mailto:CParker@lockeliddell.com]
> **Sent:** Wednesday, August 25, 2004 10:31 AM
> **To:** Huelbig, Larry
> **Cc:** Alan Taylor; Wolfe, Chris E.; Lewis, Gene; Klaus Genssler (E-mail)
> **Subject:** RE: Antelope
>
> Larry, our client is prepared to make a substantial cash investment in Antelope immediately if this normal due diligence can be completed. We believe all the information requested is presently available to the company. We are prepared to meet with company representatives and of course sign required confidentiality agreements. It would appear to be in the company's best interest if this exchange of information could begin. Charlie
> -----Original Message-----
> **From:** Huelbig, Larry [mailto:Larry.Huelbig@haynesboone.com]
> **Sent:** Wednesday, August 25, 2004 9:24 AM
> **To:** Parker, Charles
> **Cc:** ahtaylor@antelopetech.com; Wolfe, Chris E.
> **Subject:** Antelope
>
> Your fax of August 25 is acknowledged. ( In the future, please send all faxes addressed to me at my direct fax number: 713-236-5547.) I will forward it to Antelope.
>
> As an aside, I personally do not think that preconditions to negotiations are an appropriate way to start negotiations, especially given the time constraints. For example, do your clients really feel that a patent opinion can be issued in 1-3 days? Antelope will accept the best offer for the company, given the time constraints. Preconditions may only make a party's offer less attractive.
>
> If your clients' preconditions are really preconditions, it would be helpful if they also disclosed, at least in general terms, their proposal. Antelope should not have to devote substantial time and expense to satisfying your clients' substantial due diligence requirements, if their proposed offer does not meet Antelope's needs.
>
> Larry Huelbig
> Haynes and Boone, LLP

62. I had scheduled a call with Gardner Altman (attorney for Gary Newton) for August 26, 2004 to discuss strategies for protecting the company. The call never happened.

63. On August 28, 2004 I received a Notice of a Special Meeting of Shareholders to be held September 10, 2004 for the purpose of removing the current board and electing Anna C. Cole, Gary Newton, Rolf Genssler, Klaus Genssler, and Kevin Stolle as the new Antelope Board of Directors.

64. On August 28, 2004, I sent the following regarding reconstituting the board.

> **From:** Stephen Guyer [mailto:csguyer@antelopetech.com]
> **Sent:** Saturday, August 28, 2004 3:14 PM
> **To:** ahtaylor@antelopetech.com; Anna Cole; cecilia.fabre@argis.com; claude.frey@bluewin.ch; danielburki@bluewin.ch; dewitt@antelopetech.ch; DavidLLandreth@aol.com; GayWellsH@aol.com; grfch@swissonline.ch; ivan.cardenas@antelopetech.com; Jan Witt; rxfixer@aol.com; johnJlipinski@aol.com; kageyer@antelopetech.com; keim@sbcglobal.net; kelvin@fourmilab.ch; robert.haugen@prudentia-energy.com; rsondag@liteye.com; Robert.Haugen@Kingwoodcable.net; rons@mdsslaw.com; scott.carlin@antelopetech.com; TJHenderson@Houston.rr.com; tom.scott@antelopetech.ch; vjcmd@Houston.rr.com; vcardenas1@Houston.rr.com
> **Cc:** rons@mdsslaw.com; ghaii@intrstar.net; chris.wolfe@haynesboone.com
> **Subject:** Re: Board reconstitution
> **Importance:** High
>
> Ladies and Gentlemen:
>
> Please accept this notice that Antelope Technologies, Inc. desires to reconstruct its Board of Directors. The members of the board would consist of:
>
> 1. Alan H. Taylor
> 2. Kenneth A. Geyer
> 3. Anna C. Cole
> 4. Thomas P. Scott
> 5. Ivan R. Cardenas
> 6. C. Stephen Guyer
> 7. Terry Henderson
> 8. Rudy Fabre
> 9. J. Gary Newton
> 10. David E. Witt
>
> This action was taken after careful examination of procedural issues surrounding the August 16, 2004 shareholders meeting.
>
> **Furthermore in order to affirm this action, a SPECIAL MEETING OF SHAREHOLDERS will be held at 9:00am, MDT on September 7, 2004. Should shareholders wish to convene this meeting more quickly, they may forward a written *Waiver of Notice* to me via email.**
>
> Sincerely,
> ***ANTELOPE TECHNOLOGIES, INC.***
> C. Stephen Guyer, CFO

65. On August 29, 2004 I sent the following response to Alan Taylor regarding a promissory note that had been submitted by Xybernaut.

Alan,

Attached is a copy of the Xybernaut note with my comments. I really did try to limit my comments to business issues only. But-- this is a tough note! However, I believe the critical components are:

- Acknowledgement from Xybernaut that they have received full and fair disclosure

- Leaving the door open for future equity; maybe with an LOI with Xybernaut

- Also, specifying that as long as the collateral base is maintained, we would be allowed to borrow more funds

- There is an accounting concept called "Fair Value." Setting aside their GAAP requirement, we may in fact be solvent!

- Note that this note blocks any BK proceeding; and even if we did file, the discharge of the debt would be rescinded.

- Rather than the phrase "in its sole and absolute discretion" any permission or declination by Xybernaut should also carry "not to be unreasonably withheld."

Let's discuss further at your leisure.

Sincerely,
**ANTELOPE TECHNOLOGIES, INC.**
C. Stephen Guyer, CFO

66. I received the following from Ivan Cardenas on August 29, 2004.

**From:** Ivan Cardenas
**Sent:** Sunday, August 29, 2004 11:12 AM
**To:** Alan Taylor; Terry Henderson; Stephen Guyer
**Subject:** Legal Board Reconstitution - Please review before I send out....

To our reconstituted board,

I have some point to make about our situation regarding our board. Two scenarios are in play simultaneously

1)   Our board has not been adjudicated illegal. The TRO issued by the Texas court has been withdrawn per the exhibit agreements (2 and 3) below. Our counsel has informed us that the procedure followed for our last shareholder board election may be subject to interpretation and this possibility was implied by Scaltech in negotiated agreement (exhibits 2 and 3) below.

2)   In our current situation, we are OBLIGATED to comply with our legal agreements with Scaltech and this removes any illegality accusations from our current          board   if   we   comply   with reconstitution. This is our legal obligation.

Under this scenario, the board as a legal entity is completely within its authority from its bylaws to appoint vacancies. The annual shareholder meeting authorized 15 positions, 10 were filled in December; now we have 7. Our current board can reconstitute this board to its previous composition under the bylaws as in exhibit 1 below. We should in no way feel inhibited as a board in acting under OUR OWN BYLAWS.

Our board if challenged could be deemed to have been reconfigured improperly in accordance with Colorado law. If this supposition (this is not fact at this point and may not be when one reviews the case history of Colorado law). If this is the case, the legal board from before August 16 is the last legal board and a reasonable and possibly preferred remedy would be to first reconstitute that composition.

In either scenario, and these are the only two, reconstituting the board to its previous composition is the same end result and remedy. Reconstituting the board as a single action before any discussion or other measures are made before calling the next meeting is a response the will properly answer both scenarios.

It is not clear to me that a shareholder vote is the proper vehicle. If a shareholder vote was improperly held, it is the board as legal representatives of the company to rescind the result, not investors who have no operational role other than election of the board or enforcing fiduciary responsibility by legal means. If a shareholder meeting and vote is valid for anything other than removing a specific director other than in the annual meeting, as would be the case here, then the original vote would be valid as well and hence scenario 1 is valid above.

I believe it is our fiduciary and legal duty to comply in a timely manner as a company with a board reconstruction approach that is clearly available to us. I believe it is abundantly clear that we can act to resolve our board authority under our current legal status and bylaws to a configuration that is beyond question. It is our duty to investors and shareholders demand we act as quickly as humanly possible under our current severe financial pressures.


Exhibit 1

Article 4.3 Vacancy-- of Antelope's bylaws provides that "Any vacancy for any reason in the Board of Directors may be filled by the affirmative vote of a majority of the remaining directors, even if less than a quorum. A director elected to fill a vacancy due to an increase in directors shall serve until the annual shareholders meeting.

Exhibit 2

Mr. Larry Huelbig
Haynes & Boone
One Houston Center
1221 McKinney Street, Suite 2100
Houston, Texas 77010-2007

Re:   Scaltech International, Inc. v. Antelope Technologies, Inc.

Dear Larry:

This will confirm our telephone conference of this morning concerning steps that Antelope must take in order for meaningful negotiations to proceed. First, the four-person committee appointed by the board for purposes of negotiating with client must be fully informed and updated. Second, Antelope must begin the process of rescinding the improper removal of directors. As we discussed, we can do this by means of agreement through our lawsuit to in essence go back to the status quo of the directors prior to the recent shareholders meeting removing three directors. There cannot be any meaningful negotiations unless there is a properly constituted board.

Charles R. Parker                    *Via Facsimile: 713.229.2632*
Locke Liddell & Sapp LLP
600 Travis St., Ste. 3400
Houston, Texas 77002-3095

Re:   No. 2004-44311; *Tom Scott, et al. vs. Antelope Technologies, Inc., et al.*; In the 127th Judicial District Court of Harris County, Texas

Dear Charles:

This letter is to confirm our telephone conference of today regarding the above matter.

More specifically, Tom Scott, Ken Geyer and Scaltech International, Inc. (jointly "Scaltech") have not filed/posted a bond in connection with the court's August 18, 2004, Temporary Restraining Order. Moreover, Scaltech does not intend to go forward with its application for a temporary injunction set for August 30, 2004. However, Scaltech otherwise retains the right to move forward with its request for a temporary injunction at a later date and retains all other claims and intends to proceed with its case in chief, if such be necessary. Scaltech is passing its hearing set for August 30, 2004, because it prefers to seek a business solution to the current dispute. Antelope Technologies, Inc. welcomes negotiations toward a business solution.

Exhibit 3

If the above is your recollection and Scaltech's agreement, please sign below, returning a signed copy directly to me. I will then file the signed copy with the Court as a Rule 11 Agreement. (Please call the court to pass the temporary injunction hearing.)

Very truly yours,

Larry Huelbig
*Direct Phone Number: 713.547.2014*
*Direct Fax Number: 713.236.5530*
*huelbigh@haynesboone.com*

Agreed:

Charles Parker.                        Date:  8/23/04
Attorney for Plaintiffs

Ivan Cardenas

Antelope Technologies

67. On September 2, 2004, I received a Notice of Special Board meeting to be held in Fayetteville, NC on September 4, 2004.

68. On September 3, 2004 I overheard a telephone conversation between Scott Carlin and Genssler. Among other things, Carlin said "just make sure Stephen and Terry get 'something.'" I additionally overheard a conversation between Carlin and Anna Cole. Among other things, Carlin said, "Do it tonight."

69. On September 4, 2004 I received via email, copies of irrevocable proxies for all voting shares of Kenneth Geyer, Tom Scott, David Witt and Janice Witt given to Klaus Genssler.

70. On September 4, 2004 after traveling to Fayetteville I appeared at the location specified in the notice; the home of Gary Newton. After ringing the doorbell repeatedly, I called inside using my cell phone. I also called Anna Cole's cell phone. Standing on the porch of the home, Gary Newton called my cell phone to say I could participate in the meeting telephonically if I chose. I was told that Anna Cole was ill and that I could not enter the house for the meeting. I returned to the hotel and utilized the telephonic access method; recording the meeting.

71. A Special meeting of the Board of Directors of **Antelope Technologies, Inc.** was held telephonically on September 4th, 2004 at 9:00 MDT via conference call. Present on the call was: Terry Henderson, Victor Cardenas (for Rudy Fabre), C. Stephen Guyer, Anna C. Cole, J. Gary Newton, Ivan R. Cardenas, David E. Witt, and Thomas P. Scott (joined later), being a quorum of the directors of the Corporation.

The meeting was chaired by Anna Cole who called the role and asked if there were any other persons on the call, and if so to please identify themselves.

Anna Cole made a motion that the board accept the resignations of Kenneth A. Geyer, Thomas P. Scott and Alan H. Taylor from the board, as officers and as employees. The resignation letter by Alan Taylor was read. It was seconded by Gary Newton. A brief discussion followed regarding letters of resignations from Kenneth and Tom. Anna was asked if she had similar resignation letters from Kenneth and Tom. Anna assured the board that the resignations had been properly documented and she would provide copies of the letters to the board after the meeting.

UPON MOTION DULY MADE, SECONDED AND CARRIED BY A MAJORITY, the board RESOLVED to accept the resignations of Kenneth A. Geyer, Thomas P. Scott and Alan H. Taylor. The vote was conducted by roll call with the following results.

|  |  | For | Against | Abstain |
|---|---|---|---|---|

| 1. | Anna C. Cole | X | | |
|---|---|---|---|---|
| 2. | C. Stephen Guyer | | X | |
| 3. | David E. Witt | X | | |
| 4. | Ivan R. Cardenas | X | | |
| 5. | J. Gary Newton | X | | |
| 6. | Terry Henderson | X | | |
| 7. | Thomas P. Scott | X | | |
| 8. | Victor Cardenas (for Rudy Fabre) | X | | |
| | **Totals** | 7 | 1 | |

Anna Cole asked if C. Stephen Guyer would resign. Mr. Guyer indicated that he was not prepared to resign at this time.

Anna Cole made a motion that C. Stephen Guyer be discharged from all his positions associated with Antelope. Terry Henderson informed Anna that Stephen had been discharged from his employee position while in Switzerland, by Alan Taylor, on July 12, 2004. With regard to his Board position, Anna must be aware of how his removal must be conducted, but that the Board does not have the authority to remove a Board member

Mr. Guyer offered that there was a Consulting and Fee Agreement between Antelope and his consulting firm (Guyer Management Assistance, Inc.) effective July 12, 2004. This meant that as of that date, Mr. Guyer became an independent contractor through his consulting firm and was no longer an employee. However, the consulting agreement specified that his duties, offices and responsibilities were virtually the same as his employment contract and that it was not a requirement that officers be *employees*. Ms. Cole suggested that legal counsel be brought onto the call for clarification. Mr. Guyer opposed including counsel unless that counsel was independent; or if not, all parties to the possible adversarial debate were represented.

Gary Newton requested that the board fire Mr. Guyer from all positions over which the board had authority. Ms. Cole asked if Mr. Guyer would confirm that he was no longer an employee as of July 12, 2004. Mr. Guyer answered, "That's correct."

Anna Cole offered a motion that Tom Lykos to be appointed to the board as a director and be appointed interim Chief Executive Officer. Mr. Newton seconded the motion. After some procedural clarification regarding board appointments by the board versus shareholders and clarification that the board was appointing Mr. Lykos to fill a recently created vacancy until the next annual or special shareholder's meeting, discussion commenced.

Several board members including David Witt, Stephen Guyer, and Terry Henderson indicated that they had no information regarding Mr. Lykos; his

background, affiliations, or indeed no knowledge at all concerning the implications of this motion.

Nevertheless, UPON MOTION DULY MADE, SECONDED AND CARRIED BY A MAJORITY, the board RESOLVED to appoint Mr. Thomas Lykos to the board of directors and designate him Chief Executive Officer.  The vote was conducted by roll call with the following results.

|     |                                 | For | Against | Abstain |
|-----|---------------------------------|-----|---------|---------|
| 1.  | Anna C. Cole                    | X   |         |         |
| 2.  | C. Stephen Guyer                |     | X       |         |
| 3.  | David E. Witt                   |     |         | X       |
| 4.  | Ivan R. Cardenas                | X   |         |         |
| 5.  | J. Gary Newton                  | X   |         |         |
| 6.  | Terry Henderson                 |     | X       |         |
| 7.  | Victor Cardenas (for Rudy Fabre)| X   |         |         |
|     | **Totals**                      | **4** | **2** | **1**   |

Anna Cole invited everyone who was not now a member of the board to leave the call.  Upon request, all callers identified themselves including Tom Lykos, the newly appointed CEO; making eight participants on the call.

Anna Cole presented a summary of the financial condition of Antelope including the following issues.
- Default on the loan to the Banque Cantonale Neuchâteloise
- Unpaid loans from Antelope USA to Antelope Switzerland
- Rent for the USA office
- Delinquency of American Express invoices
- Delinquencies to vendors
- Delinquent taxes

Further discussion of the financial status of the Corporation continued.  It was indicated that the loan with BCN was now past due, but that the Bank had not yet foreclosed.  Anna concluded that the total debt for Antelope was about $4 million.  Gary followed that with a comment that it was essentially bankrupt.

Clarifying conversation ensued regarding notices, amounts, length of arrears, and particularly personal guarantees by Anna Cole and David Witt for the office lease in Denver.  Ivan Cardenas presented a more detailed account of vendor delinquencies.

The condition of 4th quarter 2004 payroll taxes was presented.  Mr. Guyer indicated that he had negotiated an extension until the end of September for these taxes in the amount of approximately $62,000.  Mr. Newton asked if it was not true that the person signing the payroll checks has personal liability for those taxes and Mr. Guyer confirmed.  Mr. Newton then indicated, "Then we have no problem."

Terry Henderson asked for more specifics regarding the plan that Mr. Lykos was bringing to the organization. Mr. Lykos emphasized the need to move quickly given the company's desperate circumstance, but that he was new, and would have to evaluate his options before moving forward.

Anna reminded the board that the Xybernaut proposal as she last saw it would have caused an immediate default by Antelope on its license with IBM. She asked if anyone on the board knew of any other current financing proposals.

Terry Henderson stated that what Anna was referring to was an original draft proposal from Xybernaut. Steven Neuman of Xybernaut had assured Alan Taylor that revisions could be made that would be acceptable to Antelope, and that a deal could be struck. Tom Lykos asked if Alan was the only one to hear this offer from Steven, and the answer given was yes (however, there was also email from Steven to Alan which also indicated such).

Mr. Henderson further explained that a meeting with Xybernaut to finalize changes was scheduled for August 30, 2004, but was cancelled due to loss of control by CEO Alan Taylor. This was apparent when participation at the properly scheduled Board meetings of August 28th and 29th were only attended by 5 Board members. Xybernaut had made it clear from the start that they did not want to be involved if there was not a strong united Board. Based on this, Alan informed them of his loss of control of the board and that Xybernaut did not have an authorized board to deal with. Hence, they withdrew their offer.

Anna Cole then put forth a motion that Tom Lykos be empowered to perform a restructuring of the company to eliminate liabilities, reduce costs, and to make the location of Antelope's corporate office Houston, Texas; all actions to preserve assets of the company. Gary Newton seconded the motion.

Without discussion, Ms. Cole immediately called the roll for a vote.

UPON MOTION DULY MADE, SECONDED AND CARRIED BY A MAJORITY, the board RESOLVED to empower Tom Lykos to perform a restructuring of the company to eliminate liabilities, reduce costs, and to make the location of Antelope's corporate office Houston, Texas. The vote was conducted by roll call with the following results.

|   |   | For | Against | Abstain |
|---|---|---|---|---|
| 1. | Anna C. Cole | X | | |
| 2. | C. Stephen Guyer | | X | |
| 3. | David E. Witt | X | | |
| 4. | Ivan R. Cardenas | X | | |
| 5. | J. Gary Newton | X | | |
| 6. | Terry Henderson | | X | |

| 7. | Tom Lykos | | | X |
|----|-----------|---|---|---|
| 8. | Victor Cardenas (for Rudy Fabre) | X | | |
| | **Totals** | **5** | **2** | **1** |

Ms. Cole then made a motion to adjourn the meeting. However, Mr. Guyer appealed that he be allowed to make a comment and a motion of his own.

He stated that he believes we have made decisions with people who have conflicts of interest, are not in good faith, that and that are a breach of their fiduciary responsibilities to the organization.

Therefore it would be appropriate to retain a *Special Litigation Committee* to resolve, hopefully before straight-on litigation occurs, all of these matters. Mr. Guyer explained that a "special litigation committee" is an independent attorney, who is disinterested, that would perform the necessary analysis and make a decision in the best interest of the shareholders. The decisions of the special litigation committee are binding upon the board of directors.

Mr. Newton asked how Mr. Guyer would pay for this committee. Mr. Guyer indicated that at the moment that was undetermined. Mr. Newton declared "We're Bankrupt!"

Mr. Guyer asked if there was a second to his motion. Terry Henderson seconded the motion. Mr. Guyer invited discussion.

Mr. Lykos and Mr. Guyer commenced a conversation regarding actual, pending and threatened litigation. Specifically discussed was the nature, location, status and probable outcome of:

- The suit brought by Kenneth Geyer, Tom Scott and Scaltech against Antelope and individual directors for improper board member removal, breach of fiduciary responsibility, and breach of employment contracts.

- The suit in District Court, Douglas County, Colorado, Case No: 02CV1202, brought by Mike Guzofsky and Robert Southard against Tom P. Scott, Kenneth A. Geyer, Liteye Systems, LLC, GCSW Technologies, LLC, (Formerly Antelope Technologies, LLC) and Antelope Technologies, Inc..

- An action threatened by Marya Kokaska regarding her employment agreement

Mr. Lykos queried Mr. Guyer regarding his knowledge of other possible litigation; specifically as it might relate to Mr. Guyer's earlier comments regarding conflict of interest, good faith and breach of fiduciary duty. Mr. Guyer indicated

that he had no knowledge of any other impending litigation, but that the board should evaluate the merits of actions based on the referenced bodies of law.

Mr. Newton confirmed that he was the only one on the board who carried liability insurance. Mr. Guyer explained the status of a Directors and Officers insurance policy application that was currently in underwriting.

Mr. Newton called the question.

Terry Henderson offered the observation that there has definitely been plenty of conflict within the board and personal conflict that is not in the best interest of shareholders and therefore the Special Litigation Committee is justified. As far as funding it, that's a secondary question. The real issue is "is it the needed." Mr. Henderson then agreed to go ahead and vote.

UPON MOTION DULY MADE, SECONDED AND DEFEATED BY A MAJORITY, the board RESOLVED NOT to appoint special independent counsel to serve as a Special Litigation Committee. The vote was conducted by roll call with the following results.

|   |   | For | Against | Abstain |
|---|---|---|---|---|
| 1. | Anna C. Cole | | X | |
| 2. | C. Stephen Guyer | X | | |
| 3. | David E. Witt | | X | |
| 4. | Ivan R. Cardenas | | X | |
| 5. | J. Gary Newton | | X | |
| 6. | Terry Henderson | X | | |
| 7. | Tom Lykos | | | X |
| 8. | Victor Cardenas (for Rudy Fabre) | | X | |
|   | **Totals** | **2** | **5** | **1** |

Terry Henderson said that in his opinion that the participation Xybernaut would give us deep funding and move ahead. Antelope has tremendous potential down the road. All it needed was a little interim funding to get there.

Mr. Newton indicated that he had been hearing that for three years. He believed the Xybernaut funding really would not have provided the technology and help needed to be able to salvage Anna's Department of Defense order. Further that we have employees that have not been paid in nearly a year, we're being evicted the rent's behind and so on.

Anna Cole stated that the Xybernaut offer and all the offers she saw and reviewed were contingent on the military order. That order has as yet to be officially obtained.

Mr. Henderson assured Ms. Cole that the Xybernaut offer did not say that. Ivan Cardenas interjected that he would have liked to have seen those proposals. It appears that Xybernaut chose to not disclose them to him.

Mr. Henderson explained that Alan Taylor (being the honest guy he is), told Xybernaut that we no longer had a functional board due to lack participation in the board meetings. Xybernaut had warned Alan from the beginning if there's conflict within the board they would not deal we us. They'd had a bad experience with that in past.

Mr. Lykos confirmed the parties who had direct conversations with Xybernaut. Board members who having direct conversations with Xybernaut included: Gary Newton, Stephen Guyer, Alan Taylor, Terry Henderson, and Anna Cole. However, Mr. Henderson and Ms. Cole's conversation were prior to any offers from Xybernaut. Alan Taylor held most of the follow-up conversations with Xybernaut.

The meeting was adjourned by unanimous consent. Gary Newton made the closing remark to lykos, "Tell April to kiss the baby for me."

72. On September 5, 2004, I received a phone call from Scott Carlin explaining that the new board was concerned about me possibly stealing items from the office. We met at the office and I surrendered my keys to Carlin.

73. On September 6, 2004 I was informed that Ivan Cardenas had unexpectedly departed from Switzerland with the hard drives out of the network servers.

74. On September 6, 2004 I received a request from Todd Curtis to meet with Scott Carlin at the Denver office to discuss accounting and systems information. After speaking with Curtis directly, it was agreed that all he required was a copy of the QuickBooks files.

75. Later on that same date, I sent the following memorandum to Curtis.

Todd,

I will not be emailing the QuickBooks files this evening. As a director, creditor, personal guarantor, and shareholder of Antelope, I cannot transfer anything to you without proper authorization. At the board meeting on Saturday, September 4, 2004, I confirmed that I was no longer an *employee* of Antelope as of 12 July 2004. However, on that date I entered into an agreement to, among other things, "serve as the firm's Chief Financial Officer." I have not received notice of termination of that agreement. Termination of the agreement requires "that the Client shall immediately pay any remaining balance due on Client's account."

Furthermore, I am still a named personal defendant in a lawsuit brought by Ken Geyer, Tom Scott and Scaltech International. That immediately creates a conflict of interest condition between us.

Antelope owes me individually over $250,000 in accrued but unpaid compensation. It would be a breach of my statutory duties to transfer any information regarding the firm to a person that at this time has no standing or reason to receive it; who in fact is an agent of the opposing side of what I believe to be a vexatious legal action. It would be grievous if it were determined later that I did anything that in retrospect would be deemed to support actions that, upon information and belief harmed our existing shareholders.

On the other hand, it could very well be (and I hope it is true), that your employer Klaus Genssler has a plan that could ultimately bring success to Antelope and its shareholders. I would certainly support any such plan and I remain open to reviewing the ideas of Mr. Genssler and his associates.

Please understand (as I know you do), that this is a very complex and intricate position for me. I am subject to multiple and simultaneous demands and responsibilities that are at best paradoxical; at worst contradictory. As long as I remain a:

- Director with responsibilities to shareholders;
- Creditor with over $250,000 owed to me personally for employment compensation;
- Personal guarantor for trust fund taxes in excess of $62,000 (although clearly not the only personal guarantor);
- Personal defendant in a lawsuit brought by Scaltech International, Inc., (conflict of interest);
- Shareholder of Antelope;

I cannot take any actions regarding Antelope until:

- There is good faith assurance and documentation that such actions are in fulfillment of my fiduciary responsibility to the shareholders;
- There is good faith assurance and documentation that such direction will bring about the ultimate satisfaction of the debt Antelope owes me personally;
- A plan exists for the mitigation of trust fund tax liability;
- The lawsuit brought by Scaltech is completely withdrawn without recourse;
- Information is presented that will allow me to communicate to the shareholders that we are taking steps to preserve their interests and eventual wealth.

Once again, please be assured that I wish to cooperate fully with any course of action that leads the organization toward survival and prosperity. Please do not view this stance today as anything more than my best and heart-felt effort to do what is correct and fair.

Thank you. If I may be of assistance in any way, please do not hesitate to call.

Sincerely,
**ANTELOPE TECHNOLOGIES, INC.**
C. Stephen Guyer, CFO

76. On September 7, 2004 I went to the Denver office and discovered trucks being loaded with all Antelope property that was in the building. Scott Carlin was

directing the effort. Carlin showed me a memo from new interim CEO, Tom Lykos directing the removal of the items, freezing of Denver bank accounts, and requesting a record of transitions directly from our Denver banker.

77. On September 8, 2004 I sent a demand letter (via FedEx) to the board of directors of Antelope for my accrued but unpaid wages in the amount of $263,890.

78. On September 9, 2004 I sent the following email and QuickBooks files to Scott Carlin.

> Scott,
>
> I am attaching the most recent QuickBooks file I have. I am sending them to you because you are an employee of Antelope (not Todd Curtis) and for my own assurance that the transfer of this file enables Antelope to continue day-to-day operations.
>
> While still having great consternation about all that has happened, as outlined in the email below, I also do not want there to be any question of my basic cooperation or that I interfered with on-going company operations. As you've heard me say many times, my primary duty is to our shareholders.
>
> Sincerely,
> **GUYER MANAGEMENT ASSISTANCE, INC.**
> C. Stephen Guyer, Chairman

79. On September 9, 2004 I received a notice from Anna Cole canceling the previously scheduled shareholder meeting.

Further the Affiant sayeth not.

C. Stephen Guyer

The foregoing Affidavit was acknowledged before me this 17th day of November, 2004 by C. STEPHEN GUYER.

Witness my hand and official seal.

My commission expires: ___16 -12 - 05___.

(Seal)

_____
                                    Notary Public

___2205 Wildcat Reserve Pkwy___
                                    (Address)

___Highlands Ranch, Co 80129___
                                    (City and State)

# ATTACHMENT # 7



**Antelope**
TECHNOLOGIES

# MUTUAL NONDISCLOSURE & NON-COMPETE AGREEMENT

This agreement (hereinafter "the Agreement") is entered into and made effective as of:

_____July_____, __4th__ 2004, the ("Effective Date") by and between **Antelope Technologies, Inc.**, a Colorado corporation, having a place of business at 8955 South Ridgeline Boulevard, Suite 1000, Highlands Ranch, Colorado 80129 (hereinafter "Antelope")

And: __Scaltech Int'l Inc.__,

(hereinafter "Participant") concerning proprietary information which Participant may furnish to Antelope relating to Participant's product, business plans, proprietary technology, internal processes or other proprietary information of any kind and which Antelope may furnish to Participant relating to Antelope's product and business plans, proprietary technology, internal processes or other proprietary information of any kind (hereinafter "Proprietary Information").

Proprietary information of a furnishing party is that information which it has not released publicly and considers being confidential.

In consideration of the premises and the promises made herein, the parties agree to be legally bound as follows:

1. All Proprietary Information furnished by either party to the other hereunder in tangible form shall be clearly marked with a "proprietary," "confidential" or similar legend, and if it cannot reasonably be so marked, written notice shall be given to the receiving party at the time it is furnished advising that it is to be treated as Proprietary Information. In the event Proprietary Information is furnished other than in tangible form, the furnishing party shall inform the receiving party of its proprietary nature at the time it is furnished and describe it in a written transmittal to the receiving party within thirty (30) days.

2. Title or right to possess Proprietary Information as between the parties shall, except as otherwise provided herein, remain in the party which furnishes it to the other party. Neither party shall furnish to the other party any Proprietary Information which it does not have the right to furnish and shall defend and indemnify the receiving party against any claim or liability resulting from breach of such obligation.

3. All Proprietary Information furnished by either party to the other party under this Agreement shall be used by the receiving party solely for the purpose of evaluation to determine whether the parties may have an interest in entering into a further business relationship and shall be treated by the receiving party with the same degree of care to preclude disclosure thereof that the receiving party uses to protect its own information of like importance. Any other agreement between the parties relating to different subject matter shall not be affected by this Agreement.

4. Neither party shall make any copies of Proprietary Information received from the other party except as necessary for performing the authorized evaluation, and any copies which are made shall be identified as Proprietary Information the same as the original.

---

CONFIDENTIAL – Antelope Technologies, Inc.
Page 1 of 3

5. Neither party shall be restricted from disclosing Proprietary Information of the other party pursuant to a judicial or governmental order, but such disclosure shall be made only to the extent so ordered and provided that the receiving party: (a) shall timely notify the other party so that it may intervene in response to such order, or (b) if timely notice cannot be given, shall seek to obtain a protective order from the court or government for such information.

6. The obligations and limitations set forth herein regarding Proprietary Information shall not apply to information which is:
   a. at any time in the public domain, as evidenced by written documents, other than by breach of this Agreement on the part of the receiving party; or
   b. rightfully known to the receiving party prior to receipt of the same from the furnishing party as evidenced by bona fide written, dated documents, and was not acquired, directly or indirectly, from the furnishing party; or
   c. independently developed by personnel of the receiving party who have not had access to Proprietary Information received from the furnishing party; or
   d. generally made available to third parties by the furnishing party without restriction concerning use or disclosure

7. Either party may terminate the use of its Proprietary Information by the receiving party at any time without any liability for such termination, but the obligations of the parties set forth herein regarding use and disclosure of Proprietary Information shall not terminate until three (3) years after the date of termination, after which the duties of each party with respect to Proprietary Information which it has received from the other party shall be governed solely by copyright and patent laws except in the case of software for which the obligations shall continue until the occurrence of any circumstances listed in the preceding paragraph.

8. During the term of and for a period of three years after the termination of this Agreement, Participant, for itself and for its affiliates, associates, successors and assigns, agrees not to directly or indirectly finance, acquire, own, lease, manage, operate or control, or participate in the financing, acquisition, ownership, lease, management, operation or control of, or otherwise be an investor in or a consultant or adviser to, any business, firm, corporation or entity that is a direct competitor of Antelope Technologies, Inc. in modular computing.

9. When it no longer has need thereof for the purpose stated herein or upon request of the furnishing party, whichever occurs first, each party shall promptly cease using and shall return or destroy (and if requested by the furnishing party certify destruction of: (a) all Proprietary Information which it receives from the other party along with all tangible copies which it may have made, and (b) all copies stored in any computer memory or storage medium.

10. The failure of either party to enforce any right resulting from breach of provision of this Agreement by the other party shall not be deemed a waiver of any right relating to a subsequent breach of such provision or any other right hereunder. This Agreement is subject to the laws of the State of Colorado.

11. This Agreement states the entire agreement and supersedes all prior agreements, written or verbal, between the parties with respect to the subject matter hereof and may not be amended except in writing signed by a duly authorized representative of the respective parties.

12. Each party acknowledges and recognizes that a violation of the covenants contained herein will cause such damage to the other party, as will be irreparable, and that the damaged party will have no adequate remedy at law for such violation. Accordingly, each party agrees that the other party shall be entitled as a matter of right to an injunction from any court of competent jurisdiction, restraining any further violation of such covenants. Such right to injunctive relief shall be cumulative and in addition to whatever remedies the damaged party may have at law.

CONFIDENTIAL – Antelope Technologies, Inc.
Page 2 of 3

13. In the event of invalidity or unenforceability of any provisions of this Agreement, such invalidity or unenforceability shall not render invalid the remainder of this Agreement or the remainder of such provision. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only as broad as is enforceable.

IN WITNESS THEREOF, the parties, effective the date first written above, have caused this Agreement to be executed by their duly authorized representatives.

**ANTELOPE TECHNOLOGIES, INC.**

C. Stephen Guyer, Chief Financial Officer

**PARTICIPANT:**

(Signature)

Presidcnt
(Print Name, Title)

Sealtech International Inc
(Company)

7/4/04
(Date)

Please return one signed original to: C. Stephen Guyer, Antelope Technologies, Inc.
8955 South Ridgeline Boulevard, Suite 1000, Highlands Ranch, CO 80129

---

Revision: 2004.3.3

CONFIDENTIAL - Antelope Technologies, Inc.
Page 3 of 3

# ATTACHMENT # 8

**Scaltech**
**International, Inc.**

720 Oates Road
Houston, Texas 77013
Tel. (713) 674-9211
Fax. (713) 674-9990

July 6, 2004

Mr. Alan Taylor
Chief Executive Officer
Antelope Technologies, Inc.
8955 S. Ridge Boulevard
Suite 1000
Highland Ranch, Co. 80129

Dear Alan,

Re: Proposal to provide Working Capital Financing to Antelope

I am pleased to confirm Scaltech International, Inc.'s (or its designee) ("SI") proposal to provide $250,000 of working capital financing. In addition, SI will work on a best efforts basis to raise $2 million in additional equity for Antelope to continue the development of Antelope's Modular Computer Core Technology. In addition, SI will attempt to raise on a best efforts basis an amount of money to be determined in order to buy out certain founding shareholders. This working capital financing will be provided substantially on the terms set forth in the attached Term Sheet.

This letter is not a commitment to provide funding, which commitment can only be made pursuant to definitive documentation following the completion of due diligence satisfactory to SI, and execution and delivery of final binding agreements, and the absence of any material adverse change to your company, its operations and prospects.

Please acknowledge this agreement by signing and returning a copy of this letter to the undersigned.


Sincerely,

For: Scaltech International, Inc.

_____
By: Klaus Genssler, President


AGREED AND ACCEPTED THIS _____DAY OF JULY, 2004.

For: Antelope Technologies, Inc.

_____ _____
By:

_[signature]_

By: C. Stephen Guyer, CFO

Deleted: _____
_____¶
By:

Chief Executive Officer
Antelope Technologies, Inc.
Page 3

# TERM SHEET
## Working Capital Loan and Equity Placement

**Holder (lender):**     Scaltech International, Inc., or its assignee ("SI")

**Maker (borrower):**     Antelope Technologies, Inc. ("Company")

**Amount**:     $250,000 USD

**Interest Rate:**     10% per annum, payable monthly

**Conversion:**     Convertible at any time at SI's choice into Antelope Common Stock (55.1% voting and 44.9% non voting shares) at a price of $2.9412 per share.

**Term:**     Re-payable on 12/31/2004 or at any time prior to that at Antelope's choice.

**Collateral:**     A Perfected Security Interest in all receivables and inventory of Antelope Technologies, Inc. and a second position security interest in the assets of Antelope Technologies (Suisse), SA.

**Covenants:**     Loan becomes immediately due if any of the following occurs.

     a)     Any substantive change in Antelope's current senior management

     b)     Antelope becomes insolvent

     c)     Material adverse change in the operations or prospects of the Company

**Equity:**     a)     Warrants to purchase 0.1% of equity of Company to be issued immediately after funding of the $250,000 loan described above on a fully diluted basis, exercisable at $0.01 per share (consisting of 55.1% voting and 44.9% non voting shares). These warrants will expire July 31, 2009.

     b)     Warrants or an option to purchase 679,995 shares of Company (55.1% voting and 44.9% non voting shares) exercisable at $2.9412 per share. These warrants will expire November 30, 2004.

     c)     Warrants issued to Klaus Genssler (or his designee) to purchase 0.5% of equity of Company on a fully diluted basis, exercisable at $0.01 per share (consisting of 55.1% voting and 44.9% non voting shares), which shall be granted immediately after the warrants for 679,995 shares have been exercised by SI. These warrants will expire September 30, 2009.

**Other Conditions:**     a)     Subject to prior authorization by Antelope, Antelope shall pay for all documentation and expenses (including reasonable attorneys' fees) related to this loan and the exercise of the warrants and shall pay for all third party expenses and travel costs incurred by SI to complete its due diligence.

b)      SI shall have the *First Right of Refusal* (but not obligation) to provide Antelope the funds to purchase up to and including 100% of the voting and non-voting stock of Kenneth A. Geyer and Thomas P. Scott.  Such capital shall be provided by issuance of shares of the Company to SI equal to $2.9412 per share (consisting of 55.1% voting and 44.9% non voting shares).

c)      Antelope shall not issue more than 110,000 shares of a combination of voting and non voting stock from this date until the exercise and/or expiration of the warrants under Equity-paragraph (b).  Such shares shall be issued at a minimum price of $2.9412 per share.

**Conditions precedent:**

a)      Modification and assent to amended *Executive Employee Agreements* satisfactory to SI and remaining executives.

b)      Resignation of Kenneth A. Geyer and Thomas P. Scott

c)      The Company shall use its best efforts to obtain forgiveness of accrued but unpaid "signing bonuses" accrued as of June 30, 2004

d)      Formation of a new board of directors consisting of:

1. Alan H. Taylor
2. C. Stephen Guyer
3. Klaus Genssler
4. Terry Henderson
5. Rudy Fabre
6. J. Gary Newton
7. To be submitted by SI and approved by the board

e)      Commitment by Antelope to finalize a liquidity event within 60 months of the exercise of the 679,995 warrants at $2.9412 per share.  Such event could be, but not limited to:

Acquisition by a third party
Public offering for at least 25% of the Company and registration of existing shares
Merger into a publicly traded entity

The liquidity event shall require the approval of both, the board of directors and a majority of the shareholders, and such other approvals as may be required from a regulatory point of view.

f)      Reissue all shares held by shareholders having <u>only voting</u> shares in excess of 17,000 shares into 55.1% voting and 44.9% non voting shares.

**Closing Conditions:**      Definitive documentation, completion of due diligence satisfactory to Scaltech, the execution and delivery of final binding agreements, and the absence of any material adverse conditions for Antelope, its operations and prospects.

CONFIDENTIAL - Antelope Technologies, Inc. & Klaus Genssler

# ATTACHMENT # 9



**SUBSCRIPTION AGREEMENT**

MCC Computer Investor Group LLP

Antelope Technologies, Inc.
8955 South Ridgeline Boulevard
Suite 1200
Highlands Ranch, CO 80129

Ladies and Gentlemen:

**1. Representations and Warranties**. The undersigned purchaser hereby represents and warrants to Antelope Technologies Inc., a Colorado corporation (the "Company"), and its managers and members:

(a)    The common stock (the "Securities") in the Company which is being acquired by the purchaser is being acquired for his or her own account and for investment and not with a view to subdivision, resale, distribution or fractionalization thereof, in whole or in part, to others and no other person has any direct or indirect interest in the Securities; the purchaser will not sell, transfer or otherwise dispose of the Securities except in transactions which are not in violation of the Securities Act of 1933, as amended (the "Act"); and the purchaser is aware that the Securities are and will be, when issued, "restricted securities" as that term is defined in Rule 144 (the "Rule") of the General Rules and Regulations under the Act.

(b)    The purchaser has had an opportunity to ask questions of and receive satisfactory answers from duly designated representatives of the Company concerning the terms and conditions pursuant to which the offer to purchase the Securities is being made. Purchaser has been afforded the opportunity to examine such documents and other information which he or she has requested for the purpose of answering any question he or she may have concerning the business, affairs and financial condition of the Company.

(c)    The purchaser understands that the Securities are unregistered and must be held indefinitely unless they are subsequently registered under the Act or an exemption from such registration is available. The purchaser further acknowledges that he or she is fully aware of the applicable limitations on the resale of the Securities. The Rule permits sales of "restricted securities" held for not less than one year and upon compliance with the requirements of such Rule. If the Rule is available to the purchaser, the purchaser may make only routine sales of the Securities in limited amounts in accordance with the terms and conditions of that Rule.

(d)    The Company is the only person which may register its Securities under the Act and it currently is not contemplating registering any of its Securities. Furthermore, the Company has not made any representations, warranties or covenants to the purchaser regarding the registration of the Securities or compliance with Regulation A or some other exemption under the Act.

(e)    Any and all certificates representing the Securities and any and all securities issued in replacement thereof or in exchange there for shall bear the following legend or one substantially similar thereto, which the purchaser has read and understands:

---

Revision: 2004.05.001                    CONFIDENTIAL - Antelope Technologies, Inc.

Aug 15 04 08:44p     Klaus Genssler          281 286 2555           p.3
Case 9:05-cv-00038-RC-KFG   Document 283-2   Filed 10/24/14   Page 315 of 377 PageID #: 2978

Antelope Subscription - 2 of 4

The shares of stock represented by this certificate have not been registered under the Securities Act of 1933 or the laws of any state and have been issued pursuant to a private offering exemption from registration pertaining to such shares and pursuant to a representation by the shareholder named hereon that said shares have been acquired for purposes of investment and not for purposes of distribution or resale. These shares may not be sold, mortgaged, pledged, hypothecated or otherwise transferred except pursuant to registration as above described or exemption from such registration in fact and in law applicable to such shares in the opinion of counsel for the corporation.

The purchaser further agrees that the Company shall have the right to give stop transfer instructions to its transfer agent, if any, or to note stop transfer instructions in its security holder records, and acknowledges that the Company has informed the purchaser of its intention to issue such instructions.

(f)     The purchaser acknowledges that an investment in the Company involves a high degree of risk that includes, but is not limited to, the following:

a.     The Company was only recently formed and has no operating history. No assurance can be given that the Company ever will be able to achieve profitable operations.

b.     The sole asset of the Company consists of a license agreement with IBM.

c.     The success of the Company is dependent in large part on its management, none of whom have significant experience in the business of the Company.

(g)     The purchaser is an investor who directly or with the assistance of his or her purchaser representatives has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Company based upon the information furnished to him or her; his or her personal knowledge of the business and affairs of the Company; the records, files and plans of the Company to all of which he or she has had full access; such additional information as he or she may have requested and has received from the Company; and the independent inquiries and investigations undertaken by him or her.

(h)     The purchaser can bear the economic risk of loss of his or her entire investment; he or she has adequate means for providing for his or her current needs and personal contingencies; and he or she has no need for liquidity with respect to his or her investment in the Securities. The purchaser understands that no portion of his or her subscription proceeds will be deposited into an escrow account, but rather will be deposited directly into a Company account to be used for working capital.

(i)     **The purchaser [   ] is [ X ] is not (check one) an accredited investor** as defined in Exhibit A attached hereto. (If you are accredited, check the appropriate category on Exhibit A).

(j)     No person has made any direct or indirect representation or warranty of any kind to the purchaser with respect to the economic return which may accrue to the purchaser. The purchaser has consulted with his or her own tax counsel and other advisors with respect to an investment in the Company.

(k)    The purchaser is domiciled in and is a bona fide resident of (or, if an entity, has its principal office in **the State of Texas**

(l)    All information, representations and warranties contained herein or otherwise given or made to the Company by the purchaser, are correct and complete as of the date of this Subscription Agreement.

**2. Indemnification.** The purchaser understands and acknowledges the meaning and legal consequences of the representations and warranties contained herein [and in the Offeree Questionnaire], and hereby agrees to indemnify and hold the Company and its agents, employees, officers, directors, shareholders, representatives, affiliates and controlling persons harmless from and against any and all loss, damage or liability (including reasonable attorneys' fees and disbursements) due to or arising out of a breach of any such representation, warranty, acknowledgment or agreement. No waiver by the Company of any breach by the undersigned of any such representation, warranty, acknowledgment or agreement shall in any manner be deemed to be the waiver of any rights granted in federal or state securities laws.

**3. Subscription.** The purchaser hereby subscribes to purchase **884,238 voting** and 720,549 non voting common stock in the Company for a total purchase price of **$4,720,000, at $ 2.9412 US Dollars** per share, and encloses a check, money order, or will wire transfer the total amount payable to the order of the Company in payment of the purchase price. The payment terms for the total purchase price are: $300,000 on August 20,2004, $250,000 on August 31, 2004 and the balance on or before October 15, 2004.

**4. Miscellaneous.** This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of Colorado. This Subscription Agreement sets forth the entire agreement relating to the purchase of the Securities, supersedes any prior agreements, whether written or oral and may be modified only in writing, signed by a duly authorized officer of the Company and the purchaser. This Subscription Agreement shall be binding upon and the benefits hereunder shall inure to the purchaser and his or her heirs, personal representatives, successors and assigns whether or not the terms hereof are noted on the certificate(s) representing such Securities.

Dated this 15th day of August, 2004
Very truly yours, *For: Mcc Computer Investor Group LLP*
*Klaus Genssler*
Printed Name
Signature
*400 North Richey Road*
Mailing Address
*Pasadena, Tx   77506*
Mailing City, State, Zip

Agreed and Accepted:

For: Antelope Technologies, Inc.

By:
Kenneth Geyer, President
*CHAIRMAN OF THE BOARD*

Aug 15 04 08:44p    Klaus Genssler                281 286 2555           p.5
Case 9:05-cv-00038-RC-KFG  Document 283-2  Filed 10/24/14  Page 317 of 377 PageID #: 2980

Antelope Subscription - 4 of 4

## DEFINITION OF ACCREDITED INVESTOR
## PURSUANT TO RULE 501(A) OF
## REGULATION D, SECURITIES ACT OF 1933

Accredited investor shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(1) [　] Any bank as defined in Section 3(a)(2) of the Securities Act of 1933 (the "Act") or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act, whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of the Investment Company Act of 1940; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment advisor, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) [　] Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3) [　] Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4) [　] Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) [　] Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000;

(6) [　] Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) [　] Any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a Asophisticated person≃ as described in Rule 506(b)(2)(ii); and

(8) [　] Any entity in which all of the equity owners are accredited investors.

# ATTACHMENT # 10

P.3
TRORX
CASO

NO. 2004-44311

| | | |
|---|---|---|
| TOM SCOTT, KEN GEYER AND<br>SCALTECH INTERNATIONAL, INC. | § § § | IN THE DISTRICT COURT OF STBNX |
| *Plaintiffs,* | § § | |
| VS. | § § | |
| ANTELOPE TECHNOLOGIES, INC.<br>ALAN TAYLOR, TERRY HENBDERSON,<br>RUDY FABRE, STEPHEN GUYER,<br>ANNA COLE, GARY NEWTON<br>and IVAN CARDENAS | § § § § § § | HARRIS COUNTY, TEXAS |
| *Defendants.* | § § | ___ JUDICIAL DISTRICT |

## TEMPORARY RESTRAINING ORDER

On this day, came to be heard the Application for Temporary Restraining Order of Plaintiffs, Tom Scott, Ken Geyer and Scaltech International, Inc.

The Court, after examining Plaintiffs' Original Petition and Application for Injunctive Relief, verification in support thereof, and all other pleadings, finds there is credible evidence that:

a. There is reasonable probability that Plaintiffs will establish that Defendants engaged in illegal and improper conduct by convening board meetings and shareholder meetings contrary to applicable law and the Company's bylaws.

b. Unless Defendants are immediately restrained and ordered as set forth below, harm to Plaintiffs is imminent and Plaintiffs will be irreparably injured because Antelope Technologies, Inc. will continue to unlawfully conduct the affairs of the corporation to its detriment.

c. If Defendants are not directed to take the actions ordered herein, Plaintiffs will suffer irreparable injury in that it will (1) subject Antelope Technologies, Inc. to liability for the improper removal of directors subject to a long-term employment contract, (2) be unable to satisfy its impending financial obligations; and (3) continue to violate the law by acting through an improperly elected board of directors

   d. Defendants will not be harmed if injunctive relief is granted because they are merely being ordered to comply with the laws of the State of Colorado and the corporation's bylaws by not managing the affairs of Antelope Technologies inconsistent with the long-term viability of the company.

IT IS THEREFORE ORDERED THAT:

Defendants, Antelope Technologies, Alan Taylor, Anna Cole, Stephen Guyer, Rudy Fabre, Terry Henderson and Gary Newton, and all persons in active concert or participation with them are restrained and enjoined from:

1. Convening any board meetings until Tom Scott, David Witt and Ken Geyer are reinstated to the Antelope Technologies board of directors;

2. Managing the affairs of Antelope Technologies through any Board resolution involving the participation of board members elected pursuant to a special shareholders' meeting held on August 16, 2004;

3. Transferring or conveying any proprietary technological information to a competitor of Antelope Technology;

4. Considering any investment proposal not previously presented to the board of directors prior to August 16, 2004;

5. Convening any board meetings until Tom Scott, Ken Geyer and David Witt are reinstated to the Antelope Technologies board of directors; and

6. Managing the affairs of Antelope Technologies through any Board resolution involving the participation of board members elected pursuant to a special shareholders' meeting held on August 16, 2004.

It is Further ORDERED that the Clerk shall issue and send notice to all Defendants that a hearing on Plaintiffs' Application for Temporary Injunction is set for _August 30_, 2004, 2004, at _9:00 A_.m. The purpose of the hearing shall be to determine whether this Temporary Restraining Order shall be made a Temporary Injunction pending full trial on the merits. This order is effective for 14 days beginning at the time signed.

Bond is hereby set at $ _100,000.00_. This order is not effective until the bond is posted with the -2- Clerk of this Court.

HOUSTON:980000/40000:940536v1

SIGNED August 18, 2004. _Tony Lindsay_

This Order expires on: ~~2004~~

Signed on this _____ day of _____, 2004.

_____
Judge Presiding

**Approved as to Substance and Form:**

**LOCKE LIDDELL & SAPP LLP**

By: _____
    CHARLES R. PARKER
    State Bar No.: 15479500
    BRIAN Q. CARMICHAEL
    State Bar No.: 03820700
    600 Travis Street, Suite 3400
    Houston, Texas 77002-3095
    (713) 226-1200 – Telephone
    (713) 223-3717 – Facsimile

ATTORNEYS FOR PLAINTIFFS,
TOM SCOTT, KEN GEYER AND
SCALTECH INTERNATIONAL, INC.

# ATTACHMENT # 11

# antelope

September 2, 2004

To the Board of Directors

The Board of Directors refuses to communicate with me; I am no longer able to function. I have effectively been fired without cause by the Board.

I resign effective immediately as an Officer, Director and employee. My resignation is made with the express reservation of all of my rights as a former Officer, Director, Employee and current Creditor of Antelope Technologies, Inc.


Sincerely

Alan H. Taylor

# ATTACHMENT # 12

---

## SECOND AFFIDAVIT OF C. STEPHEN GUYER

STATE OF COLORADO

ss.

COUNTY OF DOUGLAS

BEFORE ME, the undersigned authority, personally appeared C. Stephen Guyer, a person known to me who, by me being duly sworn, stated his oath the following:

1. My name is C. Stephen Guyer. I am more than eighteen (18) years of age; I am not disqualified for any reason in making this affidavit; I have personal knowledge of the facts set forth herein; and I know those facts to be true and correct.

2. On August 30, 2004, distributed the following.

> **From:** Stephen Guyer [mailto:csguyer@antelopetech.com]
> **Sent:** Saturday, August 28, 2004 7:07 PM
> **To:** Alan Taylor; Anna Cole; Ivan Cardenas; rxfixer@aol.com; rons@mdsslaw.com; Rudy Fabre; TJHenderson@Houston.rr.com.; Kenneth Geyer; tom.scott@antelopetech.ch; dewitt@antelopetech.ch
> **Subject:** Re: Notice of Board Meetings
>
> Ladies and Gentlemen:
>
> Please accept this email as notice that we will begin daily board meetings commencing Saturday, August 28, 2004.
>
> The next gathering will be **Sunday, August 29, 2004 9:00am MDT and another on Monday, August 30, 2004, 9:00 MDT,**
>
> Call in numbers are:
>
> **Conference Call Access:**
> **800-373-0950 or 973-686-9828 (int'l)**
> **Participant code: 413478#**
> Sincerely,
> ***ANTELOPE TECHNOLOGIES, INC.***
> C. Stephen Guyer, CFO

3. On September 7, 2004 I exchanged the following emails with Anna Cole. (Read from bottom up.)

> Stephen,
> Thank you for the e mail. You may refer people to me and I will be happy to put them in contact with Tom.
> Kind regards,
> Anna C. Cole
> IBM Relationship Lead

---

919 386 1049 direct
www.antelopetech.com

**From:** C. Stephen Guyer [mailto:csguyer@guyermanagement.com]
**Sent:** Tuesday, September 07, 2004 10:19 AM
**To:** Anna Cole
**Subject:** Re: Contact Information

Anna,

I know I will be receiving requests from people I've been working with.  Would
you please forward Tom Lykos's complete contact information?  Then I will be
able to refer matters to the appropriate person.

Thank you.  I hope you're feeling better and that the pregnancy continues to go
well.

Sincerely,
*GUYER MANAGEMENT ASSISTANCE, INC.*
C. Stephen Guyer, Chairman

4.   On September 8, 2004 I distributed the following email to various Antelope-
related parties.

**From:** C. Stephen Guyer [mailto:csguyer@guyermanagement.com]
**Sent:** Wednesday, September 08, 2004 5:54 AM
**To:** csguyer@antelopetech.com
**Subject:** Re: Change at Antelope

Re: Change at Antelope

On September 4, 2004 the Board of Directors of Antelope Technologies, Inc.
restructured the company.  The board appointed Thomas J. Lykos as C.E.O.
The company has relocated to:

**400 N. Richey Street**
**Pasadena, TX  77506**

Anna Cole is assisting Mr. Lykos in this transition.  She may be reached at:

**(919) 386-1049**
**Email: Anna.Cole@Antelopetech.com**

I will be remaining in Denver and shall begin seeking another involvement soon.
It is with personal deep regret that this change occurred so abruptly.  Please
accept my apology for any inconvenience.

Sincerely,
*GUYER MANAGEMENT ASSISTANCE, INC.*
C. Stephen Guyer, Chairman

5.  One September 8, 2004 I received the following notice from Fritz Stahl representing interested Swiss parties and the Swiss Board of Directors.

> Ladies, Gentlemen,
>
> Please find hereafter an urgent message of the board of directors of Antelope Technologies (Switzerland) SA.
>
> If the 3 requests are not met within the deadline, I have order to open a criminal case in Switzerland, Texas -USA and Colorado - USA, against all persons possibly involved with the disappearance of the corporate assets of the Swiss company.
>
> Bests regards.
>
> Fritz Stahl

### TO WHOM IT MAY CONCERN

> The Swiss members of the board of directors of Antelope Technologies (Suisse) SA as well as the State Authorities and the State Bank of the canton of Neuchâtel, are very concerned about the recent events, namely:
>
> a) the sudden disappearance of Mr. Ivan Cardenas on Friday September 3, 2004; therefore on going business has presently come to a hold
>
> b) the disappearance, at the same time, of two hard discs containing all sensible data for Antelope Technologies (Suisse) SA
>
> c) the incomprehensible shipment of electronic goods, property of Antelope Technologies (Suisse) SA, for a global value of approximately USD 268'000.00 to the following address :
>
> > Todd Curtis
> > 720 Oats Road
> > Houston, TX 77013 / USA
>
> d) the equally incomprehensible mission ordered to Mr. Stirnweiss to render himself to the US, on Monday September 6, 2004.
>
> e) upon realizing above events the Swiss board members unsuccessfully attempted several times to contact Mr. Ivan Cardenas, Mrs. Ana Cole and Mr. Stirnweiss to obtain explanations regarding above mentioned acts.
>
> In view of the above, the Swiss board members are left with no alternative, but to take the following actions:
> 1)  summon all persons informed and/or implied to immediately return the two hard discs removed,
> 2)  summon all persons informed and/or implied to return the goods shipped to Houston,
> 3)  summon all persons informed and/or implied to explain the mission of Mr. Stirnweiss in America.

If above requests are not met within the deadline of Friday, September 10, 2004 at 17.00 hours (local time in Switzerland), the Swiss board members will file criminal charges both in Switzerland, as well as in the United States of America to locate and bring to justice the people concerned.

Antelope Technologies(Switzerland)SA
 - the board directors -

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Etude Stahl Péquignot Lorenz Calame
Trésor 9 (Place des Halles)
Case postale 2232
CH - 2001 Neuchâtel
Tél. +41 (0) 32 729 02 02
Fax +41 (0) 32 729 02 09
E-mail: splc@splc.ch

6. On September 22, 2004 I circulated minutes of the September 4, 2004 board meeting that were constructed from the recording I had made. Those minutes are incorporated herein by reference.

7. On September 23, 2004, Lykos filed the following with the Texas Secretary of State.

| | | | |
|---|---|---|---|
| **Filing Number:** | 800393077 | **Entity Type:** | Domestic Business Corporation |
| **Original Date of Filing:** | September 23, 2004 | **Entity Status:** | In existence (Name Reservation) |
| **Formation Date:** | N/A | | |
| **Tax ID:** | | **FEIN:** | |
| **Duration:** | Non-Perpetual | **Expiration Period:** | |

**Name:   MCC Computer Corp.**
**Address:** [ADDRESS NOT PROVIDED]

| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES |
|---|---|---|---|---|---|
| **Last Update** | **Name** | | **Title** | **Address** | |
| September 23, 2004 | Thomas John Lykos Jr. | | Applicant | 4101 Centurion Way Addison, TX 75001 USA | |

8.  On September 24, 2004 I received a different version of the minutes written and distributed by Gary Newton.  These minutes were grossly incorrect; particularly in the face of the actual recording.

9.  On September 25, 2004 I sent the following to the board of directors.

> **From:** C. Stephen Guyer [mailto:csguyer@guyermanagement.com]
> **Sent:** Saturday, September 25, 2004 7:13 PM
> **To:** RXFIXER@aol.com; Anna.Cole@antelopetech.com;
> TJHenderson@Houston.rr.com; icardenas@antelopetech.com;
> Rudy.fabre@argis.com; Tom.Lykos@antelopetech.com
> **Cc:** 'David E. Witt'
> **Subject:** RE: (no subject)
>
> Gary,
>
> I do not approve these minutes.  Several things:
>
> I am unaware that you were appointed as what would be *recording secretary* for this meeting.  That appointment is not proper nor in accordance with By-laws.  Likewise, I assume you are not holding yourself out as the secretary of corporation.  There has been no proper vote on that either.
>
> There are numerous inaccuracies in your re-counting of the meeting; particularly who was making motions and who was seconding.  The minutes I submitted were based upon a recording of the assembly as it happened.
>
> We could certainly spend a great deal of time arguing the details, however the transcript of the recording of the meeting is definitive.  Of course, the importance of these minutes will be retrospective only.
>
> I suggest that you withdraw your re-counting of meeting as being both erroneous and without standing.  To my knowledge, you are not the person empowered to do this.  Further, it seems to be a further attempt to push forward a personal position without regard for due process, other shareholders and structure.
>
> It is unmistakable that there is severe conflict among the board at this time.  I would hope that we can resolve this divergence through considered thought and discussion; rather than distracting posturing and bluster.
>
> I remain, as I was in Fayetteville on the 4[th], available to meet with you any time.
>
> Sincerely,
> ***GUYER MANAGEMENT ASSISTANCE, INC.***
> C. Stephen Guyer, Chairman

10. On September 30, 2004 I received the following memorandum from Lykos.

Memorandum

To: Stephen Guyer
From: Tom Lykos, Interim CEO
Date: September 29, 2004
Re: Information

There is certain information that you are withholding that is interfering with my directive to analyze and pursue options for Antelope Technologies USA. Previously, representatives of Antelope USA have contacted you requesting this information. My understanding from them which was confirmed in your letter of September 06 2004, is that you assert that you will not forward this information to me, because of your concerns over your fiduciary obligations to the Company.

Through this letter you are directed to forward to me the files and information noted on Exhibit A which is attached to this Memorandum. The information requested is property of the Company and can not be considered as your personal property. Failure to forward this information will be viewed as an action taken by you in a personal capacity that is hostile to the Company.

Please contact Ivan Cardenas at 713-920-0242, to arrange the transfer of the materials requested herein that are within your possession.

You should also be aware that a motion to dismiss without prejudice the lawsuit referred to in your letter (Tom Scott et al. v. Antelope Technologies, Inc., et al) was file on September 27, 2004.

Attachment: Exhibit A.

Cc: Board of Directors, Antelope Technologies, Inc.(USA)

11. On September 29, 2004 Terry Henderson and I made the following request for a special shareholders meeting.

Dear Shareholders of Antelope Technologies, Inc:

On behalf of Stephen Guyer and me, having more than 10 % ownership of the voting shares of Antelope Technologies, Inc. (ATI), under Section 3.3 of the Bylaws, we do hereby call for a **Special Meeting of the Shareholders**. In accordance with the notice requirements under Section 3.4, the meeting will be set for Friday, October 8, 2004, at 9 am Central Time. The location will be at the newly established Corporate offices at 400 N. Richey Street, Pasadena, Texas, 77506 or via teleconference at:

|  |  |
|---|---|
| Toll Free: | 1-800-910-2586 |
| Toll: | 1-719-955-9024 |
| Moderator Passcode: | 9078820 |
| Passcode: | 907882 |

The purpose of the meeting is to find out what is going on with the Company, and at a minimum to answer the 9 questions below.

Although Stephen and I are still officially ATI Board members, we have not been included in any of the decisions since Tom Lykos was elected to be the new interim CEO. Mr. Lykos was elected during the September 4, 2004, Board of

Directors meeting, over Stephen and my objection (we had absolutely no knowledge of who Mr. Lykos was). Since then, I have requested feedback on what actions Tom is taking, and have gotten no specific answers. Stephen has requested that Tom set a Board of Directors meeting, with no response. Therefore, in order to uphold our fiduciary duties as Board members, we feel we have no alternative but to request this Special Shareholders meeting to find out what the plans are for Antelope Technologies, Inc.

We are requesting that Tom Lykos be present at this Board meeting, and address forthrightly the following questions:

- Give an explanation of how a major move to abandon the Swiss Corp, ATSA, can be transacted without a Board vote.
- What are Mr. Lykos' plans to handle the impending criminal charges lodged against the perpetrators of the Swiss office caper?
- With the loss of the Swiss Corp's manufacturing and associated suppliers, what are the plans for manufacturing ATI products?
- Status of the Fort Bragg order under current circumstances, what is the plan to deliver.
- What is the status of our marketing efforts, and the plan to satisfy the tremendous demand in our product during this change of control?
- What is the plan to handle the debt with ATI?
- Where is the funding for these plans going to come from, what are the terms of this funding?
- We have heard from several sources that there is a plan being pursued to bankrupt ATI. Please explain how all the Shareholders will benefit from this scheme.
- Given the tremendous interest in the ATI products, how could a company with such great potential be a candidate for bankruptcy?

Sincerely,

Terry


12. On September 29, 2004 I received the following memorandum from Lykos.

To:      Stephen Guyer
From:   Tom Lykos, Interim CEO
Date:    September 29, 2004
Re:      Board Minutes

It was my impression that Gary Newton kept the Board Minutes of the September 4, 2004 meeting. The minutes you circulated contain language that I consider inappropriate. Your own commentary often "spins" the facts. Thus, the minutes are not deemed as approved as of September 27, 2004. Board minutes will be considered for approval prior to the next Board meeting.

Other than serving on the Board, I am not certain of your duties and responsibilities to Antelope USA. Please provide me on a daily basis (beginning today) a summary of your business related activities performed for Antelope Technologies, Inc.   Please forward your daily activity report to tom.lykos@antelopetech.com.   I would also appreciate a summary of your

activities performed since June 1, 2004. Also, until further notice, you are no longer authorized to incur any expenses in connection with your relationship with Antelope.

13. On September 30, 2004 I sent the following to Lykos.

| | |
|---|---|
| **To:** | Tom Lykos |
| **From:** | Stephen Guyer |
| **Date:** | 30 September 2004 |
| **Re:** | Information and Board Minutes |
| **CC:** | Board of Directors, Antelope Technologies, Inc. |

Before responding to your fax of 30 September 2004, please note that Antelope Technologies, Inc. owes me a great deal of money; specifically, $263,890 in earned but unpaid salary, $131,945 in statutory penalties under C.R.S. §8-4-109(3), two invoices for consulting services for $17,468.75 and $29,375.00. That is a total of $442,678.75.

I sent a letter describing the amount due for wages and how it could be paid on 7 September 2004. To date, I have received no response.

Please let me know when I may expect payment. The lack of this payment is severely damaging my ability to do anything.

Regarding information that you incorrectly believe I am withholding from Antelope. This information is already in the possession of Mr. Cardenas and Mr. Curtis; indeed the screen prints you forwarded to me are from Todd's own computer and reveal that the requested information is already in your possession. Therefore, I will regard your request as an over-sight or some attempt to further affix blame where none is warranted.

Further on this subject, I have received no other requests for information other than for QuickBooks files. Subsequent to my letter of 6 September 2004 which you referenced, I sent the following on 9 September 2004 to Scott Carlin.

14. On October 7, 2004 I received the following memorandum from Lykos.

| | |
|---|---|
| To: | Shareholders of Antelope Technologies, Inc. ("Company") |
| From: | Tom Lykos, Interim CEO |
| Date: | October 7, 2004 |
| Re: | Shareholder Meeting |

You may have received a communication from Terry Henderson notifying you of a Special Shareholders Meeting to be held tomorrow at the Company's Headquarters at 400 N. Richey, Pasadena, Texas. No such meeting will be held tomorrow. I informed Mr. Henderson shortly after the receipt of an email from him that, given a prior commitment, I would not be in attendance. More important, notice of the meeting was defective for a variety of reasons. However, such a meeting will be held in the very near future.

The purpose of such a meeting is to address certain issues that are currently confronting the Company and its Swiss Subsidiary. To that end, I have been

preparing a Report to the Board Members of the Company. In that Report, areas of concern addressed by Mr. Henderson and others of import to shareholders are addressed. The Report will first be distributed to Board Members for discussion at the Board Meeting to be held next week. Shortly after the Board Meeting, the Report will be distributed to individual shareholders for their review.

Please be assured that your patience has been greatly appreciated as it has taken approximately 33 days to examine the issues of concern to shareholders and prepare a response. In addition, the management team has been responding to a number of issues that had to be addressed on a real time basis – some of these issues had been presented to the management long before my appointment on September 4, 2004.

15. On October 8, 2004 I received a copy of *Report of the Interim CEO to the Board of Directors and Shareholders of Antelope Technologies* with various attachments. The document is hereby incorporated by reference. The report contained several significant errors. Therefore, on October 26, 2004 I sent the following letter to Mr. Lykos.

Thomas Lykos
Antelope Technologies, Inc.
400 North Richey St
Pasadena, TX 77506

Dear Tom,

Following are some clarifications regarding your *Report of the Interim CEO To the Board and Shareholders of Antelope Technologies, Inc.*

On page 3 you reference a $631,357 accounts receivable number as of 3/31/2004. If you are referring to the shareholder report, the amount actually reported was $404,122; consisting of $275,912 of USA operating receivables, $119,294 of VAT receivable by the Swiss company and $8,915 of sub-lease receivables. $480,000 of inter-company receivables had been eliminated.

On June 3, 2004 I constructed a complete reconciliation between Liteye and Antelope as of 5/31/2004. In summary,

| | |
|---|---|
| Antelope Purchases from Liteye (Open Balance) | 13,037.00 |
| Due to Due from | (4,336.17) |
| Sub lease | (9,764.19) |
| Net (Liteye owes Antelope) | (1,063.36) |

Todd Curtis has the detailed schedules in the "Liteye_Intercompany" folder.

I hope this is helpful. Thank you. If you have any questions or if I may be of further assistance, please feel free to call.

/ss/
C. Stephen Guyer

CSG: mm

16. On November 11, 2004 I received another *Report of the Interim CEO to the Board of Directors and Shareholders of Antelope Technologies with attachments* dated November 11, 2004 with additional attachments. The document is hereby incorporated by reference. The report contained many errors and the previously described corrections had <u>not</u> been made.

17. In addition to the errors communicated to Mr. Lykos on October 26, 2004, the report contains the following inaccuracies.

  a. The wire you refer to on page 3 was in US Dollars, not CHF (Swiss Francs). That money was part of the original share capital and came from ATUSA. $700,000 was returned to ATUSA pursuant to the *Sub-license Agreement* and *Management Services Agreement*. $500,000 went to IBM for the license payment and $47,115 went to Phoenix Technologies for the *BIOS License*. The remaining amount was used for other USA payables and operating expenses.

  b. I believe the total claim of Meyers Land and Cattle is closer to $140,000 not $34,000. Meyers is expecting $11,700 for each unpaid month of the remaining lease; June 30, 2005.

  c. On page 1, Mr. Lykos claims that no independent examination or audit of the company's books and records has been undertaken. This is clearly not true and I refer to the "Accountant's Compilation Report" contained the *Report to Shareholders* of May 31, 2004. Furthermore, as accounts payable records will support, Antelope engaged and frequently consulted with EKS&H, Ernst & Young, and PriceWaterHouse (all independent accounting firms), from the founding of the firm through my tenure as CFO.

  d. On page 2, Mr. Lykos claims the IBM Technology License as a "hard asset" of Antelope USA as of September 30, 2004 while later in the report describes the License's transfer to the Swiss entity. This is a contradictory position.

  e. Page 4, contains a simple arithmetic error. The sum of the material liabilities presented total $3,509,607, not $2,930,000.

  f. Also on page 4, the footnote references "Dan and Jan" Witt. Dan is really David E. Witt.

  g. On page 6, under litigation, my name is misspelled "Geyer" rather than "Guyer." Regarding the lawsuit itself,

  On September 8, 2004, I sent written demand to Defendant Antelope Technologies, Inc. (including each and every member of the Board of Directors), by Federal Express for payment of my earned but unpaid wages. A copy of the demand letter with Federal Express Tracking and Delivery Reports is attached hereto as Attachment 1 to this Affidavit as proof of compliance with C.R.S. § 8-4-109(3). As a result, Mr. Guyer is entitled to the statutory penalty of 50% of his earned and unpaid wages.

  The amount of damages being sought from Defendant Antelope Technologies, Inc. is as follows:
  | | |
  |---|---|
  | $263,890.00 | principal amount of earned but unpaid wages |
  | $131,945.00 | 50% penalty of unpaid earned wages |
  | $5,805.58 | prejudgment interest at 8% from July 12, 2004 |

$    181.00    costs
**$ 401,821.58**    Total Judgment Requested

h. On page 7, "Management" section, Lykos describes the IBM license being carried on the books of the USA entity. He claims this is misleading. However, since the Swiss entity was virtually 100% owned by the USA company, Generally Accepted Accounting Practices ("GAAP") requires that financial statements be presented on a "fully consolidated" basis.

i. It is clear to me from this statement and others in the report that Lykos does not have a basic working knowledge of accounting rules and practices.

j. Further on page 7, Mr. Lykos implies that the books and records were not set-up properly and that there was a lack of "basic financial accounting practices at the company." The books were set-up by myself (who has 30 years experience in business and finance), reviewed by the CPA firm of EKS&H and to some extent Ernst & Young. Furthermore, in August 2003, the board adopted specific resolutions regarding the control of expenditures. That resolution is incorporated herein by reference.

k. Regarding Lykos's reference (page 7, last paragraph) to shipping, invoicing and collections, I prepared a complete shipping report from FedEx on August 23, 2004. Scott Carlin and I spent 4 hours reconciling all shipments to invoices on August 25, 2004.

18. On November 17, 2004 I received the following email form a colleague. This email clearly indicates that Scott Carlin has been monitoring my Antelope email after having changed the password to deny me access in September 2004.

Stephen:

Inadvertently, I sent the email below to you at your old email address. Note the response. My apology if this causes difficulties. You may want to make sure that the old address is removed.

Jim Hemphill

3881 East Mallard Street
Highlands Ranch, Colorado 80126-2938
720/344-9630; 720/810-2234 mobile

**From:** Scott Carlin [mailto:scott.carlin@antelopetech.com]
**Sent:** Wednesday, November 17, 2004 2:17 PM
**To:** Jim Hemphill
**Subject:** RE: Integrated Alliance

Hi Jim....Stephen can be reached at his permanent email
CSGuyer@guyermanagement.com.
Hope all is well with you.

| Want your picture in Forbes? Get a Modular PCI
| http://www.antelopetech.com/press/2004-0621-02-Forbes.jpg
|
| Scott Carlin, Antelope Technologies, Worldwide Sales

| 720.344.4313 (main) or 303-799-8898 (direct)
| http://www.antelopetech.com/staff/scottcarlin.vcf

19. On November 20, 2004 I sent the following email to the board.

Ladies and Gentlemen,

As the following indicates, it appears that my email address was not removed from the system. Rather, Scott Carlin is monitoring activity in that account for reasons unknown, and is responding to messages received. I have not been able to access that account since late September.

I consider this extremely improper and unethical. Please direct Scott to remove the account and place a suitable "Return to Sender" message in the system.

Sincerely,
**GUYER MANAGEMENT ASSISTANCE, INC.**
C. Stephen Guyer, Chairman

On November 20, 2004 I discovered that on November 8, 2004 the following webpage was constructed and placed on the Internet. The referenced phone numbers are for Ivan Cardenas and Anna Cole.



## MODULAR COMPUTER COMPANY, LLC

**The Modular PC contains all the normal features of a desktop computer...**

*...a processor, a hard drive, memory, video card, audio card, Windows XP\* Professional and more. It is a compact replacement for that big computer box under your desk. And by being so small, you can take it with you at all times (in your pocket if you like), unlike your desktop computer.*




## ***Site Under Construction***

**For more information please call our sales staff at (281) 286-9200 or (919) 386-1049 sales@modular-pc.com**

**www.modular-pc.com**

The pictures are from Antelope Technologies, Inc.

Further the Affiant sayeth not.

C. Stephen Guyer

The foregoing Affidavit was acknowledged before me this 24 $^{TH}$ day of November, 2004 by C. STEPHEN GUYER.

Witness my hand and official seal.

My commission expires: 10-17-05                    .

(Seal)

_____
Notary Public

2205 Wildcat Reservoir Pkwy
(Address)

Highlands Ranch Co 80129
(City and State)

# ATTACHMENT # 13

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
07/21/2010

| | | |
|---|---|---|
| IN RE: | § | |
| ANTELOPE TECHNOLOGIES, INC., | § | CASE NO. 07-31159-H3-11 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| ANTELOPE TECHNOLOGIES, INC., | § | |
| | § | |
| Debtor-Appellant, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-0205 |
| | § | |
| JANIS LOWE and ALAN TAYLOR, | § | |
| | § | |
| Appellees. | § | |

## MEMORANDUM OPINION AND ORDER

Debtor-Appellant, Antelope Technologies, Inc. (Antelope), appeals the Bankruptcy Court's January 7, 2010, Judgment, dismissing the above-captioned Chapter 11 case.[1] Pending before the court is the Brief of Debtor-Appellant (Docket Entry No. 3), and Brief for Interest Party/Appellees Janis Lowe and Alan Taylor (Docket Entry No. 7). The court has carefully considered the parties' briefs, the record, and all the facts and circumstances, and concludes that the Bankruptcy Court's Judgment should be affirmed.

---

[1]Judgment, Record 76 included in Docket Entry No. 2. Future references to the Record in this Memorandum Opinion and Order are to the items included in the Record on Appeal contained in Docket Entry No. 2.

## I.  **Factual Background**

Antelope is a company formed in 2001 and incorporated in 2002 that produces mobile modular computers.  The technology underlying the computers is patented by IBM.  Antelope has a license agreement with IBM that required a payment of $500,000 and funds to operate the company.  When the original owners of Antelope -- Ken Geyer, Anna Cole, Gary Newton, Tom Scott, and David Witt -- encountered difficulty raising funds to execute the IBM license agreement, they worked with Ivan Cardenas and Alan Taylor to relocate much of Antelope's operations to Switzerland in order to obtain a bank loan guaranteed by the Swiss government.  ATI Swiss was formed as a subsidiary of Antelope for this purpose.  In addition, Antelope initiated a $1 million share offering to new investors for the purpose of raising equity needed to qualify for the Swiss-government guaranteed bank loan.  When Antelope and ATI Swiss had raised the requisite equity, ATI Swiss obtained a $3 million bank loan, $500,000 of which was used to acquire the IBM license.  The $500,000 payment to IBM consisted of a license fee of $325,000 and a prepayment of royalties of $175,000.  In exchange for the license agreement, IBM provided Antelope technical documentation needed to produce modular computers.  Once Antelope received the technical documentation, Antelope found the IBM technology deficient and hired European engineers to help improve IBM's technology.[2]

---

[2]Debtor's First Amended and Modified Disclosure Statement for Debtor's Chapter 11 Plan of Reorganization, Record 26, pp. 10-12.

In the spring of 2004 Antelope was unable to make its first principal payment on the Swiss bank loan. As part of a new fund-raising effort, Antelope's Chief Executive Officer (CEO), Alan Taylor, introduced Klaus Genssler, the representative of Scaltech International, N.V., to Antelope. Scaltech offered Antelope a financing proposal, but on August 3, 2004, Antelope's board of directors voted not to accept the offer. Although Scaltech subsequently offered Antelope a new financing proposal, Taylor attempted to obtain financing from another company, Xybernaut.[3]

At a meeting held on September 4, 2004, Antelope's board of directors accepted the resignations of CEO, Alan Taylor, and board members Kenneth A. Geyer and Thomas P. Scott, and named Thomas Lykos, Jr. as both a new board member and interim CEO.[4]

On November 14, 2004, Antelope's board of directors approved by a 4-3 vote, Lykos' proposal to file a Chapter 11 petition,[5] and resolved that the petition be filed immediately.[6]

In February of 2005 a group of minority shareholders, including Taylor, filed a shareholders' derivative action against

---

[3]Id. at 13.

[4]Minutes of Board of Directors Meeting of Antelope Technologies, Inc., included in Record 83 (marked Debtor's Exhibit 2).

[5]Minutes of Board of Directors Meeting of Antelope Technologies, Inc., included in Record 83 (marked Debtor's Exhibit 3).

[6]Resolution of the Directors of Antelope Technologies, Inc. (USA), Attachment 1 to Minutes of Board of Directors Meeting of Antelope Technologies, Inc., included in Record 83 (marked Debtor's Exhibit 3).

Antelope, Lykos, and others in the United States District Court for the Eastern District of Texas styled <u>Janis Lowe, et al. v. Eltan, B.V., et al.</u>, Civil Action No. 9:05cv38.[7]

In November of 2006 Antelope initiated steps to acquire assets of MCC Computer Company LLC (MCC) using financing provided by Scaltech, and to effect the Chapter 11 filing that the board had approved on November 14, 2004.[8]

On February 14, 2007, Antelope filed a voluntary Chapter 11 petition, a proposed plan of reorganization, and a disclosure statement.[9]  Three minority shareholders objected to the plan: Stephen Guyer, Janis Lowe, and Alan Taylor.[10]  Despite the three objections, on November 21, 2007, the Bankruptcy Court entered an Order Confirming Debtor's Plan of Reorganization.[11]

On November 29, 2007, Lowe and Taylor filed a Notice of Appeal from the Order Confirming Debtor's Plan of Reorganization.[12]  On

---

[7]Evidentiary Hearing on Motion to Appoint Chapter 11 Trustee, Record 77, pp. 7 and 51.  <u>See also</u> Debtor's First Amended and Modified Disclosure Statement for Debtor's Chapter 11 Plan of Reorganization, Record 26, p. 15.

[8]Debtor's First Amended and Modified Disclosure Statement for Debtor's Chapter 11 Plan of Reorganization, Record 26, p. 15.

[9]<u>See</u> Debtor's Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code, Record 7, and Disclosure Statement for Debtor's Chapter 11 Plan of Reorganization, Record 8.

[10]<u>See</u> Objection to Approval of Disclosure Statement and Proposed Plan filed by C. Stephen Guyer, Record 10; and Objection to Disclosure Statement and proposed plan filed by Alan Taylor and Janis Lowe, Record 11.

[11]Order Confirming Debtor's Plan of Reorganization, Record 47.

[12]Notice of Appeal to District Court from Order Confirming Debtor's Chapter 11 Plan, Record 51.

August 12, 2008, and March 11, 2009, the United States District Court entered a Memorandum Order and Opinion vacating the Bankruptcy Court's Order Confirming Debtor's Plan of Reorganization and remanding to the Bankruptcy Court.[13] Observing that Lykos "freely admitted" the Chapter 11 petition was filed to avoid effects of the shareholder derivative action filed in the Eastern District of Texas[14] and that the plan operated to release Antelope's management from claims asserted in that action,[15] the District Court concluded that the Chapter 11 petition did not appear to have been filed in good faith. Accordingly, the District Court instructed the Bankruptcy Court to "(1) hold a hearing on whether to appoint a Chapter 11 Trustee; and (2) make findings of fact on whether the Plan was proposed in good faith."[16]

Antelope appealed the District Court's Order vacating the Plan to the Fifth Circuit, but the appeal was dismissed for lack of jurisdiction.[17]

On September 25, 2009, the Bankruptcy Court held an evidentiary hearing on the motion to appoint a Chapter 11 trustee filed by Lowe and Taylor.[18] Taylor testified that following his

---

[13]Memorandum Order and Opinion, Records 66 and 67.

[14]Id. at 11.

[15]Id. at 6 and 12.

[16]Id. at 15.

[17]In re Antelope Technologies, Inc., 326 Fed. Appx. 304, 2009 WL 1560017 (5th Cir. June 2, 2009).

[18]Evidentiary Hearing on Motion to Appoint Chapter 11 Trustee, Record 77.

resignation as CEO he had no further relationship with Antelope as an officer,[19] he and other minority shareholders had filed a shareholder derivative action in the Eastern District of Texas under Civil Action Number 9:05-CV-38,[20] and the disclosure statement included a description of that derivative shareholder action.[21]

On November 4, 2009, the Bankruptcy Court held an evidentiary show cause hearing to determine why this case should not be dismissed in light of the concerns expressed by the District Court that Antelope's Chapter 11 petition had not been filed in good faith.[22] Lykos testified that when Taylor resigned in September of 2004 Antelope lacked funding, Antelope's compensation package for management was excessive, and Antelope was in default on a $3 million loan that it had no ability to repay.[23] Lykos also testified that in February of 2007, when Antelope filed its Chapter 11 petition, the shareholder derivative action pending in the Eastern District of Texas impeded Antelope from attracting capital investment, and that the bankruptcy filing was intended to protect Antelope's one viable asset (an IBM license) to get all the

---

[19]Id. at 19.

[20]Id. at 7.

[21]Id. at 9. See also Debtor's First Amended and Modified Disclosure Statement for Debtor's Chapter 11 Plan of Reorganization, Record 26, p. 15 ("Lowe v. Eltan" lawsuit).

[22]Show Cause Hearing, Record 78.

[23]Id. at 11-14.

-6-

technology needed under one roof, and to deal with all the creditors of both Antelope and MCC on a combined basis.[24]

On January 7, 2010, the Bankruptcy Court issued a final Judgment dismissing Antelope's Chapter 11 petition,[25] and a Memorandum Opinion with findings of facts and conclusions of law explaining the reasons for that dismissal.[26]

## II.  Standard of Review

A district court has jurisdiction to hear an appeal from a bankruptcy court's final judgment or order.  See 28 U.S.C. § 158(a).  The Bankruptcy Court's findings of fact are reviewed under the "clearly erroneous" standard.  In re Perry, 345 F.3d 303, 309 (5th Cir. 2003).  The "clearly erroneous" standard allows this court to reverse the Bankruptcy Court's findings of fact "only if left with 'the definite and firm conviction that a mistake has been committed.'"  Id. (quoting In re Dennis, 330 F.3d 696, 701 (5th Cir. 2003)).  The Bankruptcy Court's conclusions of law, conclusions on mixed questions of law and fact, and conclusions on application of the law to the facts are reviewed de novo.  In re United States Brass Corp., 171 F.3d 1016, 1021 (5th Cir. 1999).[27]

---

[24]Id. at 12-13 and 15.

[25]Judgment, Record 76.

[26]Memorandum Opinion, Record 75.  See also In re Antelope Technologies, Inc., 2010 WL 104556 (Bankr. S.D. Tex. 2010).

[27]See Brief of Debtor-Appellant, Docket Entry No. 3, p. 3 ("It is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination (continued...)

## III.  Analysis

Antelope argues that the Bankruptcy Court erred when it found

that Antelope

> filed the petition for the primary purpose of obtaining
> leverage in the shareholder litigation, not for the
> Debtor's financial reorganization or in response to a
> particular financial crisis.  The Court's findings are
> completely devoid of minimum evidentiary support
> displaying some hue of credibility and bear no rational
> relationship to the supportive evidentiary data adduced
> at the motion to appoint Chapter 11 trustee and show
> cause hearings held on September 24, 2009 and November 4,
> 2009, respectively, and prior hearings before the
> bankruptcy court, evidence offered that resulted in the
> November, 2007 order of confirmation and the bankruptcy
> court's finding that the Chapter 11 plan had been filed
> in good faith.  Accordingly, its findings were clearly
> erroneous and should be set aside and the judgment
> dismissing the case should be reversed.[28]

Appellees, Lowe and Taylor, argue that the Bankruptcy Court's

judgment should be affirmed because

> [t]he Bankruptcy Court's decision was based on evidence
> presented by Antelope, the Appellant, which clearly
> showed that Antelope filed the Bankruptcy primarily to
> gain an unfair advantage in the Shareholder Litigation
> and not for financial reorganization.  In reaching its
> decision, the Bankruptcy Court reviewed the totality of
> the circumstances, including a review of the proposed
> Chapter [11] plan, the testimony and the events in the
> bankruptcy.  Appellant argues that there was no evidence
> to support the decision of the Bankruptcy Court, which is
> far from the truth.  Antelope's plan was brought in bad
> faith with the sole goals of ousting minority

---

[27](...continued)
either is completely devoid of minimum evidentiary support
displaying some hue of credibility or bears no rational
relationship to the supportive evidentiary data.  Hoots v.
Pennsylvania, 703 F.2d 722, 725 (3d Cir. 1973).").

[28]Id. at 9-10.

shareholders and eliminat[ing] the liability of the present insiders of Antelope. The testimony of Lykos at the confirmation hearing, the 341 meeting of the creditors, and the show cause hearing, Antelope's exhibits presented at the Show Cause hearing, the review of the Shareholder Complaint and its docket, the review of the Chapter [11] Plan, the bankruptcy docket, and events in the Bankruptcy provided enough evidence to support the Bankruptcy Court's findings, that Antelope was using the bankruptcy process merely to obtain an unfair advantage in the Shareholder Litigation. The Bankruptcy Court's decision was not clearly erroneous; therefore, it should not be disturbed.[29]

## A.  Applicable Law

In support of its decision to dismiss Antelope's Chapter 11 petition sua sponte, the Bankruptcy Court cited § 1112(b) of the Bankruptcy Code,[30] and In re Starmark Clinics, LP, 388 B.R. 729 (Bankr. S.D. Tex. 2008).[31]  Although § 1112(b) does not expressly

---

[29]Brief for Interest Party/Appellees Janis Lowe and Alan Taylor, Docket Entry No. 7, p. 15.

[30]Section 1112 of the Bankruptcy Code provides:

Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1).

[31]Memorandum Opinion, Record 75.  See also In re Antelope Technologies, Inc., 2010 WL 104556 (Bankr. S.D. Tex. 2010).

provide Bankruptcy Courts with the authority to dismiss Chapter 11 petitions <u>sua sponte</u>, neither party disputes the Bankruptcy Court's assertion that § 1112(b) authorizes <u>sua sponte</u> dismissals for cause.  In <u>Starmark</u> the Bankruptcy Court concluded not only that it could dismiss a Chapter 11 petition <u>sua sponte</u> for cause, but also that cause to dismiss exists when a Chapter 11 petition is filed to gain an unfair advantage in another lawsuit.  388 B.R. at 735-36 (citing <u>Argus Group 1700, Inc. v. Steinman (In re Steinman)</u>, 206 B.R. 757, 764-765 (E.D. Pa. 1997) (recognizing that evidence of bad faith and/or lack of good faith in filing a bankruptcy petition establishes the requisite "cause" for dismissal under § 1112(b), and that filing a bankruptcy petition to gain advantage in other lawsuit constituted cause for dismissal)).

The parties agree that the purpose of Chapter 11 of the Bankruptcy Code is to assist financially distressed businesses by providing breathing space to reorganize.[32]  <u>See</u> <u>Lemelle v. Universal Manufacturing Corp.</u>, 18 F.3d 1268, 1272 (5th Cir. 1994) ("The purpose of Chapter 11 reorganization is 'to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state.'") (quoting <u>Little</u>

---

[32]<u>See</u> Brief of Debtor-Appellant, Docket Entry No. 3, p. 10 (citing <u>In re Dolton Lodge Trust No. 35188</u>, 22 B.R. 918, 922 (Bankr. N.D. Ill. 1982); Brief for Interest Party/Appellees Janis Lowe and Alan Taylor, Docket Entry No. 7, p. 17 ("Antelope correctly states that the purpose of Chapter 11 is to assist financially distressed businesses by providing them with breathing space to reorganize.").

Creek Development Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.), 779 F.2d 1068, 1073 (5th Cir. 1986)). Although the Bankruptcy Code does not expressly require petitions to be filed in good faith, courts, including the Fifth Circuit, have recognized an implicit good faith requirement for filing a bankruptcy petition to prevent fraud or abuse of the bankruptcy process. See Little Creek, 779 F.2d at 1072 ("[E]very bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution and confirmation of bankruptcy proceedings."). See also Carolin Corporation v. Miller, 886 F.2d 693, 698 (4th Cir. 1989) (requirement of good faith implicit in statutory language and legislative history of § 1112(b)); In re Trident Associates Ltd. Partnership, 52 F.3d 127, 131 (6th Cir.), cert. denied, 116 S.Ct. 188 (1995) (upholding Bankruptcy Court's decision to lift automatic stay and dismiss petition because petitioner filed in bad faith to isolate insolvent property and its creditors on the eve of foreclosure). In Little Creek, 779 F.2d 1072-74, the Fifth Circuit explained that Bankruptcy Courts are responsible for enforcing a standard of good faith and have the ability to dismiss petitions sua sponte if after examining all the particular facts and circumstances they conclude that a petition was not filed in good faith. See Matter of Atlas Supply Corp., 857 F.2d 1061 (5th Cir. 1988) (when determining whether a petition should be dismissed for cause, courts consider the totality of the circumstances).

-11-

## B. Analysis

Following two evidentiary hearings, one on the motion to appoint a Chapter 11 trustee held on September 25, 2009, and one on the Order to Show Cause held on November 4, 2009, the Bankruptcy Court issued a Memorandum Opinion concluding that

> it appears clear that, although Lykos (and perhaps Genssler) saw an opportunity for growth of the Debtor's business through recapitalization, Debtor's near-term capital needs were not so urgent as to cause the filing of a Chapter 11 petition at the time Debtor's board authorized and directed Lykos to file it (Debtor's Exhibit 3), or for more than two years thereafter. Indeed, in light of the passage of two years after that resolution was approved (itself passed after the resignation or ouster of previous management, including Taylor, the former CEO), the proposing on the petition date of a plan by which Genssler was to obtain a release of the shareholder litigation and retain control of Debtor, and Lykos' admission that the upcoming trial prompted the filing, the court infers that Debtor filed the petition in the instant case for the primary purpose of obtaining leverage in the shareholder litigation, not for the Debtor's financial reorganization or in response to a particular financial crisis. There is litigation pending in the United States District Court for the Eastern District of Texas addressing rights the minority shareholders believe have been infringed. In light of the filing of the bankruptcy petition to gain an unfair advantage in the shareholder litigation, the absence of any clear need for financial reorganization, and the assertions that the management who ultimately filed the bankruptcy petition gained control by illegal or unethical means, which assertions can be dealt with in the pending shareholder litigation, the court concludes, on the totality of the circumstances, that the above captioned Chapter 11 case should be dismissed.[33]

The Bankruptcy Court based its decision to dismiss Antelope's Chapter 11 petition on its conclusion that Antelope's primary

---

[33]Memorandum Opinion, Record 75, pp. 8-9. _See also_ _In re Antelope Technologies, Inc._, 2010 WL 104556, *3 (Bankr. S.D. Tex. 2010).

purpose for filing the Chapter 11 petition was not to reorganize or respond to a financial crisis but, instead, to gain unfair advantage in the shareholder derivative action pending in the Eastern District of Texas. The Bankruptcy Court based this conclusion on the terms of the proposed plan, which release Genssler, Lykos, and other Antelope insiders from the claims asserted against them in the shareholder derivative action, and on the absence of evidence showing that Antelope had a clear need for financial reorganization. For the reasons explained below, the court concludes that the findings of fact on which the Bankruptcy Court based its decision to dismiss Antelope's Chapter 11 petition were not clearly erroneous.

    1.    <u>No Clear Need for Financial Reorganization</u>

    The Bankruptcy Court concluded that

> although Lykos (and perhaps Genssler) saw an opportunity
> for growth of the Debtor's business through
> recapitalization, Debtor's near-term capital needs were
> not so urgent as to cause the filing of a Chapter 11
> petition at the time Debtor's board authorized and
> directed Lykos to file it (Debtor's Exhibit 3), or for
> more than two years thereafter.[34]

This conclusion is based on the Bankruptcy Court's findings of fact that on November 14, 2004, Antelope's board of directors resolved to file a Chapter 11 petition immediately and authorized Lykos to

---

[34]Memorandum Opinion, Record 75, p. 8. <u>See also</u> <u>In re Antelope</u>
<u>Technologies, Inc.</u>, 2010 WL 104556, *3 (Bankr. S.D. Tex. 2010).

-13-

do so, but that Antelope delayed for over two years and did not file the petition until February 14, 2007.[35]

Antelope does not dispute these individual fact-findings of the Bankruptcy Court, but, instead, argues that the Bankruptcy Court erred by concluding that Antelope had no clear need for financial reorganization. In support of this argument Antelope cites Lykos' testimony (1) that when Taylor resigned in September of 2004 Antelope suffered from a lack of income, an excessive compensation package for former management, and an inability to obtain financing and/or repay a $3 million loan,[36] (2) that when Antelope filed its Chapter 11 petition in February of 2007, IBM was attempting to terminate Antelope's IBM license,[37] and (3) that the shareholder derivative action pending in the Eastern District of Texas impeded Antelope from attracting capital investment.[38] Antelope argues that

---

[35]Memorandum Opinion, Record 75, p. 5. See also In re Antelope Technologies, Inc., 2010 WL 104556, *2 (Bankr. S.D. Tex. 2010); Lykos' testimony at the Show Cause Hearing, Record 78, pp. 9-15; Minutes of Board of Directors Meeting of Antelope Technologies, Inc., and Resolution of the Directors of Antelope Technologies, Inc. (USA), Attachment 1 to Minutes of Board of Directors Meeting of Antelope Technologies, Inc., included in Record 83 (marked Debtor's Exhibit 3).

[36]Brief of Debtor-Appellant, Docket Entry No. 3, p. 6 (citing Record 78, pp. 11-12), and pp. 10-11 (citing Rec. 77, pp. 27-28 and Rec. 78, p. 40).

[37]Id. at 6, 12, and 21 (citing Show Cause Hearing, Record 78, pp. 10, 12-13).

[38]Id. at 6-7 and 11 (citing Show Cause Hearing, Record 78, pp. 13-14).

-14-

> [i]n a report by Lykos as interim CEO to the Debtor's Board of Directors and shareholders offered into evidence at the show cause hearing, a recommendation was made that existing shareholders were in the best position to recapitalize Debtor. *See Rec. 78, p. 8.*
>
> At no time did any shareholder express a willingness to infuse additional capital into Debtor either prior to or subsequent to the Board of Directors or shareholder vote approving a Chapter 11 filing. *See Rec. 7, 8.*[39]

The evidence that Antelope cites in support of its argument that the Bankruptcy Court erred by concluding that Antelope had no clear need for financial reorganization shows that there may have existed "an opportunity for growth of the Debtor's business through recapitalization,"[40] but does not show that Antelope's near-term capital needs were so urgent as to cause the filing of a Chapter 11 petition either when its board authorized and directed Lykos to do so -- *i.e.*, in November of 2004 -- or when the petition was filed -- *i.e.*, in February of 2007.

(a) Antelope's Financial Condition in 2004

The undisputed fact that Antelope delayed over two years from November of 2004 when its board approved the Chapter 11 filing until February of 2007 when Antelope effected the filing strongly supports the Bankruptcy Court's conclusion that Antelope had no clear need for financial reorganization under Chapter 11 when Antelope's board of directors approved that filing.

---

[39]*Id.* at 11.

[40]Memorandum Opinion, Record 75, p. 8. *See also* *In re Antelope Technologies, Inc.*, 2010 WL 104556, *3 (Bankr. S.D. Tex. 2010).

(b)   IBM License

Antelope contends that immediately before it filed the Chapter 11 petition IBM was attempting to terminate Antelope's license; and had Antelope been liquidated, the IBM license would have been lost.[41]   But Antelope has not cited any evidence showing that the need to protect the IBM license was considered by its board of directors as a reason for authorizing the bankruptcy filing in 2004, or that the Chapter 11 filing in 2007 had any effect on the status of Antelope's IBM license.   Antelope's contention that the bankruptcy filing was prompted by a need to protect its IBM license is contradicted by that part of the Disclosure Statement subtitled "Events Leading to the Commencement of the Chapter 11 Case" that Antelope filed together with its petition and proposed plan on February 14, 2007.   There, Antelope states that

> A[ntelope] T[echnologies] I[nc.] now owns all of the modular computer assets, including improvements of the computer to make it a viable product. **The IBM License is also secure in the hands of Antelope.**  However, Antelope still has significant debts from the pre 2005 operations under the original Antelope management team and in preparing with its sole secured lender Scaltech a comprehensive business and reorganization plan, it became clear that a formal reorganization under the Bankruptcy code as approved in 2004 would be required.[42]

---

[41]Brief of Debtor-Appellant, Docket Entry No. 3, p. 12 (citing Show Cause Hearing, Record 78, pp. 10 and 21).

[42]Debtor's Disclosure Statement for Debtor's Chapter 11 Plan of Reorganization, Record 8, p. 16 (emphasis added).  <u>See also</u> Debtor's First Amended and Modified Disclosure Statement for Debtor's Chapter 11 Plan of Reorganization, Record 26, p. 16.

-16-

Antelope's recognition in the Disclosure Statement that "[t]he IBM License is . . . secure in the hands of Antelope," contradicts Antelope's argument that the Chapter 11 filing was needed to protect its IBM license.

> (c)  Ability to Attract New Capital

Antelope contends that the shareholder derivative action pending in the Eastern District of Texas impeded it from attracting essential capital investment.[43] But in that part of the Disclosure Statement subtitled "Events Leading to the Commencement of the Chapter 11 Case" that Antelope filed together with its petition and proposed plan on February 14, 2007, it fails to mention the shareholder derivative action.  Moreover, Antelope acknowledged therein that during the three months immediately preceding the Chapter 11 filing, "a secured loan in the amount of $395,000 was provided to Antelope."[44]  The acknowledgment in the Disclosure Statement that only months before the bankruptcy filing "a secured loan in the amount of $395,000 was provided to Antelope" contradicts Antelope's argument that it needed the Chapter 11 filing to attract essential capital investment.

---

[43]Brief of Debtor-Appellant, Docket Entry No. 3, pp. 6-7 and 11 (citing Show Cause Hearing, Record 78, pp. 13-14).

[44]Debtor's Disclosure Statement for Debtor's Chapter 11 Plan of Reorganization, Record 8, p. 16.  <u>See also</u> Debtor's First Amended and Modified Disclosure Statement for Debtor's Chapter 11 Plan of Reorganization, Record 26, p. 15 (same).

-17-

(d)   Conclusions

Antelope disputes the Bankruptcy Court's conclusion that it had no clear need for financial reorganization, but fails to point to any evidence from which the Bankruptcy Court could reasonably have concluded that its near-term capital needs were so urgent as to cause the filing of a Chapter 11 petition either when its board authorized and directed Lykos to do so in November of 2004 or when the petition was filed in February of 2007.  Accordingly, the court concludes that the findings of fact on which the Bankruptcy Court based its conclusion that Antelope had no clear need for financial reorganization are neither devoid of evidentiary support nor clearly erroneous.

2.   Advantage in Shareholder Derivative Action

The Bankruptcy Court concluded that

in light of the passage of two years after that resolution was approved (itself passed after the resignation or ouster of previous management, including Taylor, the former CEO), the proposing on the petition date of a plan by which Genssler was to obtain a release of the shareholder litigation and retain control of Debtor, and Lykos' admission that the upcoming trial prompted the filing, the court infers that Debtor filed the petition in the instant case for the primary purpose of obtaining leverage in the shareholder litigation, not for the Debtor's financial reorganization or in response to a particular financial crisis.[45]

These conclusions are based on the Bankruptcy Court's findings of fact regarding both the terms of the plan and the District Court's

_____

[45]Memorandum Opinion, Record 75, p. 8.  See also In re Antelope Technologies, Inc., 2010 WL 104556, *3 (Bankr. S.D. Tex. 2010).

-18-

observations that "Genssler is the owner of Scaltech, and that Lykos was Genssler's attorney,"[46] Lykos "'admitted that the upcoming Shareholder Litigation trial prompted the filing of the Chapter 11 petition,'"[47] and "Genssler 'was paid in full through Scaltech, and avoided the derivative lawsuit.'"[48]

Antelope argues that the Bankruptcy Court erred by concluding that the Chapter 11 petition was filed to gain leverage in the shareholder litigation and not for Antelope's financial reorganization or in response to a particular financial crisis. In support of this argument Antelope contends that the Bankruptcy Court's "only 'factual' justification [for its conclusions] is defective in and of itself because it relied on 'facts' cited by an appellate court that confused Lowe and Taylor's unproven allegations and speculation with fact."[49] Antelope asserts that Lykos testified at the show cause hearing that

> the Derivative Shareholder Litigation was a meritless lawsuit brought by a small minority of Debtor's shareholders, some of whom had created the situation that

---

[46]Id. at 7 (citing Docket Entry No. 21 in Case No. 4:07cv4135, at p. 2). See also In re Antelope Technologies, Inc., 2010 WL 104556, *2 (Bankr. S.D. Tex. 2010).

[47]Id. at 7 (citing Docket Entry No. 21 in Case No. 4:07cv4135, at p. 4). See also In re Antelope Technologies, Inc., 2010 WL 104556, *2 (Bankr. S.D. Tex. 2010).

[48]Id. at 6-7 (citing Docket Entry No. 21 in Case No. 4:07cv4135, at p. 6). See also In re Antelope Technologies, Inc., 2010 WL 104556, *2 (Bankr. S.D. Tex. 2010).

[49]Brief of Debtor-Appellant, Docket Entry No. 3, p. 13 (citing Memorandum Order and Opinion, Records 66 and 67).

-19-

led to Debtor's bankruptcy. *See Rec. 78, p. 53.* Lowe and Taylor presented no credible evidence whatsoever that the bankruptcy proceeding had been filed to gain an advantage in a two party dispute. *See Rec. 78.* To the contrary, Debtor presented compelling evidence supporting its good faith filing of the bankruptcy proceeding in this case. *See Rec. 78.*[50]

   (a)  Advantage to Genssler and Lykos

Antelope argues that the Bankruptcy Court's findings that Genssler was paid in full through Scaltech and avoided the derivative lawsuit, that Genssler is the owner of Scaltech, and that Lykos was Genssler's attorney cannot be "findings of fact" because they are not based on evidence but, instead, on unproven allegations that the District Court mistook as facts. The District Court's Memorandum Order and Opinion cites as the source of these findings the Order Confirming the Debtor's Plan of Reorganization, Exhibit A to which was Antelope's Plan.[51]

The Antelope Plan identifies Scaltech as the only secured creditor and provides for Scaltech to be fully compensated and released from liability for any claims related to Antelope and/or its bankruptcy including, presumably, any claims that may have been asserted against Scaltech in the shareholder derivative action.[52]

---

[50]<u>Id.</u> at 7 (citing Show Cause Hearing, Record 78, p. 7).

[51]Memorandum Order and Opinion, Records 66 and 67, p. 6 (citing Docket Entry No. 13, Exhibit 47, Order Confirming Debtor's Plan of Reorganization (Record 47 in this action)).

[52]Debtor's Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code, Exhibit A attached to Record 47,
(continued...)

The Plan provides for two classes of unsecured creditors to be paid the cash equivalent of 5% of their estimated claims,[53] and for the claims of equity shareholders such as Lowe and Taylor to be canceled.[54] The Plan contains provisions that release and exculpate all directors, officers, employees, members, partners, professionals, and agents of both Antelope and Scaltech from any claims related to Antelope and/or its bankruptcy action;[55] and the list of Senior Management included in Debtor's First Amended and Modified Disclosure Statement identifies Genssler as Antelope's CEO and Lykos as Antelope's President and General Counsel.[56] Because the Plan provides (1) for Scaltech to be paid in full; (2) for claims asserted against the directors, officers, and employees of Antelope and Scaltech, and against Scaltech itself, to be released; and (3) for these parties to be exculpated, the Bankruptcy Court's findings of fact that Scaltech would be paid in full and that Genssler would avoid the shareholder derivative lawsuit were not devoid of evidentiary support but, instead, were based on evidence

---

[52](...continued)
p. 10, § 5.2 (providing, inter alia, "[t]he full amount of the Scaltech Pre-Petition Claim owing as of the Effective Date shall be an Allowed Secured Claim pursuant to this Plan, and shall be satisfied as stated below").

[53]Id. at 11 § 5.4.

[54]Id. § 5.5.

[55]Id. §§ 14.4 ("Releases"), and 14.5 ("Exculpation of Post-Petition Board, Officers, Agents and Scaltech").

[56]Exhibit C attached to Record 26.

properly presented to the Bankruptcy Court in Antelope's disclosure statement and previously confirmed plan. Accordingly, the Bankruptcy Court's findings of fact that Scaltech would be paid in full and that Genssler would avoid the shareholder derivative lawsuit are not clearly erroneous. Whether Genssler owns Scaltech and whether Lykos was Genssler's attorney are findings that are not needed to support the Bankruptcy Court's conclusion that the Chapter 11 petition was filed to gain advantage in the shareholder derivative action.

(b) Admission that Shareholder Litigation Prompted Chapter 11 Filing

Antelope argues that the Bankruptcy Court's finding that Lykos admitted that the upcoming Shareholder Litigation trial prompted the filing of the Chapter 11 petition is not based on evidence and, therefore, cannot be a finding of fact. In support of its statement that Lykos admitted that the upcoming Shareholder Litigation trial prompted the filing of the Chapter 11 petition, the District Court cited Lykos' testimony at the § 341 meeting of creditors.[57] Appellees have designated the transcript from the § 341 meeting as Record 84 in this action.[58] At the § 341 meeting

---

[57]Memorandum Order and Opinion, Records 66 and 67, p. 4 (citing Docket Entry No. 13, Exhibit 34, Transcript for the § 341 Hearing held on April 5, 2007).

[58]Interest Parties/Appellees Janis Lowe's and Alan Taylor's Supplemental Designation of Items to Be Included in the Record, Docket Entry No. 6.

Lykos testified that the shareholder derivative action pending in the Eastern District of Texas was a reason for filing the Chapter 11 petition:

Mr. Sharp:        . . . the bankruptcy was filed in February of 2007. And the primary reason, I think what you testified, is that you were unable to meet payroll debt, and you're making attempts to resolve a lawsuit.

                 Are we referring to lawsuits in the plural, or just lawsuit that's the number -- the number one -- the Harris County lawsuit that's listed on the -- your statement of financial affairs page 834.

Mr. Lykos:       I was referring to the lawsuit in Lufkin, Texas.

                              . . .

Mr. Sharp:       . . . When we're talking about the reason for the bankruptcy, you stated that attempts to resolve the lawsuit. Is that also including the Lufkin lawsuit?

Mr. Lykos:       Yeah. I'm not sure I really understand your question.

Mr. Sharp:       For the filing of the bankruptcy. Correct?

Mr. Lykos:       Right. Yeah. No doubt about it.

Mr. Sharp:       Okay.

Mr. Lykos:       It's a derivative lawsuit. The only claims that I see in the entire lawsuit as it's been explained to me by all the lawyers is derivative claims, which would be assets owned by Antelope, not individuals.[59]

---

[59]Section 341 Hearing, Record 84 attached to Docket Entry No. 6, p. 40:15-24 and p. 41:10-23.

-23-

Because this testimony provided by Lykos at the § 341 meeting
constitutes evidentiary support for the District Court's statement
that Lykos admitted the shareholder derivative action prompted the
Chapter 11 filing,[60] the Bankruptcy Court's reliance on this
statement in the District Court's Memorandum Order and Opinion does
not lack evidentiary support.  Alternatively, the court concludes
that testimony provided by Lykos at the show cause hearing
conducted by the Bankruptcy Court on November 4, 2009, also
provides evidentiary support for the Bankruptcy Court's finding
that Lykos admitted the shareholder derivative action prompted the
Chapter 11 filing.  At the show cause hearing Lykos explained why
the shareholder derivative action pending in the Eastern District
of Texas was a reason for the bankruptcy filing:

> Q:   With regard to the timeframe immediately prior to
> the filing of the bankruptcy, there was litigation
> pending in the Eastern District of Texas that had
> been brought by some of the disgruntled
> shareholders as, effectively, a third-party -- the
> company theoretically was a third-party
> beneficiary, the owner of the cause of action.
>
> Is that correct?
>
> A.   It was a derivative lawsuit.
>
> Q.   That's correct.
>
> A.   Yes.

---

[60]See Memorandum Order and Opinion, Records 66 and 67, p. 4
("Antelope's CEO, Lykos, has admitted that the upcoming Shareholder
Litigation trial prompted the filing of the Chapter 11 petition.
Dkt. 13, Ex. 34.").

-24-

Q.   And that existed on the books.  Did that stand as a
     problem for obtaining any investment into Antelope?

A.   Yes.

Q.   Why?

A.   Well the -- especially once the bankruptcy had been
     filed, the people who would manage the company, and
     who ultimately would invest in the company, were
     the people who were party to that lawsuit and [it]
     would be hard to attract money into that company
     while the company was suing the management
     responsible for bringing the company out of
     bankruptcy.[61]

Antelope's Plan would release claims asserted against "the
people who would manage the company," e.g., Antelope's current CEO,
Genssler, and current president and general counsel, Lykos.[62]
Lykos' testimony at the show cause hearing that the shareholder
derivative action impeded Antelope's ability to attract capital
investment because

> **the people who would manage the company,** and who
> ultimately would invest in the company, were the people
> who were party to that lawsuit and [it] would be hard to
> attract money into that company while the company was
> suing the management responsible for bringing the company
> out of bankruptcy,[63]

therefore strongly supports the Bankruptcy Court's conclusion that
the Chapter 11 petition was filed to gain an unfair advantage in
the shareholder derivative action pending in the Eastern District
of Texas.  The Bankruptcy Court could also reasonably have inferred

---

[61]Show Cause Hearing, Record 78, pp. 13:15 - 14:10.

[62]See § III.B.2(a), above.

[63]Show Cause Hearing, Record 78, p. 14:6-10 (emphasis added).

-25-

from this testimony that Lykos admitted the shareholder derivative
action prompted the filing of the Chapter 11 petition. Indeed,
Antelope appears to have drawn the same inference since in its
brief to this court, Antelope cites this same Lykos testimony as
evidence that the Chapter 11 filing was justified because the
shareholder derivative action impeded its ability to attract
capital investment.[64]

(c) Conclusions

Antelope disputes the Bankruptcy Court's conclusion that the
Chapter 11 petition was filed to gain leverage in the shareholder
derivative action pending in the Eastern District of Texas, but
fails to point to any evidence from which the Bankruptcy Court
could reasonably have concluded otherwise. Accordingly, the court
concludes that the findings of fact on which the Bankruptcy Court
based its conclusion that the Chapter 11 petition was filed to gain
an unfair advantage in the shareholder derivative action pending in
the Eastern District of Texas are neither devoid of evidentiary
support nor clearly erroneous.

**C.  Conclusions**

For the reasons explained above, the court concludes that the
Bankruptcy Court's findings of fact are not devoid of evidentiary

---

[64]See Brief of Debtor-Appellant, Docket Entry No. 3, pp. 6-7
and 11 (citing Show Cause Hearing, Record 78, pp. 13-14); and
§ III.B.1(c), above.

-26-

support but are rationally related to the supportive evidence contained in the record and developed at the hearings held before the Bankruptcy Court. Accordingly, the court concludes that the Bankruptcy Court's findings of fact are not clearly erroneous, and that the Bankruptcy Court's conclusion that Antelope's Chapter 11 petition should be dismissed because the petition was not filed for the purpose of Antelope's financial reorganization or in response to a particular financial crisis but, instead, to gain unfair advantage in the shareholder derivative action pending in the Eastern District of Texas, should be affirmed.

## IV. Order

The Bankruptcy Court's final Judgment dismissing Antelope's Chapter 11 petition is **AFFIRMED**.

**SIGNED** at Houston, Texas, on this the 21st day of July, 2010.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

-27-

# ATTACHMENT # 14



## SCHONFELD v. HILLIARD

*NO. 95 CIV. 3052 MBM.*

---

*62 F.Supp.2d 1062 (1999)*

### Reese SCHONFELD, individually and derivatively as a shareholder of International News Network, Inc., Plaintiff, v. Russ HILLIARD, Les Hilliard and International News Network, Inc., Defendants.

*United States District Court, S.D. New York.*
*February 1, 1999.*

*James P. Murphy, Murphy, Kirkpatrick & Fain, Billings, MN, for Les Hilliard.*

#### OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff Reese Schonfeld, on behalf of himself and derivatively as a one-third shareholder of International News Network, Inc. ("INN"), sues Russ Hilliard and his brother, Les Hilliard, for various damages arising from the breach of an oral contract. Under the alleged contract, the Hilliards were obligated to finance a contemporaneously executed interim supply agreement between INN and the British Broadcasting Corporation World Service Television Limited ("BBC"). Plaintiff asserts, among other things, claims for breach of contract, breach of fiduciary duty and fraud.

The Hilliards now move for summary judgment pursuant to Fed.R.Civ.P. 56 dismissing all ten claims against them. In addition, the Hilliards submit two motions *in limine* to strike the proposed testimony of plaintiff's damages experts. Plaintiff cross-moves to strike all or part of the testimony of the four Hilliard experts. For the reasons stated below, the defendants' motions for summary judgment are granted in part and denied in part.

### I.

Many of the facts relating to the formation of the alleged oral contract are in dispute. The following relevant facts are presented in the light most favorable to plaintiff.

**[62 F.Supp.2d 1065]**

Russ Hilliard and Les Hilliard are brothers who separately own and operate small cable television companies in the mid-West. In 1988, they founded INN, a Delaware corporation, for the purpose of distributing an international news and information channel in the United States. (Russ Hilliard Decl. ¶ 2) Later that year, the Hilliards retained the financial services company Daniels & Associates ("Daniels") to prepare a business plan and solicit investors for the project. (Dickinson Dep. at 29)[1]

In 1990, the Hilliards hired plaintiff, a founder and former President and CEO of Cable News Network ("CNN"), as a consultant for INN. (Russ Hilliard Decl. ¶ 4) Later, in 1993, the Hilliards again approached plaintiff, who at that time was President of the Television Food Network, to discuss the possibility of bringing the BBC World News Channel, in a 24-hour format, to the United States. (*Id.* ¶ 5)

The Hilliards' negotiations with plaintiff culminated in a shareholder agreement, dated February 24, 1994, in which each signatory became a one-third shareholder in INN. (Russ Hilliard Decl. Ex. 1) Under that agreement, each shareholder was obligated to contribute $10,000 as equity in INN. (*Id.* ¶ 8(b)) In addition, Russ Hilliard and Les Hilliard each loaned INN $300,000 and agreed "to cause additional loans to be made to [INN] (in an amount not to exceed $350,000 in the aggregate) as may be necessary." (*Id.*) That agreement provided for a two-member Board of Directors. (*Id.* ¶ 3) Although no directors were officially designated, the record shows that Russ Hilliard and plaintiff effectively acted as directors. At this time, plaintiff also took on the roles of President and CEO of the new corporation. (Russ Hilliard Decl. ¶ 7)

With the reorganization of INN complete, the participants focused on acquiring BBC programming for a 24-hour news and information channel (the "Channel"). From the inception of the project, the parties understood that INN would be merely an investor in any entity ultimately established for the purpose of operating the Channel. INN's shareholders would be allowed to increase their equity in the proposed Channel by making additional cash investments in the operating entity rather than in INN, but no definitive decisions were made as to the percentage of profits INN, or any other equity investor, would receive.[2] (Russ Hilliard Decl. Ex. 1)

In late 1993 and early 1994, INN, through its attorney Richard Blumenthal, and plaintiff, the acting President, negotiated an agreement with the BBC, executed on March 14, 1994 (the "March Supply Agreement"). Subject to limitations, the BBC granted INN a 20-year permit to distribute BBC programming on the proposed Channel, commencing not earlier than June 1995 and not later than January 1996. (Russ Hilliard Decl. Ex. 2) The March Supply Agreement gave INN the exclusive right to distribute and license the Channel "as a whole." (*Id.* ¶¶ 7.1.2-3) Arguably, INN had exclusive rights only to the provision of programming in 24-hour blocks, permitting the BBC to license blocks of less than 24 hours to other U.S. channels. (*Id.* ¶¶ 7-8) Upon the written consent of the BBC, INN was allowed to assign the benefits of the March Supply Agreement to the proposed operating entity. (*Id.* ¶ 21.1) This consent was not to be withheld unreasonably. (*Id.*) With respect to any other assignments, however, the March Supply Agreement was personal to INN and, apparently, the BBC could grant or withhold consent for assignment

**[62 F.Supp.2d 1066]**

as it saw fit.[3] (*Id.*) In addition, the BBC reserved the right to terminate all its obligations under the March Supply Agreement if INN failed to commence distribution of the

Channel by March 1995. (*Id.* ¶ 18.1)

INN made several attempts to locate investors and secure carriage agreements from cable operators in an unsuccessful effort to meet the capital requirements prescribed by the March Supply Agreement. (Russ Hilliard Decl. ¶ 11) According to Blumenthal, the Hilliards promised that, in addition to their contributions under the shareholder agreement, "they would pay the initial cost of funding INN's efforts [in] seeking to implement the original [March] supply agreement." (Blumenthal Dep. at 54) Blumenthal testified that the Hilliards made an oral promise to pay ancillary costs — such as attorneys' and consulting fees. (*Id.*)

Soon after executing the March Supply Agreement, INN was approached by Cox Cable Communications ("Cox"), one of the largest cable operators in the United States (Dickinson Dep. at 39), with an offer effectively to buy out INN's supply rights. (*Id.* at 104-05) Cox wanted to launch two BBC channels, one with news and the other with entertainment programming. (*Id.* at 91) Cox was willing to pay INN a total of $1.7 million plus 20% of tenth-year gross revenues of both the proposed channels. (*Id.* at 91-92; Fader Decl. Vol. I, Ex. 4A) The deal eventually collapsed in August 1994, however, when INN denied a request by Cox for a 90-day extension to work out with the BBC certain non-financial terms of the arrangement. (Young Dep. at 52-54, 57, 143-44)

In October 1994, the FCC announced "going forward" rules, which allowed cable operators to charge subscribers an increased monthly rate for each new channel, up to six, added as of January 1, 1995. (Pl. Mem. in Opp'n at 25) This regulatory change provided a "window of opportunity" for the Channel to obtain distribution. (Young Dep. at 70-71) Eager to be in the market when the new rules took effect, INN and the BBC arranged a series of meetings to discuss the possibility of advancing the start date for launch of the Channel. (Russ Hilliard Decl. ¶¶ 14-16)

On November 17, 1994, and in the days following, Russ Hilliard, plaintiff and Blumenthal met in New York with Mark Young and Sarah Cooper — representatives of the BBC — to negotiate a deal whereby the BBC would provide programming on an interim basis within 60 to 90 days. In an "Interim Agreement," effective December 14, 1994, the BBC agreed to provide provisional programming as early as possible, and agreed to begin development of a revised programming format, specifically designed for the American audience, for launch no later than December 31, 1995, under a revised 20-year supply agreement (the "December Supply Agreement").[4] (Russ Hilliard Decl. Ex. 3, at 1) In consideration for the interim programming feed, the Interim Agreement provided that INN

**[62 F.Supp.2d 1067]**

would pay the BBC the following amounts: (i) £3.35 million (the "Basic Payment") in a series of installments beginning January 3, 1995, and ending August 15, 1995; (ii) an additional fee of between £250,000 and £1.5 million in order to pay the BBC's costs in altering or substituting programming; and (iii) all costs associated with the transponder transmission of the "Interim Channel." (*Id.* at 2-5) The Interim Agreement provided also that the BBC could terminate the Interim Agreement if, by January 31, 1995, INN did not have letters from cable systems with an aggregate of at least 500,000 subscribers indicating an intent to carry the Interim Channel and the Channel. (*Id.* at 5)

According to plaintiff, Russ Hilliard made repeated representations to plaintiff, Blumenthal, Cooper and Young that he would fund the Interim Agreement. (Young Dep. at 73; Schonfeld Dep. at 77-78; Blumenthal Dep. at 82) Two witnesses aver also that at the November 1994 meetings, Russ Hilliard assured all participants that he and his brother, Les Hilliard, would personally fund the Interim Agreement if necessary. (Schonfeld Dep. at 71, 73; Blumenthal Dep. at 65) There is no evidence, however, of the exact wording of the promise to fund. Moreover, it is undisputed that there was no oral or written agreement regarding the form of funding — whether a loan or an equity investment, the total sum of the promised funding, or the liabilities and remedies of the parties in the event of a failure to fund. Even so, plaintiff and the BBC representatives present consistent testimony that when they signed both the Interim Agreement and the December Supply Agreement, they relied upon the Hilliards' promise to provide funding. (Young Dep. at 188-89, 211; Russ Hilliard Dep. 223-24, 299)

Les Hilliard was not at the relevant meetings in November 1994 and did not make an express oral promise to lend or invest any additional funds at that time. (Schonfeld Dep. at 66) Both Young and Blumenthal testify, however, that they believed that Russ Hilliard was acting on his brother's authority, as he had on several occasions during the INN-BBC negotiations. (Young Dep. at 84-85; Blumenthal Dep. at 72, 161-62) Moreover, Les Hilliard allegedly alluded to the funding promise in conversation directly to Blumenthal. (Blumenthal Dep. at 102) In addition, it is alleged that on at least one occasion Les Hilliard was present when Russ Hilliard confirmed to the relevant parties that the Hilliards would personally fund the Interim Agreement. (Schonfeld Dep. at 35) Les Hilliard allegedly did nothing to disabuse the parties of their belief that Russ Hilliard was authorized to speak on his behalf. (Pl. Mem. in Opp'n at 88)

As the deadline for the first payment drew near, Russ Hilliard spoke directly with Young and said that he would prefer to "extend the time scale by which [the first] payment will be made to the beginning of January." (Young Dep. at 74) Russ Hilliard explained that "because of the Christmas break and his and Les' holiday in Jamaica, they would be unable to get their funds from their bank account into the INN bank account in time to allow the interim agreement to be signed." (*Id.*) On December 15, 1994, Cooper telephoned Russ Hilliard to confirm that the first $1 million payment could be made on January 3, 1995, and the Interim Agreement was put in final form based on that understanding. (Fader Decl. Vol. II, Ex. 58; Young Dep. at 102-04)

As of the middle of January 1995, the Hilliards had made no payments, INN was in default of payments totaling $5 million and the Hilliards had failed to return plaintiff's and BBC's many telephone calls. (Young Dep. at 121-26; Cooper Dep. at 21-22) On February 8, 1995, Russ Hilliard, plaintiff, Young, Cooper and two other representatives of the BBC met in New York to determine whether the breaches of the Interim Agreement and the alleged oral agreement would be rectified. At the meeting, Russ Hilliard did not deny that

**[62 F.Supp.2d 1068]**

he and his brother had promised to fund the Interim Agreement (Cooper Dep. at 44, 62), although he did offer a reason for why the funds were not provided, having to do with the difficulty INN would have obtaining cable operator support. Ultimately, the BBC agreed to release INN without any payment and in exchange, INN dissolved the Interim and December Supply Agreements. (Young Dep. at 99-100, 139-40; Russ Hilliard Decl. Ex. 5)

Plaintiff alleges the Hilliards never intended to fund the Interim Agreement and that they made malicious and willful misrepresentations to conceal that fact. (Am. Compl. ¶¶ 70-71) He further alleges that but for the Hilliards' false inducement he would not have abandoned the existing March Supply Agreement to enter into the Interim and December Supply Agreements. (*Id.* ¶ 75)

In April 1995, plaintiff commenced this diversity action pursuant to 28 U.S.C. § 1332(a)(1), alleging derivative claims for fraud, breach of contract, promissory estoppel, breach of the fiduciary duties of loyalty and care, and mismanagement and waste of corporate assets. In addition, he alleges direct claims for breach of contract, promissory estoppel and breach of the fiduciary duties of loyalty and care. (Am. Compl. ¶¶ 69-126)

**II.**

Before turning to the merits of the Hilliards' summary judgment motion, I address two threshold issues regarding this court's jurisdiction and the law that governs the litigation.

First, I consider whether this court has jurisdiction over the subject matter of plaintiff's claims. *See* Fed.R.Civ.P. 12(h)(3); (Russ Hilliard Reply Mem. at 39-41). The court's subject matter jurisdiction is predicated upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a), which requires that the amount in controversy exceed $75,000. It is undisputed that there exists complete diversity of citizenship. The Hilliards, however, contend that the amount in controversy, at least under Claims 7 to 10, is less than the jurisdictional minimum and that those claims, therefore, must be dismissed.

The Supreme Court established in *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288-89, 58 S.Ct. 586, 82 L.Ed. 845 (1938), that:

> The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.

In shaping the "legal certainty" principle set forth in *St. Paul,* the Second Circuit has noted that

> legal impossibility of recovery must be so certain as to virtually negat[e] the plaintiff's good faith in asserting the claim. If the right to recovery is uncertain, the doubt should be resolved ... in favor of the subjective good faith of the plaintiff.

*Tongkook America, Inc. v. Shipton Sportswear Co.,* 14 F.3d 781, 784 (2d Cir.1994) (citations omitted). The party invoking the jurisdiction of the court has the burden of proof on this issue. *See Chase Manhattan Bank v. American Nat'l Bank,* 93 F.3d 1064, 1070 (2d Cir.1996).

The court's inquiry into jurisdiction is not limited to the face of the complaint, *see McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 181, 56 S.Ct. 780, 80 L.Ed. 1135 (1936), but resort to discovery materials may be used only "to amplify the meaning of the complaint allegations." *Zacharia v. Harbor Island Spa, Inc.,* 684 F.2d 199, 202 (2d Cir.1982) (citation omitted). Moreover, any defense asserted on the merits may not be considered or adjudicated on a jurisdictional motion. *See id.* A valid defense, in other words, does not deprive a federal court of

[62 F.Supp.2d 1069]

jurisdiction. *See Smithers v. Smith,* 204 U.S. 632, 642, 27 S.Ct. 297, 51 L.Ed. 656 (1907); *Tongkook America,* 14 F.3d at 784.

Although not cited by the Hilliards, there is case law that permits a court when faced with a rule that bars or limits liability, to go beyond the pleadings for the limited purpose of applying that rule to determine the court's jurisdiction. *See, e.g., Pratt Central Park Ltd. v. Dames & Moore, Inc.,* 60 F.3d 350 (7th Cir.1995); *Valhal Corp. v. Sullivan Assoc. Inc.,* 44 F.3d 195 (3d Cir.1995); *Pachinger v. MGM Grand Hotel-Las Vegas, Inc.,* 802 F.2d 362 (9th Cir.1986). The Second Circuit, however, has not adopted this approach.

The controlling law for this court was established in *Zacharia.* In that case, the lower court had dismissed a guest's claim for the value of items deposited in a hotel safe deposit box. *See Zacharia,* 684 F.2d at 201-02. The district court had first determined that a limitation-of-liability policy, signed by the guest, capped recovery below the amount-in-controversy requirement. Then, after finding that the policy was valid under state law, the court dismissed the complaint for lack of subject matter jurisdiction. *See id.* at 202. The Second Circuit reversed, finding that the district court had improperly gone beyond the allegations in the complaint. The Court held that the liability limitation was an affirmative defense, the completeness of which did not deprive the court of jurisdiction, and reiterated that jurisdiction is based on the complaint alone, without considering defenses. *See id.; see also Ochoa v. Interbrew America, Inc.,* 999 F.2d 626 (2d Cir.1993) (noting that, in the absence of a claim of bad faith, the determination of amount in controversy is limited to a plaintiff's complaint).

The Hilliards base their jurisdictional challenge, in part, on their belief that plaintiff cannot recover for lost profits under New York law. (*See* Russ Hilliard Reply Mem. at 39-41) For the reasons discussed below, I agree that the claim for lost profits must be dismissed. That decision, however, is based on a factual analysis that goes beyond the complaint, which, as noted, is not permitted on a jurisdictional motion. *See Zacharia,* 684 F.2d at 202. Because it is undisputed that a claim for lost profits is not barred in New York, it is not legally impossible that plaintiff might recover the amounts he claims. Accordingly, I cannot at the present time dismiss this case for lack of subject matter jurisdiction.

The second threshold issue is whether New York or Delaware law governs (i) the issues related to the formation, enforcement and breach of the alleged oral contract to fund, and (ii) the issues of fiduciary status and breach of fiduciary duties.

It is well established that a federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *See Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In New York, choice-of-law issues involving contractual disputes are governed by an "interest analysis" or "most significant relationship" test. *Coastal Aviation, Inc. v. Commander Aircraft Co.,* 937 F.Supp. 1051, 1060 (S.D.N.Y. 1996) (citing *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 137 (2d Cir.1991)); *see also Intercontinental Planning Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576 (1969) (extending New York's traditional "center of gravity" or "grouping of contracts" approach to an interest analysis). Specifically, "the law of the jurisdiction having the greatest interest in the litigation controls." *Id.* In conducting this analysis, a court should consider factors such as (1) the location of contracting, (2) the location of contract negotiation, (3) the location of performance, (4) the location of the subject matter of the contract, and (5) the domiciles, residences, nationalities, places of incorporation,

[62 F.Supp.2d 1070]

and the places of business of the parties. *See id.* at 137.

In this case, both parties have assumed that New York law governs the oral agreement; they rely exclusively on New York law to support their respective contentions on contract formation, enforcement, breach and damages. *Cf. id.* at 137 (deciding that parties may consent to the application of New York law by their conduct); *Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52 (2d Cir.1984) (same). Because there is no countervailing public policy that mandates otherwise, I will assume also that New York governs all contractual disputes.

A disagreement does exist, however, as to which law governs plaintiff's breach of fiduciary duty claims. The Hilliards argue that under New York choice-of-law rules, the law of the state of incorporation — here, Delaware law — governs the fiduciary claims. (*See* Russ Hilliard Mem. at 70 n. 11); *see also Walton v. Morgan Stanley & Co.,* 623 F.2d 796, 798 n. 3 (2d Cir.1980) (stating, without analysis, that the law of the state of incorporation applies in fiduciary duty actions (citing *Diamond v. Oreamuno,* 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969))).

Contrary to the Hilliards' assertion, however, New York does not automatically apply the law of the state of incorporation to determine shareholder rights and fiduciary liabilities. In *Greenspun v. Lindley,* 36 N.Y.2d 473, 369 N.Y.S.2d 123, 330 N.E.2d 79 (1975), the Court of Appeals confronted the question of whether New York or Massachusetts law should govern a shareholder's derivative action brought in a New York court against the trustees of a business trust organized under laws of Massachusetts. Although the Court held that Massachusetts law controlled, the court rejected "any automatic application of the so-called 'internal affairs' choice-of-law rule" *id.* at 478, 369 N.Y.S.2d at 126, 330 N.E.2d 79. Instead, the Court looked to several factors: the state of incorporation, the fact that the declaration of trust expressly provided for the application of Massachusetts law, and the lack of evidence that the trust had a significant "presence" in New York. *Id.; see also Norlin Corp. v. Rooney, Pace Inc.* 744 F.2d 255, 263 (2d Cir.1984) (restating the analytical framework presented in *Greenspun*); *cf. Restatement (Second) of Conflicts of Laws* § 309, comment c (stating that the law of a state other than state of incorporation may apply "where the corporation does all, or nearly all, of its business and has most of its shareholders in this other state and has little contact, apart from the fact of its incorporation, with the state of incorporation"). In short "the principles compelling a forum state to apply foreign law come into play only when a legitimate and substantial interest of another state would thereby be served." *Norlin,* 744 F.2d at 263 (citations omitted).

INN was a corporation organized under the laws of Delaware. Nevertheless, the INN Shareholders Agreement, the only document that provides for corporate governance and shareholder rights and responsibilities, expressly provides that: "This Agreement shall be governed by the laws of the State of New York applicable without regard to the principles of conflicts of laws." (*See* Russ Hilliard Ex. 1, ¶ 13) Thus, New York law is presumptively applicable.

A finding that the parties intended New York law to apply to shareholder claims is consistent also with another provision of the Shareholders Agreement naming New York as the site for any arbitrations. (*See id.* ¶ 6) Moreover, even after the Hilliards asserted that Delaware law governs, both parties continued to cite New York law in support of their contentions regarding the fiduciary duty claims. (*See, e.g.,* Russ Mem. at 63-65; Russ Hilliard Reply at 42; Pl. Mem. in Opp'n at 113 n. 92) Finally, the record reveals significant contacts with New York which support a finding of a New York "presence" by INN. For instance, all documents at issue in this litigation, including the Shareholders Agreement, were drafted in New York;

**[62 F.Supp.2d 1071]**

all significant business meetings, negotiations and announcements took place in New York; and INN's President, Chairman and one-third shareholder is a resident of New York.

Because the Hilliards have shown no distinctions between Delaware law and New York law that raise countervailing issues of public policy, I find no reason to ignore the express choice-of-law term of the Shareholders Agreement. Therefore, I will apply New York law to plaintiff's fiduciary duty actions as well.

### III.

Summary judgment is mandated when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, "the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994). Nevertheless, Rule 56 jurisprudence is clear in "provid[ing] that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party, therefore, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations will not suffice to create a genuine issue." *Delaware & Hudson Ry. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990).

### IV.

### A. *RECOVERY OF LOST PROFITS DAMAGES*

Plaintiff seeks damages of approximately $100 to $270 million in lost profits flowing from INN's loss of the December Supply Agreement. (*See* Murphy Aff. Ex. E) The Hilliards move for summary judgment and dismissal of all lost profits claims for (1) lack of evidence to prove lost profits damages with the requisite degree of certainty, and (2) plaintiff's failure to prove that liability for future lost profits was in the contemplation of the parties to the contract at the time it was made. For the reasons discussed below, I agree with the Hilliards on both points and dismiss plaintiff's claims for lost profits.

In an action for breach of contract, the injured party is entitled to the benefit of the bargain, and the recovery may include the profits which he would have derived from performance of the contract. *See Perma Research & Dev. v. Singer Co.,* 542 F.2d 111, 116 (2d Cir.1976). New York law, which controls here, permits recovery of lost future profits as damages, but only under rigorous rules:

> First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.... In addition, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made.

*Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234 (1986) (per curiam) ("*Kenford I*") (citations omitted). For a new business, such as a start-up cable channel, evidence of lost profits receives greater scrutiny for the obvious reason that there does not exist a reasonable basis of experience — *i.e.* historic profits — upon which to

**[62 F.Supp.2d 1072]**

estimate lost profits with the requisite degree of reasonable certainty. *See id.* (citing *Cramer v. Grand Rapids Show Case Co.,* 223 N.Y. 63, 68-69, 119 N.E. 227 (3d Dep't 1918)).

In *Kenford I,* in circumstances highly analogous to those presented here, New York's Court of Appeals articulated the standard for proving lost profits with reasonable certainty. Erie County had entered into a contract with Kenford and its affiliate, Dome Stadium, in which Kenford agreed to convey land to the county for construction of a domed stadium. The county agreed to construct the stadium and to lease it to Dome Stadium for 40 years or, if the parties could not agree upon the terms of the lease, to enter into a 20-year contract under which Dome Stadium would manage the facility. The stadium was never constructed and Dome Stadium sued the county for breach. The Court affirmed the lower court's decision to set aside a jury verdict for $25.6 million for lost profits flowing from the management contract.

In upholding the lower court's decision, the Court found no fault with the statistical procedures or data used to calculate the damages — in fact, the Court noted that the proof offered, "unquestionably, represents business and industry's most advanced and sophisticated method for predicting the probable results of contemplated projects." *Kenford I,* 67 N.Y.2d at 261-62, 502 N.Y.S.2d at 133, 493 N.E.2d 234. Even so, the Court found the economic assessment of damages legally insufficient, stating that

> [d]espite the massive quantity of expert proof submitted by [Dome Stadium], the ultimate conclusions are still projections, and as employed in the present day commercial world, subject to adjustment and modification. We of course recognize that any projection cannot be absolute, nor is there any such requirement, but it is axiomatic that the degree of certainty is dependent upon known or unknown factors which form the basis of the ultimate conclusion.... Quite simply, the multitude of assumptions required to establish projections of profitability over the life of this contract require speculation and conjecture, making it beyond the capability of even the most sophisticated procedures to satisfy the legal requirement of proof with reasonable certainty.

*Id.* at 262, 502 N.Y.S.2d at 133, 493 N.E.2d 234.

*Kenford I* does not absolutely bar the award of lost profits for failed ventures with no profit history, but the *Kenford I* Court refused to enter into the speculative counterfactual required to determine hypothetical revenues over a period of 20 years from performances at a stadium that was never built, by entertainers who were never booked, before an audience that was never developed. The relevant issue, the Court made clear, is one of evidence; hopes and plans are not enough, and the burden is upon the plaintiff to prove lost profits with reasonable certainty.

The second element plaintiff must establish, is that liability for lost profits damages was within the contemplation of the parties at the time the contract was made. The standard rests on an evaluation of what liability is foreseeable and "fairly may be supposed to have assumed consciously" by the defendant given the circumstances of

the contract. *Kenford Co. v. County of Erie,* 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989) ("*Kenford II*") (citations omitted) (quoting *Globe Ref. Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 544, 23 S.Ct. 754, 47 L.Ed. 1171 (1903)).

As discussed below, plaintiff has failed to establish his lost future profits with the degree of certainty required by the New York courts, and he has failed also to establish that liability for such damages was contemplated by the parties at the time of contracting.

[62 F.Supp.2d 1073]

### 1. *THE REQUISITE CERTAINTY OF LOSSES*

As a threshold issue, plaintiff argues, through his expert and his lawyers, that the stricter, new business standard of review is inapplicable to this case. The expert opines that the proposed Channel is not a start-up business by industry standards because the crucial programming element, the BBC feed, is well established. (*See* Curtis Dep. at 95) Plaintiff's counsel make the more bald, yet ultimately tangential argument, that because the BBC is not new, the new business standard does not apply to it. (*See* Pl. Mem. in Opp'n at 68-70)

The latter argument, though undoubtedly true, is unenlightening, however, because plaintiff does not seek future lost profits that would have been generated by the BBC operating in its usual venue. Plaintiff's argument is a non-issue. The New York standard for proving a lost profits damage claim is ultimately the same for both new and well-established businesses. The relevant distinction is that a well-established business provides a plaintiff with an evidentiary advantage in establishing the requisite certainty insofar as the performance records of such businesses generally have been held to provide a reasonable foundation for damages. *See, e.g., Cramer,* 223 N.Y. 63, 68-69, 119 N.E. 227 (noting that the owner of an established business may have records upon which a reasonable estimate of injury may be made). When lost profits are sought from a business with no, or limited, profit records, alternative evidence must be presented to establish whether any damages even exist, let alone the amount of damages. Such evidence calls for more tenuous inferences to reach a conclusion on damages, and, therefore, such evidence merits greater scrutiny. *See Kenford I,* 67 N.Y.2d at 261, 502 N.Y.S.2d at 132, 493 N.E.2d 234; *International Telepassport Corp. v. USFI, Inc.,* 89 F.3d 82, 86 (2d Cir.1996) ("[T]he new business rule is not a *per se* rule forbidding the award of lost profits damages to new businesses, but rather an evidentiary rule ...." (citations omitted)).

It is undisputed that the proposed operating entity has no historic profits from which to extrapolate future earnings for one year, let alone 20 years, into the future. *Cf. Systems Corp. v. American Tel. & Tel. Co.,* 60 F.R.D. 692, 694 (S.D.N.Y. 1973) ("The court recognizes that the general rule is that profits from a business contemplated but not yet established are too remote and uncertain to form the basis of an award."); *676 R.S.D., Inc. v. Scandia Realty,* 195 A.D.2d 387, 387, 600 N.Y.S.2d 678, 679 (1st Dep't 1993) (affirming dismissal of a lost profits claim on the ground that there was no basis upon which to estimate amount because plaintiff was in business for only three months); *Ciraolo v. Miller,* 138 A.D.2d 443, 444, 525 N.Y.S.2d 861, 862 (2d Dep't 1988) (setting aside an "unduly speculative" calculation of lost profits based upon a 12-month projection because plaintiff was a new business).

Because the operating entity has no performance records, plaintiff bases his damage assessment on the business plans and revenue projections INN developed for attracting investors. (*See* Picon Decl. Ex. G) These projections, however, are subject to the same criticism as ones presented to the Court in *Kenford I.* Indeed, plaintiff's damage assessment presumes at least, that: (i) an operating entity would have been formed and operated for 20 years; (ii) an estimated $44 million in pre-launch financing would have been raised; (iii) the hypothetical subscriber levels would have been reached; (iv) carriage agreements would have been entered; (v) advertisers would have been found at the assumed rates; (vi) all projected expenses would have proved correct; (vi) marketing costs would have remained constant and expenditures would have been sufficient to attract and maintain subscriber interest; and (vii) the type and amount of equity interest held by each investor, including INN, would have been determined in the manner plaintiff alleges. (*See* Fader Decl.

[62 F.Supp.2d 1074]

Vol. I, Ex. 2A) Each of these presumptions is based on nothing but speculation and conjecture. It certainly cannot be said that plaintiff's lost profits are reasonably certain. *See Kidder, Peabody & Co. v. IAG Int'l Acceptance Group,* 28 F.Supp.2d 126, 134 (S.D.N.Y.1998) (holding that the claimant cannot establish lost profits where its calculation is dependent upon a host of assumptions concerning uncertain contingencies, and applies numerous variables about which an expert can only surmise); *cf. Herman Schwabe, Inc. v. United Shoe Mach. Corp.,* 297 F.2d 906 (2d Cir.1962) (affirming the trial court's exclusion of expert testimony on lost profit damages for failure to support an underlying assumption on market penetration rates); *Target Market Publ'g, Inc. v. ADVO, Inc.,* 136 F.3d 1139, 1143-44 (7th Cir.1998) (stating that "a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered") (quoting *General Electric Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 516, 519, 139 L.Ed.2d 508 (1994)).

Further, it is significant that the effects of general market risks on the venture's probability of success are not mentioned. For example, plaintiff's assessment does not incorporate a sensitivity analysis of what effect the entry of competitors[5], technology developments, regulatory changes or general market movements might have on future cash flows. (*See, e.g.,* Curtis Dep. at 56, 61) Indeed, when told that some cable owners are paid to carry a channel, plaintiff's damages expert admitted that if it was necessary to pay for carriage the Channel would not survive (*see* Ackerman Aff. at 110-113), proving that a change in one market variable could in itself undermine plaintiff's calculation.

When there is uncertainty only as to the amount of damages, that question may be submitted to a jury. *See Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 926 (2d Cir.1977) (restating the rule that "when the existence of damage is certain, and the only uncertainty is as to its amount, the plaintiff will not be denied a recovery of substantial damages"). However, if the very existence of damages is uncertain, as it is here, recovery is unwarranted because the breach will put plaintiff in a better position than he might reasonably have expected to be in after full performance. *See Freund v. Washington Square Press, Inc.,* 34 N.Y.2d 379, 382, 357 N.Y.S.2d 857, 860, 314 N.E.2d 419 (1974) (articulating the rule that an injured party should not recover more from the breach than he would have gained had the contract been fully performed). Failure to control for adverse market conditions allows the false inference that plaintiff's venture was an assured success and, therefore, that the breach caused injury.[6]

[62 F.Supp.2d 1075]

Although plaintiff does not explicitly make the argument, there is some indication that he would support, or at least verify, his damage assessment by reference to the experience of other cable stations. (*See* Ackerman Aff. Ex. 5) New York courts, in fact, have allowed lost profits of a new business to be established by reference to the profits of existing, comparable firms. *See, e.g., Bloor v. Falstaff Brewing Corp.,* 454 F.Supp. 258, 277-78 (S.D.N.Y.1978) (establishing a seller's damage for a brewer's breach by reference to sales achieved by comparable, franchised brewers). Plaintiff's expert, Grimes, casually compares the Channel's projected subscriber rates to those of A & E, Discovery, CNN and PBS as well as new, less established channels such as TLC and the Cartoon Network. (*See* Ackerman Aff. Ex. 5) However, the probative quality of this type of comparative evidence depends on the similarity between the business at issue and the chosen comparables. *See generally* 3 Dan B. Dobbs, *Law of Remedies* § 12.4(3), at 73 (2d ed.1993). A comparison of the contemplated venture with firms that have management in place, actual expenses, carriage arrangements and at least some record of public acceptance, does not support an inference that the contemplated venture would have proved successful.

The selection of a suitable firm, or firms, to compare to an unproved business is a tricky undertaking. The selected firm must be reasonably similar to provide an inference of both likely initial success and continuing profitability. Perhaps for that reason, New York has demanded a high degree of correlation between a start-up firm and an existing firm before allowing the profits of the latter to function as future lost profits evidence for the former. Firms as to which comparisons have been permitted include firms that purvey uniform and established products, or use standardized operating methods; permissible comparisons have been drawn between a new franchisee and other similarly situated franchisees, or between a new subsidiary and its parent firm. *See, e.g., S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 852 (2d Cir.1987) (allowing Nike's own projections of subsidiary's expected profits as evidence of lost profits, when projections were based on Nike's historic record and formed basis of Nike's decision to breach); *Bloor,* 454 F.Supp. at 277-78 (comparison of franchisees). Here, none of the mentioned comparables are in a franchisor/franchisee or a parent/subsidiary relationship with the proposed operating entity. Because there is no evidence that the proffered firms are comparable to the start-up firm at issue

here as to their investors, management, marketing costs or

[62 F.Supp.2d 1076]

a myriad of other elements necessary for a profitable enterprise, there is no reason to assume that their profits may be treated as comparable for damages purposes.

In addition, the relevance of any comparison is doubtful because the BBC, and all other program providers and distributors, do not sell staples, such as food, for which there is always a presumptive market. They sell entertainment products whose success depends entirely on consumer taste. The heterogeneity of entertainment products, and the volatility of consumer preferences, reduces the relevance of any cross-firm comparisons and increases the difficulty of predicting future hits and misses for even the most savvy of marketers and investors. Indeed, New York courts have been especially loath to award lost profits for entertainment ventures. *See Kenford I*, 67 N.Y.2d at 262-63, 502 N.Y.S.2d at 133, 493 N.E.2d 234 ("[T]he whim of the general public and the fickle nature of popular support for professional athletic endeavors must be given great weight in attempting to ascertain damages 20 years in the future."); *Freund*, 34 N.Y.2d at 383, 357 N.Y.S.2d at 861, 314 N.E.2d 419 (holding that lost book royalties that resulted from a publisher's failure to print were too uncertain even though this was not the author's first work); *Broadway Photoplay Co. v. World Film Corp.*, 225 N.Y. 104, 107, 121 N.E. 756 (1919) (noting that no one can compute in advance the earnings of plays); *cf. Contemporary Mission*, 557 F.2d at 927 (permitting statistical evidence of the continuing sales of 324 similarly successful recordings when the plaintiff's recording had already established its public appeal by reaching number 61 on the music charts). The circumstances of this case do not warrant resort to a more speculative standard.

Perhaps aware of the shaky foundation upon which his damage assessment is based, plaintiff argues that the business plans are sufficient evidence in and of themselves because their reliability, and the assurance of the Channel's success, was guaranteed by the Hilliards' pre-litigation behavior, specifically their willingness to distribute the INN business plans to prospective investors. (*See* Curtis Dep. at 102) To support this premise, plaintiff relies heavily on *Ashland Management Inc. v. Janien*, 82 N.Y.2d 395, 405, 604 N.Y.S.2d 912, 917, 624 N.E.2d 1007 (1993), where the New York Court of Appeals approved the use of a promisor's projections of gross revenues as the basis for measuring the promisee's damages. However, *Ashland* is easily distinguished. In *Ashland*, the plaintiff, an established financial advisory company, hired Janien to develop a stock selection investment model, Eta. The program was successful in the market test stage and a licensing arrangement was drafted in which royalties were based, in part, on a four-year projection of revenues from the Eta model. The contract guaranteed royalty payments even if Janien left Ashland's employment "for any reason." *Id.* at 400-401, 604 N.Y.S.2d at 914, 624 N.E.2d 1007. The trial court held that Janien was entitled to damages for lost profits based on the projections in the contract. The New York Court of Appeals affirmed on the following basis:

> Ashland itself had enough confidence in its ability to perform to predict minimum amounts of funding which Eta would attract. It agreed to compensate Janien on that basis. Based on this evidence, the court properly relied on the [contract's revenue] projections and the [compensation based on revenue] provisions to hold that defendant had met his burden of proving his lost profits with reasonable certainty.

*Id.* at 406, 604 N.Y.S.2d at 917, 624 N.E.2d 1007.

The plaintiff's evidence in *Ashland* was doubly relevant. First, that evidence demonstrated that compensation based on future profits, and the continuing obligation of Ashland to compensate him even after termination, were within the contemplation of the parties at the time of the contract.

[62 F.Supp.2d 1077]

Second, the inclusion of the revenue projections in the contract showed that Ashland, the defendant, was confident in the success of the pre-tested investment model it bought.

Those characteristics are absent here. It is inappropriate to equate the evidentiary significance of the projected net revenues in INN's business plans here, on the one hand, with the revenue forecasts that formed the contractual basis of guaranteed royalty payments in *Ashland*, on the other. At the time Ashland contracted, it was an established company that managed over $1 billion in funds, it had a ready reservoir of data it could convert to Eta and it identified the minimum funds that it intended to transfer into that new product. INN, in contrast, never had control over the revenues that the operating entity might generate, it had no built-in carriage system, no established customer base, no guaranteed advertisers and insufficient capital to complete the project. (Russ Hilliard Decl. Ex. 3, at 2-5) Potential investors in the operating entity received no guarantee of return from either plaintiff or the Hilliards in any manner akin to the guarantee Ashland made to Janien. To the contrary, the INN shareholders recognized that the proposed venture was risky. In the business plans sent to investors, the shareholders spoke, not of their certainty of success, but rather of their general "belief" that the projected revenues eventually would be realized. (*See* Fader Decl., Vol. I, Exs. 2B & 2C) The sophisticated investor understands that a solicitation to invest in a high-risk venture is as much an appeal to faith as to experience. To hold the Hilliards effectively as guarantors against the risks identified in the business plan, solely because their faith was sincere, is contrary to the relevant legal standards and basic economic principles.

Finally, plaintiff emphasizes that his own experience in launching CNN and the Television Food Network provided an assurance of success and a foundation for the reasonable certainty of the INN projections. In some businesses, notably businesses in the professional services industry, profits depend on factors unique to a plaintiff, such that the plaintiff's own past experience may be the only reliable guide to future profits. *See, e.g., Wade v. Southwestern Bell Tel. Co.*, 352 S.W.2d 460, 461 (Tex.Civ.App.1961) (finding that the income lost by a lawyer when the publisher of a telephone directory breached a contract to list his name under "Attorneys" could not be measured by reference to the profits of another law firm). This is not such a business. Although plaintiff added legitimacy to the project and reduced its uncertainty, future profits would not be the result solely of his efforts. Nor, in view of the difficulty of selecting comparable firms, discussed above, is there sufficient evidence that plaintiff's past cable experience is relevant in this case. Even assuming that plaintiff was able to commit himself full time to the INN project, the deal at issue is multi-layered and complex, involving many personalities, competing interests and marketplace contingencies. Therefore — barring evidence that plaintiff was a media Midas — plaintiff's role as negotiator with the BBC is an insufficient guarantor of the probability of future profits.

### 2. *THE CONTEMPLATION OF THE PARTIES*

Plaintiff's lost profits claim fails also for the independent reason that liability for such damages was not fairly contemplated by the parties at the time of contracting. *See Kenford I*, 67 N.Y.2d at 261, 502 N.Y.S.2d at 132, 493 N.E.2d 234. Neither the December Supply Agreement nor the Interim Agreement of which the alleged oral agreement is a part mentioned damage calculations. If there is no contract provision governing the availability of lost profits damages as a remedy for breach, New York law requires the court to "consider what the parties would have concluded had they considered the subject." *Id.* at 262, 502 N.Y.S.2d at 133, 493 N.E.2d 234. Plaintiff has proffered insufficient

[62 F.Supp.2d 1078]

evidence to establish "the heavy responsibility for estimated future profits that he seeks to impose." *Ashland*, 82 N.Y.2d at 404, 604 N.Y.S.2d at 916, 624 N.E.2d 1007.

Plaintiff argues that the Hilliards accepted liability for lost profits damages related to the December Supply Agreement because they knew that failure to fund the Interim Agreement would jeopardize INN's long-term supply rights. As plaintiff states the standard, a defendant is liable for all foreseeable harms. Therefore, plaintiff reasons, because the anticipated profits under the December Supply Agreement were not only foreseen, but also the basis of the contracts, the Hilliards are liable for loss of those profits. To support this claim, plaintiff cites *Ashland*, 82 N.Y.2d at 403, 604 N.Y.S.2d at 915, 624 N.E.2d 1007, where the Court stated that "[t]he rule that damages must be within the contemplation of the parties is a rule of foreseeability."

Plaintiff misstates the standard because he has failed to examine the *Ashland* Court's analysis of the issue. As presented by plaintiff, the *Ashland* rule would permit imposition of liabilities beyond those the parties agreed upon because to foresee a possible harm is not necessarily to consent to or even to contemplate liability for that harm. *See* 3 Dobbs, *supra*, § 12.4(4), at 83. The danger of imposing an over-broad standard did not exist in *Ashland* because that contract specifically provided for the recovery of damages. Therefore, the parties contemplated damages at the same time they contemplated liability — i.e., at the time they contracted. Even so, the Court applied a "common sense" rule for evaluating the extent of damages within the contemplation of the parties. *Id.* at 404, 604 N.Y.S.2d 912, 624 N.E.2d 1007. That rule

was first adopted in a case where the contract was silent as to damages, and was described in the following manner:

> In determining the reasonable contemplation of the parties, the nature, purpose and particular circumstances of the contract known by the parties should be considered ..., as well as "what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that is assumed, when the contract was made."

*Kenford II*, 73 N.Y.2d at 319, 540 N.Y.S.2d at 3, 537 N.E.2d 176 (citations omitted) (quoting *Globe Ref. Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 544, 23 S.Ct. 754, 47 L.Ed. 1171 (1903)).

Applying those principles here, the purpose of entering the contracts was eventually to capture the profits projected under the business plans, but the Hilliards' anticipation of hypothetical profits does not translate into acceptance of full liability for such profits. *See Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 334 (2d Cir.1993) (holding that the knowledge that delay in a project may result in lost profits may be insufficient to establish liability for those profits when the record contained no specific evidence of acceptance or even discussion of lost profits liability); *Goodstein Constr. Corp. v. City of New York*, 80 N.Y.2d 366, 375, 590 N.Y.S.2d 425, 430, 604 N.E.2d 1356 (1992) (holding the "the City's knowledge of the details of plaintiff's plans and cost estimates does not suggest that the City was agreeing to underwrite the hypothetical profits from these plans"). There is no assertion that, at the time of contracting, the Hilliards accepted liability for lost profits either in the contemplated interim period or under the December Supply Agreement. The informality of the oral agreement being sued upon, the lack of damage provisions in any of the written agreements, the speculative existence of future profits and the magnitude of alleged damages compared to the amount that was to be invested, all support a finding that liability for 20 years of lost profits was not in the contemplation of the Hilliards. *Cf. Trademark Research Corp.*, 995 F.2d at 334 (stating that the defendant's awareness

**[62 F.Supp.2d 1079]**

of the plaintiff's immense down-side risk militates against the conclusion that the defendant would have assumed it); *Kenford I*, 67 N.Y.2d at 262, 502 N.Y.S.2d at 133, 493 N.E.2d 234 (finding that evidence surrounding the negotiation and execution of a 20-year management agreement failed to demonstrate that liability for the estimated future profits was within the contemplation of the parties).

\* \* \* \* \* \*

In sum, plaintiff has not proved the existence of damages with reasonable certainty. The operating entity's profits were purely hypothetical, stemming from the sale of untested programming to a hypothetical subscriber base, sold to advertisers at a hypothetical price and supported by hypothetical investors and carriers. Even plaintiff's ultimate share of the profits as an equity holder in INN is hypothetical because the percentages to be owned by the original shareholders were to be determined only after investors had been found. In addition, plaintiff has failed to show that damages for lost profits were in the contemplation of the parties to the contract. Because plaintiff has failed to meet the threshold requirements to sustain a lost profits damage claim, all claims for future lost profits are dismissed, and the Hilliards' motions for summary judgment on this issue are granted.

## B. RECOVERY OF THE MARKET VALUE OF THE SUPPLY AGREEMENT

Plaintiff asserts that if his lost profits claims are dismissed, he still is entitled to recover the market value of INN's March Supply Agreement under his fraud action, Claim 1 (Am.Compl.¶¶ 75-76), and to recover the market value of the December Supply Agreement under his derivative claims for breach of contract and waste of corporate assets, Claims 2 and 6. (*Id.* ¶¶ 81, 101) In his derivative and direct claims for breach of fiduciary duties, Claims 9 and 10, plaintiff asks for "actual" damages in the amount of an amount "believed to exceed $10,000,000." (*Id.* ¶¶ 93, 98, 121, 126) Reading the complaint in its entirety, it appears that plaintiff claims no actual damages that might reach this sum except the value of either the March or December Supply Agreement. The recovery sought under plaintiff's derivative claim of promissory estoppel and under his direct breach of contract action, Claims 3 and 7, is vague, but these claims appear also to seek the recovery of the market value of either the March or December Agreement. (*Id.* ¶¶ 87, 109)

In essence, plaintiff seeks to be compensated, not for future lost profits, but for what a willing buyer would pay a willing seller for the profit opportunity represented by INN's 20-year BBC program rights.[7] Defining these contract rights as an existing asset, plaintiff recasts the loss of that asset either as a pecuniary loss directly resulting from the fraud or as a general damage, naturally flowing from the breach of contract. Because general

**[62 F.Supp.2d 1080]**

damages, unlike expectation damages, are always considered to be in the contemplation of the parties, such a characterization of the programming contract, if adopted, would relieve plaintiff of much of his evidentiary burden to prove future lost profits. But plaintiff does not explain why INN's 20-year programming contract should be distinguished from Dome Stadium's 20-year management rights contract for which the *Kenford I* Court denied recovery. *See Kenford I*, 67 N.Y.2d at 261, 502 N.Y.S.2d at 132, 493 N.E.2d 234. Moreover, even assuming that the programming contract is a definable asset, to recover for its loss plaintiff would still have to prove the asset's value with reasonable certainty. This, again, plaintiff cannot do because the value of that asset depends on its potential to generate profit, which is highly speculative.

Beyond assertions that the programming contract was "a valuable asset," the evidence as to that asset's value relies exclusively on the Cox pre-breach offer for INN's programming rights with the BBC. (*See* Pl. Mem. in Opp'n at 66) Plaintiff presents the Cox offer, not pleading that it was lost due to the Hilliards' alleged fraud (*see* Am. Compl. ¶¶ 70-76), but as an example — indeed the definitive example — of what a willing buyer would pay for the 20-year programming contract. (*See* Pl. Mem. in Opp'n at 102)

Ignoring for the moment the long chain of provable inferences this methodology requires — that the rights are freely assignable, which they are not (*see* Russ Hilliard Decl. Ex. 1, ¶ 21.1), that a market exists for such an investment, which it does not — the valuation of the Cox offer requires that profit projections be used to establish value. Although the offer proposed an up-front payment, most of INN's compensation was contingent on the revenue generated by the two proposed channels in the tenth year of operation. (*See* Fader Decl. Vol. I, Ex. 4A, at 2) To calculate the value of the offer, the expert had to project likely revenues 10 years into the future. Based on the terms of the Cox offer, both the Cox and INN business plan forecasts, the expert calculated a market value range of $17,122,000 to $29,369,000. (Picon Decl. Ex. H)

It is only logical that the certainty rules apply just as firmly to projected profits used to prove market value of an asset as they do when profits are used to prove any other damage claim. Indeed, "profits do not become more certain or more reliable as evidence simply because they are used to prove something else." 3 Dobbs, *supra*, § 12.4(3), at 77. I have already decided that INN's revenue estimates are too speculative to support a lost profits claim. After examining the evidence, I conclude that the Cox forecast of future revenues, used to support an inference for the market value of the programming contract, is also insufficient to prove damages with reasonable certainty.

To be sure, there are aspects of the Cox projections that, if true, arguably render them more certain than the INN forecast: it may be assumed, for example, that Cox has a record of expenses, an established management and a ready distribution system for new programming. Moreover, the profit forecast of interest is for 10, not 20, years into the future. But these assumptions are unique to Cox and the specific terms of the Cox offer; and again, plaintiff does not seek to recover the value of this offer, but rather sues for the market value of the 20-year programming contract. Curtis himself testified that replacing INN's cost projections for those of Cox, even holding all else constant, the Channel could be "a lost venture." (*See* Ackerman Aff. at 86)

To determine a market value for any highly specialized good is difficult. In certain instances, it could be that the offer of a single buyer would be sufficient to permit an inference of value. In this case, however, where, among other things, (i) the offer was never final; (ii) the offer involves revenue projections of an untested entertainment product; (iii) the assignability

**[62 F.Supp.2d 1081]**

of rights was limited by the need for BBC approval; and (iv) any valuation is highly dependent on the unique characteristics of the hypothetical buyer, a more rigorous valuation methodology is called for.

To support this back-door introduction of future profits projections, plaintiff relies on *Cayuga Harvester, Inc. v. Allis-Chalmers Corp.*, 95 A.D.2d 5, 465 N.Y.S.2d 606 (4th Dep't 1983). In *Cayuga Harvester*, the Court allowed a farmer to recover for crops lost due to the malfunction of a harvesting machine. After stating the rule that a plaintiff who seeks fraud damages is limited to "actual pecuniary loss," the Court found that recovery of lost profits might be appropriate because

> [a]ny profits that might be included in [plaintiff's] recovery would not be profits from an anticipated resale of the machine or from an expected increase in the value of plaintiff's investment in it ... but rather profits that plaintiff would *normally receive* from its corn crop *if sold at market value* as a return on its investment in labor, seed, fertilizer and other expenses in the crop.

*Id.* at 24, 465 N.Y.S.2d at 619 (emphasis added).

This case is easily distinguished from *Cayuga Harvester*. The plaintiff in *Cayuga Harvester* was an established corn farmer who bought a harvester that did not operate properly and continued to break down during the harvest season of 1981. *See id.* at 7, 465 N.Y.S.2d at 609. To prove the amount of corn lost, the farmer could offer his own historic yields and the yields of neighboring farmers. The corn price, established by many buyers and sellers in the commodity market, was readily ascertained. The market value of the lost yield was simply the corn price multiplied by the amount of lost yield minus forgone expenditures.

In the present case, there are no analogous reliable means by which to determine the market value of the 20-year programming contract. As discussed above, the operating entity has no historic record of operation and no relevant competitors, and the market price of the programming contract is heavily dependent on the private valuations of individual purchasers and investors. More important, plaintiff cannot argue that the $17 to $29 million claimed represents profits INN would "normally receive." The values he claims are based on a hypothetical resale of INN's programming rights to another party. Resale, however, was not the stated purpose of the programming contract, the rights were not freely assignable, and a successful resale would have been a fortuitous, not a normal, event. Because plaintiff fails to point to any additional case law to support his claim that the programming contract is a recoverable asset, or to distinguish his claim from a request for lost profits — and even if he could, the valuation is uncertain — the claim for recovery of the value of the contract must be dismissed and all expert testimony proffered in support of that claim is excluded as irrelevant and speculative.

## C. DAMAGE TO BUSINESS REPUTATION

As part of his direct action for recovery under the doctrine of promissory estoppel, Claim 8, plaintiff seeks damages to his business reputation in an amount to be determined at trial. (*See* Am. Compl. at ¶ 113) However, plaintiff fails to offer support by his own, or corroborating testimony, that such damages exist. When asked directly whether he could name one project that he was unable to work on due to his association with INN and the BBC, he could not. (*See* Ackerman Aff. Ex. A, at 534-35) Plaintiff did recall two negative comments about INN and the project, one made by a TV Food Network official, and one made by Nory LeBrun of the Home Shopping Network. (*See id.* at 533-536) Neither of the comments relate to plaintiff personally, and LeBrun himself testified that his opinion of plaintiff was not affected by the INN transactions and LeBrun could cite no missed business opportunities

**[62 F.Supp.2d 1082]**

or disparaging comments about plaintiff. (*See id.* Ex. E at 120) The BBC later hired plaintiff as a consultant, so he can scarcely claim that his standing with the BBC was diminished in a way that caused him harm. (*See* Russ Hilliard Decl. Ex. 5 at ¶ 9)

When responding to a summary judgment motion, a plaintiff may not rely on mere allegations when, as here, the motion is supported by facts and testimony. *See Delaware & Hudson Ry.*, 902 F.2d at 178; *see also Anderson*, 477 U.S. at 247-48, 106 S.Ct. 2505. Even when asked to supplement his deposition to supply proof of injury to his reputation, plaintiff had nothing to add. (*See* Ackerman Aff. Ex. A at 538) Because plaintiff has not established any damage to his business reputation, this portion of his claim is dismissed.

## D. PUNITIVE DAMAGES

The Hilliards move also for summary judgment on plaintiff's demand for punitive damages. Plaintiff seeks punitive damages under his fraudulent inducement claim (Claim 1) as well as under his direct and derivative breach of fiduciary duty claims (Claims 4, 5, 9 and 10). The Hilliards argue that the fraud and breaches of fiduciary duty claims are nothing more than the breach of contract claim recast as an action in tort. Accordingly, they argue, punitive damages should be denied in this case because plaintiff seeks recovery of an alleged private wrong and New York allows punitive damages only when a breach of contract implicates public rights.

The general rule in New York is that punitive damages are not recoverable for an ordinary breach of contract because such actions deal with wrongs between private parties. *See Rocanova v. Equitable Life Assurance Soc'y of the United States*, 83 N.Y.2d 603, 613, 612 N.Y.S.2d 339, 342, 634 N.E.2d 940 (1994). However, in *Rocanova* the New York Court of Appeals explained an exception to the general rule, stating that,

> [p]unitive damages are available where the conduct constituting, accompanying, or associated with the breach of contract is first actionable as an independent tort for which compensatory damages are ordinarily available, and is sufficiently egregious ... to warrant the additional imposition of exemplary damages. Thus, a private party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally.

*Id.* at 613, 612 N.Y.S.2d at 342-43, 634 N.E.2d 940 (citations omitted). This court has synthesized the *Rocanova* analysis into a two part test that permits punitive damages when (1) there has been egregious and independently actionable tortious conduct by the defendant and (2) such conduct was part of a pattern of conduct directed at the general public. *See In re West 56th Street Assocs.*, 181 B.R. 720, 724 (S.D.N.Y. 1995).

In satisfaction of the first element, the challenged conduct must evince a "'high degree of moral turpitude' and demonstrat[e] `such wanton dishonesty as to imply criminal indifference to civil obligations'" *Rocanova*, 83 N.Y.2d at 612, 612 N.Y.S.2d at 343, 634 N.E.2d 940 (quoting *Walker v. Sheldon*, 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 491, 179 N.E.2d 497 (1961)). To support a claim of punitive damages a claim of "[m]ere fraud is insufficient" because "punitive damages [are] available only where [the] defendant acts with evil and impermissibly mercenary motives." *Wallach Marine Corp. v. Donzi Marine Corp.*, 675 F.Supp. 838, 842 (S.D.N.Y.1987). Similarly, in a claim of breach of fiduciary duty, a plaintiff must allege circumstances that prove a defendant's conduct is "sufficiently blameworthy" to warrant punitive damages. *Doe v. Roe*, 190 A.D.2d 463, 475, 599 N.Y.S.2d 350, 356 (4th Dep't 1993). The second element, whether there is a pattern of

**[62 F.Supp.2d 1083]**

conduct aimed at the public, is not an issue and requires no further explanation.

The challenged conduct in this case fails to satisfy even the first element of the *Rocanova* test. First, the record does not support a finding that the Hilliards "willfully" or "recklessly" breached the alleged promise to fund. There is intense dispute between the Hilliards and plaintiff regarding both the existence of a promise to fund, and the scope of obligations under that alleged promise. This is, therefore, not a case where a defendant blatantly violated a clear obligation; rather, it is a case in which the Hilliards' obligations, if any, are so undefined that a trial would be required to clarify them. *See In re West 56th Street Assoc.,* 181 B.R. at 727 (finding that the contract at issue was too ambiguous for any breach to be "willful"). Second, there is no evidence of "malicious" or "blameworthy" conduct. It is undisputed that *all* the parties agreed that, given the change in FCC rules, moving up the programming schedule was, in essence, a sound business decision. At the time of the alleged breach, the Hilliards, for their part, had far more invested in INN in both years of planning and capital investment, than did plaintiff. Any failure of the venture and any harm to INN as a corporation, would have been to the Hilliards' detriment, not their benefit. Therefore, this is neither a case of self-dealing nor a case in which a fiduciary would be personally harmed by his own reckless behavior. *Cf. Giblin,* 73 N.Y.2d at 772, 536 N.Y.S.2d at 55, 532 N.E.2d 1282 (affirming that defendant' wrongful diversion and squandering of corporate assets, payments of salaries to themselves, and other acts warranted the imposition of punitive damages). The parties' ongoing unity of purpose, supports a finding that the Hilliards could not have had "evil intent." To decide otherwise would be to find that the Hilliards had been working against their own best interests.

Moreover, it is uncontested that the second element of the *Rocanova* test is not satisfied because this action does not allege conduct directed at the general public. In fact, given my decisions regarding plaintiff's damage claims, plaintiff cannot even prove a private injury. Nevertheless, plaintiff argues that this second element is not required under New York law because several courts have awarded punitive damages even in the absence of a public wrong. *See Aero Garage Corp. v. Hirschfeld,* 185 A.D.2d 775, 777, 586 N.Y.S.2d 611, 613 (N.Y.A.D.1992) (holding that where the defendant "were fully aware from the outset that their actions were blatantly in breach of the agreement with plaintiff and yet displayed their willingness to go to any lengths" to achieve their goal, punitive damages for breach of contract was appropriate); *Giblin v. Murphy,* 73 N.Y.2d 769, 536 N.Y.S.2d 54, 532 N.E.2d 1282, (1988) (affirming lower courts decision to allow punitive damages in the absence of public harm when defendant had recklessly and repeatedly breached their fiduciary duties by diverting corporate funds to themselves and conducted an "out-and-out fraud"); *see also Action S.A. v. Marc Rich & Co.,* 951 F.2d 504, 509 (2d Cir.1991) ("Under New York law, punitive damages are appropriate in cases involving 'gross, wanton or willful fraud or other morally culpable conduct.' Such conduct need not be directed at the general public.") (citations omitted).

It is doubtful that these cases accurately express New York law given the decision of New York's highest court in *Rocanova. See Parke-Hayden, Inc. v. Loews Theatre Management Corp.,* 789 F.Supp. 1257, 1267 (S.D.N.Y.1992) (noting that the cases that do not require a public wrong for an award of punitive damages "run decidedly against the grain of prevailing New York law"). However, even assuming that these cases remain valid, plaintiff's claims for punitive damages fail because, as I have already found, the Hilliards' conduct does not constitute the morally culpable behavior demonstrated in the very cases upon which plaintiff relies. Accordingly, plaintiff's

[62 F.Supp.2d 1084]

claims for punitive damages in Claims 1, 4, 7, 9 are dismissed.

\* \* \* \* \* \*

Under his breach of contract claims, Claim 2 and 7, and claims of breach of fiduciary duties, Claims 4, 5, 6, 9, and 10, plaintiff seeks no relief other than lost profits, "actual" damages — equivalent to the market value of the programming contract — and punitive damages. As discussed above, plaintiff has failed to introduce sufficient evidence in support of these claims for damages and, therefore, the underlying claims are dismissed for failure to show injury. *See, e.g., Coastal Aviation, Inc. v. Commander Aircraft Co.,* 937 F.Supp. 1051, 1060 (S.D.N.Y.1996) (listing proof of damage to the plaintiff as an essential element of a breach of contract claim); *S & K Sales Co.,* 816 F.2d at 847-48 (same in a breach of fiduciary duty action). Likewise, under his promissory estoppel claims, Claims 3 and 8, plaintiff requests combinations of lost profits, "actual" damages, punitive damages and damage to his business reputation. Again, these damages claims are unprovable or barred as a matter of law and, accordingly, the promissory estoppel claims are dismissed for failure to show injury. *See, e.g., Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 73 (2d Cir.1989) (listing injury to plaintiff as a necessary element of a claim for promissory estoppel).

## V.

Plaintiff's one remaining claim is for fraud, Claim 1. To establish a cause of action for fraud, plaintiff must prove that the Hilliards made a materially false representation with intent to deceive, that plaintiff reasonably relied on that assertion and incurred some "out-of-pocket" injury from his reliance. *See CPC Int'l, Inc. v. McKesson Corp.,* 70 N.Y.2d 268, 285, 519 N.Y.S.2d 804, 812, 514 N.E.2d 116 (1987) (listing the elements of a fraud action and noting that reliance must be reasonable); *Nottenberg v. Walber,* 160 A.D.2d 574, 575, 554 N.Y.S.2d 217, 218 (1st Dep't 1990) (same); *cf. Ostano Commerzanstalt v. Telewide Sys., Inc.,* 794 F.2d 763, 766 (2d Cir.1986) (holding that, in a New York fraud action, a plaintiff may be awarded only out-of-pocket rather than expectation damages).

Plaintiff has provided four witnesses who testify that the Hilliards promised to fund the Interim Agreement and "but for" that promise the BBC would not have signed the Interim or December Supply Agreements. (*See* Schonfeld Dep. at 35; Blumenthal Dep. at 65; Young Dep. at 73-74, 101, 188-89, 211; Cooper Dep. at 8). Plaintiff provides evidence also that the Hilliards' promise to fund was false and that the Hilliards always intended to find third-party funding. (*See* Les Hilliard Dep. at 106; Russ Hilliard Dep. at 223-24, 299, 315) The record would support, therefore, a finding that the Hilliards made a material false representation with intent to deceive and that plaintiff relied on that representation.

As for the reasonableness of plaintiff's alleged reliance, there is some indication that the Hilliards had the means by which to fulfill the promise to fund — for example, each brother owns a valuable cable company, Russ Hilliard claimed to have purchased a $7 million plane and to own a vacation home in Jamaica. (*See* Schonfeld Dep. at 69, 575; Dickinson Dep. at 244; Young Dep. at 65-66; Cooper Dep. at 10) Whether or not this evidence of wealth justified reliance is an issue of fact for a jury to decide. *See, e.g., Polycast Tech. Corp. v. Uniroyal, Inc.,* 792 F.Supp. 244, 253 (S.D.N.Y.1992) (holding that whether or not a plaintiff's reliance is reasonable, is a question of fact); *Stratford Group, Ltd. v. Interstate Bakeries Corp.,* 590 F.Supp. 859, 865 (S.D.N.Y.1984) (same).

The last element of a fraud action, a showing of "out-of-pocket" injury, deserves separate treatment. With plaintiff's claim for the market value of the programming contract dismissed, plaintiff's only surviving

[62 F.Supp.2d 1085]

damage claim under his fraud action is for travel expenses of approximately $15,000. (*See* Schonfeld Dep. at 289-94; Pl. Mem. in Opp'n at 102 n. 82) This is the full extent of plaintiff's possible recovery because demands for punitive damages have been stricken also. Nevertheless, it is irrelevant that the alleged injury is slight, as any out-of-pocket injury is sufficient to prevent the fraud action from being summarily dismissed.

\* \* \* \* \* \*

For the reasons set forth above, defendant' motion in part is granted and Claims 2 through 10 in plaintiff's amended complaint are dismissed. Defendant' motion for summary judgment on plaintiff's claim of fraud, Claim 1, is denied.

SO ORDERED:

**FOOTNOTES**

1. All the depositions are attached as exhibits, and listed by the name of the deponent, in Volumes III and IV of the Bruce E. Fader Declaration.

2. The Stockholders' Agreement ¶ 8(d) provides in relevant part: "Each of the Stockholders may retain for his own account any equity (received with respect to actual cash investments made by him) in the entity operating the Channel ...."

3. Clause 21 of the March Supply Agreement controlled all assignments and, to the extent it is relevant, provided the following:

4. The March Supply Agreement was modified in December 1994 and signed contemporaneously with the Interim Agreement. These modifications included, a change in the launch deadline from January 1996 to December 1995, a corresponding acceleration of the investment schedule, a 15% cap on INN's contribution to the initial investment requirements and an agreement to give the BBC a 20% equity share in the operating entity. (Russ Hilliard Decl. Ex. 4, ¶¶ 15.1.1, 21.1)

5. It should be noted that because the December Supply Agreement could be construed as exclusive only to a 24-hour programming feed, the BBC itself posed a potential competitive threat to the INN venture. If the December Supply Agreement was non-exclusive as to smaller blocks of programming, the BBC could sell any choice news coverage at market rates to Channel competitors, thereby diminishing the value of INN's 24-hour BBC feed. Even if at a later date this "cherry-picking" was determined to breach the December Supply Agreement terms, there is already sufficient uncertainty that plaintiff's expert should have considered this potential risk.

6. The Hilliards argue also that the evidence provided by Curtis, and by William Grimes, a cable industry executive, fails to meet the methodological standards for scientific evidence under the standard set forth in , 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In the Supreme Court identified four factors for a federal judge to consider in assessing the reliability of scientific studies: (i) whether the technique used can be tested; (ii) whether the technique has been subjected to peer review; (iii) whether the potential rate of error is known; and (iv) whether the technique is generally accepted in the scientific community. at 593-594, 113 S.Ct. 2786.

7. Plaintiff is vague about whether he seeks to recover the market value of the March or the December Supply Agreement. Depending on which theory of law plaintiff bases his damages on, he must provide market value assessments for either the March or December Supply Agreement. Accepting that the market value of either agreement is recoverable, the loss of the March Supply Agreement would be the alleged injury under a theory of fraud in the inducement of contract and the loss of the December Supply Agreement would be the alleged injury under a claim of breach of contract or fiduciary duty.

---

Copyright © 2014 Leagle, Inc.